## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

———————————————————— |
|
New Hampshire Lottery Commission, |
|
Plaintiff, |
v. | Civil Case No.
|
William Barr, in his official capacity |
As Attorney General; United States |
Department of Justice |
|
Defendants |
———————————————————— |

## COMPLAINT

The plaintiff, the New Hampshire Lottery Commission, seeks declaratory and injunctive relief against the defendants, William Barr, in his official capacity as the Attorney General of the United States Department of Justice ("USDOJ"), and the USDOJ under the Declaratory Judgment Act, 28 U.S.C. § 2201, and for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  In support thereof, the plaintiff states as follows:

## INTRODUCTION

1.      This action challenges a binding opinion issued by the USDOJ on November 2, 2018 titled *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling* (the "2018 Opinion"). 42 Op. O.L.C. 1-23.

2.      The 2018 Opinion reverses a 2011 opinion by the USDOJ finding that 18 U.S.C. § 1084, a criminal statute known as the Wire Act, applies only to betting or wagering on sporting events or contests and therefore did not apply to sales of lottery tickets over the Internet by States.  *See Whether Proposals by Illinois and New York to Use the Internet and Out-of-State*

1

*Transaction Processors to Sell Lottery Tickets to In-State Adults Violates the Wire Act*, 35 Op. O.L.C. 1-13 (2011) ("2011 Opinion").

3.      The two federal circuit courts of appeal that have addressed the issue, which includes the First Circuit, have held that 18 U.S.C. § 1084 applies solely to betting or wagering on sports events or contests.  *See United States v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014) ("The Wire Act applies only to 'wagers on any sporting event or contest,' that is, sports betting.") (quoting 18 U.S.C. § 1084(a)); *In re MasterCard Int'l Inc.*, 313 F.3d 257, 263 (5th Cir. 2002) ("Because the Wire Act does not prohibit non-sports internet gambling, any debts incurred in connection with such gambling are not illegal.").

4.      The United States Supreme Court has also indicated that this is the correct reading of the Wire Act.  *Murphy v. Nat'l Collegiate Athletic Assn.*, __ U.S. __, __, 138 S. Ct. 1461, 1483 (2018) (explaining that 18 U.S.C. § 1084, which "outlaws the interstate transmission of information that assists in the placing of a bet on a sporting event" and applies "only if the underlying gambling is illegal under state law," helps advance "a coherent federal policy" that "respect[s] the policy choices of the people of each State on the controversial issue of gambling").

5.      Nonetheless, in the face of these clear, binding precedents, the 2018 Opinion finds that 18 U.S.C. § 1084 extends to non-sports betting or wagering.

6.      The effect of the 2018 Opinion is to extend criminal liability under 18 U.S.C. § 1084 far beyond betting or wagering on sporting events or contests to include virtually any conceivable form of gambling, which would encompass state-conducted lotteries.

7.      Such a construction of the statute is not faithful to the text, structure, purpose, or legislative history of the Wire Act.  This is particularly the case where Title 18 of the U.S. Code,

Chapter 61, already contains specific provisions that:  restrict lotteries; regulate interstate commerce with respect to lottery ticket transmissions; exempt lottery activity "conducted by a State" from certain of its prohibitions; and define a "lottery" to specifically <u>not</u> include "the placing or accepting of bets or wagers on sporting events or contests," 18 U.S.C. §§ 1301-1308. In the face of these existing laws that explicitly exempt state-run lotteries from the federal lottery proscription, the Wire Act's general prohibition pertaining to sports betting cannot be read to criminalize state-lottery operations and thereby nullify portions of 18 U.S.C. §§ 1301-1308.

8.      Such a construction would also render the statute unconstitutionally vague, as well as unconstitutional under the First Amendment. *See Greater New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173 (1999) (holding that "prohibition on broadcasting lottery information could not be applied to advertisements of lawful private casino gambling that were broadcast by petitioners' radio or television stations located in Louisiana, where such gambling was legal" even if such broadcasts might be seen or heard in neighboring states where such gambling was illegal); *Enforceability of 18 U.S.C. § 1302*, 24 Op. O.L.C. 1 (Sept. 25, 2000) ("[a]pplication of 18 U.S.C. § 1302 to prohibit the mailing of truthful advertising concerning certain lawful gambling operations would violate the First Amendment").

