**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

_____

|
New Hampshire Lottery Commission,    |
   |
          Plaintiff,    |
v.    |      Civil Case No. 19-cv-163
   |
William Barr, in his official capacity    |
As Attorney General; United States    |
Department of Justice    |
   |
          Defendants    |
_____|

**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

## PRELIMINARY STATEMENT

Since its passage in 1961, 18 U.S.C. § 1084 has never been used to prohibit the States from conducting lotteries.  State-conducted lottery activity has always been recognized under 18 U.S.C. §§ 1301-1308, the federal anti-lottery statutes, which govern the interstate transmission of lottery tickets and related lottery information.  In 2011, New York and Illinois asked the United States Department of Justice ("USDOJ") whether the online sales of lottery tickets by a state-conducted lottery would violate 18 U.S.C. § 1084.  The USDOJ responded in the negative, finding that 18 U.S.C. § 1084 was limited to betting or wagering on sports events or contests (the "2011 Opinion").  In a November 2, 2018 opinion, however, the USDOJ reversed course and departed from existing federal circuit court precedent, finding that 18 U.S.C. § 1084 extended to non-sports betting or wager to include state-conducted lottery activity (the "2018 Opinion").  The effect of the 2018 Opinion is to criminalize every modern day aspect of a state-conducted lottery and put in jeopardy millions of dollars in revenues that New Hampshire raises from such lotteries to fund its public education system.

The plaintiff, the New Hampshire Lottery Commission ("NHLC"), seeks an order from this court declaring that 18 U.S.C. § 1084 does not apply to state-conducted lotteries and vacating and setting aside the 2018 Opinion under the Administrative Procedure Act ("APA") for at least the following reasons.  First, the term "whoever" contained in 18 U.S.C. § 1084(a) does not, as a matter of statutory construction, extend to the States.  Second, First Circuit precedent expressly holds that 18 U.S.C. § 1084(a) is limited solely to sports betting.  Third, construing 18 U.S.C. § 1084(a) as broadly as the defendants contends defeats the purpose of the statute, creates absurd and impractical results, would render the statute both unconstitutionally vague  and in violation of the First Amendment.  Fourth, construing 18 U.S.C. § 1084(a) so

1

broadly as to encompass state-conducted lotteries violates the plain statement rule developed under the United States Supreme Court's Tenth Amendment jurisprudence.  Fifth, construing 18 U.S.C. § 1084(a) so broadly as to encompass state-conducted lotteries violates the canon of statutory construction that specific statutes (in this case, the federal anti-lottery statutes, 18 U.S.C. §§ 1301-1308) control over general statutes like 18 U.S.C. § 1084(a), where the two conflict and the more general statute would nullify portions of the more specific statutes.

## STATEMENT OF FACTS AND LEGAL BACKGROUND

### I.  New Hampshire Lottery System

Under Part II, Article 6-b of the New Hampshire Constitution and N.H. Rev. Stat. § 284:21-j, all NHLC revenues, less monies required to fund the operations of NHLC itself, are credited to the state's Education Trust Fund.  Decl. of Charles R. McIntyre at ¶¶ 5-6.  Since its inception in 1964, the NHLC has deposited in excess of $2 billion in that fund for the support of New Hampshire public education.  For the 2018 Fiscal Year (July 1, 2017-June 30, 2018), the NHLC recorded operating revenue of $337.8 million and deposited $87.2 million into the Education Trust Fund.  *Id.* at 8.

The NHLC sells multiple types of lottery games, the vast majority of which are sold through the NHLC's network of over 1,400 retailers.  *Id.* at ¶ 9.  In order to operate the lottery games and support its retailer network, the NHLC contracts with a lottery services vendor, Intralot, Inc., to provide a computer gaming system ("CGS") which manages the games and a back office system ("BOS") to manage inventory and sales data.  *Id.* at ¶ 10.  Pursuant to industry regulation and best practice, lotteries are required to have duplicate CGS locations so that they can continue to operate in the event that one system fails. *Id.* at ¶ 11. Frequently, these duplicate systems will be sited in different states to create sufficient geographical diversity to

continue operations in the event of a natural disaster. *Id.* Lotteries are required through industry regulation to operate out of their disaster recovery site at least twice per year. *Id.* NHLC's CGS servers for traditional retailer based lottery products are currently located in Barre, Vermont with a disaster recovery location in Strongsville, Ohio. *Id.*

Each of NHLC's retailers are provided at least one lottery terminal which is a computer device that connects the retailer to the vendor's CGS and BOS systems via the internet, through a cellular network, or through a satellite connection. *Id.* at ¶ 12. Based on the type of game being played, the terminal sends and receives different types of data from the CGS and BOS. *Id.*

**Instant Ticket Games.** The most common lottery game is an "instant" or "scratch" game, where a player purchases pre-printed tickets and scratches the ticket to reveal the result. *Id.* at ¶ 13. Generally, these tickets may only be purchased with cash and the purchaser is physically present in the retail location. *Id.* Though the ticket is pre-printed with an outcome, the result of the ticket is also stored in the CGS. *Id.* at ¶ 14. Activation of a ticket for sale and eligibility of prizes to be claimed are also controlled through the CGS. *Id.* Accordingly, a retailer will use the lottery terminal to activate the ticket book, validate the ticket results, and record the sale and payment of prizes paid. *Id.* This data is transferred from the individual sale location in New Hampshire to the CGS and BOS servers in Vermont with a replication of the data then sent to the vendor's disaster recovery data center in Ohio. *Id.* NHLC has relied on transmitting data from its retailers to its vendors via some form of wire communication since at least the 1980's. *Id.* at ¶ 15.[1]

**Draw-Based Games.** The NHLC also sells "draw based" games. *Id.* at ¶ 17. In a draw game, a player purchases a wager in the form of a set of numbers for a draw that will be

---

[1] Most of the 48 state and territorial lotteries in the United States rely on transmitting data to an out of state CGS server or out of state disaster recovery CGS server to support their sales of instant tickets. Decl. of Charles R. McIntyre at ¶ 16.

conducted in the future.  *Id.*  At a designated time and place, numbers are drawn either physically or through a random number generator. *Id.*  The player matches their wager against the draw results to reveal the result.  *Id.*  With the exception of iLottery purchases, discussed *infra*, draw games are purchased from a lottery retailer through the use of the terminal.  *Id.* at ¶ 18.  The retailer terminal will request a wager transaction from the CGS based on the type of bet the player makes. *Id.*  The CGS will then generate a wager in the system and send the information about the transaction to the terminal.  *Id.*  The terminal prints a record of the wager which is given to the player. *Id.* This data travels over the Internet, cellular network, or via satellite between the CGS in Vermont, a duplicate CGS system in Ohio, and the retailer terminal in New Hampshire. *Id.*  NHLC sells a New Hampshire draw-based game, Keno 603, in which draws occur every five minutes between 11:00 a.m. and 1:00 a.m. every day. *Id.* at ¶ 19.

