# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| New Hampshire Lottery Commission, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> William Barr, in his official capacity ) <br> As Attorney General; ) <br> ) <br> United States Department of Justice, ) <br> ) <br> Defendants. ) <br> NeoPollard Interactive, LLC, ) <br> ) <br> Pollard Banknote Limited, ) <br> ) <br> Plaintiffs ) <br> ) <br> v. ) <br> ) <br> William Barr, in his official capacity ) <br> As Attorney General; ) <br> ) <br> United States Department of Justice, ) <br> ) <br> The United States of America, ) <br> ) <br> Defendants. ) | Civil Action No. 1:19-cv-00163-PB |

**[PROPOSED] MEMORANDUM OF LAW OF**
**_AMICUS_ MICHIGAN BUREAU OF STATE LOTTERY IN SUPPORT OF PLAINTIFFS'**
**MOTIONS FOR SUMMARY JUDGMENT**

The Michigan Bureau of State Lottery ("Michigan Lottery" or "*Amicus*") files this Proposed Memorandum of Law of *Amicus Curiae* to provide this Court with additional perspective on the erroneous nature of the Department of Justice's (DOJ) 2018 Opinion and the

1

detrimental impact it has on the 47 jurisdictions nationwide that rely on lottery revenues to fund vital services.

The Michigan Lottery hereby represents that the Kentucky Lottery Corporation, the Tennessee Education Lottery Corporation, the Virginia Lottery, the Rhode Island Lottery, the Colorado State Lottery Division, the North Carolina Education Lottery, the State of Delaware, the State of Idaho, the State of Vermont, the State of Mississippi, the State of Alaska, and the District of Columbia all support this motion and the requested relief.  See **Exhibit 1**.

### INTEREST AND STATEMENT OF POSITION OF *AMICUS* CURIAE

In fiscal year 2017 alone, reported revenues for the forty-seven (47) government-operated lotteries nationwide exceeded $80 billion,[1] providing critical support for preK-12 education, college scholarships, environmental protection, senior citizens, first responders, and infrastructure projects, among other things.  But now those vital revenues are at risk.  The Department of Justice's (DOJ) 2018 Opinion titled *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling,* 42 Op. O.L.C. (2018), (the 2018 Opinion) casts doubt on whether even routine activities involved in operating a state lottery could be viewed as violating the Wire Act, 18 U.S.C. §1084, a criminal statute enacted in 1961 to combat sports bookmaking.  The 2018 Opinion inexplicably reverses the reasoning in the DOJ's 2011 Opinion titled *Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violates the Wire Act*, 35 Op. O.L.C. (2011), (the 2011 Opinion) and specifically identifies government-operated lotteries as potentially violating the Wire Act.  *See* 2018 Opinion at 22.

---

[1] Terri Markle, Bruce LaFleur, & Byron LaFleur, *LaFleur's 2018 World Lottery Almanac*, 243 Tbl. *FY 17 Consolidated U.S. Lottery Revenues, Prizes & Government Transfers by GDP* (26th ed. 2018).

The interest of the *Amicus* in this case is threefold. First, each lottery and state supporting the *Amicus*, (aside from Mississippi and Alaska[2]), has entered into at least one multi-jurisdictional agreement with Plaintiff New Hampshire Lottery Commission governing sales of multi-jurisdictional lottery games such as Mega Millions, Powerball, or Lucky for Life. Nationwide, these three games generated a reported $7.8 billion in revenues in 2017.[3] Thus, impairing lottery sales will cause the lotteries significant financial harm. Second, the lotteries have contracted with various vendors—including, in some cases, Plaintiff Pollard Banknote—to provide services that are potentially implicated by the 2018 Opinion. Third, the lotteries are now faced with choosing between permanently losing millions of dollars in funding for vital public services or potentially facing criminal liability. Although each lottery employs geolocation or other technology to ensure that lottery wagers are placed only within the applicable jurisdiction, lottery communications covered by the Wire Act may cross state lines.

This Court should apply the Wire Act's language, declare that it does not apply to the non-sports activities of government-conducted lotteries, and enjoin the DOJ from taking action pursuant to its 2018 Opinion. Moreover, because the DOJ's actions endanger revenue generated for numerous governments across the United States, this Court should enter an order universally enjoining enforcement of the 2018 Opinion or, in the alternative, issue a declaratory judgment in Plaintiffs' favor that applies to the DOJ nationwide.

