# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NEW HAMPSHIRE LOTTERY COMMISSION, NEOPOLLARD INTERACTIVE, LLC, and POLLARD BANKNOTE LIMITED, <br><br> Plaintiffs, <br><br> COMMONWEALTH OF PENNSYLVANIA, acting by and through, DEPARTMENT OF REVENUE, SECRETARY C. DANIEL HASSELL, and BUREAU OF LOTTERY <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> WILLIAM BARR, in his official capacity as Attorney General, THE UNITED STATES DEPARTMENT OF JUSTICE, and THE UNITED STATE OF AMERICA, <br><br> Defendants. | C.A. No. 1:19-cv-00163-PB |

## PLAINTIFF-INTERVENOR COMMONWEALTH OF PENNSLVANIA, DEPARTMENT OF REVENUE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Plaintiff-Intervenor, the Commonwealth of Pennsylvania, acting by and through, Department of Revenue, Secretary C. Daniel Hassell, and Bureau of Lottery (the "Pennsylvania Lottery") respectfully moves for summary judgment as to all claims asserted in its Complaint in Intervention. In support of its Motion, the Pennsylvania Lottery refers the Court to its Memorandum of Law filed in Support of its Motion for Summary Judgment (and exhibits attached thereto).

WHEREFORE, for the reasons set forth in the Memorandum of Law in Support of the Pennsylvania Lottery's Motion for Summary Judgment, there are no disputed issues of material fact and the Pennsylvania Lottery is entitled to judgment as a matter of law. The Court should grant this motion, enter judgment for the Pennsylvania Lottery and grant the Pennsylvania Lottery any further relief this Court deems just and proper.

<div style="margin-left:40%">

Respectfully submitted,

COMMONWEALTH OF PENNSYLVANIA, acting by and through, DEPARTMENT OF REVENUE, SECRETARY C. DANIEL HASSELL, and BUREAU OF LOTTERY

By Its Attorneys,

SHEEHAN PHINNEY BASS & GREEN

</div>

Dated: March 8, 2019                     By: */s/ Robert R. Lucic*

<div style="margin-left:40%">

Robert R. Lucic, Esq.
(NH Bar #9062)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8188
rlucic@sheehan.com

*/s/ Patrick J. Queenan*
Patrick J. Queenan, Esq.
(NH Bar #20127)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8108
pqueenan@sheehan.com

-and-

</div>

PEPPER HAMILTON LLP

*/s/ A. Michael Pratt*
A.  Michael Pratt, Esq.
(*pro hac vice* pending)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215-981-4000
prattam@pepperlaw.com

*/s/ Joanna J. Cline*
Joanna J. Cline, Esq.
(*pro hac vice* pending)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215-981-4000
clinej@pepperlaw.com

*/s/ Christopher B. Chuff*
Christopher B. Chuff, Esq.
(*pro hac vice* pending)
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
215-981-4000
chuffc@pepperlaw.com

## CERTIFCATE OF SERVICE

I hereby certify that on March 8, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

*/s/ Patrick J. Queenan*
Patrick J. Queenan

# ATTACHMENT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| NEW HAMPSHIRE LOTTERY COMMISSION, NEOPOLLARD INTERACTIVE, LLC, and POLLARD BANKNOTE LIMITED,<br><br>Plaintiffs,<br><br>COMMONWEALTH OF PENNSYLVANIA, acting by and through, DEPARTMENT OF REVENUE, SECRETARY C. DANIEL HASSELL, and BUREAU OF LOTTERY,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>WILLIAM BARR, in his official capacity as Attorney General, THE UNITED STATES DEPARTMENT OF JUSTICE, and THE UNITED STATE OF AMERICA,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 1:19-cv-00163-PB |

## PROPOSED-INTERVENOR COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF REVENUE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# I.     PRELIMINARY STATEMENT

The Pennsylvania Lottery agrees with Plaintiffs that the Office of Legal Counsel's ("OLC's") reversal of its 2011Opinion regarding the scope of the Wire Act, 18 U.S.C. § 1084, is arbitrary, contrary to the plain meaning of the Wire Act, and inconsistent with directly applicable precedent.  The Pennsylvania Lottery writes separately only to describe facts specific to the structure of Pennsylvania Lottery and to inform the Court of the negative impact of the OLC's about-face on Pennsylvanians—specifically older Pennsylvanians—who are the beneficiaries of Pennsylvania Lottery revenue.

