**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

===================================
                                                    )
NEW HAMPSHIRE LOTTERY                               )
COMMISSION, NEOPOLLARD                              )
INTERACTIVE, LLC., AND POLLARD                      )
BANKNOTE LIMITED,                                   )
                                                    )
      Plaintiffs.                              )
                                                    )        No. 1:19-cv-00163-PB
vs.                                                 )
                                                    )        ORAL ARGUMENT REQUESTED
WILLIAM BARR, IN HIS OFFICIAL                       )
CAPACITY AS ATTORNEY GENERAL,                       )
UNITED STATES DEPARTMENT OF                         )
JUSTICE AND UNITED STATES OF                        )
AMERICA,            .                               )
                                                    )
      Defendants.                              )
                                                    )
                                                    )
===================================

**BRIEF FOR THE STATE OF NEW JERSEY AS *AMICUS CURIAE***
**IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

INTEREST OF AMICUS CURIAE ................................................................................ 3

ARGUMENT .................................................................................................................. 9

   1.   The 2018 Reinterpretation Can and Should be Vacated Under Both the Declaratory Judgment Act and the Administrative Procedure Act ............................................... 9

     (a)   The DOJ's Statutory Interpretation Is Not Entitled to Deference ........................... 10

     (b)   The 2018 Reinterpretation Impermissibly Failed to Account for Reasonable Reliance Interests. ............................................................................................. 13

     (c)   The 2018 Reinterpretation Is Wrong under Established Canons of Construction ... 16

       (i)   The Rule of Lenity Requires That the Wire Act Be Narrowly Construed .............. 17

      (ii)   The Canon Against Upsetting the Federalist Balance Requires the Narrower Construction of the Wire Act. ............................................................................ 20

   2.   This Court Should Grant Nationwide Relief. ................................................................. 22

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbot Labs. v. Gardner*,
   387 U.S. 136 (1967)............................................................................8, 23

*Aetna Cas. & Surety Co. v. Quarles*,
   92 F.2d 321 (4th Cir. 1937) ...................................................................22

*Barlow v. Collins*,
   397 U.S. 159 (1970)................................................................................12

*Bennett v. Spear*,
   520 U.S. 154 (1997).................................................................................9

*Bond v. United States*,
   572 U.S. 844 (2014)................................................................................20

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)......................................................................9, 10, 11

*Christiensen v. Harris Cty.*,
   529 U.S. 576 (2000)................................................................................12

*Dolfi v. Pontesso*,
   156 F.3d 696 (6th Cir. 1998) .................................................................11

*Earth Island Inst. v. Ruthenbeck*,
   490 F.3d 687 (9th Cir. 2007), *aff'd in part, rev'd in part sub nom. Summers v.
   Earth Island Inst.*, 555 U.S. 488 (2009)................................................24

*Encino Motorcars, LLC v. Navarro*,
   136 S.Ct. 2117 (2016).......................................................................13, 15

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
   45 F.3d 530 (1st Cir. 1995)....................................................................22

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)................................................................................13

*Goldings v. Winn*,
   383 F.3d 17 (1st Cir. 2004)...............................................................10, 23

*Gonzalez v. Oregon*,
   546 U.S. 243 (2006)........................................................................ *passim*

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)............................................................................20

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989)...........................................................24

*Huddleston v. United States*,
   415 U.S. 814 (1974)............................................................................18

*Iannelli v. United States*,
   420 U.S. 770 (1975)............................................................................21

*Marbury v. Madison*,
   1 Cranch 137 (1803) ..........................................................................12

*McNally v. U.S.*,
   483 U.S. 350 (1987)............................................................................18

*Mingo Logan Coal Co. v. E.P.A.*,
   829 F.3d 710 (D.C. Cir. 2016)...........................................................15

*Monsoon v. D.E.A.*,
   522 F. Supp. 2d 1188 (D.N.D. 2007)................................................23

*Mosquera-Perez v. I.N.S.*,
   3 F.3d 553 (1st Cir. 1993)..................................................................16

*Murphy v. N.C.A.A.*,
   138 S.Ct. 1461 (2018)........................................................................21

*New State Ice Co. v. Liebmann*,
   285 U.S. 262 (1932)............................................................................21

*Oregon v. Ashcroft*,
   192 F. Supp. 2d 1077 (D. Ore. 2002)...............................................24

*Oregon v. Ashcroft*,
   368 F.3d 1118 (9th Cir. 2004) ......................................................10, 24

*Oregon v. Ice*,
   555 U.S. 160 (2009)............................................................................21

*Pub. Serv. Comm. of Utah v. Wycoff Co.*,
   344 U.S. 237 (1952)............................................................................22

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)............................................................................12

*Smiley v. Citibank (South Dakota), N.A.,*
  517 U.S. 735 (1996) ..............................................................................13, 15

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers,*
  531 U.S. 159 (2001) ......................................................................................12

*United States v. Anzalone,*
  766 F.2d 676 (1st Cir. 1985) ..................................................................17, 19

*United States v. Bass,*
  404 U.S. 336 (1971) ..............................................................................18, 19, 20

*United States v. Cleveland,*
  531 U.S. 12 (2000) ........................................................................................21

*United States v. Gibbens,*
  25 F.3d 28 (1st Cir. 1994) ............................................................................17

*United States v. Jones,*
  529 U.S. 848 (2000) ......................................................................................20

*United States v. Lyons,*
  740 F.3d 702 (1st Cir. 2014) ........................................................................17

*United States v. Santos,*
  553 U.S. 507 (2008) ......................................................................................17

*United States v. Welch,*
  327 F.3d 1081 (10th Cir. 2003) ....................................................................11

**Statutes**

5 U.S.C. § 702 ........................................................................................................1

5 U.S.C. § 704 (1) ..................................................................................................9

5 U.S.C. § 706(2)(A) ..............................................................................................9

5 U.S.C. § 706(a) ..................................................................................................23

18 U.S.C. § 1084 ..............................................................................................1, 14

18 U.S.C. § 1084(a) ..............................................................................................16

21 U.S.C. § 801 ....................................................................................................10

28 U.S.C. § 2201 ....................................................................................................1

28 U.S.C. § 2201(a) ....................................................................................8, 22, 23

31 U.S.C. §§ 3163 through 3167 ...................................................................................14

33 U.S.C. § 3344(a) ......................................................................................................12

N.J.S.A. 2C:37-1 ..........................................................................................................21

