## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| NEW HAMPSHIRE LOTTERY COMMISSION, NEOPOLLARD INTERACTIVE, LLC, and POLLARD BANKNOTE LIMITED, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| WILLIAM BARR, in his official capacity as Attorney General, THE UNITED STATES DEPARTMENT OF JUSTICE, and THE UNITED STATE OF AMERICA, | ) ) ) ) ) ) | C.A. No. 1:19-cv-00163-PB |
| Defendants. | ) ) |  |

### BRIEF FOR COMMONWEALTH OF PENNSYLVANIA AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................... 1

II. STATEMENT OF INTEREST ..................................................................................... 2

    A. The Pennsylvania Lottery System ..................................................................... 3

    B. iLottery................................................................................................................ 4

    C. iGaming.............................................................................................................. 5

III. ARGUMENT................................................................................................................. 6

IV. CONCLUSION.............................................................................................................. 7

I.      **PRELIMINARY STATEMENT**

The Commonwealth of Pennsylvania, acting by and through the Department of Revenue, Secretary C. Daniel Hassell, and the Bureau of Lottery (the "Pennsylvania Lottery"), hereby respectfully submits this brief as *amicus curiae* in the consolidated action brought by the New Hampshire Lottery Commission ("New Hampshire Lottery"), NeoPollard Interactive LLC ("NeoPollard"), and Pollard Banknote Limited ("Pollard," together with the New Hampshire Lottery and NeoPollard, the "Plaintiffs") against the U.S. Attorney General William Barr, the U.S. Department of Justice (the "USDOJ"), and the United States of America (collectively, the "Defendants").[1]

Through its action, the Plaintiffs challenge the legality of a 2018 opinion issued by the USDOJ's Office of Legal Counsel ("OLC"). That opinion represented a total reversal of the USDOJ's longstanding position concerning the scope of the Wire Act, 18 U.S.C. § 1084. *See Reconsidering Whether the Wire Act Applies to Non-Sports Gambling, Office of Legal Counsel*, 42 Op. O.L.C. (Nov. 2, 2018), https://www.justice.gov/sites/default/files/opinions/attachments/2018/12/20/2018-11-02-wire.pdf ("2018 Opinion"). And the opinion laid the groundwork for the USDOJ's ensuing threat to prosecute those that fail to come into compliance by April. *See Memorandum from Rod Rosenstein, Deputy Attorney General* (January 15, 2019), https://www.justice.gov/file/1124286/download ("Rosenstein Memo").[2]

Notably, the 2018 Opinion breaks from an earlier 2011 OLC opinion, which concluded that the Wire Act prohibited only sports gambling. *See Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to*

---

[1] The Court granted the Commonwealth of Pennsylvania the right to submit a brief as *amicus curiae* and to participate in oral argument. *See* Endorsed Order, Dkt. No. 32.
[2] As part of this litigation, USDOJ has issued a further memo extending the 90-day period for an additional 60 days. *See* Dkt. No. 23.

*InState Adults Violate the Wire Act, Office of Legal Counsel*, 35 Op. O.L.C. 1, 1–2 (Sept. 20, 2011), https://www.justice.gov/sites/default/files/olc/opinions/2011/09/31/state-lotteries-opinion.pdf ("2011 Opinion"). According to the 2018 Opinion, aspects of the Wire Act apply beyond sports betting to all forms of betting or wagering, including state-run lotteries.

The Pennsylvania Lottery files this brief as *amicus curiae* in support of the Plaintiffs' motions for summary judgment (Dkt. Nos. 2, 10) and to respectfully request that the Court declare that the Wire Act, 18 U.S.C. § 1084, applies only to sports gambling. The Pennsylvania Lottery felt compelled to submit this brief *amicus curiae* to, among other things, inform the Court of the substantial impact that the Court's decision could have on the Commonwealth and its citizens, particularly its elderly citizens, if the Court were not to declare the USDOJ's newly-developed interpretation of the Wire Act invalid as a matter of law.

## II.  STATEMENT OF INTEREST

As explained below, the Pennsylvania Lottery's interest in this matter arises from the severe harm that the Commonwealth and its citizens will experience if the Court were not to protect it from the "complications that follow from executive agencies' penchant for changing their views about the law's meaning almost as often as they change administrations." *Burlington N. Santa Fe Ry. v. Loos*, No. 17-1042, 2019 U.S. LEXIS 1734, at *34 (Mar. 4, 2019) (Gorsuch, J., dissenting). Not only would the Pennsylvania Lottery lose revenue that funds programs benefitting older Pennsylvanians, but it would have to forfeit the substantial investment the Pennsylvania Lottery made, in direct reliance on the 2011 Opinion, to develop its iLottery platform.

