**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| NEW HAMPSHIRE LOTTERY COMMISSION, | |
| Plaintiffs, | |
| v. | |
| WILLIAM BARR, in his official capacity as Attorney General, | Civil Action No. 1:19-cv-00163-PB |
| UNITED STATES DEPARTMENT OF JUSTICE, | |
| Defendants. | |
| NEOPOLLARD INTERACTIVE LLC, | |
| POLLARD BANKNOTE LIMITED, | |
| Plaintiffs, | |
| v. | |
| WILLIAM P. BARR, in his official capacity as Attorney General of the United States of America, | Civil Action No. 1:19-cv-00170-SM (consolidated) |
| THE UNITED STATES DEPARTMENT OF JUSTICE, | |
| THE UNITED STATES OF AMERICA, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND
OBJECTIONS TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ........................................................................................................... 1

STATEMENT OF MATERIAL FACTS ............................................................................ 2

I.     Background ........................................................................................................ 2

II.    Procedural History ........................................................................................... 5

STANDARD OF REVIEW ................................................................................................ 5

ARGUMENT ................................................................................................................... 6

I.     The Court Should Dismiss These Cases For Lack Of Standing. ................................ 6

     A.    Plaintiffs Fail To Allege Any Intention To Engage In Conduct "Arguably Affected With A Constitutional Interest" And Do Not Identify A "Credible Threat" Of Prosecution. ....................................................................................... 6

     B.    In The Alternative, Plaintiffs Have Standing To Challenge Only The Specific Conclusions Reached In The OLC Memo. .......................................................... 9

II.    Plaintiffs' Claims Fail On The Merits Because Only One Of The Wire Act's Four Prohibitions Is Limited To Sports Gambling. ................................................. 10

     A.    The Clear Text Of The Wire Act Shows That Only One Of Its Four Prohibitions Is Limited To Sports Gambling. ................................................... 11

          1.   The Sports-Gambling Modifier Does Not Travel Backwards To Apply To The First Prohibition Of The First Clause. ........................................... 11

          2.   The Sports-Gambling Modifier Does Not Travel Forwards To Apply To Either Prohibition Of The Second Clause. ...................................................... 15

          3.   Additional Textual Evidence Within The Wire Act Confirms That The Statute Is Not Exclusively Limited To Sports Gambling. ........................... 17

     B.    The Court Need Not Consider Ambiguous Legislative History Or Statutory Purpose. ................................................................................................................ 19

          1.   Legislative History Does Not Demonstrate The Wire Act Exclusively Targets Sports Gambling. ........................................................................... 20

          2.   Statutory Purpose Does Not Demonstrate That The Wire Act Exclusively Targets Sports Gambling. ........................................................................... 22

     C.    The First Circuit Has Not Held That The Wire Act Is Limited To Sports Gambling. ................................................................................................................ 24

     D.    Constitutional Concerns Do Not Compel Plaintiffs' Interpretation Of The Statute. ................................................................................................................ 26

          1.   OLC's Interpretation Does Not Raise First Amendment Concerns. ............ 26

2. OLC's Interpretation Does Not Render The Statute Impermissibly Vague. ..................................................................................... 27

3. OLC's Interpretation Does Not Implicate The Tenth Amendment Or Other Federalism Concerns .......................................... 29

**III. Should The Court Rule Against Defendants, It Should Enter Exclusively Declaratory Relief. ................................................................. 30**

**IV. The Court Should Reject Amici's Additional Arguments. ................ 32**

A. The Rule Of Lenity Does Not Apply .................................... 32

B. Any Relief Should Be Limited To The Parties. ..................... 33

C. Reliance Interests Do Not Inform The Correct Construction Of A Statute. ......... 34

D. The UIGEA Does Not Override Or Conflict With The Wire Act. ....................... 35

**CONCLUSION ......................................................................... 36**

## **TABLE OF AUTHORITIES**

**Constitutional Provisions**

U.S. Const. art. III, sec. 2 ........................................................................................... 1

**Statutes**

18 U.S.C. § 1084 .............................................................................................. *passim*

18 U.S.C. § 1953 .................................................................................................... 22

18 U.S.C. § 1955 .................................................................................................... 36

18 U.S.C. § 2252 .................................................................................................... 13

28 U.S.C. § 2201 ............................................................................................... 30, 33

31 U.S.C. § 5361 ..................................................................................................... 3

31 U.S.C. § 5362 .................................................................................................... 35

31 U.S.C. § 5363 .................................................................................................... 35

39 Stat. 951, 965 (Mar. 2, 1917) ............................................................................ 14

5 U.S.C. § 704 .................................................................................................. 30, 31

**Cases**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ...................................................................................... 10

*Albernaz v. United States*,
    450 U.S. 333 (1981) ...................................................................................... 32

*Ali v. United States*,
    No. 12-0816A, 2012 WL 4103867 (W.D.N.Y. Sept. 14, 2012) .............................. 32

*Arizona v. Evans*,
    514 U.S. 1 (1995) ........................................................................................... 34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................... 6

*AT&T Co. v. EEOC*,
    270 F.3d 973 (D.C. Cir. 2001) ........................................................................ 31

*Avco Corp. v. U.S. Dep't of Justice*,
    884 F.2d 621 (D.C. Cir. 1989) ............................................................. 22

*Babbitt v. Farm Workers*,
    442 U.S. 289 (1979) ........................................................................... 7

*Barnhart v. Thomas*,
    540 U.S. 20 (2003) ............................................................................ 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................... 6

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................................... 34

*Campbell v. Medalie*,
    71 F.2d 671 (2d Cir. 1934) ................................................................. 32

*Christoforu v. United States*,
    842 F. Supp. 1453 (S.D. Fla. 1994) ................................................... 32

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ............................................................. 33

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................... 6

*Davis v. FEC*,
    554 U.S. 724 (2008) ........................................................................... 10

*Deaver v. Seymour*,
    822 F.2d 66 (D.C. Cir. 1987) ....................................................... 31, 32

*Dedham Water Co. v. Cumberland Farms Dairy*,
    972 F.2d 453 (1st Cir. 1992) .............................................................. 25

*Digital Realty Tr., Inc. v. Somers*,
    138 S. Ct. 767 (2018) ......................................................................... 17

*DRG Funding Corp. v. Sec. of Housing & Urban Dev.*,
    76 F.3d 1212 (D.C. Cir. 1996) ........................................................... 31

*Dunn v. CFTC*,
    519 U.S. 465 (1997) ........................................................................... 23

*El Dia v. Hernandez Colon*,
    963 F.2d 488 (1st Cir. 1992) .............................................................. 9

*Encino Motorcars, LLC v. Navarro*,
　138 S. Ct. 1134 (2018) ................................................................ 19, 22

*Ernst & Ernst v. Hochfelder*,
　425 U.S. 185 (1976) .......................................................................... 11

*Estate of Kalahasthi v. United States*,
　630 F. Supp. 2d 1120 (C.D. Cal. 2008) ............................................ 22

*Frozen Food Express v. United States*,
　351 U.S. 40 (1956) ............................................................................ 31

*FTC v. Standard Oil Co.*,
　449 U.S. 232 (1980) .......................................................................... 31

*Gill v. Whitford*,
　138 S. Ct. 1916 (2018) ...................................................................... 34

*GTE South Inc. v. Morrison*,
　6 F. Supp. 2d 517 (E.D. Va. 1998) ................................................... 22

*Hartford Assocs. v. United States*,
　792 F. Supp. 358 (D.N.J. 1992) ........................................................ 32

*Holder v. Humanitarian Law Project*,
　561 U.S. 1 (2010) .......................................................................... 7, 28

*In re Hart*,
　328 F.3d 45 (1st Cir. 2008) .............................................................. 17

*In re Mastercard Int'l*,
　313 F.3d 257 (5th Cir. 2002) ............................................................ 26

*Int'l Longshoremen's & Warehousemen's Union v. Boyd*,
　347 U.S. 222 (1954) ............................................................................ 7

*Jernigan v. State of Miss.*,
　812 F. Supp. 688 (S.D. Miss. 1993) ................................................. 32

*Kajtazi v. Johnson-Skinner*,
　2017 WL 436038 (S.D.N.Y. Jan. 30, 2017) ..................................... 32

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
　543 U.S. 50 (2004) ............................................................................ 16

*Lockhart v. United States*,
　136 S. Ct. 958 (2016) ......................................................... 12, 13, 14, 16

*Loughrin v. United States*,
   134 S. Ct. 2384 (2014) ................................................................................ 17

*Lujan v. Defs. Of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................... 6

*Monsanto Co. v. Geertson Seed Farms*,
   61 U.S. 139 (2010) ...................................................................................... 31

*Municipality of San Juan v. Rullán*,
   318 F.3d 26 (1st Cir. 2003) ......................................................................... 25

*Murphy v. National Collegiate Athletic Association*,
   138 S. Ct. 1461 (2018) ................................................................................ 30

*New Hampshire Hemp Council, Inc. v. Marshall*,
   203 F.3d 1 (1st Cir. 2000) ......................................................................... 8, 9

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ...................................................................................... 19

*Pension Benefit Guar. Corp. v. LTV Corp.*,
   496 U.S. 633 (1990) .................................................................................... 36

*Porto Rico Ry., Light & Power Co. v. Mor*,
   253 U.S. 345 (1920) .................................................................................... 14

*Pub. Citizen v. U.S. Dep't of Justice*,
   491 U.S. 440 (1989) .................................................................................... 23

*Rogers v. Scurr*,
   676 F.2d 1211 (8th Cir. 1982) .................................................................... 34

*Rossiter v. Potter*,
   357 F.3d 26 (1st Cir. 2004) ......................................................................... 25

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018) .................................................................................. 17