9.      The 2018 Opinion's interpretation of the Wire Act also intrudes upon the sovereign interests of the State of New Hampshire without unmistakably clear language demonstrating that Congress intended such a result.  Consequently, the interpretation runs afoul of the United States Supreme Court's Tenth Amendment jurisprudence as set forth in *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), which mandates that a clear statement of congressional intent before a statute is susceptible of an interpretation that alters the state-federal balance.

10. Consequently, the 2018 Opinion is contrary to law and beyond the defendants' statutory authority to enforce. The 2018 Opinion also exposes the New Hampshire lottery system to substantial uncertainty as to the continued legality of its operations, which fund New Hampshire's public education system.

11. Accordingly, the New Hampshire Lottery Commission is entitled to a declaratory judgment defining the rights of the parties under 18 U.S.C. § 1084 and 28 U.S.C. § 2201 and is also entitled to an order vacating and setting aside the 2018 Opinion under 5 U.S.C. §§ 706(2)(A), (C).

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-2202, and 5 U.S.C. §§ 704-706, as this action presents a case and controversy under the Declaratory Judgment Act and the APA.

13. Venue lies in this district under 28 U.S.C. § 1391(e)(1) in that the United States Department of Justice is a United States agency, the plaintiff resides in New Hampshire, and no real property is involved in this action. Venue also lies in this district under 5 U.S.C. § 703 because there is no special statutory procedure for appeal and this Court is a court of competent jurisdiction.

## PARTIES

14. The plaintiff, the New Hampshire Lottery Commission ("NHLC"), is an executive branch agency of the State of New Hampshire located at 14 Integra Drive, Concord, New Hampshire. The agency is overseen by three commissioners who are appointed and confirmed by the Governor and Executive Council of the State. N.H. Rev. Stat. § 284:21-a. The Executive

Director is appointed by the Commission and is responsible for the day to day operations of the agency. N.H. Rev. Stat. 284:21-b, II.

15.     The defendant, William Barr, in his official capacity as Attorney General for the United States Department of Justice, is a federal officer whose agency, the USDOJ, is located at 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.  Pursuant to 28 U.S.C. § 510, the Attorney General has delegated to the Office of Legal Counsel with the USDOJ responsibility for rendering formal, binding opinions to the heads of the various organizational units within the USDOJ, including the Criminal Division, that those units are required to follow.

## BACKGROUND

### I.  New Hampshire Lottery System

16.     Pursuant to Part II, Article 6-b of the New Hampshire Constitution and N.H. Rev. Stat. § 284:21-j, all NHLC revenues, less monies required to fund the operations of NHLC itself, are credited to the state's Education Trust Fund.

17.     Since its inception in 1964, the NHLC has deposited in excess of $2 billion in the Education Trust Fund for the support of New Hampshire public education.

18.     For the 2018 Fiscal Year (July 1, 2017-June 30, 2018), the NHLC recorded operating revenue of $337.8 million and deposited $87.2 million into the Education Trust Fund. The Commission expects its contribution to education to exceed $90 million in the current fiscal year.

19.     The NHLC is authorized by law to sell multiple types of lottery games, the vast majority of which are sold through the NHLC's network of over 1,400 retailers.

20.     In order to operate the lottery games and support its retailer network, the NHLC contracts with a lottery services vendor, Intralot, Inc., to provide a computer gaming system

("CGS") which manages the games and a back office system ("BOS") to manage inventory and sales data.

21.     Pursuant to industry regulation and best practice, lotteries are required to have duplicate CGS locations so that they can continue to operate in the event that one system fails.

22.     Frequently, these duplicate systems will be sited in different states to create sufficient geographical diversity to continue operations in the event of a natural disaster.

23.     Lotteries are required through industry regulation to operate out of their disaster recovery site at least twice per year.

24.     NHLC's CGS servers for traditional retailer (commonly referred to as "bricks and mortar") based lottery products are currently located in Barre, Vermont with a disaster recovery location in Strongsville, Ohio.

25.     Each retailer is provided at least one lottery terminal which is a computer device that connects the retailer to the vendor's CGS and BOS systems via the internet, through a cellular network, or through a satellite connection. Based on the type of game being played, the terminal sends and receives different types of data from the CGS and BOS.