**Multi-Jurisdictional Games.**  In 1985, the New Hampshire Legislature adopted N.H. Rev. Stat. § 287-F, creating the Tri-State Lotto Compact with Maine and Vermont.  *Id.* at ¶ 20. Tri-State Lotto offers a variety of instant and draw based games that sell and are legal in all three states.  This includes multiple daily draw based games.  *Id.*  The NHLC is also a member of the Multi-State Lottery Association which permits the NHLC the ability to sell the Powerball and Mega Millions.  *Id.* at ¶ 21.  These games are each played twice a week.  *Id.*  New Hampshire has also joined a consortium of 25 states and the District of Columbia in selling the draw based game Lucky for Life.  *Id.*  In New Hampshire, the sales of multi-jurisdictional games occur through the communications of the lottery terminal and the CGS.  *Id.* at ¶ 22.

For multi-jurisdictional games, however, additional actions are taken to ensure the game's successful operation. *Id.*  First, prior to the draw, the bet transactions must be sent from the CGS to an independent control system ("ICS") under the NHLC's control. *Id.*  This is done

4

to ensure the integrity of the wagering information. *Id.* This bet data is transferred from Vermont or Ohio to two ICS servers in New Hampshire over the Internet. *Id.* Additionally, general sales and total transactions must be shared with the member states so that the jackpot amount can be accurately calculated and to reconcile the number of wagers and monies wagered. *Id.* Currently, this information is also transferred through the Internet to the multi-jurisdictional association running the game. *Id.* Finally, once a jackpot is won, the participating lotteries will transfer their portion of the jackpot to the jurisdiction that sold the winning ticket, either directly or through the association that runs the game. *Id.* This is typically accomplished through a wire transfer of funds or an automated clearing house ("ACH") process. *Id.* These multi-jurisdictional draw games have operated on the interstate transfer of data and prize money through the telephone, internet, and wire transactions for over thirty (30) years. *Id.* at ¶ 23.

**iLottery Games.** In 2017, the New Hampshire authorized the sale of lottery tickets "through the use of mobile applications by mobile devices or over the Internet." *See* RSA 284:21-h, II (e). On September 4, 2018, the NHLC launched its "iLottery" platform, which allows players to purchase e-instant and draw-based tickets through the Internet. *Id.* at ¶ 25. The iLottery platform is operated through one retailer, NeoPollard Interactive ("NPI"); NPI operates a separate CGS with server sites located within the State of New Hampshire. *Id.* at ¶ 26. Prior to placing a bet on the Internet platform, a player must provide personal data which is vetted to ensure that the person is an eligible player. *Id.* The system also uses geo-location data from the player's computer or mobile device to ensure the player can only make a wager when they are physically located within the State of New Hampshire. *Id.*

iLottery instant and draw games can be played on the Internet platform in the same manner as traditional tickets. *Id.* at ¶ 27. E-instant tickets have pre-determined outcomes that are

revealed when a player "scratches" the virtual ticket. *Id.*  Draw games request that the CGS create a transaction which is sent to the player as a virtual ticket.  *Id.*  In all other respects, the games operate in the same manner. *Id.*  Players pay for the game through a digital wallet funded through debit cards, ACH, or PayPal; however, players may only make deposits when they are physically located within the State.  *Id.* at ¶ 28. Accordingly, all financial transactions and bets must begin and end in New Hampshire.  Given the nature of the Internet, however, NHLC cannot guarantee that intermediate routing of data or information ancillary to the transaction does not cross state lines. *Id.* The NHLC anticipates revenues from these sales to be approximately $4-6 million for Fiscal Year 2020, and $6-8 million for Fiscal year 2021. *Id.* at ¶ 29.

**Advertising and Customer Interaction.**  The NHLC advertises its products by engaging in traditional media marketing, direct e-mail campaigns, and social media interactions with its customers. *Id.* at ¶ 32-34.  This includes offers and promotions for both traditional retail sales and iLottery purchases.  *Id.*  While these advertisements are always targeted for the purposes of creating lottery sales within New Hampshire, these communications may, by the nature of the media, cross state lines. *Id.*  NHLC maintains a website which advertises lottery games, posts draw results, provides information on where games can be played, game rules, odds, and prizes. *Id.* at ¶ 31.  The website also has information and demonstrations of  NHLC's iLottery product. *Id.*  While iLottery transactions are not permitted outside of the state, this website is not walled off to New Hampshire and is available to any person with Internet access. *Id.*

NHLC also engages in e-mail marketing with persons who have signed up for the NHLC's former loyalty program or have created a New Hampshire iLottery account. *Id.* at ¶ 32. These e-mails provide information on lottery games and may contain offers or promotions for lottery products. *Id.* While sales of NHLC's products may only occur within the state, e-mails

may be routed to New Hampshire residents who are temporarily out of state or to individuals

who set up an account in New Hampshire but reside in other locations.  *Id.*  NHLC has also used

various social media channels including Facebook, Twitter, Instagram, and YouTube to advertise

products, hold promotional contests, and post draw results. *Id.* at ¶ 33.  These channels are open

to the platform's users worldwide and are not limited to the State of New Hampshire. *Id.*  NHLC

also engages in traditional television and radio marketing to advertise its product and mission. *Id.*

at ¶ 34.  While NHLC only buys advertisements from New Hampshire media outlets these

broadcasts may, by their nature, cross state lines. *Id.*

## II.  Lottery Statutes And Related Authorities

In 1895, Congress passed 18 U.S.C. § 1301, "which outlawed the transportation of lottery

tickets in interstate or foreign commerce." *United States v. Edge Broadcasting Co.*, 509 U.S.