---

[2] The State of Alaska does not have a lottery. Its interest stems from an education raffle that is done through Alaska's Permanent Fund Dividend program.
[3] *Id.* at 357 Tbl. *U.S. Lotteries' Calendar 2017 Sales By Game.*

3

## ARGUMENT

Although this Court weighs many factors in considering whether to issue a declaratory judgment or permanent injunction, *see, e.g., MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), *Amicus* offers support on two critical issues: the Wire Act's limitation to sports wagering and the need for nationwide equitable relief. This case presents a substantial controversy of sufficient immediacy to require declaratory relief, s*ee MedImmune,* 549 U.S. at 127, and the irreparable harm to the public fisc, *see eBay*, 547 U.S. at 331, together with the risk of nationwide enforcement and the need to fully remedy the parties' harms, necessitates nationwide injunctive relief.

### I.     The Wire Act's prohibitions apply only to sports wagering.

The Wire Act's language shows that the modifier "on any sporting event or contest" modifies both "bets or wagers" and "information assisting in the placing of bets or wagers." Applying the last-antecedent rule, as the 2018 Opinion did to limit the modifier to only the latter phrase, results in an unlikely, if not absurd, result. If the Court views resort to the legislative history necessary, the history confirms that the Wire Act's prohibitions are limited to sports-wagering activities.

#### A.     The statute's language reflects its limited scope.

Subsection (a) of the Wire Act, 18 U.S.C. § 1084(a), contains two broad clauses, each of which sets forth prohibited uses of a wire communication facility. The plain language of the first clause shows that it is limited to sports wagering. The first clause prohibits knowing use of a wire communication facility "for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or

contest." *Id.*   This language is best interpreted by applying the "series-qualifier" principle of statutory interpretation to reach a coherent, consistent result.  That rule provides that a modifier at the end of a series of terms modifies all of them when the modifier is as applicable "to the first and other words as to the last." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (internal quotation omitted).  In such circumstances, "the natural construction of the language demands that the clause be applicable to all." *Id.*  In other words, when presented with two parallel phrases—such as "bets or wagers" and "information assisting in the placing of bets or wagers"—the modifier should be read to apply to both.  Here, the modifier is plainly as applicable to both phrases.  Thus, "the natural construction of the language demands" applying the series qualifier "on any sporting event or contest" to both "bets or wagers" and "information assisting in the placing of bets or wagers."[4]

The 2018 Opinion rejected the series-modifier rule, concluding that the first clause's structure was not straightforward, and instead applied the last antecedent rule. *See* 2018 Opinion at 8-10.  But it did so in a "mechanical way" that "require[s] accepting unlikely premises," contrary to *Paroline*, 472 U.S. at 477 (internal quotation omitted).  More specifically, the 2018 Opinion concluded that the Wire Act forbids transmitting *all* bets and wagers, but that it forbids transmitting information assisting in placing *only* sports-related bets or wagers.  This interpretation's inconsistency is also seen in the interplay between the first and second clauses.  The second clause prohibits knowing use of a wire communication facility "for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers."  18 U.S.C. §1084(a).  Because the 2018 Opinion interprets this clause as applying beyond sports-related

---

[4] See also Plaintiff NeoPollard's Memorandum of Law in Support of Motion for Summary Judgment, p. 12–13.

activity, a lottery would be prohibited from using the interstate wires to communicate a message entitling a player to receive winnings, even though it *could* permissibly transmit information assisting that person in placing the (ultimately winning) lottery wager.

### B.     The Wire Act's legislative history confirms its limited scope.

If the Court determines that resort to the Wire Act's legislative history is appropriate, reviewing that history confirms that the Wire Act applies only to sports-wagering activity. The Wire Act was passed to combat sports gambling. In 1961, Attorney General Robert F. Kennedy proposed the legislation as part of a comprehensive effort to fight organized crime, which relied in part on gambling to fund its operations. *See Robert Kennedy Urges New Laws to Fight Rackets*, N.Y. Times, Apr. 7, 1961, at 1; *see also* Martin R. Pollner, *Attorney General Robert F. Kennedy's Legislative Program to Curb Organized Crime and Racketeering*, 28 Brook. L. Rev. 37, 38 (1961). After the Wire Act was enacted, Attorney General Kennedy confirmed its intended scope, noting that the law had "an immediate effect on the operators of the nation's leading race wire services." Robert F. Kennedy, *The Program of the Department of Justice on Organized Crime*, 38 Notre Dame L. Rev. 637, 638 (1963). The legislative history provides no express indication that Congress intended the Wire Act's prohibitions to extend beyond sports-wagering activity.