# II.     STATEMENT OF MATERIAL FACTS

In addition to the facts set forth in the Memoranda of Law in Support of the New Hampshire Lottery Commission's Motion for Summary Judgment (Dkt. No. 2) and the Motion for Summary Judgment of Neopollard Interactive LLC and Pollard Banknote Limited (Dkt. No. 10), which are incorporated herein by reference, the Pennsylvania Lottery presents the following additional facts:

## A.     Pennsylvania Lottery Background and Structure

The Pennsylvania Lottery is a bureau within the Pennsylvania Department of Revenue, which is an executive branch agency of the Commonwealth of Pennsylvania.  *See* Declaration of Drew Svitko in Support of Proposed-Intervenor Commonwealth of Pennsylvania's Motion For Summary Judgment ("Svitko Dec") at ¶ 4.  Pursuant to 72 P.S. § 3761-301, all Pennsylvania Lottery net proceeds are utilized for the benefit of older Pennsylvanians, through programs such as property tax relief, rent rebates, reduced fare transit and prescription drug benefits.  *Id.* at ¶ 5.

Since its inception in1971, the Pennsylvania Lottery has contributed over $29 billion to benefit these programs.  *Id.* at ¶ 6.  For the 2018 Fiscal Year (July 1, 2017-June 30, 2018), the Pennsylvania Lottery recorded sales of more than $4.2 billion, from which more than $2.7 billion

in prizes was paid and more than $1 billion went to support programs benefitting older Pennsylvanians. *Id.* at ¶ 7. In 2018, the Pennsylvania Lottery generated over $23.8 million in iLottery (described below) gross gaming revenue alone. *Id.* at ¶ 8. Through the current Fiscal Year 2018/2019 the Pennsylvania Lottery has recognized over $30 million in gross gaming revenue. *Id.* at ¶ 9.

The Pennsylvania Lottery is authorized by law to sell multiple types of lottery games through the Lottery's network of over 9,600 retailers. *Id.* In order to operate the lottery games and support its retailer network, the Pennsylvania Lottery contracts with a lottery services vendor, Scientific Games International, Inc. ("SciGames"), to provide a central gaming system ("CGS") which manages the games through Point of Sale terminals ("POS") and a connected back office system to manage inventory and sales data. *Id.* at ¶ 10.

As is the case with the New Hampshire Lottery, the Pennsylvania Lottery has duplicate CGS locations, situated in different states to create sufficient geographic diversity to continue operations in the event of a natural disaster, and it must operate out of its disaster recovery site at least twice per year. *Id.* at ¶ 1.

SciGames' CGS servers for traditional retailer (commonly referred to as "bricks and mortar") based lottery products are currently located at Lottery headquarters in Middletown Pennsylvania, as well as a back-up location in Alpharetta, Georgia. *Id.* at ¶ 12. Additionally, SciGames utilizes Atlanta, Georgia and Las Vegas, Nevada for data administration related to non-traditional and/or iLottery products such as keno, virtual sports, gift cards and play at the pump. *Id.* at ¶ 13.

A Lottery retailer will be provided at least one lottery POS which is a computer device that connects the retailer to the vendor's CGS and back-office systems through a number of types

of transmissions. *Id.* at ¶ 14. These include IP cellular modems on a private network, VSAT on a private network, MPLS Circuits, DSL Circuits, cable modems, or ISDN. *Id.* at ¶ 15. Based on the type of game being played, the terminal sends and receives different types of data from the CGS and BOS. *Id.* at ¶ 16.