**Other Authorities**

Byron Tau & Alexandra Berzon, *Justice Dep't.'s Reversal on Online Gaming Tracked Memo from Adelson Lobbyists*, Wall St. J. (Jan. 18, 2019), *available at* https://www.wsj.com/articles/justice-departments-reversal-on-online-gambling-tracked-memo-from-adelson-lobbyists-11547854137?mod=searchresults&page=1&pos=20 ...............................................6

Catherine Ho, *Senate Republicans Revive Legislation to Ban Online Gambling*, Wash. Post. (Sept. 28, 2016), *available at* https://www.washingtonpost.com/politics/gop-megadonor-sheldon-adelson-faces-conservative-rebellion-over-online-gambling/2014/11/20/b0b03318-6f44-11e4-ad12-3734c461eab6_story.html?utm_term=.1228de2fbd33; ...............................6

Edwin M. Borchard, "The Declaratory Action As an Alternative Remedy," 36 Yale L. J. 403 (1927) ..........................................................................................22

Tom Hamburger, *GOP Megadonor Sheldon Adelson Faces Conservative Rebellion Over Online Gaming,* Wash. Post. (Nov. 20, 2014)*, available at* https://www.washingtonpost.com/politics/gop-megadonor-sheldon-adelson-faces-conservative-rebellion-over-online-gambling/2014/11/20/b0b03318-6f44-11e4-ad12-3734c461eab6_story.html?utm_term=.1228de2fbd33 ...............................6

U.S Attorneys, from Rod A. Rosenstein, Dep. Att'y Gen., *Re: Applicability of the Wire Act to Non-Sports Gambling* (Jan. 15, 2019) ..................................................7

**Regulations**

N.J.A.C 13:69O-1.1 to -3.1 .............................................................................................4

N.J.A.C. 13:69O-1.2(l)(14)(ix) ...................................................................................14

## PRELIMINARY STATEMENT

The State of New Jersey respectfully submits this brief *amicus curiae* in support of the Plaintiffs' Motions for Summary Judgment. Like the Plaintiffs, New Jersey asks the Court to declare unlawful the Department of Justice's ("DOJ") erroneous and unfair 2018 Opinion changing its interpretation of the Wire Act, 18 U.S.C. § 1084 ("the Act" or "the Statute"). DOJ's 2018 Opinion reversed its prior position, which it had adopted only seven years earlier in a 2011 Opinion, that the Wire Act applies solely to the use of the wires for sports-related gambling. New Jersey seeks to participate in this matter because, in addition to having invested a lottery like New Hampshire has done, New Jersey has also developed a thriving non-sports-related legal Internet gaming industry ("iGaming") in response to the DOJ's 2011 express authorization of such Internet gambling. This burgeoning iGaming industry annually yields hundreds of millions of dollars in private revenue and tens of millions of dollars to New Jersey's economy in State taxes and fees. Absent judicial intervention, this iGaming industry may be forced to shut down and those revenues will disappear.

New Jersey respectfully requests leave to participate in this matter as *amicus curiae*, and to submit this brief, so that the Court can more fully consider the tremendous impact that its decision will have on States, businesses, and people outside of New Hampshire. Indeed, it is no overstatement to describe this case as one of great nationwide significance, as other states in addition to New Jersey have made similar investments to develop their own Internet gambling industries. With particular focus on this nationwide impact, New Jersey addresses several points in order to assist the Court by supplementing the thorough arguments in Plaintiffs' briefs. Specifically, and as is discussed in more detail below, this Court has the authority to review, declare unlawful, and vacate the DOJ's 2018 Opinion pursuant to both the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. § 702. And under well-

established precedent, it is clear that DOJ's 2018 Opinion is entitled to no judicial deference whatsoever. The Court should vacate that Opinion not only because it is wrong and contrary to law for the reasons explained in Plaintiffs' briefs, but also because it fails to adequately account for the reasonable reliance of States like New Jersey that have made immense investments of public and private resources based upon the DOJ's previous interpretation of the Statute. In addition, the 2018 Opinion violates such fundamental principles as the rule of lenity and the canon requiring a clear statement from Congress before the balance between federal and state regulation may be altered; those principles compel that the Court should not allow this extraordinary about-face in the Executive Branch's interpretation of a criminal statute.

Furthermore, this Court can and should grant relief that reaches beyond the parties and the District of New Hampshire, and that protects the interests of third-parties like New Jersey nationwide. Under the Declaratory Judgment Act, the Court should declare that the Wire Act does not cover non-sports-related gambling in any jurisdiction, and under the Administrative Procedure Act, the Court should vacate the DOJ's 2018 reinterpretation of the Wire Act as null and void. Ultimately, these remedies are not only authorized and appropriate, but necessary in fairness to the public and private entities that relied upon the DOJ's initial interpretation in good faith. Moreover, such remedies from this Court will prevent the waste of time and resources that would result if every other State that is harmed by the DOJ's 2018 Opinion is forced to bring duplicative litigation in its local federal district court. For these reasons, as discussed in more detail below, this Court should grant the Plaintiffs' motions for summary judgment and, having done so, should provide for relief that is nationwide in its scope.

## INTEREST OF AMICUS CURIAE

New Jersey's significant interest in this matter arises from its substantial investment in and development of a state-sanctioned and regulated iGaming industry in direct reliance upon the DOJ's prior authorization. Specifically, in December 2011, in response to a request for guidance from several States, DOJ's Office of Legal Counsel ("OLC") undertook a thorough and persuasive analysis of the Wire Act, examining its text and legislative history and concluding that it prohibits only sports-related Internet gambling. *See Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act*, 35 Op. O.L.C. (2011) ("2011 Opinion"). As a result, the OLC determined that regulation of non-sports-related Internet gambling was a matter that Congress left to each State in that State's sovereign capacity.

As of 2011, New Jersey was one of many states that already had their own lotteries, including multistate games like Powerball and Mega Millions. But after 2011, and as a direct result of the 2011 Opinion, some states began to legalize and regulate, and to invest heavily in, Internet gambling. New Jersey in particular in 2013 began permitting non-sports-related games that were played in Atlantic City's casinos—from poker to roulette to craps, among many others—to be offered via iGaming websites. *See* L.2013, c. 27, § 1, eff. Feb. 26, 2013, operative Nov. 21, 2013.

Ensuring that legalized iGaming would be operated safely and consistently with sound public policy required a major investment of time and resources. In New Jersey, the State's Division of Gaming Enforcement ("DGE") was tasked with developing and implementing regulations, technical standards, software, testing apparatuses, geolocation technology to ensure that those participating in wagering are physically in the State, social security number and address verification systems to prevent underage gaming, and numerous other policies and

3

procedures. To construct this regulatory and technical framework, DGE assembled a team of accountants, investigators, engineers, and attorneys; contracted the services of a firm with pertinent regulatory experience; and consulted with regulators, operators, and content providers from other countries and States with iGaming industries. DGE thus promulgated a comprehensive and stringent regulatory framework for the new industry. *See* N.J.A.C 13:69O-1.1 to -3.1.