### A. The Pennsylvania Lottery System[3]

The Pennsylvania Lottery is a bureau within the Pennsylvania Department of Revenue, which is an executive branch agency of the Commonwealth of Pennsylvania. Pursuant to 72 P.S. § 3761-301, all Pennsylvania Lottery net proceeds are utilized for the benefit of older Pennsylvanians, through programs such as property tax relief, rent rebates, reduced fare transit and prescription drug benefits.

The Pennsylvania Lottery is authorized by law to sell multiple types of lottery games through the Lottery's network of over 9,600 retailers. The Pennsylvania Lottery offers a series of different game platforms, including instant scratch off games, draw-based games, multi-jurisdictional games, such as Powerball and MegaMillions, and its iLottery platform. Each of these games involves the use of interstate wire transmissions in varying degrees.

The Pennsylvania Lottery has a tremendous impact on the Commonwealth and its citizens. Since its inception in 1971, the Pennsylvania Lottery has contributed over $29 billion to benefit programs benefitting older Pennsylvanians. For the 2018 Fiscal Year (July 1, 2017-June 30, 2018), the Pennsylvania Lottery recorded sales of more than $4.2 billion, from which more than $2.7 billion in prizes was paid and more than $1 billion went to support programs benefitting older Pennsylvanians. Given the use of certain wire transmissions for Pennsylvania Lottery games, the broadest interpretation of the 2018 Opinion, which the USDOJ has refused to renounce, could result in the suspension of all state lottery sales, resulting in an immediate annual loss of over $1 billion in Lottery proceeds that benefit older Pennsylvanians, as well as additional expenses to try to comply with the 2018 Opinion. It would also jeopardize the jobs and livelihoods of a countless number of citizens throughout the Commonwealth.

---

[3] In connection with its proposed motion for summary judgment, the Pennsylvania Lottery submitted the Declaration of Drew Svitko, which attests to many of the facts set forth in this Statement Interest. Dkt. No. 32-3.

B.       <u>iLottery</u>

In 2017, in direct reliance on the 2011 Opinion, the Pennsylvania General Assembly authorized the sale of lottery tickets through the use of mobile applications or web-based platforms. 4 Pa.C.S. § 503. The iLottery Statute authorizes the Pennsylvania Lottery to operate "iLottery games" and sell "traditional lottery products over the Internet." 4 Pa.C.S. §§ 502. In May 2018, the Pennsylvania Lottery launched its "iLottery" platform, which allows players to play digital instant tickets through their mobile device, personal computer, or tablet.

Since its authorization in 2017, and in reliance on the 2011 Opinion, the Pennsylvania Lottery has spent a significant amount of time and money developing its iLottery gaming platform. In addition to amounts expended by the Commonwealth on iLottery, the implementation of iLottery required Pennsylvania's vendor to incur certain upfront investments in equipment and technology. A substantial portion of those investments were to ensure that those using the iLottery gaming platform participate while physically located in the state and meet the age requirements necessary to play. The Pennsylvania Lottery also made a significant investment to prevent cheating or player fraud. And, it dedicated significant sums toward the development of software designed to curb problem gambling, including options that allow participants to set deposit limits, loss limits, time limits for sessions, and "cooling off" periods or of up to 30 days. All told, the Pennsylvania Lottery incurred approximately $3.1 million in costs developing the iLottery gaming platform, all of which were incurred in direct reliance on the 2011 Opinion.

Like its other lottery products, Pennsylvania's iLottery program has a significant impact on the Commonwealth and its citizens. With respect to iLottery alone, the Pennsylvania Lottery generated over $23.8 million gross gaming revenue alone in 2018. Through the current Fiscal

-4-

Year 2018/2019, the Pennsylvania Lottery has recognized over $30 million in gross gaming revenue from the iLottery program.

Even the narrowest of interpretations of the 2011 opinion could invalidate iLottery. Such a result would not only cause hundreds of millions of dollars in revenue loss, but would also render the millions of dollars that the Pennsylvania Lottery expended on developing iLottery—in reliance on the 2011 Opinion—valueless. The USDOJ's newfound interpretation of the Wire Act does not sufficiently account for these considerable reliance interests.

### C.   iGaming

In addition to iLottery, the Pennsylvania General Assembly also authorized interactive gaming or "iGaming" in 2017 in direct reliance on the 2011 Opinion. 4 Pa.C.S. § 13B. The iGaming Statute authorizes the Pennsylvania Gaming Control Board to sell licenses to provide non-sports-related games, such as games typically offered in casinos, to participants via the internet. *Id.* In summer of 2018, Pennsylvania launched its "iGaming" platform and began accepting applications for licenses, which, upon approval, authorize the licensee to offer interactive games to participants through the internet.