*Russello v. United States*,
   464 U.S. 16 (1983) ...................................................................................... 22

*Schlegel v. Holder*,
   No. 13-3251, 2014 WL 12607718 (D. Minn. May 21, 2014) ...................... 32

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .................................................................................. 5

*Steffel v. Thomspon,*
 415 U.S. 452 (1974) ................................................................. 7

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ............................................................. 6, 7

*Town of Chester v. Laroe Estates, Inc.,*
 137 S. Ct. 1645 (2017) ...................................................... 10, 33

*Trump v. Hawaii,*
 138 S. Ct. 2392 (2018) ........................................................... 34

*United States v. Bass,*
 404 U.S. 336 (1971) ......................................................... 15, 16

*United States v. Brisbane,*
 367 F.3d 910 (D.C. Cir. 2004) ................................................ 33

*United States v. DiChristina,*
 886 F. Supp. 2d 164 (E.D.N.Y. 2012) ...................................... 26

*United States v. Granderson,*
 511 U.S. 39 (1994) ................................................................ 20

*United States v. Hausmann,*
 345 F.3d 952 (7th Cir. 2003) .................................................. 29

*United States v. Kaczowski,*
 114 F. Supp. 2d 143 (W.D.N.Y. 2000) ..................................... 26

*United States v. Kaplan,*
 No. 06CR-337-CEJ-2, ECF No. 606 (E.D. Mo. Mar. 20, 2008) ..................................... *passim*

*United States v. Locke,*
 471 U.S. 84 (1985) ................................................................ 20

*United States v. Lombardo,*
 639 F. Supp. 2d 1271 (D. Utah 2007) .................................. *passim*

*United States v. Luna,*
 649 F.3d 91 (1st Cir. 2011) .................................................... 25

*United States v. Lyons,*
 740 F.3d 702 (1st Cir. 2014) .......................................... 24, 25, 26

*United States v. Michel,*
 446 F.3d 1122 (10th Cir. 2006) .............................................. 32

*United States v. Rodriguez-Rodriguez,*
   663 F.3d 53 (1st Cir. 2011) ................................................... 13

*United States v. Ross,*
   No. 98 CR. 1174-1 (KMV), 1999 WL 782749 (S.D.N.Y. Sept. 16, 1999) ......................... 3, 12

*United States v. Starks,*
   861 F.3d 306 (1st Cir. 2017) ................................................... 25, 26

*United States v. Williams,*
   553 U.S. 285 (2008) ................................................... 28

*Vacco v. World Interactive Gaming Corp.,*
   714 N.Y.S.2d 844 (N.Y. Sup. Ct. 1999) ................................................... 3

*Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n,*
   263 F.3d 379 (4th Cir. 2001) ................................................... 34

*Virginia v. Am. Booksellers Ass'n,*
   484 U.S. 383 (1988) ................................................... 7

*Warth v. Seldin,*
   422 U.S. 490 (1975) ................................................... 6

*Washington Pub. Power Supply Sys. v. Pac. Nw. Power Co.,*
   332 F.2d 87 (9th Cir. 1964) ................................................... 9

*Wong v. Minn. Dep't of Human Servs.,*
   820 F.3d 922 (8th Cir. 2016) ................................................... 16

*Younger v. Harris,*
   401 U.S. 37 (1971) ................................................... 31

**Administrative Materials**

U.S. Dep't of Justice, Office of Legal Counsel,
   *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling* (Nov. 2, 2018),
   https://www.justice.gov/olc/file/1121531/download ....................................... *passim*

U.S. Dep't of Justice, Office of Legal Counsel,
   *Scope of Exemption Under Federal Lottery Statutes for Lotteries Conducted By a State Acting
   Under Authority of State Law* (Oct. 16, 2008), https://www.justice.gov/sites/default/files/olc/
   opinions/attachments/2015/06/23/op-olc-v032-p0129.pdf ....................................... 29

U.S. Dep't of Justice, Office of Legal Counsel,
   *Whether Proposals by Illinois and New York to Use the Internet and
   Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate The*

*Wire Act* (Sept. 20, 2011), https://www.justice.gov/sites/default/files/olc/opinions/2011/ 09/31/state-lotteries-opinion.pdf ................................................................................................ 4

**Other Authorities**

2A Norman J. Singer, Statutes and Statutory Construction (6th rev. ed. 2000) ........................... 12

Antonin Scalia & Bryan A. Garner,
    Reading Law: The Interpretation of Legal Texts (2012) .................................................... 13, 14

Robert F. Kennedy,
    *The Program of the Department of Justice on Organized Crime*,
    38 Notre Dame L. Rev. 637 (1963) ......................................................................................... 20

# INTRODUCTION

These consolidated cases present a single question of statutory interpretation: does the Wire Act, 18 U.S.C. § 1084(a), prohibit the use of the interstate wires for all gambling, or only gambling on sporting events and contests? For years, the Department of Justice had understood the statute to extend beyond sports gambling, and it had successfully brought numerous prosecutions based upon that interpretation. Although the Department changed its position in 2011, last year, after carefully analyzing the statute, the Department's Office of Legal Counsel ("OLC") issued an opinion advising that all but one of the statute's four prohibitions apply to gambling generally, and not merely sports gambling. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling* (Nov. 2, 2018), https://www.justice.gov/ olc/file/1121531/download ("2018 OLC Opinion"). In these cases, Plaintiffs contend that the Department's traditional position is wrong and that non-sports gambling falls entirely beyond the reach of the Wire Act.

At the outset, the Court should not reach that question, because it lacks jurisdiction to decide it. Article III limits the Court's jurisdiction to "cases" and "controversies," U.S. Const. art. III, sec. 2, yet Plaintiffs are seeking a pure advisory opinion about the meaning of a federal criminal statute. Plaintiffs are not being chilled from engaging in conduct affected with a constitutional interest and have not pointed to any reason to believe that the government is preparing to bring Wire Act charges against them or anyone else, or even that their actions necessarily contravene OLC's interpretation of the statute. OLC has opined on one aspect of what the Wire Act means, but whether to bring any particular prosecution (or any prosecutions at all) is subject to the government's prosecutorial discretion.

Should the Court reach the merits, Defendants correctly interpreted the Wire Act. The statute contains two clauses, each of which contains two prohibitions. Only the second of the four

prohibitions is limited to sports gambling, and it would disfigure the statutory text beyond recognition to conclude that the so-called "sports-gambling modifier" is both backwards-looking (applying to the first prohibition) *and* forwards-looking (applying to the third and fourth prohibitions). Plaintiffs try to muddy the waters by relying on legislative history and First Circuit dicta, but those efforts cannot overcome the plain statutory text.

## STATEMENT OF MATERIAL FACTS[1]

### I.    Background

In 1961, Congress enacted the Wire Act. In relevant part, the statute provides as follows:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1084(a).

As set out above, the Act contains two clauses, each of which contains two prohibitions.

For clarity, Defendants will refer to those clauses and prohibitions as follows:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility

> > **[Clause 1]** for the transmission in interstate or foreign commerce of

> > > **[Prohibition 1-A]** bets or wagers

> > > or

> > > **[Prohibition 1-B]** information assisting in the placing of bets or wagers on any sporting event or contest,

---

[1] The Local Rules of this Court require an opposition to a motion for summary judgment to "incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the adverse party contends a genuine dispute exists so as to require a trial." *See* LR 56.1(a)-(b). Defendants agree with Plaintiffs that this case raises purely legal questions and that there are no disputed material facts requiring trial.

or

**[Clause 2]** for the transmission of a wire communication which entitles the recipient to receive money or credit

> **[Prohibition 2-A]** as a result of bets or wagers,

> or

> **[Prohibition 2-B]** for information assisting in the placing of bets or wagers,

shall be fined under this title or imprisoned not more than two years, or both.

*Id.*

Prior to 2011, it was the established position of the Department of Justice that the Wire Act prohibits the use of interstate wires for all gambling, and not just sports gambling. *See* 2018 OLC Opinion at 5 n.7 (collecting citations). Indeed, "the Department secured at least seventeen Wire Act convictions between Fiscal Years 2005 and 2011 that involved non-sports betting." *Id.* at 5 n.8. Various district courts upheld prosecutions involving non-sports gambling. *See United States v. Lombardo*, 639 F. Supp. 2d 1271, 1281 (D. Utah 2007) (holding that the "sporting event or contest" qualifier does not apply to section 1084(a)'s second clause and noting that this conclusion "aligns with the Tenth Circuit's Criminal Pattern Jury Instructions"); *United States v. Kaplan*, No. 06CR-337CEJ-2, ECF No. 606 (E.D. Mo. Mar. 20, 2008) (report and recommendation) (concluding that the "sporting event or contest" qualifier applies only to the second prohibition in section 1084(a)'s first clause); *see also United States v. Ross*, No. 98 CR. 1174-1 (KMV), 1999 WL 782749, at *2 (S.D.N.Y. Sept. 16, 1999) (suggesting that the term "sporting event or contest" modifies only the second prohibition in section 1084(a)'s first clause); *Vacco v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 847, 851-52 (N.Y. Sup. Ct. 1999) (same).

In 2011, the Criminal Division asked OLC to resolve a potential conflict between the Wire Act and the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367 ("UIGEA").