**A. Instant Ticket Games**

26.     The most common lottery game is an "instant" or "scratch" game, in which a player purchases pre-printed tickets and scratches the ticket to reveal the result of the wager.

27.     Generally, these tickets may only be purchased with cash and the purchaser is physically present in the retail location.

28.     Though the ticket is pre-printed with an outcome, the result of the ticket is also stored in the CGS.

29.     Activation of a ticket for sale and eligibility of prizes to be claimed are also controlled through the CGS.

30.     Accordingly, a retailer will use the lottery terminal to activate the ticket book, validate the results of the instant ticket, and ultimately record the sale and payment of prizes paid.

31.     This data is transferred from the individual sale location in New Hampshire to the CGS and BOS servers in Vermont with a replication of the data then sent to the vendor's disaster recovery data center in Ohio.

32.     NHLC has relied on the use of transmitting data from its retailers to its vendors via some form of wire communication since at least the 1980's.

33.     Most of the 48 state and territorial lotteries in the United States rely on transmitting data to an out of state CGS server or out of state disaster recovery CGS server to support their sales of instant tickets.

**B. Draw Based Games**

34.     In addition to instant tickets, the NHLC sells a variety of "draw based" games.

35.     In a draw game, a player purchases a wager in the form of a set of numbers for a draw that will be conducted at some point in the future.

36.     At the designated time and place numbers are drawn either physically or through the use of a random number generator.

37.     The player matches the wager they made against the draw results to reveal the result.

38.     With the exception of iLottery purchases, draw games are purchased from a lottery retailer through the use of the terminal.

39.     The retailer terminal will request a wager transaction from the CGS based on the type of bet made by the player.

40.     The CGS will then generate a wager in the system and send the information about the transaction to the terminal.

41.     The terminal prints a record of the wager which is given to the player.

42.     This data travels over the internet, cellular network, or via satellite between the CGS in Vermont, a duplicate CGS system in Ohio, and the retailer terminal in New Hampshire.

43.     NHLC sells a New Hampshire draw based game, Keno 603, in which draws occur every five minutes between 11:00 a.m. and 1:00 a.m. every day and sells a wide variety of multi-jurisdictional draw games, as set forth in detail below.

**C.  Multi-Jurisdictional Games**

44.     In 1985, the New Hampshire Legislature adopted N.H. Rev. Stat. § 287-F, creating the Tri-State Lotto Compact along with the states of Maine and Vermont.

45.     Tri-State Lotto offers a variety of instant and draw based games that sell and are legal in all three states.  This includes multiple daily draw based games.

46.     The NHLC is also a member of the Multi-State Lottery Association which permits the NHLC the ability to sell the multi-jurisdictional draw based games Powerball and Mega Millions.  These games are each played twice a week.

47.     New Hampshire has also joined a consortium of 25 states and the District of Columbia in selling the draw based game Lucky for Life.

48.     In New Hampshire, the sales of multi-jurisdictional games occur through the communications of the lottery terminal and the CGS.

49.     For multi-jurisdictional games, however, additional actions must be taken to ensure the successful operation of the game.

50.     First, prior to the draw, the bet transactions must be sent from the CGS to an independent control system ("ICS") under the control of the NHLC.  This is done to ensure the integrity of the wagering information.

51.     In the case of New Hampshire, this bet data is transferred from Vermont or Ohio to two ICS servers in New Hampshire over the Internet.

52.     Additionally, general sales and total transactions must be shared with the member states so that the jackpot amount can be accurately calculated and to reconcile the number of wagers and monies wagered.  Currently, this information is also transferred through the Internet to the multi-jurisdictional association running the game.

53.     Finally, once a jackpot is won, the participating lotteries will transfer their portion of the jackpot to the jurisdiction that sold the winning ticket, either directly or through the association that runs the game.

54.     This is typically accomplished through a wire transfer of funds or an automated clearing house ("ACH") process.

55.     These multi-jurisdictional draw games, which involve up to 48 states and territories have operated on the interstate transfer of data and prize money through the telephone, internet, and wire transactions for well over thirty (30) years.

**D.  iLottery Games**

56.     In 2017, the New Hampshire Legislature authorized the sale of lottery tickets "through the use of mobile applications by mobile devices or over the Internet." *See* RSA 284:21-h, II (e).