418, 422 (1993).  In 1934, Congress extended the federal lottery control scheme by prohibiting

the broadcast of lottery advertisements.  *Id.*  In 1975, "Congress amended the statutory scheme to

allow newspapers and broadcasters to advertise state-run lotteries if the newspaper is published

in or the broadcast station is licensed to a State which conducts a state-run lottery." *Id.*  "This

exemption was enacted 'to accommodate the operation of legally authorized State-run lotteries

consistent with continued Federal protection to the policies of non-lottery States.'"  *Id.* at 423

(quoting S. Rep. No. 93-1404, p. 2 (1974)).

In 1994, Congress passed the Interstate Wagering Amendment, which amended 18

U.S.C. § 1301 to close a loophole in the interstate transmission of lottery tickets and related

information in a manner that permitted like-minded states to form interstate lotteries by formal

agreement.  *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1297 (3d Cir. 1996).  The loophole

existed because 18 U.S.C. § 1301 did not contemplate the selling of lottery tickets via computer

technology.  *Id.*  Thus, Congress amended 18 U.S.C. § 1301 to make clear that anyone who

"knowingly *transmits in interstate or foreign commerce* information to be used for the purpose

of procuring a chance, share or interest" would be in violation of the anti-lottery statutes.  *Id.*

(emphasis added).  Congress believed that this amendment preserved "state sovereignty in the

regulation of lotteries" by "giving the states the sole right to regulate lottery sales within their

borders" and "permit[ting] the sale of interests in out-of-state lottery tickets . . . by concluding an

agreement for that purpose with other states."  *Id.*  "The Interstate Wagering Amendment thus

allows the various states to gauge the economic effects of their own lotteries without out-of-state

interference, to form their own judgments about the propriety of lotteries, and to regulate the

types of state-sponsored gambling they wish to allow within their borders."  *Id.*

      In 2008, the USDOJ issued an opinion titled, "Scope of Exemption Under Federal

Lottery Statutes for Lotteries Conducted by a State Acting Under the Authority of State Law." 32

Op. O.L.C. 129 (Oct. 16, 2008).  That opinion concluded that the federal lottery statutes exempt

from criminal liability lotteries "conducted by [a] State acting under the authority of State law"

and that state lotteries could employ other private entities to help them implement their lotteries

so long as "the state exercise[s] actual control over all significant business decisions made by the

lottery enterprise and retain[s] all but a de minimis share of the equity interest in the profits and

losses of the business, as well as the rights to the trademarks and other unique intellectual

property or essential assets of the state's lottery." *Id.*

      That opinion observed that "[t]oday, forty states, as well as the District of Columbia,

operate government-run lotteries," *id.* at 131 & n. 3, and explained that:

> Our conclusion that the state must exercise actual control over all significant
> business decisions of the lottery and retain all but a de minimis share of the equity
> interest does not mean that the state in conducting the lottery enterprise may not
> contract with private firms to provide goods and services necessary to the lottery.

> States that operate their own lotteries routinely contract with private businesses to print and sell lottery tickets, promote the lottery, insure against loss, consult about games, and perform a wide range of other functions as part of operating the lottery.  We do not read the lottery statutes to foreclose these types of arrangements; that a state contracts with a private company to assist in certain functions associated with the lottery, even where the contractor is compensated for its services by a relatively small fixed percentage of revenues of the lottery, does not mean that the state itself is no longer conducting the lottery.

*Id.* at 139-40.  This opinion makes no mention of the Wire Act prohibiting the States themselves or these private entities from engaging in activity permitted under the federal lottery statutes.

### III. The Wire Act (18 U.S. § 1084)

In 1961, Congress amended Chapter 50 of title 18 of the U.S. Code by adding the definition of "wire communication facility" to 18 U.S.C. § 1081 and adding 18 U.S.C. § 1084 to the statutory chapter. Pub. L. No. 87-216, § 2, 75 Stat. 491 (codified 18 U.S.C. §§ 1081; 1084). In testimony before the Senate, the United States Department of Justice, main advocates of the bill, stated that the scope of the bill was confined to sports gambling. Senator Estes Kefauver had noted that the wires were used not only in sports gambling but also in numbers games too. *The Attorney General's Program to Curb Organized Crime and Racketeering: Hearing son S. 1653, S. 1654, S. 1655, S. 1656, S. 157, S. 1658, S. 1665 Before the S. Comm. on the Judiciary*, 87th Cong. 277-78 (1961).  In reply, Herbert Miller, the Assistant Attorney General for the United States Department of Justice's Criminal Division stated unequivocally, "This bill, of course, would not cover [numbers games] because it is limited to sporting events or contests." *Id.*[2]

Since its passage, 18 U.S.C. § 1084 has not been used to prosecute or otherwise regulate state-conducted lottery activity.  In 2002, the Fifth Circuit interpreted the Wire Act as limited to betting or wagering on sporting events or contests. *In re Mastercard Int'l Inc.*, 313 F.3d 257, 262 (5th Cir. 2002).  In 2006, Congress passed the Unlawful Internet Gambling Enforcement Act

---

[2] The legislative history further confirms that 18 U.S.C. § 1084 is limited to betting on sports events or contests. The 2011 Opinion analyzes and discusses this legislative history at length. 35 Op. O.L.C. at 7-12.

("UIGEA"). 31 U.S.C. §§ 5361-67.  The UIGEA recognizes the legality of state-conducted

lotteries and thus made clear that the "intermediate routing of electronic data" does not transform

a bet or wager initiated in a State and ultimately received in the same State an unlawful,

interstate transmission. 31 U.S.C. § 5362(10).