### C.     The Wire Act should be read *in pari materia* with the UIGEA.

Further, broadly enforcing the Wire Act to encompass government-operated lotteries would cause confusion. The Unlawful Internet Gaming Enforcement Act, 31 U.S.C. §§ 5361–5367, specifically excludes intrastate bets authorized by state law (such as wagers on state-operated lotteries) from "unlawful Internet gambling," 31 U.S.C. § 5362(10)(B), and excludes

6

intermediate routing of data from the determination of where the bet is placed or received, 31 U.S.C. § 5362(10)(E). Both the Wire Act and the UIGEA regulate persons "engaged in the business of betting or wagering" and should be read *in pari materia* to harmonize the two statutes. *See Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 137–38 (1st Cir. 2017). A contrary reading would create an inconsistent body of federal anti-gambling laws.

### D. Multiple federal appellate courts have concluded that the Wire Act prohibits transmissions related only to sports gambling.

Both the First Circuit and Fifth Circuit Courts of Appeal have concluded that the Wire Act's language applies only to sports-related gambling. The Fifth Circuit, in *In re Mastercard Int'l Inc.*, 313 F.3d 257 (5th Cir. 2007), adopted the lower court's conclusion that "a plain reading of the [Wire Act] clearly requires the object of the gambling be a sporting event or contest. Both the rule and the exception to the rule expressly qualify the nature of the gambling activity as that related to a 'sporting event or contest.'" *Id.* at 262 (citing *In re MasterCard Intern. Inc.*, 132 F. Supp. 2d 468, 480 (E.D. La. 2001)). The First Circuit, in *United States v. Lyons,* 740 F.3d 702, 718 (1st Cir. 2014), held that the Wire Act "applies only to 'wagers on any sporting event or contest,' that is, sports betting." *Id.* (citing 18 U.S.C. § 1084(a)).

## II.   Nationwide equitable relief is appropriate.

If declaratory or injunctive relief is granted, the *Amicus* requests that this Court issue nationwide equitable relief to preserve this $80-billion-dollar-per-year industry that supports critical public services in many states. A federal district court has wide discretion concerning injunctive relief. *See K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989). Moreover, "[i]njunctions must be tailored to the specific harm to be prevented." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000).

It is consistent with principles of equity that the Court require the DOJ to apply the same standard to other jurisdictions that it orders the DOJ to apply in New Hampshire. *See, e.g., Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989) (noting that invalidating agency regulations usually results in vacating them, not merely prohibiting their application to petitioners). *Amicus* requests that, if the Court chooses not to grant nationwide relief, it asks the DOJ to commit on the record that it will not enforce the 2018 Opinion in other jurisdictions.

But additional grounds for nationwide equitable relief favor granting broad relief here, including the DOJ's nationwide enforcement of the 2018 Opinion and the inability of local relief to fully remedy Plaintiffs' harms.

### A. Nationwide relief best responds to nationwide enforcement.

In cases where a federal executive agency's decisions will be universally enforced, nationwide equitable relief is appropriate. *See New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502, 677–78 (S.D.N.Y. 2019) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.")); *Earth Island Institute v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007), rev'd in part on other grounds, 555 U.S. 488 (2009). That is precisely the case here. This suit does not present an issue that might "benefit from development in different factual contexts and in multiple decisions by various courts of appeals," *see California v. Health & Human Servs.*, 351 F. Supp. 3d 1267, 1300 (N.D. Cal. 2019) (citing *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018)). The issue will be identical in other jurisdictions, and the irreparable harms suffered will vary only in their extent.

More particularly, if relief is not nationwide, the irreparable injuries the New Hampshire Lottery Commission alleges will be suffered by the other jurisdictions operating lotteries. These

8

lotteries remain at risk of the DOJ's enforcement of the 2018 Opinion. *See City of Chicago v. Sessions*, 888 F.3d 272, 289 (7th Cir. 2018) ("[F]or issues of widespread national impact, a nationwide injunction can be beneficial in terms of efficiency and certainty in the law, and more importantly, in the avoidance of irreparable harm . . . ."). Without equitable relief on a national level, government-operated lotteries will have to choose from a number of undesirable options: (a) to suspend lottery sales until the prospect of criminal liability is eliminated; (b) to make costly changes in attempting to comply with the broadest possible interpretation of the 2018 Opinion; or (c) to seek judicial relief through multiple suits across the nation that could take years to resolve. Lottery sales, once lost, can never be recaptured, and pursuing any of those options will irreparably damage lotteries' support of public causes. Indeed, as previously described, the 2018 Opinion puts countless dollars of public funding at risk for a variety of critical programs.

In addition to public services, lottery sales support local businesses where tickets are sold, the vendors that provide lottery services, and countless jobs. Further, the fear of prosecution arising from the 2018 Opinion has also immediately impaired government-operated lotteries' ability to continue developing their lottery products—and the DOJ gave states less than six months to determine how to comply.