**B.    Types of Games**

As with the New Hampshire Lottery, the Pennsylvania Lottery offers a series of different game platforms that make varying degrees of use of interstate wire transmissions. *Id.* at ¶ 17.

**C.    Instant/Scratch Games**

Instant scratch off tickets are purchased with cash and the purchaser is physically present in the retail location, however, certain retailers within Pennsylvania allow for purchase of instant tickets with debit cards. *Id.* at ¶ 18. Though the ticket is pre-printed with a pre-determined outcome, the result of the ticket is also stored in the CGS. *Id.* at ¶ 19. Further, before instant tickets can even be sold at a retail location, the ticket must be "activated" by the retailer which requires the retailer to interface with the CGS. *Id.* at ¶ 20. Accordingly, a retailer will use the POS to activate the ticket book, validate the results of the instant ticket, and ultimately record the sale and payment of prizes paid. *Id.* at ¶ 21. This data is transferred from the individual sale location in Pennsylvania to the CGS and BOS servers in Pennsylvania with a replication of the data then sent to the vendor's disaster recovery data center in Georgia. *Id.* at ¶ 22. Pennsylvania Lottery has relied on the use of transmitting data from its retailers to its vendors via some form of wire communication since at least the 1980's. *Id.* at ¶ 23.

**D.    Terminal Draw Based Games**

In a draw game, a player purchases a play in the form of a set of numbers for a draw that will be conducted at some point in the future. *Id.* at ¶ 24. At the designated time and place numbers are drawn either physically or through the use of a random number generator. *Id.* at ¶

25.  The object for the player is to match as many numbers chosen by the player against the draw results.  *Id.* ¶ 26.  With the exception of iLottery purchases, draw games are purchased from a lottery retailer through the use of the terminal.  *Id.* at ¶ 27.  The retailer terminal will request a wager transaction from the CGS based on the type of bet made by the player.  *Id.* at ¶ 28.  The CGS will then generate a wager in the system and send the information about the transaction to the terminal.  *Id.* at ¶ 29.  The terminal prints a record of the wager which is given to the player.  *Id.* at ¶ 30.  This data travels through the means discussed above, dependent on the location of the retailer.  *Id.* at ¶ 31.  Pennsylvania Lottery sells Keno, in which draws occur every four minutes between 5:15 a.m. and 1:40 a.m. every day and sells a wide variety of multi-jurisdictional draw games, as set forth in detail below.  *Id.* at ¶ 32.

      **E.**      **Multi-Jurisdictional Games**

In 2002, Pennsylvania joined the consortium of states operating Powerball.  *Id.* at ¶ 33.  In 2010, the Pennsylvania Lottery added sales of Mega Millions to its stable of multi-jurisdictional games.  *Id.* at ¶ 34.  Finally, in 2015, the Pennsylvania Lottery joined the Cash4Life group.  *Id.* at ¶ 35.  All three of these multi-jurisdictional games, are draw-based games that require a player to select numbers within a set range and match the same to those drawn by game officials.  *Id.* at ¶ 36.  The Pennsylvania Lottery remains a member of the Multi-State Lottery Association ("MUSL") which permits the Lottery the ability to sell Powerball and Mega Millions.  *Id.* at ¶ 37.  Sales of multi-jurisdictional games in Pennsylvania occur through the communications of the POS and the CGS.  *Id.* at ¶ 38.

Due to the multi-state nature of Powerball and Mega Millions, however, additional actions must be taken to ensure the successful operation of the game.  *Id.* at ¶ 39.  First, regarding Powerball, member states report sales by game (which includes value-added product such as prize multipliers) to MUSL daily.  *Id.* at ¶ 40.  Following each draw conducted by

MUSL, the member states must reconcile sales revenue with prize liability for the lower seven prize levels, and allow for MUSL to sweep the remaining prize liability into a MUSL account in Iowa. *Id.* at ¶ 41. The member states pay the in-state prizes for the lower seven prize levels. *Id.* at ¶ 42. The member state where the top two prize levels are won request payment of the remaining prize amounts from MUSL. *Id.* at ¶ 43. MUSL then transfers the money to the member state which then makes the payment to the player. *Id.* at ¶ 44.