New Jersey also worked closely with private operators, their ancillary partners, and other vendors. New Jersey undertook extensive background checks of such industry participants to insure that those involved in iGaming do not have disqualifying criminal histories and that they have appropriate financial security. DGE then inspected and authorized appropriate private and public Internet platforms for launch. In addition, New Jersey also made significant investments to develop and deploy systems to prevent fraud. Thus, for example, DGE created and implemented protocols for continuous monitoring of iGaming systems, operators, and platform providers, including technical monitoring tools that enable it to track every iGaming transaction and wager and to identify anomalies indicative of online cheating or player fraud. New Jersey also developed and installed mechanisms to help find and control problem-gaming. This entailed working with vendors and operators to develop systems to identify and report potential problem gamblers, as well as ensuring that all iGaming sites allow players to set deposit limits, loss limits, and time limits on their sessions, as well as provide an option for a minimum 72 hour "cooling off" period or self-exclusion for up to five years from iGaming.

Because of these and other safeguards, the implementation of iGaming required significant upfront capital investments in facilities, equipment, and technology by the State, operators, and ancillary companies, as well as immense time, effort, and resources, requiring

countless hours of work. Capital investments, although not comprehensively computed, are estimated to be in the tens of millions of dollars.

New Jersey's iGaming industry has proven to be enormously successful. Approximately 59 companies have applied as casino service industry enterprises to conduct Internet gaming, 48 companies have applied for licenses to conduct iGaming as ancillary casino service industry enterprises, and approximately 573 vendors have filed with the State to conduct iGaming-related business. Many of these enterprises and vendors have established places of business in New Jersey specifically to take part in this new industry, thus providing employment to many New Jerseyans. All told, since its inception in 2013, iGaming is estimated to have directly and indirectly created 3,374 jobs and paid $218.9 million in wages to employees in New Jersey.

The industry has also brought significant resources to private companies and public entities, generating approximately $998.3 million in total sales from 2013 through 2016. Over the same three-year period, iGaming produced $124.4 million in tax revenue to the State and local governments. And from November 2013 to the present, DGE has collected a total of $35 million in licensing and other fees. Moreover, it appears that New Jersey's iGaming industry has not yet reached its full potential, as revenue has grown at the rate of 27% annually since 2013.

Legalized iGaming also provides a safe and secure form of entertainment. These games are carefully regulated and offered with the assurance of trusted brands and strong player protections, as noted above. This stands in stark contrast to the risks and dangers of off-shore Internet gambling sites that proliferated before 2013 and remain problematic today. Indeed, U.S. citizens spent an estimated $5.9 billion on such unregulated sites in 2008 alone. In short, New Jersey recognized that people are going to gamble via the Internet and made the reasoned policy decision that by legalizing and regulating the practice, it could protect players against fraud and

theft while redirecting the proceeds towards legitimate in-State industries and State and local governments, to the ultimate benefit of New Jersey's residents.

It is against this backdrop that the present controversy arises. In April 2017, a lobbyist for Sands Casino CEO Sheldon Adelson—a long-time proponent of using the Wire Act to prohibit all Internet gambling and thus prevent competition with the Sands' brick-and-mortar locations in Las Vegas and elsewhere—submitted a memorandum to the DOJ seeking to reverse the 2011 Opinion and particularly its conclusion that the entire Statute applies only to sports-related gambling.[1] *See* Byron Tau & Alexandra Berzon, *Justice Dep't.'s Reversal on Online Gaming Tracked Memo from Adelson Lobbyists*, Wall St. J. (Jan. 18, 2019).[2] In November 2018, just seven years after its original opinion, the OLC complied by reinterpreting the Wire Act to find that various provisions apply beyond sports-related gambling to all forms of betting and wagering. *See Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. (2018) ("2018 Reinterpretation"). In its reinterpretation, the OLC again examined the text of the Statute and, without identifying any change or new information, reached a position diametrically opposed to its conclusions in the 2011 Opinion, now finding that the same statutory text is unambiguous and not limited to sports-related gambling. *See* 2018 Reinterpretation at 17.

---

[1] This apparently was Adelson's Plan B; after the 2011 Opinion, Adelson launched two attempts to persuade Congress to amend the Wire Act to cover non-sports-related Internet gambling (H.R. 6453, 114th Cong. (2016), and S. 3376, 114th Cong. (2016)), neither of which succeeded. *See* Catherine Ho, *Senate Republicans Revive Legislation to Ban Online Gambling*, Wash. Post. (Sept. 28, 2016), *available at* https://www.washingtonpost.com/politics/gop-megadonor-sheldon-adelson-faces-conservative-rebellion-over-online-gambling/2014/11/20/b0b03318-6f44-11e4-ad12-3734c461eab6_story.html?utm_term=.1228de2fbd33; Tom Hamburger, *GOP Megadonor Sheldon Adelson Faces Conservative Rebellion Over Online Gaming,* Wash. Post. (Nov. 20, 2014)*, available at* https://www.washingtonpost.com/politics/gop-megadonor-sheldon-adelson-faces-conservative-rebellion-over-online-gambling/2014/11/20/b0b03318-6f44-11e4-ad12-3734c461eab6_story.html?utm_term=.1228de2fbd33.

[2] *Available at* https://www.wsj.com/articles/justice-departments-reversal-on-online-gambling-tracked-memo-from-adelson-lobbyists-11547854137?mod=searchresults&page=1&pos=20.

As for the reliance interests of states like New Jersey, the OLC blithely wrote:

> We acknowledge that some may have relied on the views
> expressed in our 2011 Opinion about what federal law permits.
> Some States, for example, began selling lottery tickets via the
> Internet after the issuance of our 2011 Opinion. But in light of our
> conclusion about the plain language of the statute, we do not
> believe that such reliance interests are sufficient to justify
> continued adherence to the 2011 opinion.

*Id.* at 22-23.

The OLC published its 2018 Reinterpretation on January 14, 2019. The next day, the Deputy Attorney General issued a memorandum to all United States Attorneys, Assistant Attorneys General, and the Director of the Federal Bureau of Investigation, decreeing that the 2018 Reinterpretation was the DOJ's official position on the meaning of the Wire Act, and directing federal law enforcement authorities to adhere to that interpretation in their investigative and prosecutorial capacities. *See* Memo to U.S Attorneys, from Rod A. Rosenstein, Dep. Att'y Gen., *Re: Applicability of the Wire Act to Non-Sports Gambling* (Jan. 15, 2019) ("DOJ Memo").