Since its authorization in 2017, and in reliance on the 2011 Opinion, Pennsylvania has spent a significant amount of time and money developing criteria related to the administration and enforcement of the Commonwealth's iGaming program. Indeed, for any applicant that sought a license to conduct iGaming in the Commonwealth, said applicant would be required, among other things to: (i) establish practices and procedures to ensure that interactive gaming offered in Pennsylvania complies with applicable laws, including federal gambling laws; (ii) establish standards and procedures for testing and approving interactive games; (iii) establish technical standards for the approval of interactive games; (iv) develop data security standards to ensure that those using the iGaming platforms participate while physically located in the state

and meet the age requirements necessary to play; and (v) establish an account management system that would utilize identity monitoring and confirmation software to assist in verifying the identity, age, address and other information about players as well as block access to any person on the Gaming Control Board's self-exclusion list.

Like its lottery products, Pennsylvania's iGaming program is anticipated to provide substantial benefits to the Commonwealth and its citizens. Already, licensing fees collected by the Gaming Control Board in 2018 from iGaming exceeded $110 million. While no current applicants have received final approval from the Gaming Control Board to conduct iGaming, revenue estimates for the current Fiscal Year exceed $4.5 million

If the USDOJ's newfound interpretation of the Wire Act were adopted, Pennsylvania may be required to shutter its iGaming operations. Such a result would cause millions of dollars in future revenue loss, and could potentially require the Commonwealth to refund over $110 million in license fees already collected. This is to say nothing of the potential impact on license applicants (many of whom are brick and mortar licensed venues already located and operating within Pennsylvania) that have presumably expended millions of dollars (in addition to the mandatory license fees) in anticipation of receiving approval to conduct iGaming in the near future.

The USDOJ's newfound interpretation of the Wire Act does not sufficiently account for these considerable reliance interests.

### III.   ARGUMENT

The compelling reasons as to why the Court should categorically reject the USDOJ's newly-developed interpretation of the Wire Act have been addressed thoroughly and thoughtfully in the Plaintiffs' motions for summary judgment and the other *amicus curia*e

submissions filed in this action to date. Because it does not seek to inundate the Court with duplicative argument and paper, the Pennsylvania Lottery joins those arguments.

More specifically, the Pennsylvania Lottery joins, adopts, and incorporates herein the legal arguments set forth in: the New Hampshire Lottery's Motion for Summary Judgment (Dkt. No. 2); NeoPollard and Pollard's Motion for Summary Judgment (Dkt. No. 10), the Brief for iDevelopment and Economic Association as *Amicus Curiae* in Support of Plaintiffs (Dkt. No. 33); the Memorandum of Law of *Amicus* Michigan Bureau of State Lottery in Support of Plaintiffs' Motions for Summary Judgment (Dkt. No. 37); and the Brief for the State of New Jersey as *Amicus Curiae* in Support of Plaintiffs' Motions for Summary Judgment (Dkt. No. 38).

### IV. CONCLUSION

For these reasons, and the reasons set forth in the submissions cited above, the Pennsylvania Lottery respectfully requests that the Court grant Plaintiffs' Motions for Summary Judgment, declare that the Wire Act, 18 U.S.C. § 1084, applies only to sports gambling, and grant such foregoing relief on a nationwide-basis so that the interests of non-parties across the United States, including the Commonwealth of Pennsylvania, shall be protected.

Dated: March 13, 2019

Respectfully submitted,

COMMONWEALTH OF PENNSYLVANIA, acting by and through, DEPARTMENT OF REVENUE, SECRETARY C. DANIEL HASSELL, and BUREAU OF LOTTERY

By Its Attorneys,

SHEEHAN PHINNEY BASS & GREEN

*/s/ Robert R. Lucic*
Robert R. Lucic, Esq. (NH Bar #9062)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8188
rlucic@sheehan.com

*/s/ Patrick J. Queenan*
Patrick J. Queenan, Esq. (NH Bar #20127)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8108
pqueenan@sheehan.com

-and-

PEPPER HAMILTON LLP

*/s/ A. Michael Pratt*
A. Michael Pratt, Esq.
(admitted *pro hac vice*)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215-981-4000
prattam@pepperlaw.com

*/s/ Joanna J. Cline*
Joanna J. Cline, Esq.
(admitted *pro hac vice*)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215-981-4000
clinej@pepperlaw.com

*/s/ Christopher B. Chuff*
Christopher B. Chuff, Esq.
(admitted *pro hac vice*)
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
302-777-6547
chuffc@pepperlaw.com

-9-

## CERTIFICATE OF SERVICE

    I hereby certify that on March 13, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

                                        */s/ Patrick J. Queenan*
                                        Patrick J. Queenan