The Criminal Division informed OLC that it had "uniformly taken the position that the Wire Act is not limited to sports wagering and can be applied to other forms of interstate gambling." U.S. Dep't of Justice, Office of Legal Counsel, *Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate The Wire Act* (Sept. 20, 2011), at 2, https://www.justice.gov/sites/default/files/olc/opinions/2011/09/31/state-lotteries-opinion.pdf ("2011 OLC Opinion") (internal quotation marks omitted). In response, OLC rejected the Criminal Division's longstanding position and concluded that wire communications that do not relate to a sporting event or contest fall outside the reach of the Wire Act. *See generally id.*

On November 2, 2018, after the Criminal Division requested that OLC reconsider its opinion, OLC did so and reversed the interpretation in the 2011 opinion. *See generally* 2018 OLC Opinion. OLC concluded that "[w]hile the Wire Act is not a model of artful drafting . . . the words of the statute are sufficiently clear . . . that all but one of its prohibitions sweep beyond sports gambling." *Id.* at 2.[2] On January 15, 2019, the Deputy Attorney General issued a memorandum instructing all Department of Justice attorneys to "adhere to OLC's interpretation, which represents the Department's position on the meaning of the Wire Act." *See* Memorandum from the Deputy Attorney General (Jan. 15, 2019), https://www.justice.gov/file/1124286/download. The Deputy Attorney General advised Department of Justice employees to "refrain from applying Section 1084(a) in criminal or civil actions to persons who engaged in conduct violating the Wire Act in

---

[2] The 2011 opinion and the 2018 opinion agree in one important respect: within the second clause, the phrase "which entitles the recipient to receive money or credit" applies to both prohibitions. *See* 2011 OLC Opinion at 4 n.5 ("We believe the second half of subsection 1084(a) is better read as a single prohibition barring 'the transmission of a wire communication which entitles the recipient to receive money or credit [either] as a result of bets or wagers[] or for information assisting in the placing of bets or wagers.'"); 2018 OLC Opinion at 3 n.4 (similar).

reliance on the 2011 OLC opinion prior to the date of this memorandum, and for 90 days thereafter." *See id.* On February 28, 2019, the Deputy Attorney General extended that forbearance period for an additional sixty days, through and including June 14, 2019. *See* ECF No. 23-1.

## II.   Procedural History

The New Hampshire Lottery Commission initiated the first of these consolidated cases on February 15, 2019, by filing a complaint, *see* ECF No. 1, and a summary judgment motion, *see* ECF No. 2 ("Lottery Commission Mot."). That same day, NeoPollard Interactive LLC and Pollard Banknote Limited (collectively "NeoPollard") filed a separate civil action, along with their own motion for summary judgment. That action was assigned docket number 19-170, but on February 22, 2019, the NeoPollard case was consolidated with the Lottery Commission case, *see* ECF No. 9, and NeoPollard's summary judgment motion was re-filed in this case as ECF No. 10 ("NeoPollard Mot.").

This memorandum supports Defendants' motion to dismiss the complaints filed by the New Hampshire Lottery Commission and NeoPollard, and it opposes the summary judgment motions filed by these parties. It also responds, where appropriate, to arguments presented in amicus briefs filed by the iDevelopment and Economic Association, *see* ECF No. 33 ("iDEA Amicus Br."); the Michigan Bureau of State Lottery, *see* ECF No. 37 ("Michigan Amicus Br."); the State of New Jersey, *see* ECF No. 38 ("New Jersey Amicus Br."); and the Commonwealth of Pennsylvania, *see* ECF No. 40 ("Pennsylvania Amicus Br.").

## STANDARD OF REVIEW

Defendants move to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim on which relief may be granted under Rule 12(b)(6). Under Rule 12(b)(1), "[t]he plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" its existence. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Under Rule

12(b)(6), plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Defendants also oppose Plaintiffs' motions for summary judgment. Under Rule 56, Plaintiffs may only obtain summary judgment if they establish that this Court has jurisdiction and that "there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

**I.     The Court Should Dismiss These Cases For Lack Of Standing.**

**A.     Plaintiffs Fail To Allege Any Intention To Engage In Conduct "Arguably Affected With A Constitutional Interest" And Do Not Identify A "Credible Threat" Of Prosecution.**

The Court should dismiss these cases for lack of standing, as Article III does not permit the Court to issue an advisory opinion concerning the proper interpretation of 18 U.S.C. § 1084(a). Rather, Article III limits the jurisdiction of federal courts to "cases" and "controversies," U.S. Const. art. III, sec. 2, a limit that is "founded in concern about the proper — and properly limited — role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The "irreducible constitutional minimum" of standing requires the plaintiff to have suffered an injury in fact that is caused by the challenged conduct and redressable by a favorable decision. *See, e.g.*, *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992). "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or if there is a 'substantial risk' that the harm will occur." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

Under the Supreme Court's pre-enforcement case law, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Driehaus*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Each of the cases cited in *Driehaus* for this proposition — *Steffel v. Thompson*, 415 U.S. 452 (1974); *Babbitt*; *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988); and *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) — involved contentions that a challenged law violated First Amendment free speech rights. And in concluding that the *Driehaus* petitioners had standing, the Supreme Court reiterated that they had "alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest.'" *Driehaus*, 573 U.S. at 161.

Plaintiffs fail to satisfy this test. First, Plaintiffs do not allege an intention to engage in a course of conduct "arguably affected with a constitutional interest." The heart of Plaintiffs' claim in this case is not that the government is threatening to do something that will violate their constitutional rights, but rather that they disagree with the government about whether a federal criminal statute applies to certain commercial wagering activity. In other words, this "is not a lawsuit to enforce a right; it is an endeavor to obtain a court's assurance that a statute does not govern hypothetical situations that may or may not make the challenged statute applicable." *Int'l Longshoremen's & Warehousemen's Union v. Boyd*, 347 U.S. 222, 223-24 (1954). Declaratory relief is not properly available in such circumstances.[3]

Second, Plaintiffs fail to establish a "credible threat of prosecution." OLC has answered the Criminal Division's question about what the Wire Act means, but Plaintiffs provide no reason

---

[3] The Lottery Commission suggests that Defendants' interpretation of the statute raises First Amendment concerns, but as explained below, that argument depends upon a fundamental misunderstanding of Defendants' construction of the statute. *See infra* Part II.D.1.

to suppose that they are, or anyone else is, at any imminent risk of criminal prosecution. Whether to bring any particular Wire Act case remains a question of prosecutorial discretion. Indeed, prior to 2011, the Criminal Division's established position was the same view that OLC reached in the 2018 OLC Memo. But Plaintiffs do not allege that there were any prosecutions of state lottery commissions or their vendors in the fifty years from the Wire Act's enactment in 1961 to 2011, or that they were at imminent risk of prosecution at any point prior to 2011. As was the case before 2011, whether to bring any particular criminal prosecution is a question of prosecutorial discretion.

As the NeoPollard Plaintiffs observe, in *New Hampshire Hemp Council, Inc. v. Marshall*, 203 F.3d 1 (1st Cir. 2000), the First Circuit permitted the plaintiffs to seek a declaration that non-psychoactive cannabis did not violate federal narcotics laws, after a federal government witness had testified at a state legislative hearing that the government understood such cannabis to violate the law. The case is distinguishable, however, insofar as the First Circuit looked to the government's history of prosecutions in the medical-marijuana space to conclude that there was no "reason to doubt the government's zeal in suppressing any activity it regards as fostering marijuana use." *Id.* at 5. Here, Plaintiffs can point to no history of prosecution of entities similarly situated to them. Again, it bears emphasis that the Criminal Division thought that the use of the interstate wires for gambling violated the Wire Act for decades prior to 2011, but there is zero evidence of prosecutions of entities similar to Plaintiffs. Nor has the government threatened to enforce the Wire Act against state lotteries in general, or plaintiffs in particular, and whether the government may do so is not a question addressed by the OLC opinion. In any case, it is far from clear that *New Hampshire Hemp Council* fits within the Supreme Court's recent pre-enforcement case law that requires threatened enforcement of a statute that would violate the plaintiff's constitutional rights.

In addition, *New Hampshire Hemp Council* observed that even after its ruling, "little risk exists that courts will be flooded with untoward pre-enforcement challenges" because, among other reasons, "declaratory and injunctive relief is discretionary." 203 F.3d at 5; *see also, e.g.*, *El Dia v. Hernandez Colon*, 963 F.2d 488, 493 (1st Cir. 1992) ("[D]eclaratory relief, both by its very nature and under the plain language of 28 U.S.C. § 2201, is discretionary."). As the First Circuit explained in *Hernandez Colon*, "declaratory judgments should not be pronounced 'unless the need is clear, not remote or speculative.'" 963 F.2d at 493 (quoting *Washington Pub. Power Supply Sys. v. Pac. Nw. Power Co.*, 332 F.2d 87, 88 (9th Cir. 1964)). Here, Plaintiffs are bringing a pre-enforcement challenge to an interpretation of a criminal statute that does not touch upon free speech rights or threaten to chill free speech. Thus, even if the Court has jurisdiction under Article III, it should decline to enter the discretionary remedies that Plaintiffs seek.

### B.   In The Alternative, Plaintiffs Have Standing To Challenge Only The Specific Conclusions Reached In The OLC Memo.

In the alternative, should the Court determine that *New Hampshire Hemp Council* compels the conclusion that Plaintiffs have standing, that case stands at most for the proposition that it is appropriate for a plaintiff to be able to test the construction of a criminal statute as to which the government has expressed its opinion. *See New Hampshire Hemp Council*, 203 F.3d at 6 ("[T]he DEA's emphatic position equitably argues for review — not because there is anything wrong with the agency expressing its view but because, *that view having been expressed*, there ought to be a way to resolve the legal correctness *of its position* without subjecting an honest businessman to criminal penalties well known for their severity and inflexible administration." (emphasis added)). In this case, however, the Plaintiffs are asking the Court to issue an advisory opinion on certain topics as to which OLC has expressed no opinion at all. *See* Lottery Commission Mot. at 14-18 (contending that state instrumentalities are not subject to the Wire Act), *id.* at 24-25 (addressing

9

18 U.S.C. § 1301 and 18 U.S.C. § 1307 and suggesting that they override the Wire Act); NeoPollard Mot. at 20 (similar). Insofar as OLC has expressed no opinion on those subjects, there is not adversity between the parties as to them under Article III, nor do Plaintiffs satisfy the standards for prudential standing. *See generally Abbott Labs. v. Gardner*, 387 U.S. 136 (1967). "[S]tanding is not dispensed in gross," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)), and so even if Plaintiffs could challenge OLC's specific conclusions, that would not mean that they are entitled to advisory opinions on a host of other questions left unaddressed by the OLC memo.[4]

## II.    Plaintiffs' Claims Fail On The Merits Because Only One Of The Wire Act's Four Prohibitions Is Limited To Sports Gambling.