57.     On September 4, 2018, NHLC launched its "iLottery" platform which allowed players to purchase e-instant tickets and certain draw based tickets through the Internet.

58.     The iLottery platform is operated through one retailer, NeoPollard Interactive ("NPI"); a subcontractor to Intralot, Inc. NPI operates a separate CGS with server sites located within the State of New Hampshire.

59.     Prior to placing a bet on the Internet platform, a player must provide personal data which is then vetted to ensure that the person is an eligible player.

60.     The system also uses geo-location data from the player's PC or mobile device to ensure that the player can only make a wager when they are physically located within the State of New Hampshire.

61.     iLottery instant games and draw games can be played on the internet platform in essentially the same manner as traditional tickets.

62.     E-instant tickets have pre-determined outcomes that are revealed when a player "scratches" the virtual ticket.

63.     Draw games request that the CGS create a transaction which is then sent to the player as a virtual ticket rather than a physical ticket.

64.     In all other respects the games operate in the same manner.

65.     Players pay for the game through a digital wallet which may be funded through debit cards, ACH, or PayPal; however, players may only make deposits when they are physically located within the State.

66.     Accordingly, all financial transactions and bets must begin and end in the State of New Hampshire.

67.     Given the nature of the Internet, however, NHLC cannot guarantee that intermediate routing of data or information ancillary to the transaction does not cross state lines.

68.     From September 4, 2018 to January 31, 2019, the Commission received over $3 million in deposits via the iLottery platform.

69.     The Commission anticipates revenues from this sales channel to be approximately $4-6 million for Fiscal Year 2020, and $6-8 million for Fiscal year 2021.

**E.  Advertising and Customer Interaction**

70.     As a revenue generating State agency, the NHLC advertises its products by engaging in traditional media marketing, direct e-mail campaigns, and social media interactions with its customers. This includes offers and promotions for both traditional retail sales and iLottery purchases.

71.     While these advertisements are always targeted for the purposes of creating lottery sales within New Hampshire, these communications may, by the nature of the media, cross state lines.

72.     NHLC maintains a website which advertises lottery games, posts draw results, provides information on where games can be played, game rules, odds, and prizes. The website also has information and demonstrations of NHLC's iLottery product.  While iLottery transactions are not permitted outside of the state, this website is not walled off to New Hampshire and is available to any person with internet access.

73.     NHLC also engages in e-mail marketing with individuals who have signed up for the NHLC's former loyalty program or have created a New Hampshire iLottery account. These e-mails provide information on lottery games and may contain offers or promotions for lottery products. While sales of NHLC's products may only occur within the state, e-mails may be

routed to New Hampshire residents who are temporarily out of state or to individuals who set-up an account in New Hampshire but reside in other locations.

74.     In recent years, NHLC has also used various social media channels including Facebook, Twitter, Instagram, and YouTube to advertise products, hold promotional contests, and post draw results. These channels are open to the platform's users worldwide and are not limited to the State of New Hampshire.

75.     NHLC also engages in traditional television and radio marketing to advertise its product and mission. While NHLC only buys advertisements from New Hampshire media outlets these broadcasts may, by their nature, cross state lines.

## II.  The 2011 Opinion and The 2018 Opinion

76.     In 2011, Illinois and New York asked the USDOJ whether the sale of lottery tickets over the Internet would violate the Wire Act.  The agency concluded that the Wire Act was limited to betting or wagering on sporting events or contests and therefore did not apply to state-run lotteries. *See Whether Proposal by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act*, 35 Op. O.L.C. 1-13 (September 20, 2011).

77.     On November 2, 2018, the USDOJ, through the Office of Legal Counsel, reversed the 2011 Opinion.  *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 1-23 (Nov. 28, 2018).  In doing so it departed from existing circuit court precedent and from the coherent federal policy that, according to the United States Supreme Court, the Wire Act helped advance.  *Murphy*, S. Ct. at 1483.