In 2011, New York and Illinois asked the USDOJ whether selling lottery tickets over the

Internet would violate the Wire Act.  The USDOJ concluded that the Wire Act was limited to

betting on sporting events or contests and therefore did not apply to such sales. *See Whether*

*Proposal by Illinois and New York to Use the Internet and Out-of-State Transaction Processors*

*to Sell Lottery Tickets to In-State Adults Violate the Wire Act*, 35 Op. O.L.C. 1-13 (September

20, 2011).[3]  In 2014, the First Circuit also held that the Wire Act was limited to betting or

wagering on sporting events or contests. *U.S. v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014).

**IV. The 2018 Opinion and the 90-Day Memorandum**

On November 2, 2018, the USDOJ reversed the 2011 Opinion, departing from its 2011

Opinion and existing circuit court precedent.  *Reconsidering Whether the Wire Act Applies to*

*Non-Sports Gambling*, 42 Op. O.L.C. 1-23 (Nov. 28, 2018).[4]  The opinion made clear that the

2018 Opinion "provides binding legal advice within the Executive Branch."  *Id.* at 19.  In doing

so, the opinion gave short shrift to the reliance interests at stake and indicated that the Wire Act

now extends to state-run lotteries:

> We acknowledge that some may have relied on the views expressed in our 2011
> Opinion about what federal law permits.  Some States, for example, began selling

---

[3] A true and correct copy of the 2011 Opinion is attached to the Declaration of Anthony J. Galdieri in Support of Plaintiff's Motion for Summary Judgment ("Galdieri Decl.") as Exhibit 1.

Opinions of the Office of Legal Counsel of the United States Department of Justice can also be accessed and searched via the following website:  The United States Department of justice, Office of Legal Counsel, Opinions, https://www.justice.gov/olc/opinions-main (last visited Feb. 12, 2019).

[4] A true and correct copy of the 2018 Opinion is attached to the Galdieri Declaration as Exhibit 2.

lottery tickets via the Internet after the issuance of our 2011 Opinion. But in light of our conclusion about the plain language of the statute, we do not believe that such reliance interests are sufficient to justify continued adherence to the 2011 opinion.

*Id.* at 22-23. The opinion suggests that "[a]n individual who reasonably relied upon our 2011 Opinion may have a defense for acts taken in violation of the Wire Act after publication of that opinion and prior to the publication of this one. . . . The reliance interest implicit in any such defense, however, does not bear upon our reconsideration of the 2011 Opinion." *Id.* at 23 n. 19.

On January 15, 2019, the Deputy Attorney General recognized the publication of the 2018 Opinion and issued a memorandum directing agency attorneys to "adhere to the OLC's interpretation, which represents the Department's position on the meaning of the Wire Act." *Memorandum for the Deputy Attorney General to United States Attorneys*, *Assistant Attorneys General, and Director, Federal Bureau of Investigation* (January 15, 2019) (the "90-Day Memo").[5] However, in an exercise of discretion, the Deputy Attorney General specified that the defendants' attorneys "should refrain from applying Section 1084(a) in criminal or civil actions to persons who engaged in conduct violating the Wire Act in reliance on the 2011 OLC opinion prior to the date of this memorandum, and for 90 days thereafter." *Id.* The 90-day window is designed to "give businesses that relied on the 2011 OLC opinion time to bring their operations into compliance with federal law." *Id.* However, "[t]his is an internal exercise of prosecutorial discretion; it is not a safe harbor for violations of the Wire Act." *Id.*

**V. Consequences**

The reversal of the 2011 Opinion potentially subjects the NHLC and its employees and agents to criminal liability and prosecution. Decl. of Charles R. McIntyre in Support of Plaintiff's Mot. for Summ. J. at ¶ 44. As a result, the NHLC is confronted with the uncertainty

---

[5] A true and correct copy of the 90-Day Memorandum is attached to the Galdieri Declaration as Exhibit 3.

of whether or to what extent it needs to cease its operations because all of its lottery-related activities use the Internet or wires incidentally. *Id.* at ¶ 42.  More specifically, the broadest interpretation of the 2018 Opinion could result in the suspension of all NHLC sales, resulting in an immediate annual loss of over $90 million to the State, as well as additional expenses to try to comply with the 2018 Opinion. *Id.* at ¶ 45.

To the extent the NHLC cannot utilize Internet communications for its operations, sales would likely be reduced to approximately 25% of their current level.  *Id.*  Less severe interpretations of the 2018 Opinion may still require suspension of multi-jurisdictional games and compacts that have operated with great success for the nation's lotteries since the 1980's. *Id.* at ¶ 46.  The sharing of bet information and money from wagers across state lines is essential to the operation of these games. *Id.*  Such an action would deprive New Hampshire of approximately $80 million in annual revenue and $40 million in education funding.  *Id.*  The reversal of the 2011 Opinion, without any further action or explanation, is also likely to have a chilling effect on banks accepting and processing these lottery-related transactions, which can effectively shut down this sales channel. *Id.* at ¶ 48.  This would result in a loss of approximately $6-8 million in education funding for New Hampshire. *Id.*

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), the Court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The APA provides further standards for judicial review.  Under the APA, this Court must hold unlawful and set aside final agency action that exceeds an agency's statutory authority that is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. §§ 706(2)(A), (C).

The plaintiff's claims in this case present pure issues of law that can be resolved on the merits without an administrative record.  *See, e.g.*, *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266-67 (D.C. Cir. 2001) (holding administrative record not required to determine whether agency rule violated statute; the claim could be resolved solely by reference to the statute and its legislative history); *Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434, 440 n.37 (5th Cir. 2001) (administrative record not required because "review is limited to interpreting the extent to which the regulation is consistent with the statute").

The 2018 Opinion constitutes final agency action under the APA because it is "binding" on the defendants' agents, 42 Op. O.L.C. at 19, must be adhered to by them, Galdieri Decl., Ex. 3, 90-Day Memo, represents the completion of the defendants' decision-making process, and subjects the plaintiff and its agents to potential criminal and civil liability if they fail to conform to it.  *See, e.g.*, *Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956) (holding agency's interpretation of statute was final agency action even though it would only have effect if and when a particular enforcement action was taken because failing to conform to the interpretation caused carriers to "run civil and criminal risks"); *see Trafalgar Capital Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) ("In determining whether a particular agency action is final, 'the core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."); *see also U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1815 (2016) (endorsing final agency action analysis set forth in *Frozen Food Express* and finding agency action final in part because it placed the respondents "at the risk of significant criminal and civil penalties").