The 2018 Opinion shows that the DOJ will target States that have started internet lottery sales since the 2011 Opinion. *See* 2018 Opinion at 22–23. But the Opinion could be viewed as capturing far more than internet lottery sales. It could be read as equally applying to traditional lottery games where tickets are sold in-state but information is transmitted over the wires, electronic communications between States in multi-jurisdictional lottery games such as Mega Millions (*see* New Hampshire Lottery's Compl., ¶ 44–55), communications between lottery

9

vendors and computer gaming systems sometimes located out-of-state (including emergency backup systems) (*see id.* at ¶ 20-43), and interstate advertising—including traditional media, social media, and e-mail advertising (*see id.* at ¶ 70–75).

### B.     Nationwide relief is better suited to providing complete relief to Plaintiffs.

A nationwide injunction is proper when "necessary to give Plaintiffs a full expression of their rights." *See California*, 351 F. Supp. 3d at 1300 (citing *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), rev'd on other grounds, 138 S.Ct. 2392 (2018)); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) (stating that applying an injunction to non-parties does not make it overbroad "if such breadth is necessary to give prevailing parties the relief to which they are entitled."). In the instant case, nationwide relief is better suited to providing complete relief to Plaintiffs because neither New Hampshire nor NeoPollard will be fully relieved of the 2018 Opinion's limitations if this Court restricts equitable relief to this jurisdiction. Simply put, the people they conduct lottery business with in other jurisdictions will still be affected.

As explained in its Memorandum, New Hampshire participates in multi-jurisdictional lottery games, and the other participating states will still be subject to enforcement of the 2018 Opinion if the Court does not grant nationwide relief. Consequently, if New Hampshire is provided only local relief, it will likely face reduced sales or possibly even suspension of its multi-jurisdictional lottery games. Jackpots in multi-jurisdictional lottery games will be significantly smaller if other jurisdictions cease participation because of the 2018 Opinion. Without the attraction of high-jackpot growth, sales of these games will suffer, and revenue will be permanently lost.

NeoPollard, which has indicated that equitable relief is necessary to "continue . . . lawful business practices" (NeoPollard's Compl. at ¶ 13), also will continue to face harm if relief is not

10

granted nationwide. NeoPollard provides gaming services and technology to Michigan and other jurisdictions that will remain subject to risk of enforcement of the 2018 Opinion. NeoPollard may have to invest substantial funds to create systems that comply with the 2018 Opinion and maintain those systems in addition to maintaining the current system in New Hampshire. And even with such an investment, a declaratory ruling covering only the parties leaves open the possibility that payment processors and vendors facing enforcement may terminate business because they lack assurance that the lottery transactions are lawful.

The participants in the government-operated lottery industry have created an interwoven system, and dismantling any element will have ripple effects that may not be obvious at first blush. Numerous vendors will be forced to determine whether their activities should halt. Those decisions will negatively impact both the New Hampshire Lottery and NeoPollard. Without question, anything short of nationwide equitable relief is hollow.

## CONCLUSION AND RELIEF REQUESTED

*Amicus* requests that the Court grant summary judgment in Plaintiffs' favor, granting their claims for declaratory and injunctive relief. The 2018 Opinion incorrectly interprets the Wire Act to apply beyond sports-related gambling. Given the 2018 Opinion's nationwide ramifications on government-operated lotteries and the inability of local relief to fully remedy Plaintiffs' harms, *Amicus* requests that any equitable relief rendered be nationwide in scope.

Dated: March 8, 2019

Respectfully submitted,

MICHIGAN BUREAU OF
STATE LOTTERY

By Its Attorneys,

SHEEHAN PHINNEY BASS & GREEN

By:   /s/ Peter S. Cowan
Peter S. Cowan
(NH Bar #182)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8193
pcowan@sheehan.com
(Special Assistant Attorney General)
-and-

DANA NESSEL
MICHIGAN ATTORNEY GENERAL

/s/ Donald S. McGehee
Donald S. McGehee
(Michigan Bar #P37489)
(*pro hac vice* pending)

/s/Melinda A. Leonard
Melinda A. Leonard
(Michigan Bar #P63638)
(*pro hac vice* pending)

/s/Mark G. Sands
Mark G. Sands
(Michigan Bar #P67801)
(*pro hac vice* pending)
Michigan Assistant Attorneys General
Attorneys for *Amicus Curiae*
Alcohol & Gambling Enforcement Div.
1st Floor, G. Mennen Williams Bldg.
525 West Ottawa
PO Box 30736
Lansing, MI 48909
517-241-0210
Mcgeheed1@michigan.gov