Regarding Mega Millions, fund flow remains the same as that described above related to Powerball except that for Mega Millions one state (Virginia) plays the role of MUSL in connection with this game. *Id.* at ¶ 45. All data related to ticket sales, prize funding, reconciliation and prize claims flow through the CGS. *Id.* at ¶ 46. Additionally, general sales and total transactions must be shared with the member states so that the jackpot amount can be accurately calculated and to reconcile the number of wagers and monies wagered. *Id.* at ¶ 47. Currently, this information is also transferred through the Internet to the multi-jurisdictional association running the game. *Id.* at ¶ 48.

As explained by the New Hampshire Lottery, once a jackpot is won, the participating lotteries will transfer their portion of the jackpot to the jurisdiction that sold the winning ticket, either directly or through the association that runs the game. *Id.* at ¶ 49. This is typically accomplished through a wire transfer of funds or an automated clearing house ("ACH") process. *Id.* at ¶ 50. These multi-jurisdictional draw games, which involve up to 48 states and territories have operated on the interstate transfer of data and prize money through the telephone, internet, and wire transactions for well over thirty (30) years. *Id.* at ¶ 51.

**F.      iLottery Games**

In 2017, the Pennsylvania General Assembly authorized the sale of lottery tickets through the use of mobile applications or web-based platforms. 4 Pa.C.S. § 503. *Id.* at ¶ 52. In May

2018, the Pennsylvania Lottery launched its "iLottery" platform which allowed players to play digital instant tickets through their mobile device, personal computer or tablet. *Id.* at ¶ 53. The iLottery platform is operated through SciGames that utilizes data centers in Las Vegas Nevada and Atlanta Georgia. *Id.* at ¶ 54.

Prior to registering with the Pennsylvania lottery, depositing funds or placing a wager on the Internet platform, a player must provide personal data which is then vetted to ensure that the person is an eligible player. *Id.* at ¶ 55. The Lottery and its vendor utilize industry standard geo-location data from the player's PC or mobile device to ensure that the player can only make a wager when they are physically located within Pennsylvania. *Id.* at ¶ 56. Additionally, the Lottery and SciGames utilize age verification controls to ensure that the player is of lawful age. *Id.* at ¶ 57.

iLottery games can be played on the internet platform in essentially the same manner as traditional scratch tickets. *Id.* at ¶ 58. iLottery games have pre-determined outcomes that are revealed when a player interacts with the screen. *Id.* at ¶ 59. This is usually done by the player clicking on a square so that a symbol, image or number is revealed but can also take the form of the player clicking on a "play" button that will allow images to be revealed. *Id.* at ¶ 60. Players pay for the game through a digital wallet which may be funded through VISA, Mastercard, PayNearMe or ACH; however, players may only make deposits when they are physically located within Pennsylvania. *Id.* at ¶ 61. The Pennsylvania Lottery cannot guarantee, however, that intermediate routing of data or information ancillary to the transactions does not cross state lines. *Id.* at ¶ 62.

G.  **Advertising and Customer Interaction**

As authorized by statute, the Pennsylvania Lottery advertises its products by engaging in traditional media marketing, direct e-mail campaigns, and social media interactions with its

customers.  *Id.* at ¶ 63.  This includes offers and promotions for both traditional retail sales and iLottery purchases.  *Id.* at ¶ 64.  While these advertisements are always targeted for the purposes of creating lottery sales within Pennsylvania, these communications may, by the nature of the media, cross state lines.  *Id.* at ¶ 65.  The Pennsylvania Lottery maintains a website which advertises lottery games, posts draw results, provides information on where games can be played, game rules, odds, and prizes.  *Id.* at ¶ 66.  The website also has information and demonstrations of Pennsylvania's iLottery product.  *Id.* at ¶ 67.  While iLottery transactions are not permitted outside of the state, this website is not walled off to Pennsylvania and is available to any person with internet access.  *Id.* at ¶ 68.