If allowed to stand, the 2018 Reinterpretation, and the DOJ Memo which adopts it for enforcement of the Wire Act nationwide, may end New Jersey's iGaming industry. Some aspects of the industry are specifically designed to operate in multiple states. For example, New Jersey, Delaware and Nevada have entered into a multi-state agreement to provide for and regulate Internet poker among people in each State. This now may be unlawful under the 2018 Reinterpretation. In addition, other aspects of New Jersey's iGaming industry involve interstate use of the wires, notwithstanding the best efforts of the regulators, operators, and participants. It is simply the nature of the Internet that even purely intrastate transactions may travel through channels that cross state lines. Thus, for example, when an individual in New Jersey plays an Internet casino game hosted by an Atlantic City casino, the information transmitted for gameplay or payment, whether from a bank or credit card company, may well travel through servers in

States other than New Jersey, as the Internet is designed to route such information by the fastest method possible, without regard to geographical boundaries. There is every reason to believe that the DOJ will attempt to prosecute those involved in such transactions in light of the 2018 Reinterpretation and the DOJ Memo. And that threat alone, regardless of the merit of such a prosecution, will devastate New Jersey's iGaming industry, as most, if not all, operators and vendors could and would not risk criminal prosecution.

As a result, absent judicial intervention, New Jersey may be forced to shutter its iGaming industry, lest the operators and supporting partners risk federal felony prosecution, as well as civil liability. If this transpires, the financial loss to the State would be substantial. New Jersey's State government, for example, would lose an estimated $60 million in tax revenue a year; New Jersey's DGE would lose an estimated $6.7 million in fees annually; at least 300 jobs would disappear; companies that have established offices in New Jersey for the operation of online gaming would shut down, with additional job losses resulting; and the in-State private sector would lose their iGaming business to illegal offshore sites. This is in addition to the immense waste of time and resources that went into building the industry, which would have been for naught. Both the actual and the opportunity costs of this wasted effort, taken in good faith reliance upon DOJ's earlier position, would be staggering. In sum, if the 2018 Reinterpretation and DOJ Memo are permitted to stand and these things come to pass, it would mean a tremendous public and private loss and a true injustice. It is for these reasons that New Jersey seeks to file this Brief.

## ARGUMENT

**1.     The 2018 Reinterpretation Can and Should be Vacated Under Both the Declaratory Judgment Act and the Administrative Procedure Act.**

This Court has the authority to review the DOJ's 2018 Reinterpretation at this juncture under both the Declaratory Judgment Act ("DJA") and the Administrative Procedure Act ("APA"). *See Abbot Labs. v. Gardner*, 387 U.S. 136, 153 (1967) ("Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted[.]"). Under the DJA, this matter presents a "legal issue [] fit for resolution," *id.*, and "a case of actual controversy within [the Court's] jurisdiction," 28 U.S.C. § 2201(a), as discussed by Plaintiff NeoPollard, *see* Brief in Support of Motion for Summary Judgment, at 23-25 (D.E. 10-1). And under the APA, the Court has jurisdiction and the authority to grant relief as further discussed below.[3] In resolving this issue, the Court should interpret the Wire Act without deference to the DOJ. And upon doing so, the Court should conclude the 2018 Reinterpretation is incorrect, not only for the reasons already briefed by the Plaintiffs, but also because it fails to adequately account for the reliance interests of States like New Jersey, and because it violates two fundamental canons of construction discussed below. For these reasons, the Court can and should conclude that the Wire Act does not apply to non-sports related gambling.

---

[3]New Jersey does not discuss the sound basis for the DJA claims further in this brief, but does address certain aspects of the APA claim, which is pled in the New Hampshire Lottery Commission's Complaint at ¶¶ 112-28 (D.E. 1).

(a)      The DOJ's Statutory Interpretation Is Not Entitled to Deference.

Under the APA, a reviewing court has the authority, and indeed the obligation, to "hold unlawful and set aside agency actions, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Where, as here, the action subject to judicial review is an agency's interpretation of a statute, the court's analysis should follow the two-step process announced in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).[4] Under that process, courts first assess whether the statute's meaning is unambiguous, based upon its text, but if the text is determined to be ambiguous, under some circumstances they may accord so-called "*Chevron* deference" to an agency's reasonable construction. *See Goldings v. Winn*, 383 F.3d 17, 21 (1st Cir. 2004) ("We review *de novo* an agency's construction of a statute that it administers, although subject to established principles of deference. If the language of the statute is plain and admits of no more than one meaning or if the statute's legislative history reveals an unequivocal answer as to the statute's meaning, we do not look to the interpretation that may be given to the statute by the agency charged with its enforcement.") (citation and quotation marks omitted).

_____

[4]There can be no fair question but that the 2018 Opinion, and particularly the DOJ Memo, constitute final agency action sufficient to allow an APA claim to proceed. For agency action to be "final" within the meaning of 5 U.S.C. § 704, (1) "the action must mark the 'consummation' of the agency's decisionmaking process, . . . it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). The DOJ Memo clearly is the "consummation" of the interpretive process and is not "merely tentative or interlocutory;" it is also clear that "legal consequences will flow" from it, *i.e.*, criminal prosecutions. For example, the Memo announces that "the Criminal Division's Organized Crime and Gang Section" will be tasked with "review[ing] and approv[ing] proposed Wire Act charges" and that "[t]he Justice Manual will include a new review and approval process for prosecutions pursuant to the Wire Act" consistent with the 2018 Opinion. DOJ Memo at 1.