Should the Court reach the merits, Defendants' interpretation of the Wire Act should be upheld. *First*, the text of the statute demonstrates that Congress only limited one of the statute's four prohibitions to sports gambling; the other three prohibitions are not so limited. *Second*, neither legislative history nor legislative purpose is particularly informative, nor can either overcome the statutory text. *Third*, contrary to the Plaintiffs' suggestions, the First Circuit has never had occasion to decide the reach of the Wire Act's sports-gambling modifier. *Fourth* and finally, Defendants' interpretation does not raise any constitutional concerns.

---

[4] It bears underscoring that the OLC opinion did not address whether state lottery commissions or their vendors are subject to prosecution under the Wire Act, and the Department as a whole has never issued guidance on whether or how prosecutors should enforce the Wire Act against state lottery commissions and their vendors. Should that change, Defendants will so advise the Court. In the meantime, Plaintiffs plainly cannot manufacture a justiciable controversy by filing a declaratory action that seeks to compel the Department to adopt an enforcement position. Defendants will therefore not address issues specific to state lottery commissions or their vendors, falling outside the scope of the challenged OLC opinion, at this time.

**A.    The Clear Text Of The Wire Act Shows That Only One Of Its Four Prohibitions Is Limited To Sports Gambling.**

The text of the Wire Act provides that only one of its four prohibitions is limited to sports gambling. And because that result flows from the statutory text, that is the end of the analysis. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201 (1976) ("When the Court finds the statutory language to be unambiguous, its clear meaning is controlling and the Court does not need to refer to any other source to interpret its meaning.").

As discussed above, the statute contains two clauses, each of which contains two prohibitions. The sports-gambling modifier is attached to (and obviously modifies) the second prohibition of the first clause. The question is what, if anything, it also modifies. Under established canons of construction, the sports-gambling modifier neither applies backwards, to the first prohibition of the first clause, nor forwards, to either prohibition in the second clause.

**1.    The Sports-Gambling Modifier Does Not Travel Backwards To Apply To The First Prohibition Of The First Clause.**

The statute's first clause makes it a crime to use the wires "for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest." 18 U.S.C. § 1084(a). The first question is therefore whether the sports-gambling modifier, "on any sporting event or contest," applies to both prohibitions within the first clause — "bets or wagers" and "information assisting in the placing of bets or wagers" — or only to the second prohibition.

The sports-gambling modifier applies only to the phrase that it immediately follows. Indeed, the sports-gambling modifier comes at the end of a complex modifier that defines the type of "information" reached by the prohibition: "information assisting in the placing of bets or wagers on any sporting event or contest." 18 U.S.C. § 1084(a). Since "assisting in the placing of bets or

11

wagers" modifies only "information," it follows that "on any sporting event or contest" — a component of the same modifier — is similarly limited.[5]

Contrary to Plaintiffs' contention, "every federal court to consider this language" has not held that the sports-gambling modifier applies to "both uses of 'bets or wagers' in the first clause." NeoPollard Mot. at 12. Rather, as the *Kaplan* opinion concluded, "the exclusion of the words 'on any sporting event or contest' from three of the prohibitions in subsection (a) . . . mean[s] that Congress intended just that." *Kaplan*, at 6; *see also id.* at 4 ("The statute is couched in the disjunctive and creates two distinct offenses: (1) the use of a wire communication facility for the interstate or foreign transmission of (a) bets or wagers or (b) information assisting in the placing of bet or wagers on a sporting event or contest; or (2) the transmission of a wire communication which entitles the recipient to receive money or credit as a result of (a) bets or wagers or (b) information assisting in the placing of bets or wagers."); *Ross*, 1999 WL 782749, at *2 (Wire Act creates penalties for those who "use a 'wire communication facility for the transmission in interstate or foreign commerce' of (1) 'bets or wagers' or (2) 'information assisting in the placing of bets or wagers on any sporting event or contest'").

This conclusion is consistent with established canons of construction. When a court construes the reach of modifiers like "on any sporting event or contest," the default rule is that "'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016) (quoting *Barnhart*

---

[5] As OLC explained, Congress could have easily written the statute to carry Plaintiffs' preferred meaning had it wanted to do so. *See* 2018 OLC Opinion at 10 ("The road not taken is also illuminating. Simply by adding two commas, Congress could have unambiguously extended both prohibitions in the first clause to sports-related gambling: 'for the transmission in interstate or foreign commerce of bets or wagers[,] or information assisting in the placing of bets or wagers[,] on any sporting event or contest.'")

*v. Thomas*, 540 U.S. 20, 26 (2003)); *see also Barnhart*, 540 U.S. at 26 ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent") (quoting 2A Norman J. Singer, Statutes and Statutory Construction § 47.33, at 369 (6th rev. ed. 2000)). That rule, the "last-antecedent rule," "reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it." *Lockhart*, 136 S. Ct. at 963; *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152 (2012) ("Scalia & Garner"); *United States v. Rodriguez-Rodriguez*, 663 F.3d 53, 57 (1st Cir. 2011) ("the 'rule of the last antecedent,' the hoary canon of construction pursuant to which qualifying phrases are usually to be applied to the words or phrase immediately preceding").[6]

OLC properly rejected the proposition that the series-qualifier principle counsels a different result. That principle provides that a modifying phrase may sweep beyond the nearest referent if the list "contain[s] items that readers are used to seeing listed together or a concluding modifier that readers are accustomed to applying to each of them." *Lockhart*, 136 S. Ct. at 963. Critically, the series-qualifier principle is limited to lists that are "simple and parallel *without unexpected internal modifiers or structure*." *Id.* (emphasis added); *see also* Scalia & Garner at 147 (principle applies where "there is a straightforward, parallel construction that involves all nouns or verbs in a series"). The examples offered by Scalia and Garner include the following:

- "charitable institutions or societies"

---

[6] In *Lockhart*, for example, the Court applied this rule to a statute that subjected a criminal defendant to increased penalties if the defendant had "'a prior conviction . . . under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward.'" 136 S. Ct. at 962 (quoting 18 U.S.C. § 2252(b)(2)). The Court held that the phrase "involving a minor or ward" modified only the one item on this list that immediately preceded it. *Id.* at 961.

- "intoxicating bitters or beverages"

- "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with"

- "a wall or fence that is solid"

- "a corporation or partnership registered in Delaware."

*See generally* Scalia & Garner at 147-149. In each case, there is a simple, parallel list of nouns or verbs, and so it is natural to conclude that the modifier applies to all the items in the series (whether preceding the list, as in the first three examples, or following it, as in the final two examples).

The structure of 18 U.S.C. § 1084(a)'s first clause does not consist of a simple, parallel series of nouns or verbs. The first prohibition has two nouns ("bets or wagers"), but the second consists of a noun ("information") modified by a participle ("assisting") subject to a preposition ("in") that introduces a gerund ("placing") subject to a preposition ("of") that *then* introduces two nouns ("bets or wagers"). Both prohibitions terminate with the words "bets or wagers," but their structure is completely different. Reading "on any sporting event or contest" to carry backward to modify the first reference to "bets or wagers" would "take[] more than a little mental energy" and be a "heavy lift." *Lockhart*, 136 S. Ct. at 963. "[T]he varied syntax of each item in the list makes it hard for the reader to carry the final modifying clause across all three." *Id.* Because the syntax "involves something other than a parallel series of nouns or verbs, a . . . postpositive modifier normally applies only to the nearest reasonable referent." Scalia & Garner at 152.

The century-old decision in *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345 (1920), is distinguishable. In that case, the statute provided that district courts had jurisdiction when all parties were "[1] citizens or subjects of a foreign state or states, or [2] citizens of a state, territory, or district of the United States not domiciled in Porto Rico." 253 U.S. at 346 (quoting 39 Stat. 951, 965 (Mar. 2, 1917)). The Supreme Court noted that "[w]hen several words are followed

by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Id.* at 348. The structure of the statute, however, was entirely parallel; each item on the list consisted of a noun (the same noun, "citizens"), modified by a geographical prepositional phrase introducing a list of nouns.[7] The statute was therefore a natural candidate for the series-qualifier canon. The Wire Act is not.

### 2. The Sports-Gambling Modifier Does Not Travel Forwards To Apply To Either Prohibition Of The Second Clause.

Just as the sports-gambling modifier does not travel backwards to modify the first clause's first prohibition, so OLC correctly concluded that it does not travel forwards to modify either of the second clause's two prohibitions. As a matter of basic grammar, section 1084(a)'s first clause is distinct from the second clause; the two clauses are separated not only by a comma, but also by an introductory determiner that repeats the beginning of the first clause ("for the transmission of"). There is no reference to "any sporting event or contest" in the second clause and no textual reason why the modifier in the first clause would extend to the second clause. *See, e.g.*, NeoPollard Mot. at 15 (recognizing that "the second clause does not itself contain the phrase 'on any sporting event or contest'"); *Lombardo*, 639 F. Supp. 2d at 1281 ("[T]he phrase 'sporting event or contest' modifies only the first" clause . . . ."); *Kaplan*, at 4 (same conclusion).