78.     The 2018 Opinion makes clear that it "provides binding legal advice within the Executive Branch."  *Id.* at 19.

79.     The 2018 Opinion paid no attention to the substantial reliance interests at stake and indicated that 18 U.S.C. § 1084 now extends to state-conducted lottery activity:  "We acknowledge that some may have relied on the views expressed in our 2011 Opinion about what federal law permits.  Some States, for example, began selling lottery tickets via the Internet after the issuance of our 2011 Opinion.  But in light of our conclusion about the plain language of the statute, we do not believe that such reliance interests are sufficient to justify continued adherence to the 2011 opinion." *Id.* at 22-23.

80.     In a footnote, the USDOJ suggests that "[a]n individual who reasonably relied upon our 2011 Opinion may have a defense for acts taken in violation of the Wire Act after publication of that opinion and prior to the publication of this one. . . . The reliance interest implicit in any such defense, however, does not bear upon our reconsideration of the 2011 Opinion." *Id.* at 23 n. 19.

81.     Thus, the USDOJ has stated its view that state-conducted lottery activity falls within the prohibition of the Wire Act and has not disclaimed any intent to prosecute state agents, including those private entities who the state lawfully contracts with to provide support and services for the New Hampshire Lottery system, for carrying out such activity.

### III. The Defendant's 90-Day Memorandum

82.     On January 15, 2019, the Deputy Attorney General recognized the publication of the 2018 Opinion and issued a memorandum directing USDOJ attorneys to "adhere to the OLC's interpretation, which represents the Department's position on the meaning of the Wire Act." *Memorandum for the Deputy Attorney General to United States Attorneys*, Assistant Attorneys General, and Director, Federal Bureau of Investigation (January 15, 2019).

83.     However, in an exercise of discretion, the Deputy Attorney General specified that the defendant's attorneys "should refrain from applying Section 1084(a) in criminal or civil actions to persons who engaged in conduct violating the Wire Act in reliance on the 2011 OLC opinion prior to the date of this memorandum, and for 90 days thereafter." *Id.*

84.     The 90-day window is designed to "give businesses that relied on the 2011 OLC opinion time to bring their operations into compliance with federal law." *Id.*

85.     However, "[t]his is an internal exercise of prosecutorial discretion; it is not a safe harbor for violations of the Wire Act." *Id.*

86.     The defendant's 2018 Opinion, coupled with its 90-Day Memo, make clear that the plaintiff and its agents face a credible threat of prosecution on an ongoing basis under 18 U.S.C. § 1084 for engaging in conduct that has otherwise been deemed lawful for decades and now risk substantial criminal and civil penalties for continuing to operate its state lottery activities.

## IV. Consequences

87.     As with all other industries, the lottery business has adopted the use of modern communications technology, including the Internet, to conduct its business.

88.     In doing so, the NHLC has relied on the specific statutory authorizations granted by the New Hampshire Legislature and Congress, including authorizations to join multi-state compacts and to sell multi-jurisdictional games. *See* N.H. Rev. Stat. § 284:24-I, VI; N.H. Rev. Stat. Ch. 287-F; *see* 18 U.S.C. §§ 1301-1308.

89.     The NHLC has further relied on the uninterrupted practice for several decades of utilizing interstate communications for the purposes of operating high profile multi-jurisdictional lottery games.

90.     The NHLC ensured, and continues to ensure, that when it engages in online sales of lottery products, it does so consistent with the federal Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA").

91.     The USDOJ's reversal of the 2011 Opinion, coupled with statements that depart from long-standing non-use of the Wire Act to prohibit state-run lottery activity, now subject the NHLC and its employees and agents to criminal liability and prosecution.

92.     As a result, the NHLC is confronted with the uncertainty of whether or to what extent it needs to cease its operations because all of its lottery-related activities use the Internet or wires incidentally.

93.      More specifically, the broadest interpretation of the 2018 Opinion could result in the suspension of all NHLC sales, resulting in an immediate annual loss of over $90 million to the State, as well as additional expenses to try to comply with the 2018 Opinion.

94.     To the extent the NHLC cannot utilize Internet communications in any of its operations, sales would likely be reduced to approximately 25% of their current level.

95.     Less severe interpretations of the USDOJ opinion may still require suspension of multi-jurisdictional games and compacts that have operated with great success for the nation's lotteries since the 1980's. The sharing of bet information and money from wagers across state lines is essential to the operation of these games. Such an action would deprive New Hampshire of approximately $80 million in annual revenue and $40 million in education funding.