Additionally, the 2018 Opinion's interpretation is not entitled to deference because 18 U.S.C. § 1084 is a criminal statute. *See, e.g.*, *United States v. Apel*, 571 U.S. 359, 369 (2014) (explaining that the Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference"); *Abramski v. United States*, 573 U.S. 169, 191 (2014) ("[C]riminal laws are for courts, not for the Government, to construe").

## ANALYSIS

### I.   The Plain Language Of 18 U.S.C. § 1084 Does Not Support Extending That Statute To State-Conducted Lotteries.

Whether 18 U.S.C. § 1084 extends to state-conducted lotteries requires this court to interpret the statute. In this analysis, the court looks first to the statute's plain language and structure. *United States v. Cortes-Caban*, 691 F.3d 1, 16 (1st Cir. 2012); *Sterling Suffolk Racecourse Ltd. Partnership v. Burrillville Racing Assoc.*, 989 F.2d 1266, 1270-71 (1st Cir. 1993) (hereinafter "*Sterling*"). If Congress's intent is manifest in the statutory language used, the court's analysis typically ends, unless a literal interpretation would defeat the purpose of the statute, lead to absurd or impractical results, or render the statute unconstitutional. *See, e.g.*, *Baez v. INS*, 41 F.3d 19, 24 (1st Cir. 1994); *Sagansky v. United States*, 358 F.2d 195, 201 (1st Cir. 1966) (explaining that the literal interpretation of the Wire Act advanced by the defendants would defeat a purpose of the statute, lead to impractical results, and would render the statute unconstitutionally vague). If the statutory language is ambiguous, the statute's legislative history may help resolve the ambiguity. *Milner v. Dept. of Navy*, 562 U.S. 562, 572 (2011).

United States Supreme Court and First Circuit precedent also plays a controlling role in this analysis. In *Murphy v. National Collegiate Athletic Ass'n*, __ U.S. __, __, 138 S. Ct. 1461, 1483 (2018), the United States Supreme Court explained the "general federal approach to gambling" as follows:

> Under 18 U.S.C. § 1955, operating a gambling business violates federal law only if that conduct is illegal under state or local law.  Similarly, under 18 U.S.C. § 1953, which criminalizes the interstate transmission of wagering paraphernalia, and 18 U.S.C. § 1084, *which outlaws the interstate transmission of information that assists in the placing of a bet on a sporting event*, apply only if the underlying gambling is illegal under state law.

*Id.* (emphases added).  The United State Supreme Court explained that "[t]hese provisions implement a coherent federal policy:  They respect the policy choices of the people of each State on the controversial issue of gambling." *Id.*

In *Sagansky*, 358 F.2d at 200-01, the First Circuit examined the Wire Act and recognized the difficulties that a literal interpretation of 18 U.S.C. § 1084(a) may present.  The defendants argued, in part, that the statutory reference to "bets or wagers" meant that the transmission of a single bet or wager was insufficient to sustain an indictment.  *Sagansky*, 358 F.2d at 200-01.  The First Circuit rejected that literal interpretation of the statute, explaining that "[w]ithin limits the intention of Congress may prevail over the literal language of the statute." *Id.* at 201.  The First Circuit discussed how such a literal interpretation was awkward, was not supported by the legislative history, created impractical results, and would render the statute unconstitutionally vague. *Id.*; *see Barrett v. United States*, 423 U.S. 212, 218 (1976) ("A criminal statute, to be sure, is to be strictly construed, but it is not to be construed so strictly as to defeat the obvious intention of the legislature.") (internal quotations omitted).

In *United States v. Southard*, 700 F.2d 1, 20 (1st Cir. 1983), the First Circuit explained that the purpose of 18 U.S.C. § 1084(a) "was to assist the states in enforcing their own laws against gambling." (citing H. Rep. No. 967, 87th Cong., 1st Sess., reprinted in 1961 U.S. Code Cong. & Ad. News 2631).

In *Sterling*, 989 F.2d at 1272, the First Circuit described 18 U.S.C. § 1084(a) as "a statute which criminalizes, *inter alia*, utilization of a wire facility for the 'transmission in interstate . . .

commerce of . . . information assisting in the placing of bets . . . on any sporting event.'"
(quoting 18 U.S.C. § 1084(a).  The court also held that "Congress, in adopting Section 1084, did
not intend to criminalize acts that neither the affected states nor Congress itself deemed criminal
in nature." *Id.* at 1273.

Finally, in *United States v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014), the First Circuit
held that "[t]he Wire Act applies only to 'wagers on any sporting event or contest,' that is, sports
betting."  The *Lyons* court cited to the plain language of 18 U.S.C. § 1084(a) for that conclusion
as well as a Fifth Circuit case, *In re MasterCard*, 313 F.3d at 263 , which also held that 18
U.S.C. § 1084 applies solely to wagers on sporting events or contests.

Thus, First Circuit precedent aligns with the United States Supreme Court's recent
statements in *Murphy* that 18 U.S.C. § 1084 applies only if the underlying gambling activity is
illegal under state law and extends only to sports betting.  Resolution of whether 18 U.S.C. §
1084 extends to state-conducted lottery activity is therefore analyzed against this backdrop.

**A.  The Term "Whoever" As Used In 18 U.S.C. § 1084 Does Not Include The States.**

18 U.S.C. § 1084 contains five subparts.  The first subpart defines the crime. 18 U.S.C. §
1084(a).  It states as follows:

> *Whoever* being engaged in the business of betting or wagering knowingly uses a
> wire communication facility *for* the transmission in interstate or foreign
> commerce of bets or wagers or information assisting in the placing of bets or
> wagers on any sporting event or contest, *or for* the transmission of a wire
> communication which entitles the recipient to receive money or credit as a result
> of bets or wagers, *or for* information assisting in the placing of bets or wagers,
> shall be fined under this title or imprisoned not more than two years, or both.