The Pennsylvania Lottery also engages in e-mail marketing with individuals who have signed up for the Lottery's VIP program or have created a Pennsylvania Lottery iLottery account.  *Id.* at ¶ 69.  While sales of Lottery's products may only occur within the state, e-mails may be routed to Pennsylvania residents who are temporarily out of state or to individuals who set-up an account in Pennsylvania but reside in other locations.  *Id.* at ¶ 70.

In recent years, the Pennsylvania Lottery has also used various social media channels including Facebook, Twitter, Instagram, and YouTube to advertise products, hold promotional contests, and post draw results.  *Id.* at ¶ 71.  These channels are open to the platform's users worldwide and are not limited to Pennsylvania.  *Id.* at ¶ 72.  The Pennsylvania Lottery also engages in traditional television, radio, print, digital, and out-of-home marketing to advertise its product and mission.  *Id.* at ¶ 73.  While Lottery buys advertisements from Pennsylvania media outlets these broadcasts may, by their nature, cross state lines.  *Id.* at ¶ 74.

### H.    Impact of the OLC's Reversal

Given the use of wire transmissions for Pennsylvania Lottery games as described above, the broadest interpretation of the 2018 Opinion could result in the suspension of all state lottery

sales, resulting in an immediate annual loss of over $1 billion in Lottery proceeds that benefit older Pennsylvanians, as well as additional expenses to try to comply with the 2018 Opinion. *Id.* at ¶ 75.

More narrow interpretations of the opinion could still cause hundreds of millions of dollars in revenue loss. *Id.* at ¶ 76. For example, the suspension of multi-jurisdictional games and compacts would deprive Pennsylvania of approximately $425 million in annual revenue. *Id.* at ¶ 77. These losses would be devastating to the programs funded by Lottery revenue. *Id.* at ¶ 78.

## III.   <u>ARGUMENT</u>

The Pennsylvania Lottery joins in the arguments set forth in the Memoranda of Law in Support of the New Hampshire Lottery Commission's Motion for Summary Judgment (Dkt. No. 2) and the Motion for Summary Judgment of Neopollard Interactive LLC and Pollard Banknote Limited (Dkt. No. 10) and incorporates those arguments as though fully set forth herein.

In addition, the facts set forth above substantiate the extent to which Pennsylvania Lottery games may involve wire transmissions potentially within the scope of the Wire Act if the OLC's 2018 Opinion were to stand, as well as the extent to which Pennsylvania will be harmed if the federal government's threatened enforcement of its new interpretation of the Wire Act is not enjoined.

Respectfully submitted,

COMMONWEALTH OF
PENNSYLVANIA, acting by and through,
DEPARTMENT OF REVENUE,
SECRETARY C. DANIEL HASSELL, and
BUREAU OF LOTTERY

By Its Attorneys,

SHEEHAN PHINNEY BASS & GREEN

Dated: March 8, 2019

By: */s/ Robert R. Lucic*
Robert R. Lucic, Esq.
(NH Bar #9062)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8188
rlucic@sheehan.com

*/s/ Patrick J. Queenan*
Patrick J. Queenan, Esq.
(NH Bar #20127)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8108
pqueenan@sheehan.com

-and-

PEPPER HAMILTON LLP

*/s/ A. Michael Pratt*
A.  Michael Pratt, Esq.
(*pro hac vice* pending)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215-981-4000
prattam@pepperlaw.com

*/s/ Joanna J. Cline*
Joanna J. Cline, Esq.
(*pro hac vice* pending)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215-981-4000
clinej@pepperlaw.com

*/s/ Christopher B. Chuff*
Christopher B. Chuff, Esq.
(*pro hac vice* pending)
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
215-981-4000
chuffc@pepperlaw.com

#52333032 v2

<u>CERTIFCATE OF SERVICE</u>

 I hereby certify that on March 8, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