In this case, no deference is due the DOJ's reinterpretation of the Wire Act, regardless of whether or not the Statute is ambiguous. This follows from the U.S. Supreme Court's decision in *Gonzalez v. Oregon*, 546 U.S. 243 (2006), a case that parallels this one in critical respects. In *Gonzalez*, the State of Oregon had legalized physician-assisted suicide, after which the U.S. Attorney General issued an opinion that would subject offending physicians to federal criminal prosecution and/or the loss of their registration under the Controlled Substances Act ("CSA"), 21 U.S.C. § 801, *et seq*. Oregon challenged the Attorney General's opinion in federal district court, asserting claims under the APA and DJA. *Gonzalez*, 546 U.S. at 248-50; *see also Oregon v. Ashcroft*, 368 F.3d 1118, 1134 (9th Cir. 2004) (noting that Oregon sought "declaratory and injunctive relief" for its APA claim). Eventually, the Supreme Court held that the Attorney General's interpretation was not entitled to any deference from the courts, explaining that *Chevron* deference is only applicable where Congress has afforded the agency rule-making authority under the statute at issue. *Gonzalez*, 546 U.S. at 258 ("*Chevron* deference  . . . is not accorded merely because the statute is ambiguous and an administrative official is involved. To begin with, the rule must be promulgated pursuant to authority Congress has delegated to the official."). The Court then held that while Congress had extended rule-making authority to the Attorney General under the CSA with regard to physician registration, the Attorney General had exceeded that authority, and, further, that the Attorney General's more general authority to interpret criminal laws for purposes of enforcement did not suffice to require *Chevron* deference. *Id.* at 264 ("[T]he Attorney General must [] surely evaluate compliance with federal law in deciding whether to prosecute; but this does not entitle him to *Chevron* deference.") (citing *Crandon v. United States,* 494 U.S. 152, 177 (1990) (Scalia, J., concurring in judgment) ("The Justice Department, of course, has a very specific responsibility to determine for itself what this

11

statute means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference.")).[5]

As applied here, *Gonzalez* dictates that the DOJ's interpretation of the Wire Act is entitled to no deference from this Court. The Wire Act confers no special rule-making authority upon the DOJ, and the DOJ's 2018 Reinterpretation reflects only its general authority to interpret criminal laws, which *Gonzalez* makes clear is not a basis for deference. Accordingly, in reviewing the DOJ's opinion and interpreting the Wire Act, this Court must exercise its own authority to interpret the Statute *de novo*, using established principles of statutory construction.[6] *See Marbury v. Madison*, 1 Cranch 137, 177 (1803) ("It is emphatically the province and duty of

---

[5]The Supreme Court in *Gonzalez* clearly treated as separate the question of whether deference should be afforded to the Attorney General's interpretation of the CSA based upon the rule-making authority conferred upon him by that statute, as opposed to his general authority and responsibility to interpret and enforce the criminal laws. With regard to the latter, the Supreme Court made clear that the exercise of such general enforcement authority does not warrant any deference, *Gonzalez*, 546 U.S. at 264, and other courts have reached the same conclusion. *See, e.g.*, *United States v. Welch*, 327 F.3d 1081, 1092-93 (10th Cir. 2003) (holding that prosecutor's interpretation of a criminal statute cannot be given deference, as "[s]eparation of power concerns and the recognized role of courts as final arbiters of what the law is clearly dictate this conclusion") (citations omitted); *Dolfi v. Pontesso*, 156 F.3d 696 (6th Cir. 1998) ("The special deference required by *Chevron* is based on the expertise of an administrative agency in a complex field of regulation with nuances perhaps unfamiliar to the federal courts. Unlike environmental regulation or occupational safety, criminal law and the interpretation of criminal statutes is the bread and butter of the work of federal courts.") (citation omitted).

[6]Of course, all agency action is "entitled to respect" to the extent it has the "power to persuade," which in turn depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944).  But that is just another way of saying that a court should follow an agency's statutory interpretation when the court agrees that the interpretation is correct under established principles of statutory construction. *See, e.g.*, *Gonzalez*, 546 U.S. at 256 (quoting *Skidmore*, 323 U.S. at 140, and declining to adopt the Attorney General's interpretation because it was incorrect); *Christiensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (citing *Skidmore* and rejecting agency's statutory interpretation in opinion letter as "unpersuasive").

the judicial department to say what the law is."); *see also Barlow v. Collins*, 397 U.S. 159, 166 (1970) (holding in regard to an APA claim, "since the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved, not on the basis of matters within the special competence of the Secretary, but by judicial application of canons of statutory construction"); *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 171-72 (2001) (giving no deference and resolving APA claim challenging agency interpretation of the Clean Water Act, 33 U.S.C. § 3344(a), using traditional tools of statutory construction). Thus, in accordance with the APA and *Gonzalez v. Oregon*, this Court should review the DOJ's 2018 Reinterpretation of the Wire Act without affording the DOJ's 2018 Opinion any deference whatsoever.

     (b)    The 2018 Reinterpretation Impermissibly Failed to Account for Reasonable Reliance Interests.

In addition to the many compelling reasons set forth in Plaintiffs' briefs as to why the Court should reject the DOJ's 2018 Reinterpretation, there is an additional reason that is particularly highlighted by the circumstances in which New Jersey has been placed: the 2018 Reinterpretation did not sufficiently account for the considerable reliance interests of the States like New Jersey that have invested in Internet gambling. The Supreme Court has repeatedly held that an agency's statutory interpretation must be rejected under the APA if it reverses a prior interpretation by the same agency without adequately accounting for reasonable reliance interests that have accrued in the interim. *See, e.g., F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (holding that an agency must "provide a more detailed justification" for a reversal "when its prior policy has engendered serious reliance interests that must be taken into account," adding "[i]t would be arbitrary and capricious to ignore such matters"); *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 741 (1996) ("Sudden and unexplained change, or change that does

13

not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion") (citation and quotation marks omitted); *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2120 (2016) (vacating agency interpretation of statute which reversed prior position because, "[i]n light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision"). The DOJ's 2018 Reinterpretation, however, falls far short of adequately taking reliance interests into account.

First, there can be no question but that the 2011 Opinion gave rise to reliance interests, exemplified by New Jersey's efforts to develop and maintain its iGaming industry.[7] As detailed above, the State's institution of iGaming after 2011 entailed the creation of regulatory standards, new software and technology, and oversight policies and procedures. These efforts were necessary to satisfy multiple objectives, including insuring lawfulness under the Wire Act and other federal statutes;[8] providing player protection against problem gaming, theft and fraud; and promoting technical workability, ease of use, and profitability. Accordingly, New Jersey learned about and mastered the regulation of an entire industry, and hired and trained the requisite staff and/or private vendors. Such efforts entailed many millions of dollars' worth of capital and person-power expenditures over a multi-year period.

Accordingly, New Jersey has reasonable, investment-backed expectations in its iGaming industry. And as previously discussed, those expectations have been met: iGaming now

---

[7] New Jersey also reasonably relied on Congress' rejection of proposed amendments to the Wire Act in 2015 and 2016. As previously noted, *supra*, those amendments were brought by opponents of Internet gambling for the express purpose of reversing the 2011 Opinion. That Congress declined to do so signaled support for the 2011 Opinion, which New Jersey properly understood to also support the lawfulness of its iGaming industry.