Indeed, the sports-gambling modifier appears after the second of four statutory prohibitions. It would take a considerable leap to carry that modifier both backward to the first

---

[7] *United States v. Bass*, 404 U.S. 336 (1971), is distinguishable for the same reason. In *Bass*, the Supreme Court considered a statute applying to any person "who receives, possesses, or transports in commerce or affecting commerce, . . . any firearm." *Id.* at 337. "Receives, possesses, or transports" is a simple, parallel list of verbs, making it a textbook candidate for the series-qualifier principle.

prohibition of the first clause, then forward across the entire second clause. *See, e.g.*, *United States v. Lockhart*, 749 F.3d 148, 152-53 (2d Cir. 2014) ("[T]his is not the prototypical situation in which the series qualifier canon is applied, since . . . the modifier does not end the list in its entirety."), *aff'd*, 136 S. Ct. 958 (2016); *Wong v. Minn. Dep't of Human Servs.*, 820 F.3d 922, 928 (8th Cir. 2016) ("[T]he series-qualifier canon generally applies when a modifier precedes or follows a list, not when the modifier appears in the middle."); *cf. Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 61-62 (2004) (applying a qualifier at the end of the second item on a list to the first item as well, based in part on specific textual evidence that the second item modified the first item).

Plaintiffs suggest that their interpretation is right because the phrase "in interstate or foreign commerce" applies to both clauses, even though it only appears in the first clause, and therefore the sports-gambling modifier can also be carried forward to the second clause. *See* NeoPollard Mot. at 16; Lottery Commission Mot. at 22. But as OLC explained, "the interstate-commerce modifier appears at the beginning of a list of four prohibitions, and so there is precedent to support carrying the modifier forward to modify the prohibitions in the second clause." 2018 OLC Opinion at 13 (citing *United States v. Bass*, 404 U.S. 336, 339 (1971)). Contrary to the NeoPollard Plaintiffs' suggestion that the phrase does not precede all four prohibitions, it plainly does: the words "in interstate or foreign commerce" appear in the first clause but precede the first reference to "bets or wagers." Moreover, the case for carrying the interstate-commerce modifier across the entire statute is strengthened by the canon of constitutional avoidance, since without this jurisdictional requirement there might be questions about Congress's authority to regulate purely intrastate conduct under Article I, Section 8 of the Constitution. There is no analogous reason to conclude that the sports-gambling modifier applies to the second clause.

16

### 3.     Additional Textual Evidence Within The Wire Act Confirms That The Statute Is Not Exclusively Limited To Sports Gambling.

For the reasons stated above, OLC correctly concluded that 18 U.S.C. § 1084(a) is itself clear that only one of its four prohibitions is limited to sports gambling. To the extent that there were any doubt on that score, additional indicia within the Wire Act confirm Defendants' interpretation.

> a)     Section 1084(b) Demonstrates That Congress Repeated The Phrase "Sporting Event Or Contest" When It Wanted To Apply It To Multiple Statutory Phrases.

Section 1084(b) creates certain exceptions to the prohibitions provided in Section 1084(a):

> Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of *sporting events or contests*, or for the transmission of information assisting in the placing of bets or wagers *on a sporting event or contest* from a State or foreign country where betting on that *sporting event or contest* is legal into a State or foreign country in which such betting is legal.

18 U.S.C § 1084(b) (emphasis added). As is apparent, section 1084(b) uses the phrase "sporting event[s] or contest[s]" three separate times to define the exceptions to section 1084(a), demonstrating that Congress repeated the sports-gambling modifier when applying it beyond its nearest and most natural referent. "When Congress includes particular language in one section of a statute but omits it in another," we presume "that Congress intended a difference in meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (quoting *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) (internal quotation marks and alteration omitted)); *see also, e.g.*, *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018) (rejecting a proposed reading of a statutory provision on the ground that if Congress wanted the provision to have the claimed effect "it knew how to say so"); *In re Hart*, 328 F.3d 45, 49 (1st Cir. 2008).

The *Kaplan* opinion found this specific logic persuasive. *See Kaplan*, at 5-6 ("Thus the exclusion of the words "on any sporting event or contest" from three of the prohibitions in subsection (a) of the statute *and the specific inclusion of the words in the exception in subsection (b) of the statute* mean that Congress intended just that: making illegal wire communications for bets or wagers and for entitlement to receive money or credit for bets or wagers and for entitlement to receive money or credit for information assisting in the placing of bets or wagers as separate and distinct from information assisting in the placing of bets or wagers on sporting events or contests." (emphasis added)). None of the Plaintiffs provides a meaningful response.

>    b)   Section 1084(d) Contains No Sports-Gambling Modifier, Demonstrating That The Statute Reaches Beyond Sports Gambling.

Section 1084(d) creates a notice-and-disconnect regime for common carriers, providing in relevant part as follows:

> When any common carrier, subject to the jurisdiction of the Federal Communications Commission, is notified in writing by a Federal, State, or local law enforcement agency, acting within its jurisdiction, that any facility furnished by it is being used or will be used for the purpose of transmitting or receiving *gambling information* in interstate or foreign commerce in violation of Federal, State or local law, it shall discontinue or refuse, the leasing, furnishing, or maintaining of such facility, after reasonable notice to the subscriber, but no damages, penalty or forfeiture, civil or criminal, shall be found against any common carrier for any act done in compliance with any notice received from a law enforcement agency.

18 U.S.C. § 1084(d) (emphasis added).

This section contains none of the sports-gambling restrictions that appear in section 1084(a) or (b), and section 1084(d) contains no indication that it is limited to sports gambling. Because section 1084(d) is not limited to sports gambling, the most logical inference is that section 1084(a) is also not so limited. *See Kaplan*, at 6 ("In addition, subsection (d) deals with facilities being used 'for the purpose of transmitting or receiving gambling information.' It does not limit

its application to sports betting but includes the transmission of all gambling information. This is consistent with subsection (a) and is further proof of Congressional intent."); *Lombardo*, 639 F. Supp. 2d at 1281 ("Moreover, § 1084(d) requires a common carrier, upon notice, to cease from operating any facility that will be used 'for the purpose of transmitting or receiving gambling information,' unqualified by any relation to a sporting event or contest.").

The NeoPollard Plaintiffs suggest that "[t]here was no need to repeat the scope of th[e] prohibitions" because the "subsection incorporates whatever prohibitions on gaming may exist under federal or state law, and therefore incorporates by reference the prohibitions in Section 1084(a)." Neopollard Mot. at 17-18 (emphasis omitted). Yet "gambling information" could violate the law for any number of reasons — the prohibitions provided by 18 U.S.C. § 1084(a) are merely one of them. By not including a sports-gambling modifier within 18 U.S.C. § 1084(d), Congress made clear that the notice-and-disconnect regime applies to all gambling information in violation of state, federal, and local law — not merely gambling information that is related to sports. The Court should draw the same conclusion as to the three prohibitions in 18 U.S.C. § 1084(a) that are not subject to the sports-gambling modifier.

## B.   The Court Need Not Consider Ambiguous Legislative History Or Statutory Purpose.

Because the text of the Wire Act compels OLC's conclusion, this Court need not attempt to find meaning from nearly sixty-year-old legislative history or try to give life to the "purpose" of the Wire Act. As the Supreme Court has explained, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142, 1143 (2018) ("Even if Congress did not foresee all of the

19

applications of the statute, that is no reason not to give the statutory text a fair reading"). Even if the Court were to consider these additional interpretive sources, however, they do not meaningfully move the needle in Plaintiffs' direction.

### 1. Legislative History Does Not Demonstrate The Wire Act Exclusively Targets Sports Gambling.

Plaintiffs point to legislative history to suggest that the Wire Act was "aimed only at sports betting." NeoPollard Mot. at 21. No matter where Congress "aimed," however, Congress sometimes "fire[s] a blank." *United States v. Granderson*, 511 U.S. 39, 68 (1994) (Kennedy, J., concurring). "[T]he fact that Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do." *United States v. Locke*, 471 U.S. 84, 95 (1985).

In any case, while Congress's principal goal "may well have been" to stop the use of wire communications for sports gambling, 2018 OLC Opinion at 16, Plaintiffs go beyond the historical evidence when they suggest that the legislative history reveals that "the Wire Act's prohibitions are confined to sports betting." NeoPollard Mot. at 20. Nearly all the legislative history to which Plaintiffs point consists of general statements about the goals of the Wire Act. For example, Plaintiffs point to a statement from Attorney General Kennedy indicating that the Wire Act had had "an immediate effect on the operators of the nation's leading race wire services," NeoPollard Mot. at 21 (quoting Robert F. Kennedy, *The Program of the Department of Justice on Organized Crime*, 38 Notre Dame L. Rev. 637, 638 (1963)), but that statement does not remotely say that the Wire Act's provisions exclusively regulate sports gambling. Other indicia from the history — including that the House Judiciary Committee Report was titled "Sporting Events–Transmission of Bets Wagers, and Related Information," *see* 1961 U.S.C.C.A.N. 2631, or that the same report indicated that bookmakers were dependent upon the wires, *see* NeoPollard Mot. at 22 — similarly

do not make clear that the bill was *only* intended to regulate sports gambling. It is a simply a non-sequitur to say that because some legislators had a "singular focus on sports gambling," it must be true that the supporters "understood the bill as covering only sports gambling." *Id.*

Plaintiffs' reference to a colloquy between Senator Kefauver and Assistant Attorney General Herbert Miller, *see* NeoPollard Mot. at 23, actually shows the opposite of what they intend. Plaintiffs observe that in response to questioning, Assistant Attorney General Miller advised that the bill was limited to sports gambling. Yet shortly after that hearing, the Judiciary Committee substantially redrafted the bill, including removing the grammar that had limited the draft prohibitions to sporting events and contests. *See* 2018 OLC Opinion at 16-17 & n.12. Thus, were the Court to rely upon this history, the most plausible inference would be that the Judiciary Committee made that change to address concerns that the Wire Act should reach non-sports gambling.