96.     To the extent the 2018 Opinion seeks only to enjoin the sale of lottery tickets directly over the internet, this action would be inconsistent with the prior actions of the New Hampshire Legislature, the United States Congress, federal court decisional law, and the prior

opinion of the Department of Justice. The NHLC relied on each of these legal authorities in launching an iLottery platform.

97.     The USDOJ's reversal of the 2011 Opinion, without any further action or explanation, is also likely to have a chilling effect on banks accepting and processing these lottery-related transactions, which can effectively shut down this sales channel. This would result in a loss of approximately $6-8 million in education funding for New Hampshire.

98.     The 2018 Opinion also has the potential to create catastrophic consequences for lotteries across the country and to jeopardize billions of dollars in state funding for good causes that are supported by lottery activity that is authorized and legal in every state where it takes place.

## COUNT I

### Declaratory Judgment
### 28 U.S.C. § 2201(a)

99.     The plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 98 as if set forth herein.

100.     Given the immediate, significant, and substantial threat the interpretation of 18 U.S.C. § 1084 advanced by the 2018 Opinion and endorsed by the 90-Day Memo poses to the continued operation of the New Hampshire Lottery system, and the interstate lottery system generally, as referenced in the foregoing paragraphs, this case presents "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a).

101.     As a result, the plaintiff seeks a declaratory judgment as to whether 18 U.S.C. § 1084 applies to state-conducted lotteries.

102.     The plaintiff contends that 18 U.S.C. § 1084 does not apply to state-conducted lotteries, even if it applies to betting or wagering on non-sports events or contests, and that such

an extension of 18 U.S.C. § 1084 into an area traditionally reserved to and regulated by the

States is not supported by United States Supreme Court or First Circuit jurisprudence.

103.    The USDOJ has previously found that the Framers of the Constitution reserved

the power to create, operate, and run lotteries to the States under the Tenth Amendment of the

United States Constitution. *Congressional Authority to Adopt Legislation Establishing a*

*National Lottery*, 10 Op. O.L.C. 40, 44 (April 4, 1986).

104.    It is well-settled that when Congress acts to legislate in areas traditionally

regulated by the States it must make its intent to alter the usual constitutional balance

unmistakably clear in the statute's language.  *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991).

105.    "In traditionally sensitive areas, such as legislation affecting the federal balance,

the requirement of clear statement assures that the legislature has in fact faced, and intended to

bring into issue, the critical matters involved in the judicial decision." *United States v. Bass*, 404

U.S. 336, 349 (1971).

106.    "This plain statement rule is nothing more than an acknowledgment that the States

retain substantial sovereign powers under our constitutional scheme, powers with which

Congress does not readily interfere." *Gregory*, 501 U.S. at 461.

107.    There is no indication in the plain language of 18 U.S.C. § 1084, its structure, its

purpose, or its legislative history of an unmistakable Congressional intent to outlaw state-

conducted lottery activity.

108.    Consequently, 18 U.S.C. § 1084 cannot be read to alter the usual constitutional

balance, where the power to create, operate, and conduct lotteries has been traditionally reserved

to the States.

109.    If Congress wishes to criminalize the interstate transmissions required to operate state-conducted lotteries, it must do so in clear, unmistakable language.  Congress has not done that in the Wire Act.

110.    This is in stark contrast with other statutes enacted by Congress, which contain clear, unmistakable language indicating when interstate transmissions related to state-conducted lotteries are permitted, 18 U.S.C. §§ 1301-1308, 1953(b); 31 U.S.C. § 5362(10).

111.    Accordingly, the plaintiff is entitled to an order declaring that 18 U.S.C. § 1084 does not extend to state-conducted lottery activity.  No other adequate remedy at law exists to remedy the harm the NHLC and other state lottery commissions across the country face in the wake of the 2018 Opinion.

## COUNT II

### Violation of 5 U.S.C. § 702(2)(A) & (C)

112.    The plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 111 as if set forth herein.

113.    The USDOJ is an agency within the meaning of 5 U.S.C. § 701(b)(1).

114.    The 2018 Opinion's interpretation of 18 U.S.C. § 1084, as adopted by the 90-Day Memorandum, is "final agency action for which there is no other adequate remedy." 5 U.S.C.  § 704.