*Id.* (emphases added).  The second subpart contains a safe harbor provision for transmissions of
information assisting in the placing of bets or wagers on sporting events or contests. 18 U.S.C. §
1084(b).  The third subpart specifies that 18 U.S.C. § 1084 does not create immunity from

criminal prosecution under any laws of any State.  18 U.S.C. § 1084(c).  The fourth subpart

enables Federal, State, or local law enforcement to order common carriers involved in

transmitting bets or wagers or information outlawed by 18 U.S.C. § 1084(a) to cease and desist

those operations. 18 U.S.C. § 1084(d).  The fifth subpart defines the term "State" to mean "a

State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a

commonwealth, territory or possession of the United States." 18 U.S.C. § 1084(e).

By its plain terms, 18 U.S.C. § 1084(a) applies to "persons," not to "States."  It imposes

liability only on "whoever" engages in the business of betting or wagering.  The term "whoever"

is not defined in 18 U.S.C. § 1084; however, the Dictionary Act defines "the words 'person' and

'whoever' [to] include corporations, companies, associations, firms, partnerships, societies, and

joint stock companies, as well as individuals." 1 U.S.C. § 1.  The United States Supreme Court

has held that the absence of any reference to sovereign governments in this definition reflects a

Congressional intent not to extend those statutory terms to sovereigns. *United States v. Mine

Workers*, 330, U.S. 258, 275 (1947); *see, e.g.*, *Vt. Agency of Nat. Res. v. United States ex rel.

Stevens*, 529 U.S. 765, 780 (2000); *Int'l Primate Protection League v. Administrators of Tulane*,

500 U.S. 72, 82-83 (1991); *United States v. Cooper Corp.*, 312 U.S. 600, 604-05 (1941).

From this line of cases, a presumption of statutory interpretation has developed that the

term "person" or "whoever" is not ordinarily construed to include sovereigns.  *See, e.g.*, *Vt.

Agency of Nat. Res.*, 529 U.S. at 780-81; *Cooper*, 312 U.S. at 606-07; *Nunag-Tanedo v. East

Baton Rouge Parish Sch. Bd.*, 2011 WL 13153190, at *9-12 (C.D. Cal. May 12, 2011) (holding

that the term "whoever" as used in 18 U.S.C. § 1595 does not extend to governmental entities);

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 273-77

(2012) (Artificial-Person Canon) (explaining that the term "person" as well as "whoever"

denotes natural persons and artificial persons, but traditionally excludes sovereigns).

"Particularly is this true where [as here] the statute imposes a burden or limitation, as

distinguished from conferring a benefit or advantage." *Wilson v. Omaha Tribe*, 442 US 653, 667

(1979). The presumption "may be disregarded only upon some affirmative showing of statutory

intent to the contrary." *Vt. Agency of Nat. Res.*, 529 U.S. at 781.

 18 U.S.C. § 1084 does not reflect a Congressional intent to prohibit the States from using

the wires to conduct state lottery business. To the extent any such Congressional intent can be

found in Title 18, it exists in the anti-lottery statutes, which have as their express purpose the

regulation of lotteries, *see, e.g.*, 18 U.S.C. §§ 1301-1308, and contain provisions for how States

can transmit information in conducting their lotteries, 18 U.S.C. §§ 1301, 1307. Moreover, 18

U.S.C. § 1084(e) expressly defines the term "State." This statutory definition makes no

reference to including the State, its agencies, or its officers in the term "whoever" for the

purposes of 18 U.S.C. § 1084(a). Rather, by defining the term "State" separately and using it

apart from the term "whoever" and "person," Congress's intent is made manifest: the term

"whoever" was not meant to subsume the States. This aligns with Congress's purpose to assist

the States in enforcing their own gambling laws, while permitting States to regulate gambling

activity within their own borders. Thus, 18 U.S.C. § 1084(a) does not prohibit New Hampshire

from conducting lotteries in conformance with those federal laws that govern lottery activity.

**B. 18 U.S.C. § 1084(a) Is Limited To Sports Betting.**

 The First Circuit has expressly held that "[t]he Wire Act applies only to 'wagers on any

sporting event or contest,' that is, sports betting." *Lyons*, 740 F.3d at 718. The 2018 Opinion

attempts to write off this controlling First Circuit precedent on the ground that it constitutes

dicta. 42 Op. O.L.C. at 4 n. 6. It does not. The *Lyons* court's ruling that 18 U.S.C. § 1084(a)

applies only to wagers on sporting events or contests was essential to the court's holding on the particular issue addressed.  *Id.*  Specifically, the defendants argued that there was insufficient evidence to convict them because they had accepted bets on casino games and other forms of gambling not covered by the Wire Act.  *Id.*  In conducting its analysis, the First Circuit did not assume without deciding that the Wire Act applies only to wagering on sports events or contests; it directly stated that "[t]he Wire Act applies only to 'wagers on any sporting event or contest,' that is, sports betting."  *Id.*  The First Circuit then concluded that "there was amply sufficient evidence that Lyons and Eremian, at least, aided and abetted the receipt of sports bets."  *Id.*

     This holding finds support earlier and later in the opinion as well.  For example, in construing 18 U.S.C. § 1084(a)-(b) together, the First Circuit referenced section 1084(b) as "creat[ing] an exception to section 1084(a) applicable to certain transmissions of information assisting in the placing of bets . . . ." *Id.* at 713.  The First Circuit concluded that "the Wire Act prohibits interstate gambling without criminalizing lawful intrastate gambling or prohibiting the transmission of data needed to enable intrastate gambling on events held in other states if gambling in both states on such events is lawful."  *Id.*  This construction of the statute only holds true if 18 U.S.C. § 1084(a) applies solely to sports betting.