<div style="text-align: right;">

*/s/ Patrick J. Queenan*

Patrick J. Queenan

</div>

#52333032 v2

EXHIBIT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NEW HAMPSHIRE LOTTERY COMMISSION, NEOPOLLARD INTERACTIVE, LLC, and POLLARD BANKNOTE LIMITED, <br><br> Plaintiffs, <br><br> COMMONWEALTH OF PENNSYLVANIA, acting by and through, DEPARTMENT OF REVENUE, SECRETARY C. DANIEL HASSELL, and BUREAU OF LOTTERY, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> WILLIAM BARR, in his official capacity as Attorney General, THE UNITED STATES DEPARTMENT OF JUSTICE, and THE UNITED STATE OF AMERICA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  C.A. No. 1:19-cv-00163-PB |

## <u>DECLARATION OF DREW SVITKO IN SUPPORT OF PROPOSED-INTERVENOR COMMONWEALTH OF PENNSYLVANIA'S MOTION FOR SUMMARY JUDGMENT</u>

DREW SVITKO, being of full age, hereby declares as follows:

1.  I, Drew Svitko, make the following declaration upon my own personal knowledge.

2.  I currently serve as the Executive Director of the Pennsylvania State Lottery (the "Lottery").  I have held that position since January 2015;

3.  Based on over twenty (20 ) years of experience in the lottery industry, I have personal knowledge of the operation of the Pennsylvania Lottery and multi-jurisdictional lottery games;

4. The Pennsylvania Lottery is a bureau within the Pennsylvania Department of Revenue, which is an executive branch agency of the Commonwealth of Pennsylvania.

5. Pursuant to 72 P.S. § 3761-301, all Pennsylvania Lottery net proceeds are utilized for the benefit of older Pennsylvanians, through programs such as property tax relief, rent rebates, reduced fare transit and prescription drug benefits.

6. Since its inception in1971, the Pennsylvania Lottery has contributed over $29 billion to benefit these programs.

7. For the 2018 Fiscal Year (July 1, 2017-June 30, 2018), the Pennsylvania Lottery recorded sales of more than $4.2 billion, from which more than $2.7 billion in prizes was paid and more than $1 billion went to support programs benefitting older Pennsylvanians.

8. In 2018, the Pennsylvania Lottery generated over $23.8 million in iLottery (described below) gross gaming revenue alone.

9. Through the current Fiscal Year 2018/2019 the Pennsylvania Lottery has recognized over $30 million in gross gaming revenue. The Pennsylvania Lottery is authorized by law to sell multiple types of lottery games through the Lottery's network of over 9,600 retailers.

10. In order to operate the lottery games and support its retailer network, the Pennsylvania Lottery contracts with a lottery services vendor, Scientific Games International, Inc. ("SciGames"), to provide a central gaming system ("CGS") which manages the games through Point of Sale terminals ("POS") and a connected back office system to manage inventory and sales data.

11. As is the case with the New Hampshire Lottery, the Pennsylvania Lottery has duplicate CGS locations, situated in different states to create sufficient geographic diversity to

continue operations in the event of a natural disaster, and it must operate out of its disaster recovery site at least twice per year.

12. SciGames' CGS servers for traditional retailer (commonly referred to as "brick and mortar") based lottery products are currently located at Lottery headquarters in Middletown Pennsylvania, as well as a back-up location in Alpharetta, Georgia.

13. Additionally, SciGames utilizes Atlanta, Georgia and Las Vegas, Nevada for data administration related to non-traditional and/or iLottery products such as keno, virtual sports, gift cards and play at the pump.

14. A Lottery retailer will be provided at least one lottery POS which is a computer device that connects the retailer to the vendor's CGS and back-office systems through a number of types of transmissions.

15. These include IP cellular modems on a private network, VSAT on a private network, MPLS Circuits, DSL Circuits, cable modems, or ISDN.

16. Based on the type of game being played, the terminal sends and receives different types of data from the CGS and BOS.

17. As with the New Hampshire Lottery, the Pennsylvania Lottery offers a series of different game platforms that make varying degrees of use of interstate wire transmissions.