[8] *See*, *e.g.*, N.J.A.C. 13:69O-1.2(l)(14)(ix) (requiring the patron protection page to contain "Notification of Federal prohibitions and restrictions regarding Internet gaming, specifically, any limitations upon Internet gaming as set forth in 18 U.S.C. §§ 1084 et seq. (The Wire Act) and 31 U.S.C. §§ 3163 through 3167 (UIEGA).").

generates hundreds of millions of dollars annually, with these funds contributing to the public coffer and employee wages, in addition to private revenues. Over the past several years, New Jersey has budgeted and planned for a continuing return on its investment, as have operators, vendors, and new employees of iGaming. Thus, were the iGaming industry to close abruptly, New Jersey would suffer a devastating setback. The State would lose: funding from taxes and fees; hundreds of jobs for its citizens; the secondary gains to its economy from the development of new in-state businesses and jobs; and of course, years' worth of public and private resources that could have been expended on any number of other projects.

Under these circumstances, DOJ was required to "take account of [New Jersey's and other states'] legitimate reliance on [its] prior interpretation," *Smiley*, 517 U.S. at 741, and "provide a more detailed justification" for the 2018 Reinterpretation than the 2011 Opinion, *Fox Television*, 556 U.S. at 515-16. As then-Judge Kavanaugh wrote in *Mingo Logan Coal Co. v. E.P.A.*, an agency seeking to reverse a prior decision in the face of reliance-related losses "must determine that the benefits of its desired action outweigh those costs." 829 F.3d 710, 736 (D.C. Cir. 2016) (Kavanaugh, J. dissenting) (citation, quotation marks, and modification omitted). In the 2018 Reinterpretation, DOJ did none of that. Instead, the 2018 Reinterpretation acknowledged only the reliance interests of States that began selling lottery tickets via the Internet after the 2011 Opinion, and it did that only in passing. *See* 2018 Reinterpretation at 22. DOJ thus failed to recognize, in any way, the interests of New Jersey or any other states with Internet gambling industries, which are different both in scope and in kind from Internet lottery sales. DOJ's failure to even recognize the magnitude of this reliance interest and the threat its 2018 Reinterpretation poses to entire industries not only bespeaks arbitrary governance, but, under these principles, establishes the invalidity of its decision.

15

Further, DOJ's treatment of even the incomplete reliance interest that it recognized – "in light of our conclusion about the plain language of the statute, we do not believe that such reliance interests are sufficient to justify continued adherence to the 2011 opinion," 2018 Reinterpretation at 22-22 – is inadequately reasoned. Far from weighing the costs of its reversal, or explaining any purported inadequacy with its 2011 policy, DOJ summarily rejected the reliance interests at stake as "not . . . sufficient." But that, of course, is precisely the sort of "conclusory statement[]" that the Supreme Court held inadequate in *Encino Motorcars*. 136 S.Ct. at 2120 ("[i]n light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision. This lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law.") (citation omitted). Nor is the DOJ's bare claim in 2018 that the Statute's text is so clear as to merit reversal of the 2011 Opinion sufficiently credible or persuasive to overcome the reliance interests at stake, particularly given its own contrary interpretation just a few years earlier. Accordingly, the 2018 Reinterpretation should be held invalid as a matter of law.

(c)     The 2018 Reinterpretation Is Wrong under Established Canons of Construction.

In determining the meaning of a statute, courts first look to the "ordinary meaning of the statutory language," "resort[ing] to the legislative history and other aids of statutory construction only when the literal words of the statute create ambiguity or lead to an unreasonable result[.]" *Mosquera-Perez v. I.N.S.*, 3 F.3d 553, 555 (1st Cir. 1993) (citations and quotation marks omitted). Here, the text in question is subsection (a) of the Wire Act:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which

16

> entitles the recipient to receive money or credit as a result of bets
> or wagers, or for information assisting in the placing of bets or
> wagers, shall be fined under this title or imprisoned not more than
> two years, or both.

18 U.S.C. § 1084(a). Plaintiffs have thoroughly briefed why this text and the pertinent legislative history are properly interpreted to cover only sports-related betting. *See* Plaintiff NeoPollard's Brief in Support of Motion for Summary Judgment, at 12-22 (D.E. 10-1) (discussing, *inter alia*, the significance of the "series qualifier principle" and the inaptness of DOJ's application of the "last antecedent rule;" that DOJ's interpretation would lead to absurd results; and a wealth of legislative history showing that Congress intended to reach only sports-related gambling); Plaintiff N.H. Lottery Comm.'s Brief in Support of Motion for Summary Judgment, at 1-24 (D.E. 2-1) (discussing, *inter alia*, the canon against absurd results, and noting that DOJ's interpretation gives rise to issues of federalism). Plaintiffs have also detailed why the holding of *United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014), is controlling with regard to the interpretation of the Wire Act. *See* (D.E. 10-1 at 8-11); (D.E. 2-1 at 15, 18-21). New Jersey fully agrees with these arguments and will not repeat them. New Jersey does, however, wish to set out two related points that further support the Plaintiffs' position regarding the interpretation of the Statute: that the rule of lenity and the canon requiring a clear statement of Congressional intent before a statute is interpreted to alter the federalist balance in areas of traditional State control further demonstrate that the Wire Act should not be interpreted to prohibit non-sports-related Internet gambling.

(i)      The Rule of Lenity Requires That the Wire Act Be Narrowly Construed.

The rule of lenity is a tool of statutory construction to be applied when criminal statutes are ambiguous; it holds that "the tie must go to the defendant," *United States v. Santos*, 553 U.S. 507, 514 (2008). *See also United States v. Gibbens*, 25 F.3d 28, 35 (1st Cir. 1994) ("When all

else fails to bring sufficient lucidity to the meaning of a penal statute, the rule of lenity casts the decisive vote. That rule, which mandates the resolution of ambiguities in a criminal statute favorably to the defendant, is a background principle that properly comes into play when, at the end of a thorough inquiry, the meaning of a criminal statute remains obscure[.]") (citation and quotation marks omitted). Sometimes phrased as a canon "that criminal laws are to be strictly construed," *United States v. Anzalone*, 766 F.2d 676, 680 (1st Cir. 1985), the rule of lenity has its origin in the constitutional principles of fair notice and separation of powers:

> This rule of narrow construction is rooted in the concern of the law for individual rights, and in the belief that fair warning should be accorded as to what conduct is criminal and punishable by deprivation of liberty or property. The rule is also the product of an awareness that legislators and not the courts should define criminal activity.