Indeed, that an earlier draft of the Wire Act contained commas clearly limiting the reach of the first clause of the Wire Act to sports gambling confirms that the statute could easily have been written as Plaintiffs propose — it simply was not. *See, e.g.*, *Kaplan*, at 5 ("Another rule of statutory construction also applies to the Wire Wager Act. If Congress had intended the Wire Wager Act to apply to sports betting alone, it could have said so — but it did not."). The NeoPollard Plaintiffs resist this assessment of the historical record, suggesting that there is "nothing in the legislative history to suggest that the revisions Congress later made to this language — which included removing the two additional commas — were intended to expand the scope of the first clause to cover gambling other than on sporting events." NeoPollard Mot. at 14-15. But the revisions made to the text speak for themselves, and this Court should reject the suggestion that the text should not be given its fair reading because it is not specifically confirmed by the

legislative history. As the Supreme Court has explained, "if the text is ambiguous, silence in the legislative history cannot lend any clarity," and "if the text is clear, it needs no repetition in the legislative history." *Encino Motorcars*, 138 S. Ct. at 1143; *see also Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 625 (D.C. Cir. 1989) ("[S]ilence in legislative history is almost invariably ambiguous. If a statute is plain in its words, the silence may simply mean that no one in Congress saw any reason to restate the obvious.").

Ultimately, the legislative history is ambiguous at best, and it may be read to support the conclusion that the Wire Act applies to gambling in general. Indeed, the opinion in *Kaplan* evaluated the legislative history to conclude that there is significant evidence "that the Bill was intended to apply to gambling in general not only sports gambling." *Kaplan* at 5. In any case, the Court need not rely upon the legislative history here, because the text is clear.[8]

### 2.   Statutory Purpose Does Not Demonstrate That The Wire Act Exclusively Targets Sports Gambling.

Plaintiffs' appeals to statutory purpose likewise fail because applying the Wire Act as written does not result in an interpretation "[w]here it is quite impossible that Congress could have

---

[8] The NeoPollard Plaintiffs also relatedly point to the Interstate Transportation of Wagering Paraphernalia Act, 18 U.S.C. § 1953, which was enacted the same day as the Wire Act. *See* NeoPollard Mot. at 19. According to Plaintiffs, this statute — which criminalizes the transmission in interstate commerce of certain paraphernalia used "in a numbers, policy, bolita, or similar game" — shows that "when Congress wanted to target non-sports gaming, it used detailed and exhaustive language." *Id.* But there is no general interpretive rule governing the description of gambling in the U.S. Code.   Although the Supreme Court has observed that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed" that those differences were intentional, *Russello v. United States*, 464 U.S. 16, 23 (1983), the Court has never applied such a rule to modify the plain language of separate statutes. *See, e.g.*, *Estate of Kalahasthi v. United States*, 630 F. Supp. 2d 1120, 1132 (C.D. Cal. 2008) ("By its terms, the *Russello* presumption applies only to different sections of a single act, not to separate sections of separate acts."); *GTE South Inc. v. Morrison*, 6 F. Supp. 2d 517, 530 (E.D. Va. 1998) ("[I]nterpretive inferences should be drawn from different sections in the same Act as opposed to different Acts"). The Court can divine little about the meaning of the Wire Act by comparing it to a different law.

intended the result . . . and where the alleged absurdity is so clear as to be most obvious to most anyone." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 471 (1989) (Kennedy, J., concurring in judgment); *see also, e.g.*, *Dunn v. CFTC*, 519 U.S. 465, 470 (1997); *Miller v. Baker*, 969 F.2d 1098, 1102 (D.C. Cir. 1992).  Plain language must therefore control.

First, Plaintiffs suggest that OLC's construction makes no sense because Congress would not reasonably have forbidden the transmission of all bets or wagers, but only information assisting in the placing of sports bets and wagers. *See* NeoPollard Mot. at 14. As OLC explained, however, Congress may have had reasons to specifically target the transmission of information assisting in sports gambling: Unlike lotteries, numbers games, or other kinds of non-sports gambling, sports gambling depends on the real-time transmission of information like point spreads, odds, or the results of horse races. *See* 2018 OLC Opinion at 14. In addition, Congress might have been worried that an unfocused prohibition on transmitting any information that "assisted" in any sort of gambling whatsoever would criminalize a range of speech-related conduct. Plaintiffs suggest that Congress could have addressed that concern by extending the safe harbor of section 1084(b), *see* NeoPollard Mot. at 19, but Plaintiffs' identification of other ways that Congress might have achieved its goals does not render the means that Congress actually selected absurd or incongruous.

Second, Plaintiffs argue that under OLC's interpretation, "Congress permitted the use of a wire communication facility to transmit 'information assisting in the placing of' any 'bets or wagers' other than those involving sports, but then prohibited using a wire communication facility to provide money or credit for sending that same information." NeoPollard Mot. at 18. But, as OLC explained, "the anomaly largely falls away if . . . transmitting bets or wagers of any kind is indeed unlawful under section 1084(a)'s first clause." 2018 OLC Opinion at 15. In other words, since Congress intended to prohibit the transmission of any bets or wagers under the first

prohibition of the first clause, it is reasonable to think that Congress also intended to prohibit the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers under the first prohibition of the second clause. In any case, this supposed anomaly, like the first supposed anomaly to which Plaintiffs point, is far from sufficient to resist giving the statutory text its fair meaning.

### C. The First Circuit Has Not Held That The Wire Act Is Limited To Sports Gambling.

Contrary to Plaintiffs' arguments, the First Circuit has not issued binding precedent on the reach of the Wire Act's sports-gambling modifier, nor has it even issued reasoned dicta. In *United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014), the defendants were convicted of two violations of 18 U.S.C. § 1084. In light of then then-operative 2011 OLC opinion, the government agreed that the Wire Act applied only to sports gambling, but the defendants contended that the evidence against them was insufficient "because some evidence at trial showed that [their entity, Sports Off Shore] also accepted bets on casino games and other forms of gambling not covered by the Wire Act." *Id.* at 718. Accepting the defendants' legal standard, the government argued that "the evidence at trial established that the overwhelming majority of bets placed with SOS were on sporting events." *See* Brief for the United States, *United States v. Lyons*, Nos. 12-1835, 12-1858, at 38-41 (1st Cir. Apr. 29, 2013). The question for the First Circuit was therefore whether the evidence presented by the government satisfied this agreed-upon legal test (i.e., whether there was sufficient evidence of sports gambling), not whether the Wire Act covered non-sports gambling.

The First Circuit agreed with the government and rejected the defendants' sufficiency challenge. In so doing, it said, in a single sentence, that "[t]he Wire Act only applies to 'wagers on any sporting event or contest,' that is sports betting," *Lyons*, 740 F.3d at 718 — a proposition that no one then contested. Because there was sufficient evidence that the defendants had engaged in

sports gambling, however, that proposition did not affect the result of the case: the Court would have held that there was sufficient evidence to uphold the conviction whether the Wire Act criminalized only sports gambling, or instead criminalized sports gambling and also other forms of gambling.

As the First Circuit has explained, "when a statement in a judicial decision is essential to the result reached in the case, it becomes part of the court's holding." *Rossiter v. Potter*, 357 F.3d 26, 31 (1st Cir. 2004). Dictum, in contrast, "comprises observations in a judicial opinion or order that are 'not essential' to the determination of the legal questions then before the court." *Municipality of San Juan v. Rullán*, 318 F.3d 26, 29 n.3 (1st Cir. 2003) (quoting *Dedham Water Co. v. Cumberland Farms Dairy*, 972 F.2d 453, 459 (1st Cir. 1992)). Here, because the First Circuit would have reached the exact same result (rejecting the sufficiency challenge) whether the Wire Act was or was not limited to sports gambling, and because no party contested the scope of the Wire Act, the question of whether the Wire Act is limited to sports gambling was not "essential" to the result reached by the Court.

Indeed, the fact that the scope of the Wire Act was not disputed in *Lyons* further cautions against treating the First Circuit's statement as a holding. *United States v. Starks*, 861 F.3d 306 (1st Cir. 2017), is instructive. In *Starks*, the First Circuit considered whether an armed robbery is a violent felony for purposes of the Armed Career Criminal Act. In an earlier case, *United States v. Luna*, 649 F.3d 91 (1st Cir. 2011), the First Circuit had seemingly answered that question in the affirmative. *See Luna*, 649 F.3d at 108-09 ("Luna has also provided no reason for us to conclude that the type of force involved in armed robbery is not 'violent force — that is, force capable of causing physical pain or injury,' *and we see no reason to do so*." (citation omitted and emphasis added)). As the *Starks* court noted, the final quoted clause ("we see no reason to do so") "may be

25

read to imply that the court independently considered other arguments that armed robbery does not satisfy the force clause, which Luna had failed to raise." *Starks*, 861 F.3d at 323. *Starks* nonetheless held that this language was dicta, noting that it was "presented without analysis," addressed an argument that "the defendant had waived," and "was not necessary to the court's conclusion." *Starks*, 861 F.3d at 323. So too here, the First Circuit in *Lyons* made a passing statement, devoid of analysis, on an issue that was not disputed and did not affect the result of the case. That is the very definition of dicta. Any future First Circuit panel hearing this case will interpret the Wire Act on a clean slate, and this Court should do no less.[9]

### D.    Constitutional Concerns Do Not Compel Plaintiffs' Interpretation Of The Statute.

The Lottery Commission and certain *amici* attempt to constitutionalize this case by suggesting that OLC's interpretation is foreclosed by various First Amendment, Tenth Amendment, and other constitutional concerns. Those arguments are meritless.