115.    The interpretation formally adopted by the USDOJ is binding on the USDOJ and its agents, marks the consummation of the USDOJ's decision-making process, and exposes the plaintiff and its agents to significant criminal and civil penalties if they fail to conform to it in the operation of their lottery activities.

116.    The plaintiff is, as a result, a "person aggrieved" within the meaning of the APA. 5 U.S.C. §§ 551(2), 702.

117.    The interpretation of 18 U.S.C. § 1084 contained interpretation in the 2018 Opinion and endorsed by the 90-Day Memo is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

118.    The interpretation of 18 U.S.C. § 1084 contained in the 2018 Opinion and endorsed by the 90-Day Memo is also in excess of statutory jurisdiction, authority, or short of statutory right.

119.    18 U.S.C. § 1084 does not, by its plain terms, extend to state-conducted lotteries and, in fact, applies solely to betting or wagering on sporting events or contests.

120.    The plain language of the statute, its structure, its purpose, and its legislative history uniformly support that construction of the statute.

121.    United States Supreme Court and First Circuit precedent also dictate that conclusion.

122.    Nonetheless, even if 18 U.S.C. § 1084 applies to betting or wagering on non-sporting events or contests—a result that makes no sense based on the safe harbor provision contained in 18 U.S.C. § 1084(b)—18 U.S.C. § 1084 does not extend to state-conducted lotteries for the reasons explained previously.

123.    The existence of 18 U.S.C. §§ 1301-1308, which expressly govern lotteries, allows the States to enter into agreements permitting lottery activity between them, and creates other exemptions for the use of the wires with respect to state-conducted lottery activity, are the more specific statutes, which control over 18 U.S.C. § 1084 and which 18 U.S.C. § 1084 cannot displace through creative interpretation.

124.    Interpreting 18 U.S.C. § 1084 so broadly as to criminalize state-run lottery activity is therefore inconsistent with how similar criminal laws within Title 18 of the United State Code operate.

125.    Additionally, by their plain language, the federal lottery statutes seek to advance a coherent federal policy of respecting the policy choices of the people of each State on the controversial issue of lottery gambling and have as their purpose assisting the States create, operate, and enforce their lottery gambling laws.  The 2018 Opinion interprets 18 U.S.C. § 1084 in a manner that undermines this well-considered Congressional regime.

126.    Consequently, the defendant's interpretation of 18 U.S.C. § 1084 as extending far beyond betting or wagering on sports events or contests to encompass state-conducted lottery activity is arbitrary, capricious, an abuse of discretion, and not in accordance with law, 5 U.S.C. § 706(2)(A), as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

127.    The interpretation of 18 U.S.C. § 1084 advanced by the 2018 Opinion and endorsed by the 90-Day Memo must therefore be vacated and set aside under the APA and the defendants enjoined from employing its interpretation.

128.    No other adequate remedy at law exists to remedy the harm the NHLC and other state lottery commissions across the country face in the wake of the 2018 Opinion.

WHEREFORE, the plaintiff respectfully requests that this Court issue an order:

A.  Declaring that 18 U.S.C. § 1084 does not apply to state-conducted lotteries;

B.  Vacating and setting aside the interpretation of 18 U.S.C. § 1084 advanced by the 2018 Opinion and endorsed by the 90-Day Memo under the APA  as in violation of 5 U.S.C. §§ 706(2)(A) & (C);

C.  Permanently enjoining the defendants and their agents from acting under or pursuant the interpretation of 18 U.S.C. § 1084 advanced by the 2018 Opinion and endorsed by the 90-Day Memo; and

D.  Granting such further relief as the court deems just and equitable.

Respectfully submitted,

NEW HAMPSHIRE LOTTERY COMMISSION

By its attorney,

GORDON J. MACDONALD
ATTORNEY GENERAL

Date:  February 15, 2019                    By:   /s/ Anthony J. Galdieri_____
Anthony J. Galdieri, Bar # 18594
Senior Assistant Attorney General
Francis C. Fredericks, Bar # 21161
Senior Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
anthony.galdieri@doj.nh.gov
francis.fredericksjr@doj.nh.gov

## Certificate of Service

I hereby certify that a copy of the foregoing was served this 15th day of February, 2019, on all counsel of record, via the ECF System.

/s/  Anthony J. Galdieri
Anthony J. Galdieri