     In analyzing whether Lyons was an aider or abettor, the First Circuit concluded that "Lyons was a critical part of SOS's operation and thereby demonstrated a clear intent to further SOS's business of receiving <u>illegal inter-jurisdictional sports bets</u> by phone and over the internet."  *Id.* at 715.  And, in resolving Lyons's challenges to his UIGEA convictions, the First Circuit reiterated, "It is, as we have already noted, illegal to transmit or receive a sports bet in interstate commerce under the Wire Act even if placing the bet is legal at both ends of the transmission." *Id.* at 729.  Consequently, the First Circuit's holding in *Lyons* is controlling.

The *Lyons* court's interpretation of 18 U.S.C. § 1084(a) is also the correct interpretation. Among other things, this interpretation aligns the statute's criminal prohibition, 18 U.S.C. § 1084(a), with its exemption from criminal liability, 18 U.S.C. § 1084(b). This reading advances both the "coherent federal policy" recently addressed in *Murphy*, 138 S. Ct. at 1483 and the statutory purpose identified in *Southard*, 700 F.2d at 20. It also supports the holding in *Sterling*, 989 F.2d at 1273, that "Congress, in adopting Section 1084, did not intend to criminalize acts that neither the affected states nor Congress itself deemed criminal in nature."  *See also United States v. Fabrizio*, 385 U.S. 263, 268-69 (1966) ("In passing 18 U.S.C. s 1084 and 18 U.S.C. s 1952 as companion provisions to s 1953 Congress exempted transmissions of legal gambling information from the former and limited the latter to those engaged in 'unlawful activity.'").

The *Lyons* court's interpretation also avoids the awkward, nonsensical, and potentially unconstitutional results that an overly literal reading of the statute produces. *See Sagansky*, 358 U.S. at 200-01.  Extending 18 U.S.C. § 1084 to betting or wagering on non-sports events or contests effectively criminalizes betting or wagering information shared between two or more states where, like in the case of state-conducted lotteries, the exchange of information is legal under both federal and state law.  That result is contrary to the pronouncements in *Murphy*, *Fabrizio*, and *Sterling* and should be enough on its own to counsel against that interpretation.

Nonetheless, the 2018 Opinion goes even further.  It states that 18 U.S.C. § 1084 outlaws the use of the wires to transmit "bets or wagers" generally (as opposed to bets or wager *on non-sporting events or contests*) and outlaws using a wire transmission facility to acquire information assisting in the placing of "bets or wagers" generally. *See* 2018 Opinion, 42 Op. O.L.C. at 3. This extraordinarily broad interpretation of the statute invites substantial vagueness concerns as to what conduct the statute actually criminalizes and invites arbitrary and discriminatory

enforcement of the law. *See United States v. Councilman*, 418 F.3d 67, 84 (1st Cir. 2005) (en banc) ("[A] statute is unconstitutionally vague only if it 'prohibits . . . an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application'"); *United States v. Nieves-Castano*, 480 F.3d 597, 604 (1st Cir. 2007) (stating constitutional statutes "give[] fair notice to people potentially subject to [them] and adequately guard[] against arbitrary and discriminatory enforcement).

For example, has a professional video game player who pays $5.00 to enter a video game competition for the chance win $1,000 if he or she defeats the field violated 18 U.S.C. § 1084(a)?  Has a person who enters their livestock in Best in Show competitions around the country for a fee paid through the Internet for a chance to win a monetary prize if his or her livestock wins the competition violated 18 U.S.C. § 1084?  Can a professional poker player watch his professional rivals play a poker tournament utilizing the Internet so he can learn better how to compete against them?  The 2018 Opinion stretches 18 U.S.C. § 1084 well beyond its intended meaning, purpose, and scope, to subsume within it one's own participation in games or contests, as opposed to betting or wagering on the outcome of such games or contests, and therefore renders the statute unconstitutionally vague.  The First Circuit has stated before that it will not interpret 18 U.S.C. § 1084 to produce such a result. *Sagansky*, 358 F.2d at 201.

The 2018 Opinion also raises serious First Amendment concerns.  For example, under the 2018 Opinion's interpretation, a State or private entity could not use the wires to transmit lawful, non-misleading information helpful in the placement of bets or wagers, such as advertisements, to an intrastate customer-base if the data transmitted incidentally flowed through the channels of interstate commerce or the broadcast, while originating in the State where the activity is legal, extends incidentally into other States.  Existing United States Supreme Court precedent would

suggest that such a result fails the *Central Hudson* test and violates the First Amendment. *See Greater New Orleans Broadcasting Assoc., Inc. v. United States*, 527 U.S. 173 (1999) (holding that 18 U.S.C. § 1304 "may not be applied to advertisements of private casino gambling that are broadcast by radio or television located in Louisiana, where such gambling is legal").[6]

The 2018 Opinion also picks and chooses what language to read into the prohibitions contained in 18 U.S.C. § 1084(a).  For example, the first prohibition in 18 U.S.C. § 1084(a) contains the phrase "in interstate or foreign commerce."  That phrase does not appear in the remaining two prohibitions, just like the phrase "sporting event or contest" does not appear in the remaining two prohibitions.  If the final two prohibitions are not limited to activity occurring "in interstate or foreign commerce," then purely intrastate activity also falls within those prohibitions.  That is not, however, how the United States Supreme Court has read the statute. *See Barrett*, 423 U.S. at 217 (identifying 18 U.S.C. § 1084 as a statute limited to the regulation of "only direct interstate commerce").  The 2018 Opinion does not credibly explain away this issue that its interpretation of the statute creates.  42 Op. O.L.C. at 10.

Thus, the 2018 Opinion does not withstand close scrutiny, creates absurd results, raises substantial constitutional questions, and ignores the fact that 18 U.S.C. § 1084 contains "somewhat imprecise, conversational, language." *Sagnasky*, 358 F.2d at 201.  The most natural reading of the statute, combined with the statute's structure, purpose, and the body of United States Supreme Court and First Circuit precedent construing the statute, reveal that 18 U.S.C. § 1084 applies solely to sports betting and does not extend to state-conducted lotteries.[7]

---

[6] *See also Enforceability of 18 U.S.C. § 1302*, 24 Op. O.L.C. 1 (Sept. 25, 2000) (holding that "[a]pplication of 18 U.S.C. § 1302 to prohibit the mailing of truthful advertising concerning certain lawful gambling operations would violate the First Amendment").