18. Instant scratch off tickets are purchased with cash and the purchaser is physically present in the retail location, however, certain retailers within Pennsylvania allow for purchase of instant tickets with debit cards.

19. Though the ticket is pre-printed with a pre-determined outcome, the result of the ticket is also stored in the CGS.

20.     Further, before instant tickets can even be sold at a retail location, the ticket must be "activated" by the retailer which requires the retailer to interface with the CGS.

21.     Accordingly, a retailer will use the POS to activate the ticket book, validate the results of the instant ticket, and ultimately record the sale and payment of prizes paid.

22.     This data is transferred from the individual sale location in Pennsylvania to the CGS and BOS servers in Pennsylvania with a replication of the data then sent to the vendor's disaster recovery data center in Georgia.

23.     Pennsylvania Lottery has relied on the use of transmitting data from its retailers to its vendors via some form of wire communication since at least the 1980's.

24.     In a draw game, a player purchases a play in the form of a set of numbers for a draw that will be conducted at some point in the future.

25.     At the designated time and place numbers are drawn either physically or through the use of a random number generator.

26.     The object for the player is to match as many numbers chosen by the player against the draw results.

27.     With the exception of iLottery purchases, draw games are purchased from a lottery retailer through the use of the terminal.

28.     The retailer terminal will request a wager transaction from the CGS based on the type of bet made by the player.

29.     The CGS will then generate a wager in the system and send the information about the transaction to the terminal.

30.     The terminal prints a record of the wager which is given to the player.

31.    This data travels through the means discussed above, dependent on the location of the retailer.

32.    Pennsylvania Lottery sells Keno, in which draws occur every four minutes between 5:15 a.m. and 1:40 a.m. every day and sells a wide variety of multi- jurisdictional draw games, as set forth in detail below.

33.    In 2002, Pennsylvania joined the consortium of states operating Powerball.

34.    In 2010, the Pennsylvania Lottery added sales of Mega Millions to its stable of multi-jurisdictional games.

35.    Finally, in 2015, the Pennsylvania Lottery joined the Cash4Life group.

36.    All 3of these multi-jurisdictional games, are draw-based games that require a player to select numbers within a set range and match the same to those drawn by game officials.

37.    The Pennsylvania Lottery remains a member of the Multi-State Lottery Association ("MUSL") which permits the Lottery the ability to sell Powerball and Mega Millions.

38.    Sales of multi-jurisdictional games in Pennsylvania occur through the communications of the POS and the CGS.

39.    Due to the multi-state nature of Powerball and Mega Millions, however, additional actions must be taken to ensure the successful operation of the game.

40.    First, regarding Powerball, member states report sales by game (which includes value-added product such as prize multipliers) to MUSL daily.

41.    Following each draw conducted by MUSL, the member states must reconcile sales revenue with prize liability for the lower seven prize levels, and allow MUSL to sweep the remaining prize liability into a MUSL account in Iowa.

42.     The member states pay the in-state prizes for the lower seven prize levels.

43.     The member state where the top two prize levels are won request payment of the remaining prize amounts from MUSL.

44.     MUSL then transfers the money to the member state, which then makes the payment to the player.

45.     Regarding Mega Millions, fund flow remains the same as that described above related to Powerball except that for Mega Millions one state (Virginia) plays the role of MUSL in connection with this game.

46.     All data related to ticket sales, prize funding, reconciliation and prize claims flow through the CGS.

47.     Additionally, general sales and total transactions must be shared with the member states so that the jackpot amount can be accurately calculated and to reconcile the number of wagers and monies wagered.

48.     Currently, this information is also transferred through the Internet to the multi-jurisdictional association running the game.

49.     As explained by the New Hampshire Lottery, once a jackpot is won, the participating lotteries will transfer their portion of the jackpot to the jurisdiction that sold the winning ticket, either directly or through the association that runs the game.