*Huddleston v. United States*, 415 U.S. 814, 831 (1974) (citations omitted); *see also United States v. Bass*, 404 U.S. 336, 347 (1971) ("[I]t is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.") (citation and quotation marks omitted).

Here, the rule of lenity requires that the Wire Act be construed to reach only sports-related Internet gambling. Although New Jersey submits that the text and legislative history of the Statute are sufficiently clear to resolve the matter for the reasons discussed in Plaintiffs' briefs and in the 2011 Opinion, if the Court were to determine that the Statute is ambiguous, then the rule of lenity would prohibit DOJ's new and expansive reading. Even the OLC's 2018 Reinterpretation concedes, "the Wire Act is not a model of artful drafting," 2018 Reinterpretation at 2, and the DOJ's own 2011 Opinion demonstrates, at a minimum, that an interpretation of the Wire Act that excludes non-sports-related Internet gambling from its coverage is reasonable and well-supported. Accordingly, even if the Court declines to find that

the text and legislative history unambiguously require an interpretation of the Act that permits non-sports-related Internet gambling, the same conclusion is, in any event, dictated by the rule of lenity, which requires acceptance of the narrower construction of the Act and gives life to the principle that Congress must speak in a clearer voice before attaching criminal sanctions to potentially lawful conduct. *See McNally v. U.S.*, 483 U.S. 350, 359-60 (1987) ("The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language. . . .  Rather than construe the statute in a manner that leaves its outer boundaries ambiguous . . . , we read [it] as limited in scope . . . . If Congress desires to go further, it must speak more clearly than it has."). Nor, as the First Circuit has held in applying the rule of lenity, should courts permit the government to "impose [] a [broader] duty by implication, expecting that the courts will stretch statutory construction past the breaking point to accommodate the government's interpretation." *Anzalone*, 766 F.2d at 682. But that is precisely what the DOJ has attempted to do – "impose [] a [broader] duty by implication" and "stretch statutory construction past the breaking point," all in order to accommodate the DOJ's new policy position. This Court should reject that effort, and the 2018 Reinterpretation, under the rule of lenity.

Beyond the fair notice concerns undergirding the rule of lenity, in a case in which criminal prosecution is, though not pending, certainly threatened by DOJ's 2018 Reinterpretation, another principal supporting the rule is squarely at play. As the Supreme Court has emphasized, the rule of lenity also reflects fundamental principles of separation of powers. *See Bass*, 404 U.S. at 348 ("[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures . . . should define criminal activity."). Because it is the role of Congress, and not of the Executive,

19

to determine what conduct is criminal, and because Congress has not clearly defined non-sports gambling as falling within the ambit of the Wire Act, the rule of lenity requires that DOJ's 2018 Reinterpretation be rejected. Indeed, DOJ's conduct in connection with this matter particularly strains the separation of powers; not only has it precipitously reversed its own official, published and widely disseminated opinion regarding the meaning of a criminal statute (and done so after only a few years and contrary to the prevailing judicial interpretations of that statute), but it changed that opinion on the heels of Congress having rejected an attempt to achieve that same result by an amendment to the statute. *See supra* Note 1. It is not for the DOJ to expand the reach of a criminal statute where both Congress and the courts have declined to do so. This Court should therefore reject the DOJ's effort to achieve by executive fiat what could not be accomplished in the legislature–this is the duty and abiding virtue of separate, co-equal branches of government.

   (ii)  The Canon Against Upsetting the Federalist Balance Requires the Narrower Construction of the Wire Act.

  Plaintiff New Hampshire Lottery Commission cites in its brief the canon against interpreting an ambiguous statute to alter the constitutional balance inherent in our federalist system; New Jersey briefly elaborates on the purpose and applicability of that canon here. *See* (D.E. 2-1 at 23-24). That canon is a "plain statement rule," requiring that "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citation and quotation marks omitted); *accord Bass*, 404 U.S. at 339 ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."). The canon is applicable when one proffered interpretation of a federal statute would encroach upon "areas traditionally regulated by the

States," *Gregory*, 501 U.S. at 460; *accord Bass*, 404 U.S. at 339 (noting application to "traditionally sensitive areas, such as legislation affecting the federal balance"), and reflects respect for "the States['] [] substantial sovereign powers under our constitutional scheme," *Gregory*, 501 U.S. at 460; *see also Bass*, 404 U.S. at 349 (the canon "is rooted in . . . concepts of American federalism").

Accordingly, if the Court finds the Wire Act to be ambiguous, this plain statement rule requires an interpretation that the Wire Act applies only to sports-related betting and wagering, and not to other forms of gambling. That is because, first, as the Supreme Court held in *Bass*, one "traditionally sensitive area[]" implicating the federalist balance is "conduct readily denounced as criminal by the States." 404 U.S. at 349; *accord Bond v. United States*, 572 U.S. 844, 858 (2014) (applying the plain statement rule in the criminal context and noting, "[p]erhaps the clearest example of traditional state authority is the punishment of local criminal activity"); *see also United States v. Jones*, 529 U.S. 848, 850 (2000) (applying the plain statement rule against construction of a federal statute that would have criminally sanctioned a "paradigmatic common-law state crime"); *see also United States v. Cleveland*, 531 U.S. 12, 24 (2000) ("We resist the Government's reading . . . because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress."). Here, for example, New Jersey certainly could have "readily denounced" non-sports-related Internet gambling by criminalizing it as a matter of state law, as it has done other forms of gambling, *see, e.g.,* N.J.S.A. 2C:37-1 *et seq.* (prohibiting, *inter alia*, unlicensed gambling and shipboard gambling), but instead the State chose to legalize and regulate the industry to make it safer and more beneficial to its residents. Under these circumstances, Congress should not be assumed to have superseded the States' judgments as to what conduct is criminal, at least not without a clear

statement to that effect.

Second, gambling in particular is recognized as a "traditionally sensitive area[]" that has typically been left to the States. Thus, in *Murphy v. N.C.A.A.*, the Supreme Court noted that gambling is "a controversial subject" that "requires an important policy choice," and upon review of the federal code, the Court recognized "a coherent federal policy: [Congressional] respect [for] the policy choices of the people of each State on the controversial issue of gambling." 138 S.Ct. 1461, 1483-84 (2018). *See also Iannelli v. United States*, 420 U.S. 770, 790 (1975) ("gambling activities normally are matters of state concern"). The congressional approach to gambling recognized in *Murphy* and *Iannelli* thus reflects the "long recognized [] role of the States as laboratories for devising solutions to difficult legal problems." *Oregon v. Ice*, 555 U.S. 160, 171 (2009); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). As gambling is a sensitive area of traditional State control, courts must require a clear statement from Congress before allowing federal encroachment. Because the Wire Act provides no such clear statement, it should be interpreted narrowly, and manifestly not in the expansive manner that DOJ now seeks through its 2018 Reinterpretation.