### 1.    OLC's Interpretation Does Not Raise First Amendment Concerns.

The Lottery Commission suggests that the 2018 OLC Opinion raises First Amendment concerns because "under the 2018 Opinion's interpretation, a State or private entity could not use

---

[9] Plaintiffs also point to the Fifth Circuit's indication in *In re Mastercard Int'l* that "the Wire Act does not prohibit non-sports internet gambling." 313 F.3d 257, 263 (5th Cir. 2002). A Fifth Circuit opinion is not binding on this Court, and the United States was not a party to that case. In addition, the opinion's persuasive weight is rather limited since the opinion summarily agreed with the district court. Moreover, as the *Lombardo* court observed, the Fifth Circuit "noted that the civil plaintiffs in the MasterCard case, who were essentially seeking to avoid their gambling debts, were not exactly sympathetic and should not be allowed 'to avoid meeting obligations they voluntarily took on' as 'they got exactly what they bargained for.'" *Lombardo*, 639 F. Supp. 2d at 1280 (quoting *Mastercard*, 313 F.3d at 264). The NeoPollard Plaintiffs also point to *United States v. DiChristina*, 886 F. Supp. 2d 164, 215 (E.D.N.Y. 2012), *rev'd*, 726 F.3d 92 (2d Cir. 2013), which simply cited the 2011 OLC opinion for the proposition that the Wire Act is limited to sports gambling. They also point to *United States v. Kaczowski*, 114 F. Supp. 2d 143, 154 (W.D.N.Y. 2000), which does not meaningfully address the reach of the sports-gambling modifier.

the wires to transmit lawful, non-misleading information helpful in the placement of bets or wagers, such as advertisements, to an intrastate customer-base if the data transmitted incidentally flowed through the channels of interstate commerce or the broadcast, while originating in the State where the activity is legal, extends incidentally into other States." Lottery Commission Mot. at 21. Because the Lottery Commission's argument rests upon a fundamental misunderstanding of OLC's construction of the statute, the Court need not reach this argument.

As noted above, OLC understands the Wire Act to prohibit the use of the interstate wires for the transmission of four things: "bets or wagers," (prohibition 1-A); "information assisting in the placing of bets of wagers on any sporting event or contest," (prohibition 1-B); a "wire communication which entitles the recipient to receive money or credit as a result of bets or wagers" (prohibition 2-A); and a "wire communication which entitles the recipient to receive money or credit . . . for information assisting in the placing of bets or wagers" (prohibition 2-B). The Lottery Commission's error is to read the second prohibition of the second clause as applying to all wire communications containing "information assisting in the placing of bets or wagers," but as noted above, that is not how either the 2011 OLC opinion or the 2018 OLC opinion reads the statute. *See supra* note 2 (explaining that both OLC opinions read the phrase "which entitles the recipient to receive money or credit" as applying to both prohibitions within the second clause). Because the Lottery Commission's First Amendment concerns rest entirely upon a misunderstanding of how OLC reads the statute, the Court should reject them.

### 2.   OLC's Interpretation Does Not Render The Statute Impermissibly Vague.

The Lottery Commission also contends that OLC's "extraordinarily broad interpretation of the statute invites substantial vagueness concerns as to what conduct the statute actually criminalizes." Lottery Commission Mot. at 20. OLC's interpretation, however, reflects the

traditional way that the Department had enforced the statute, and such concerns have nothing to do with whether or not the statute applies to non-sports gambling.  Thus, the vagueness argument should be rejected for at least two reasons.

First, "[o]utside the First Amendment context," courts "consider whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder*, 561 U.S. at 18-19 (alterations and internal quotations marks omitted). The Lottery Commission, however, does not identify any First Amendment protected activity in which it is chilled from engaging as a result of the 2018 OLC Opinion. The Lottery Commission instead speculates about conduct in which other persons might engage. *See* Lottery Commission Mot. at 21 (musing about a "video game player who pays $5.00 to enter a video game competition," "a person who enters their livestock in Best in Show competitions around the country," and "a professional poker player"). The Lottery Commission does not want to do any of these things, and it does not point to any First Amendment protected conduct from which it is chilled from engaging. It therefore cannot challenge the Wire Act, or OLC's interpretation of it, on vagueness grounds.

Second, and in any case, nothing about OLC's interpretation of the Wire Act renders the statute unconstitutionally vague. A criminal statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The Wire Act is as clear as any other federal or state prohibition on gambling, and the OLC interpretation provides further notice of how the government understands the statute. In any case, apart from any vagueness concerns with the Wire Act, the Lottery Commission does not explain how restricting the statute to sports gambling would eliminate any

of those concerns; it would simply make those concerns apply exclusively to sports gambling. Nothing in the Lottery Commission's proposed construction actually solves the vagueness problem that Plaintiffs believe exists.

### 3.    OLC's Interpretation Does Not Implicate The Tenth Amendment Or Other Federalism Concerns.

Finally, the Lottery Commission contends that the 2018 Opinion is contrary to the Supreme Court's Tenth Amendment jurisprudence because the "intrastate regulation of gambling and running of state-conducted lotteries has been recognized as a power reserved to the States under the Tenth Amendment." Lottery Commission Mot. at 23; *see also, e.g.*, New Jersey Amicus Br. at 20-22. The Wire Act, however, is silent on its application to state lotteries, and the OLC opinion does not discuss this question. In any event, the Wire Act concerns the use of the *interstate* wires, which Congress unquestionably has the power to regulate. *See United States v. Hausmann*, 345 F.3d 952, 958 n.4 (7th Cir. 2003) (Congress's authority to regulate interstate wire communications systems is authorized in the text of the Constitution). Absolutely nothing in the Wire Act or the 2018 Opinion's interpretation of it is contrary to the Tenth Amendment or principles of federalism. Indeed, there is a long history of Congress regulating gambling when that gambling involves interstate wires, mails, or other instrumentalities of interstate commerce. As OLC explained in 2008, "Congress in the 1890s made it a crime to sell or advertise lotteries through the mail or through interstate commerce," U.S. Dep't of Justice, Office of Legal Counsel, *Scope of Exemption Under Federal Lottery Statutes for Lotteries Conducted By a State Acting Under Authority of State Law* (Oct. 16, 2008), at 130, https://www.justice.gov/sites/default/files/olc/opinions/attachments/2015/06/23/op-olc-v032-p0129.pdf, and in the 1930s "extended these prohibitions to broadcast media and to a broader array or gambling activity." *Id.* Yet it was only in 1975 that Congress enacted exceptions to the certain statutes for lotteries operated by States. Congress's authority to

regulate interstate wires, mails, and other instrumentalities of interstate commerce is unquestionable.

Finally, nothing in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), calls this conclusion into question. In *Murphy*, the Supreme Court simply held, applying the Court's anticommandeering precedents, that the federal government could not require a state to prohibit gambling as a matter of state law. *See, e.g.*, *id.* at 1478 (federal statute unconstitutional because it "unequivocally dictates what a state legislature may and may not do"). Neither *Murphy* nor any other case suggests (much less holds) that Congress may not regulate the use of the interstate wires simply because some states wish to use them for gambling.[10]

## III. Should The Court Rule Against Defendants, It Should Enter Exclusively Declaratory Relief.

Should the Court reject all the foregoing arguments and rule against Defendants, it should enter exclusively declaratory, rather than injunctive, relief. The Declaratory Judgment Act, of course, authorizes only declaratory relief. *See* 28 U.S.C. § 2201. While the Lottery Commission includes a claim under the Administrative Procedure Act, that claim fails to state a claim on which relief may be granted because the Lottery Commission does not challenge "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

First, neither the 2018 OLC memorandum nor the Deputy Attorney General's memorandum adopting it constitutes final agency action. No legal consequences flow those actions: consequences could only follow if someone were actually charged with a violation of the

---

[10] New Jersey relatedly suggests that OLC's interpretation upsets the federal-state balance because certain states could have, but did not, criminalize internet gambling. *See* New Jersey Amicus Br. at 20-21. To state that argument is to reject it: the states enjoy nearly limitless police power and, subject to specified federal constitutional limits, can render nearly anything a crime within their jurisdictions. That well-established principle does not limit Congress's authority to regulate the use of interstate wires.

Wire Act. *See FTC v. Standard Oil Co.*, 449 U.S. 232, 242, 244 (1980) (holding, twenty-four years

after *Frozen Food Express v. United States*, 351 U.S. 40 (1956), that agency's action was not final

even though it imposed a "substantial" practical burden); *accord, e.g.*, *AT&T Co. v. EEOC*, 270

F.3d 973, 975 (D.C. Cir. 2001); *DRG Funding Corp. v. Sec. of Housing & Urban Dev.*, 76 F.3d

1212, 1214 (D.C. Cir. 1996). Second, the Lottery Commission fails to adequately plead that it has

"no other adequate remedy in a court." 5 U.S.C. § 704. Indeed, it is clear as a matter of law that

Plaintiffs have an adequate alternative remedy in a court, insofar as they could present every one

of their arguments in a motion to dismiss any indictment. *See Deaver v. Seymour*, 822 F.2d 66, 69

(D.C. Cir. 1987) (defendants in federal criminal proceeding have "a federal forum in which to

assert their defenses"); *cf. Younger v. Harris*, 401 U.S. 37, 43 (1971) (ability to defend against

criminal prosecution is "adequate remedy at law").