[7] Though the court need not reference the legislative history to conclude, in accordance with First Circuit precedent, that 18 U.S.C. § 1084 applies solely to interstate betting on sports events or contests, the legislative history confirms this conclusion and is well-analyzed and discussed in the 2011 Opinion. 35 Op. O.L.C. at 7-12.

**C.  The 2018 Opinion Interprets 18 U.S.C. § 1084 In A Manner Contrary To The United States Supreme Court's Tenth Amendment Jurisprudence**.

The intrastate regulation of gambling and running of state-conducted lotteries has been recognized as a power reserved to the States under the Tenth Amendment.  *See*, *e.g.*, *Murphy*, 138 S. Ct. at 1480-81 (striking down federal law that prohibited states from "author[izing] sports gambling" finding federal law did not preempt state regulation of gambling, and the Tenth Amendment prohibited Congress from giving "direct commands" to the states as to whether or not to permit gambling); *Congressional Authority to Adopt Legislation Establishing a National Lottery*, 10 Op. O.L.C. 40, 44-45 (1986) (concluding that the Framers of the Constitution reserved the power to conduct lotteries to the States under the Tenth Amendment).

It is also well-settled within our federalist system that "[i]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'"  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).  "'In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.'" *Id.* at 461 (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)).

As a result, federal courts will construe a statute to alter the federal balance only if it is "clear to <u>anyone</u> reading the Act" that 18 U.S.C. § 1084 applies to state-run lotteries.  *Id.* at 467 (emphasis added).  As the analyses in Sections I(A)-(B) above demonstrate, the Wire Act's language does not satisfy this exacting standard.  The plain text of 18 U.S.C. § 1084 fails to convey in unmistakably clear language an intent to criminalize the use of the wires by a state to conduct authorized lottery activity.  Rather, Congress has outlined in other, more specific statutes

23

how lotteries should be regulated and has expressly delineated the boundaries regarding how state-conducted lotteries may occur and when and how they may use the wires to conduct those lotteries.  *See, e.g.*, 18 U.S.C. §§ 1301-1308, 1953; 31 U.S.C. §§ 5361-5366.

Because the Wire Act is devoid of a clear expression of Congressional intent to curtail the states' authority to conduct lotteries, the court should not interpret 18 U.S.C. § 1084 to effect such a result.  Doing so would threaten New Hampshire's significant sovereign interest in raising revenue to support its public education system.  *See*, *e.g.*, *Gulino v. New York State Educ. Dept.*, 460 F.3d 361, 376 (2d Cir. 2006) (stating that "[p]roviding public schools ranks at the very apex of the function of a State," and identifying that "unmistakably clear" language is required if a federal law is to be interpreted in a way that impacts the provision of this "core state function."); *see also Nixon v. Missouri Mun. League*, 541 U.S. 125, 140 (2004) (explaining "federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement *Gregory* requires.").

### D.  The More Specific Federal Lottery Statutes Govern The Ability Of State-Conducted Lotteries To Use The Wires; 18 U.S.C. § 1084 Does Not Regulate That Conduct.

In construing statutes, "'[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)).  Thus, in *Radzanower*, where Congress had enacted a narrow venue provision in the National Bank Act focusing on the particular problems of national banks and, 70 years later, enacted a more general venue provision under the Securities Exchange Act, the United States Supreme Court held that the narrow venue provision contained in the National Bank Act controlled over the more general language of the Securities Exchange Act.  *Id.* at 153.

The same result should be reached in this case.  Congress passed the anti-lottery statutes, 18 U.S.C. §§ 1301-1308, to govern interstate lottery activity.  In particular, in 1994, Congress passed the Interstate Wagering Amendment to govern the interstate transmission of lottery tickets and related-lottery information, to permit States to engage in such interstate activity by agreement, and to exempt certain state-conducted lottery activity from their reach.  Under the 2018 Opinion's interpretation, that amendment was unneeded, and its authorizations and exemptions related to state-conducted lottery activity are nullified because they conflict with 18 U.S.C. § 1084(a)'s prohibitions. *See* 18 U.S.C. § 1301 (prohibiting the interstate transfer of lottery tickets by transmission in interstate commerce "unless that business is permitted under an agreement between the States in question or appropriate authorities of those States"); *id.* § 1307 (exempting certain information assisting in state-conducted lottery participation from criminal sanction and expressly defining a "lottery" to "not include the placing or accepting of bets or wagers on sporting events or contests").  Such an interpretation is absurd and inconsistent with the principle that specific statutes control over more general statutes where the two conflict.  18 U.S.C. § 1084 must therefore be interpreted not to extend to state-conducted lotteries.

## CONCLUSION

For all of the above reasons, the plaintiff is entitled to summary judgment.  This case presents pure issues of law and, therefore, no genuine issues of material fact exist.  This Court should therefore issue an order declaring that 18 U.S.C. 1084 does not extend to state-conducted lotteries, vacating and setting aside the 2018 Opinion under 5 U.S.C. § 706(2)(A) & (C), and permanently enjoining the defendants from enforcing the 2018 Opinion.

Respectfully submitted,

NEW HAMPSHIRE LOTTERY
COMMISSION

By its attorney,

GORDON J. MACDONALD
ATTORNEY GENERAL

Date:  February 15, 2019                By:  /s/ Anthony J. Galdieri
                                        Anthony J. Galdieri, Bar # 18594
                                        Senior Assistant Attorney General
                                        Francis C. Fredericks, Bar # 21161
                                        Senior Assistant Attorney General
                                        Civil Bureau
                                        New Hampshire Dept. of Justice
                                        33 Capitol Street
                                        Concord, NH 03301
                                        (603) 271-3650
                                        anthony.galdieri@doj.nh.gov
                                        francis.fredericksjr@doj.nh.gov

## Certificate of Service

I hereby certify that a copy of the foregoing was served this 15th day of February, 2019, on all counsel of record, via the ECF System.

/s/  Anthony J. Galdieri
Anthony J. Galdieri