50.     This is typically accomplished through a wire transfer of funds or an automated clearing house ("ACH") process.

51.     These multi-jurisdictional draw games, which involve up to 48 states and territories have operated on the interstate transfer of data and prize money through the telephone, internet, and wire transactions for well over thirty (30) years.

52.     In 2017, the Pennsylvania General Assembly authorized the sale of lottery tickets through the use of mobile applications or web-based platforms.  4 Pa.C.S. § 503.

53.     In May 2018, the Pennsylvania Lottery launched its "iLottery" platform which allowed players to play digital instant tickets through their mobile device, personal computer or tablet.

54.     The iLottery platform is operated through SciGames that utilizes data centers in Las Vegas Nevada and Atlanta Georgia.

55.     Prior to registering with the Pennsylvania lottery, depositing funds or placing a wager on the Internet platform, a player must provide personal data which is then vetted to ensure that the person is an eligible player.

56.     The Lottery and its vendor utilize industry standard geo-location data from the player's PC or mobile device to ensure that the player can only make a wager when they are physically located within Pennsylvania.

57.     Additionally, the Lottery and SciGames utilize age verification controls to ensure that the player is of lawful age.

58.     iLottery games can be played on the internet platform in essentially the same manner as traditional scratch tickets.

59.     iLottery games have pre-determined outcomes that are revealed when a player interacts with the screen.

60.     This is usually done by the player clicking on a square so that a symbol, image or number is revealed but can also take the form of the player clicking on a "play" button that will allow images to be revealed.

61. Players pay for the game through a digital wallet which may be funded through VISA, Mastercard, PayNearMe or ACH; however, players may only make deposits when they are physically located within Pennsylvania.

62. The Pennsylvania Lottery cannot guarantee, however, that intermediate routing of data or information ancillary to the transactions does not cross state lines.

63. As authorized by statute, the Pennsylvania Lottery advertises its products by engaging in traditional media marketing, direct e-mail campaigns, and social media interactions with its customers.

64. This includes offers and promotions for both traditional retail sales and iLottery purchases.

65. While these advertisements are always targeted for the purposes of creating lottery sales within Pennsylvania, these communications may, by the nature of the media, cross state lines.

66. The Pennsylvania Lottery maintains a website which advertises lottery games, posts draw results, provides information on where games can be played, game rules, odds, and prizes.

67. The website also has information and demonstrations of Pennsylvania's iLottery product.

68. While iLottery transactions are not permitted outside of the state, this website is not walled off to Pennsylvania and is available to any person with internet access.

69. The Pennsylvania Lottery also engages in e-mail marketing with individuals who have signed up for the Lottery's VIP program or have created a Pennsylvania Lottery iLottery account.

70.     While sales of Lottery's products may only occur within the state, e-mails may be routed to Pennsylvania residents who are temporarily out of state or to individuals who set-up an account in Pennsylvania but reside in other locations.

71.     In recent years, the Pennsylvania Lottery has also used various social media channels including Facebook, Twitter, Instagram, and YouTube to advertise products, hold promotional contests, and post draw results.

72.     These channels are open to the platform's users worldwide and are not limited to Pennsylvania.

73.     The Pennsylvania Lottery also engages in traditional television, radio, print, digital and out-of-home marketing to advertise its product and mission.

74.     While Lottery buys advertisements from Pennsylvania media outlets these broadcasts may, by their nature, cross state lines.

75.     Given the use of wire transmissions for Pennsylvania Lottery games as described above, the broadest interpretation of the 2018 Opinion could result in the suspension of all state lottery sales, resulting in an immediate annual loss of over $1 billion in Lottery proceeds that benefit older Pennsylvanians, as well as additional expenses to try to comply with the 2018 Opinion.

76.     More narrow interpretations of the opinion could still cause hundreds of millions of dollars in revenue loss.

77.     For example, the suspension of multi-jurisdictional games and compacts would deprive Pennsylvania of approximately $425 million in annual revenue.

78.     These losses would be devastating to the programs funded by Lottery revenue.

I DECLARE under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of March 2019.

_____

Drew Svitko