## 2.    This Court Should Grant Nationwide Relief.

The Declaratory Judgment Act ("DJA") provides the Court with ample authority to grant effective relief at this stage. It states:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and

> effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). As noted declaratory judgment scholar Edwin M. Borchard wrote long ago, the declaratory judgment "serves perhaps its most effective purposes . . . in the interpretation of written instruments before breach or violation or injury, or generally to remove uncertainty and doubt from legal relations that are disputed, threatened or placed in uncertainty by adverse claims." Edwin M. Borchard, "The Declaratory Action As an Alternative Remedy," 36 Yale L. J. 403, 407 (1927); *see generally Pub. Serv. Comm. of Utah v. Wycoff Co.*, 344 U.S. 237 (1952) (citing Borchard as authoritative on purpose and scope of DJA); *see also Aetna Cas. & Surety Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937) ("The statute providing for declaratory judgments . . . should be liberally construed to accomplish the purpose intended, *i.e.* to afford a speedy and inexpensive method of adjudicating legal disputes . . . without awaiting a violation of the rights or a disturbance of the relationships."); *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995) ("[The DJA] is designed to enable litigants to clarify legal rights and obligations before acting upon them."). Thus, as noted above, the Supreme Court has held that, "[w]here the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted[.]" *Abbot Labs.*, 387 U.S. at 153.[9] Because that passage powerfully describes the circumstances of this case—a purely legal

---

[9]The DJA applies equally to clarify the meaning of a criminal statute so long as, as here, "a case of actual controversy" exists. 28 U.S.C. § 2201(a). *See, e.g.*, *Gonzalez*, 546 U.S. 243 (affirming grant of declaratory relief in pre-enforcement challenge to Attorney General's interpretation of the Controlled Substances Act); *Monsoon v. D.E.A.*, 522 F. Supp. 2d 1188, 1195 (D.N.D. 2007) ("[T]he plaintiffs seek a declaratory judgment that the DEA cannot criminally prosecute them for cultivating industrial hemp under their state-issued licenses. The Administrative Procedure Act

matter of statutory interpretation upon which the status of an entire industry as either lawful or criminal depends—declaratory relief is proper.

In appropriately interpreting the Wire Act, the Court should issue a declaration that protects non-parties nationwide. Indeed, this Court giving its declaration nationwide effect is the only remedy that would truly fulfill the DJA's purpose of providing a speedy and inexpensive method of adjudicating disputes. Otherwise, New Jersey may be forced to seek a separate declaration in the District of New Jersey, and other States with lotteries or Internet gambling industries may be forced to do the same in federal district courts in their jurisdictions.

Granting relief with nationwide scope and effect also follows from the nature of the statutory remedy under the APA, which requires that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a); *see, e.g.*, *Goldings*, 383 F.3d at 29 (granting declaratory relief regarding a statutory interpretation by the Bureau of Prisons and declaring the agency's interpretation of no effect); *cf. Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed"); *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007), *aff'd in part, rev'd in part sub nom. Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (holding that nationwide injunction was compelled by text of APA, as the court was required to "hold unlawful and set aside" the offending agency action). Indeed, the Supreme Court's decision in *Gonzalez v. Oregon*, discussed above, clearly supports an order vacating the DOJ's 2018 Reinterpretation, as the Supreme Court (and the Court of Appeals)

---

and the Declaratory Judgment Act, 28 U.S.C. § 2201, confer authority on this Court to afford that remedy."), *aff'd*, 589 F.3d 952 (8th Cir. 2009).

affirmed just such an order from the District Court. *See*, *e.g.*, *Gonzalez*, 546 U.S. at 275 (affirming decision below); *Gonzalez*, 368 F.3d at 1130-31 (declaring that Attorney General's opinion that DOJ should treat physician assisted suicide as a violation of the federal Controlled Substances Act was "invalid and may not be enforced"); *Oregon v. Ashcroft*, 192 F. Supp. 2d 1077, 1093 (D. Ore. 2002) ("I resolve this case as a matter of statutory interpretation, and my interpretation of the statutory text and meaning is that the CSA does not prohibit practitioners from prescribing and dispensing controlled substances in compliance with a carefully-worded state legislative act. Thus, the Ashcroft directive is not entitled to deference under any standard and is invalid.").

Furthermore, nationwide relief is necessary in light of significant interests at stake in this matter. There are many States and other non-parties whose interests are imperiled by this litigation—for example, New Jersey built an entire iGaming industry at the express authorization of the same DOJ that now threatens participants in that industry with prosecution. Only an order and declaration that the 2018 Reinterpretation is invalid and of no legal effect, without regard to any geographic or jurisdictional limitation, will suffice to protect such interests. Otherwise, the threat of prosecution will be sufficient to chill participation in New Jersey's iGaming industry by many of the necessary partners to this enterprise, with the resulting potential losses to the government and people of New Jersey as described above. Accordingly, both the law and basic principles of fairness compel a remedy that vacates the 2018 Reinterpretation and declares on a nationwide basis that the Wire Act covers only sports-related betting and wagering, and does not apply to other forms of gambling.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motions for Summary Judgment should be granted, and the DOJ's 2018 Reinterpretation should be rejected and declared null and void.

Dated: March 11, 2019                      Respectfully Submitted,

                                        */s/ Gillian A. Woolf*
                                         Gillian A. Woolf (NH Bar No. 20457)
                                         LeClairRyan PLLC
                                         60 State Street, 23rd Floor
                                         Boston, MA 02109
                                         Tel: (857) 305 – 4415
                                         Fax: (617) 502-5723
                                         Gillian.woolf@leclairryan.com

                                         Lawrence S. Lustberg, Esq. (*pro hac vice forthcoming*)
                                         Thomas R. Valen, Esq. (*pro hac vice forthcoming*)
                                         Avram D. Frey, Esq. (*pro hac vice forthcoming*)
                                         Meghal J. Shah, Esq. (*pro hac vice forthcoming*)
                                         Gibbons P.C.
                                         One Gateway Center
                                         Newark, NJ  07102-5310
                                         Tel: (973) 596-4885
                                         Fax: (973) 639-6240
                                         llustberg@gibbonslaw.com
                                         tvalen@gibbonslaw.com
                                         afrey@gibbonslaw.com
                                         mshah@gibbonslaw.com

                                         *Counsel for Amicus Curaie the State of New Jersey*

26