Even if the Lottery Commission did state an APA claim, an injunction would still be

inappropriate for multiple reasons. First, under the APA, the default remedy is vacatur, not

prospective injunctive relief. *See* 5 U.S.C. § 706(2) (reviewing court "shall . . . hold unlawful and

set aside" agency action that fails APA standard of review). An injunction constitutes an

unwarranted "extraordinary remedy" if a less drastic remedy could sufficiently redress plaintiff's

injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). The Lottery

Commission's motion for summary judgment says not a word about why an injunction is required

to redress the injury that it alleges, which is reason enough to deny one. Second, an injunction

preventing the executive branch from bringing a future criminal prosecution — a core Article II

function — would raise serious separation of powers concerns. *See Younger*, 401 U.S. at 43-44

(noting "the basic doctrine of equity jurisprudence that courts of equity should not act, and

particularly should not act to restrain a criminal prosecution, when the moving party has an

adequate remedy at law and will not suffer irreparable injury if denied equitable relief"); *see also Deaver*, 822 F.2d at 66 (applying *Younger* in the context of federal prosecution).[11] And those concerns are all the greater where, as here, Plaintiffs have pointed to no prosecutions of similarly situated entities in the entire history of the Wire Act and OLC has expressed no opinion whatsoever on whether such prosecutions are viable.

## IV.     The Court Should Reject Amici's Additional Arguments.

In addition to the arguments raised by the parties, certain amici present additional arguments. Defendants briefly respond to the most significant.

### A.     The Rule Of Lenity Does Not Apply.

New Jersey and iDEA invoke the rule of lenity, suggesting that "if the Court were to determine that the Statute is ambiguous, the rule of lenity would prohibit DOJ's new and expansive reading." New Jersey Amicus Br. at 18; *see also* iDEA Amicus Br. at 21-24. Yet OLC's interpretation of the Wire Act is not "new and expansive," but merely restores the interpretation that the Department had traditionally employed in successfully enforcing the Act. Moreover, as the *Lombardo* court recognized, "the rule of lenity applies only where the statute includes a 'grievous ambiguity or uncertainty in its language and structure.'" 639 F. Supp. 2d at 1282 (quoting *United States v. Michel*, 446 F.3d 1122, 1135 (10th Cir. 2006) (alterations omitted)); *see also, e.g.*, *Albernaz v. United States*, 450 U.S. 333, 342 (1981) ("The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding

---

[11] *See also, e.g.*, *Kajtazi v. Johnson-Skinner*, 2017 WL 436038, at *2 (S.D.N.Y. Jan. 30, 2017); *Schlegel v. Holder*, No. 13-3251, 2014 WL 12607718, at *2 (D. Minn. May 21, 2014), *aff'd*, 593 F. App'x 599 (8th Cir. 2015); *Christoforu v. United States*, 842 F. Supp. 1453, 1456 (S.D. Fla. 1994), *aff'd*, 61 F.3d 31 (11th Cir. 1995); *Jernigan v. State of Miss.*, 812 F. Supp. 688, 692 (S.D. Miss. 1993); *Hartford Assocs. v. United States*, 792 F. Supp. 358, 363-65 (D.N.J. 1992); *see also Ali v. United States*, No. 12-0816A, 2012 WL 4103867, at *1 (W.D.N.Y. Sept. 14, 2012) (collecting additional cases); *Campbell v. Medalie*, 71 F.2d 671, 672 (2d Cir. 1934) ("A bill in equity to enjoin the prosecution of this indictment will not lie.").

consideration of being lenient to wrongdoers." (internal quotation marks and citation omitted));

*United States v. Brisbane*, 367 F.3d 910, 913 (D.C. Cir. 2004) ("[B]efore we may apply [the rule

of lenity], we must examine the statute's structure, legislative history, and motivating policies.").

Because the Court can resolve this question of statutory interpretation using traditional tools of

statutory construction, there is no need for it to apply the rule of lenity.

### B.    Any Relief Should Be Limited To The Parties.

Certain amici suggest that if the Court rules in favor of Plaintiffs, it should award

nationwide relief that reaches beyond the parties to this litigation. *See* New Jersey Amicus Br. at

22-25; Michigan Amicus Br. at 7-11. There is no basis for such a request. At the outset, none of

the parties requests nationwide relief. *See, e.g.*, *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct.

1645, 1651 (2017) ("For all relief sought, there must be a litigant with standing, whether that

litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right.").

In any case, nationwide relief would be inappropriate even if it had been requested by a

party. As the Court has recognized, only the parties would be bound by an adverse ruling, *see*

Endorsed Order Denying Motion to Intervene dated March 9, 2019, and so it would be patently

unfair for entities that would not be bound by an adverse ruling to share in any favorable ruling.

*See, e.g.*, *City of Chicago v. Sessions,* 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., concurring

in the judgment and dissenting in part) (nationwide injunctions create an inequitable "one-way-

ratchet" under which any prevailing party obtains relief on behalf of all others, but a victory by the

government would not preclude other potential plaintiffs from "run[ning] off to the 93 other

districts for more bites at the apple").

The Declaratory Judgement Act permits a district court to "declare the rights and other

legal relations *of any interested party seeking such declaration*," 28 U.S.C. § 2201(a) (emphasis

added), but it does not authorize the Court to declare the rights of nonparties. As for the APA, even

assuming that Plaintiffs state a claim, the appropriate remedy would at most be to vacate any final agency action *as it applies to Plaintiffs*. The APA provides that when a reviewing court determines that an agency acted in excess of statutory authority, the court shall "hold unlawful and set aside" the challenged action, 5 U.S.C. § 706(2), but the APA imposes no requirement that a court "set aside" the agency action on a nationwide basis. *See, e.g., Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n*, 263 F.3d 379, 393-94 (4th Cir. 2001) ("Nothing in the language of the APA . . . requires us to exercise such far-reaching power.").

Ultimately, under Article III, a court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," and so "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933, 1934 (2018). Thus, absent a recognized exception, "litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* at 702; *see also, e.g.*, *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982) ("An injunction must be tailored to remedy specific harm shown.").[12] Thus, if the Court were to rule in favor of the Plaintiffs in this case, relief should be limited to the Plaintiffs in this case.

## C.     Reliance Interests Do Not Inform The Correct Construction Of A Statute.

New Jersey faults OLC for failing to "sufficiently account for the considerable reliance interests of the States like New Jersey that have invested in Internet gambling." New Jersey

---

[12] Moreover, nationwide injunctions "take a toll on the federal court system — preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also, e.g.*, *Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) ("[W]hen frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court.").

Amicus Brief at 13. But while reliance may provide a "defense for acts taken in violation of the Wire Act after the publication of [the 2011] opinion and prior to the publication of" the 2018 Opinion, *see* 2018 OLC Opinion at 23 n.19, and may inform the government's exercise of prosecutorial discretion in any particular case, such interests are irrelevant to the correct construction of the statute. As the NeoPollard Plaintiffs acknowledge, "past practice is not a relevant consideration in questions of statutory interpretation." NeoPollard Mot. at 10 n.*. The question in this case is what the statute means, not the reasonableness of OLC's decisional process.

### D.      The UIGEA Does Not Override Or Conflict With The Wire Act.

Finally, certain amici point to the Unlawful Internet Gaming Enforcement Act. *See* Michigan Amicus Br. at 6; iDEA Amicus Br. at 18-19; *see also* Lottery Commission Mot. at 10 (referencing this statute in passing). As OLC explained, however, there is no conflict between the Wire Act and UIGEA. Under UIGEA, it is unlawful for anyone "engaged in the business of betting or wagering" to "knowingly accept" certain payments "in connection with the participation of another person in unlawful internet gambling." 31 U.S.C. § 5363. "Unlawful internet gambling," in turn, is defined to exclude, among other things, bets or wagers that are "initiated and received or otherwise made exclusively within a single State" and done so in accordance with the laws of such State, even if the routing of those wire transmissions was done in a manner that involved interstate commerce. *Id.* § 5362(10)(B)(i).

As OLC explained, UIGEA's definition of "unlawful internet gambling" does not and cannot affect the meaning of a separate statute. UIGEA's definition applies only to the "subchapter" in which UIGEA is contained, 31 U.S.C. § 5362, and the Wire Act does not use the term "unlawful Internet gambling." Indeed, UIGEA is explicit that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-

State compact prohibiting, permitting, or regulating gambling within the United States." *Id.* § 5361(b).[13] It follows that nothing in UIGEA modifies the reach of the Wire Act.

## CONCLUSION

Defendants respectfully request that the Court grant Defendants' motion to dismiss, deny Plaintiffs' motions for summary judgment, and terminate these cases.

Dated: March 22, 2019

Respectfully submitted,

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. TYLER
Assistant Director, Federal Programs Branch

/s/ *Steven A. Myers*
STEVEN A. MYERS (NY Bar No. 4823043)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L St. NW
Washington, DC 20005
Telephone: (202) 305-8648
Fax: (202) 616-8470
Email: Steven.A.Myers@usdoj.gov

*Counsel for Defendants*

---

[13] iDEA also refers to the Interstate Gambling Business Act, 18 U.S.C. § 1955, which contains its own definition of an "illegal gambling business." *Id.* § 1955(b)(1). Like UIGEA, this statute does not shed light upon the meaning of the Wire Act, an entirely separate statute. iDEA also observes that various unsuccessful efforts have been made over the years to amend the Wire Act to make it even more explicit that it applies beyond sports gambling, *see* iDEA Br. at 16-17, but the Supreme Court has explained that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," particularly when "it concerns, as it does here, a proposal that does not become law." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (citations and internal quotation marks omitted).

36

## CERTIFICATE OF SERVICE

I certify that, on March 22, 2019, I served the foregoing via ECF electronic transmission in accordance with the Court's Administrative Procedures for ECF to the registered participants as identified on the Notice of Electronic Filing.

Dated:   March 22, 2019                    /s/    Steven A. Myers

                                                        Steven A. Myers