# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

_____

New Hampshire Lottery Commission,　　|

　　　　　　Plaintiff,　　　　　　　|

v.　　　　　　　　　　　　　　　　|　　　Civil Case No. 1:19-cv-00163-PB

　　　　　　　　　　　　　　　　　|

WILLIAM BARR, in his official capacity　|
as Attorney General of the United States　|
of America; United States Department　|
of Justice　　　　　　　　　　　　|

　　　　　　　　　　　　　　　　　|

　　　　　　Defendants　　　　　　|

_____|

　　　　　　　　　　　　　　　　　|

NEOPOLLARD INTERACTIVE LLC,　　|

　　　　　　　　　　　　　　　　　|

POLLARD BANKNOTE LIMITED,　　　|

　　　　　　　　　　　　　　　　　|

　　　　　　Plaintiffs,　　　　　　|

　　　　　　　　　　　　　　　　　|

v.　　　　　　　　　　　　　　　　|　　　Civil Case No. 1:19-cv-00170-SM
　　　　　　　　　　　　　　　　　|　　　(consolidated)

WILLIAM BARR, in his official capacity　|
as Attorney General of the United States　|
of America;　　　　　　　　　　　|

　　　　　　　　　　　　　　　　　|

THE UNITED STATES　　　　　　　|
DEPARTMENT OF JUSTICE,　　　　　|

　　　　　　　　　　　　　　　　　|

THE UNITED STATES OF AMERICA,　|

　　　　　　　　　　　　　　　　　|

　　　　　　Defendants　　　　　　|

_____|

## NHLC'S MEMORANDUM OF LAW OBJECTING TO DEFENDANTS' MOTION TO DISMISS THE COMLAINT AND REPLYING TO DEFENDANTS' OBJECTION TO NHLC'S MOTION FOR SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

The question presented in NHLC's case is whether the Wire Act, 18 U.S.C. § 1084(a), extends to state-conducted lotteries.  The defendants have studiously ignored and intentionally chosen not to brief that question, *see* ECF Doc. #47 at 20[1] n. 4, arguing instead that the 2018 Opinion, which the defendants state extends Section 1084(a) to "all gambling," *id.* at 11, did not decide whether Section 1084(a) extends to state-conducted lottery activity, which is a form of gambling and which is expressly referenced in the 2018 Opinion.  The argument is not credible, and the court should reject it.[2]

The USDOJ wrote the 2011 Opinion because New York and Illinois asked it whether state-conducted online lottery ticket sales violated Section 1084(a).  In response, the defendants explained that Section 1084(a) did not prohibit state-conducted online lottery ticket sales because the statute applied to betting or wagering on sports events or contests only.  *See* 2011 Opinion, ECF Doc. #2-4 at 2 ("Because the proposed New York and Illinois lottery proposals do not involve wagering on sports events or contests, the Wire Act does not prohibit them.").  The USDOJ then issued the 2018 Opinion, which reversed the 2011 Opinion and overtly stated that the "reliance interests" of the States that "began selling lottery tickets via that Internet after the issuance of [the] 2011 Opinion" were not sufficient to require adherence to the 2011 Opinion.  ECF Doc. #2-5 at 23.  The 2018 Opinion even went so far as to suggest that such reliance may be

---

[1] All ECF Doc. # page references herein are to the page numbers the ECF system assigns to the document when it is filed.  Those page number references appear in the top right corner of the documents cited.

[2] The NHLC also contests the notion embedded in the defendants' question presented that Section 1084(a) prohibits "the use of the interstate wires." ECF Doc. #47 at 11.  It plainly does not.  Section 1084(a) applies only in the context of "interstate or foreign commerce."  18 U.S.C. § 10 defines the term "interstate commerce" to include "*commerce between* one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District Columbia." (emphasis added)  Using a channel of interstate commerce like the wires to facilitate purely intrastate commerce is not prohibited by the Wire Act's plain language and is consistent with Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), which specifies that the "intermediate routing of electronic data shall not determine the location or locations in which a bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(E).

a defense in any future criminal prosecution.  ECF Doc. #2-5 at 24, n. 19.  The Deputy Attorney

General then adopted the 2018 Opinion as binding on the agency and all federal prosecutors.

ECF Doc. #2-6.

      The USDOJ cannot issue two wholly conflicting legal opinions within eight years that

both underlined expressly pertain to the legality (or illegality) of state-lottery activity, and, at the same time,

proclaim that the NHLC does not present this Court with a concrete case or controversy.  The

2018 Opinion is broadly written and, by its plain language and the defendants' own admission,

extends to "all gambling," which includes state lotteries in all forms.  The defendants have not

disavowed prosecuting the NHLC or its vendors, agents, or associates for engaging in state-

conducted lottery activity, and the law does not require them to be indicted prior to seeking relief

under the Declaratory Judgment Act or the Administrative Procedure Act.  *See*, *e.g.*,

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *Abbott Labs. v. Gardner*, 387

U.S. 136, 150 (1967).  Thus, the NHLC may maintain this action under both statutes.

      The NHLC also prevails on the merits for several reasons.  First, the defendants have

failed to meet their burden of showing that 18 U.S.C. § 1084(a) extends to the States.  That the

Wire Act has resulted in at least two opposing legal interpretations from the USDOJ indicates

that the Act is ambiguous to such a significant extent that it cannot be fairly or constitutionally

read to include the activities of sovereign entities, like the NHLC, which performs lottery activity

that is lawful under New Hampshire law in order to raise funds for public education.  Second, the

most plausible, natural reading of 18 U.S.C. § 1084(a) reveals that the statute concerns solely

betting or wagering on sports events or contests, which would exclude state-lottery activity.  This

Court should, therefore, deny the defendants' motion to dismiss and grant the NHLC's motion

for summary judgment.

## STATEMENT OF FACTS

The NHLC set forth detailed allegations in its Complaint (ECF Doc. #1) and provided a detailed statement of facts, supported by declaration, in its Memorandum of Law in Support of its Motion for Summary Judgment (ECF Docs. #2, 2-1, & 2-2).  The defendants do not contest those allegations or factual statements.  ECF Doc. #47 at 12, n.1 ("Defendants agree with Plaintiffs that this case raises purely legal questions and that there are no disputed material facts . . . .").  Thus, in the interest judicial economy, the NHLC incorporates those allegations and uncontested facts into this memorandum.

## STANDARDS OF REVIEW

The defendants' combined motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and their objection to the NHLC's motion for summary judgment invoke three different standards of review.[3]

"The proper vehicle for challenging a court's subject-matter jurisdiction is Federal Rule of Civil Procedure 12(b)(1)." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001). Two types of challenges exist on a Rule 12(b)(1) motion to dismiss: sufficiency challenges and factual challenges. *Id.* at 363-64. The defendants make a sufficiency challenge. *See* Def.'s Memo. at 7-10 (challenging the sufficiency of the allegations).  A sufficiency challenge "accepts the plaintiff's version of jurisdictionally-significant facts as true . . . thus requiring the court to assess whether the plaintiff has propounded an adequate basis for subject-matter jurisdiction." *Valentin*, 254 F.3d at 363.  "In performing this task, the court must credit plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an

---

[3] The standard of review on summary judgment is set forth in the plaintiff's memorandum of law in support of its motion for summary judgment.  ECF Doc. #2-1 at 13-15.  The NHLC will not repeat it here.

explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly." *Id.*

"To survive a motion to dismiss" under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court employs a two-pronged approach in making this determination. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).  First, the court identifies and disregards "statements in the complaint that merely offer 'legal conclusion[s] couched as . . . fact[]' or '[t]hreadbare recitals of the elements of a cause of action.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).  Second, the court credits as true all non-conclusory factual allegations and the reasonable inferences therefrom to determine if a plausible claim for relief has been stated. *Ocasio-Hernandez*, 640 F.3d at 12.

**ARGUMENT**

**I.   The NHLC Has Standing To Obtain A Declaratory Judgment Under The Declaratory Judgment Act.**

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court  of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc.*, 549 U.S. at 127.  The United States Supreme Court's decisions have required that "the dispute be 'definite and concrete, touching the legal relations of the parties having adverse interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical

state of facts.'"  *Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).  And

the Supreme Court has summarized the standard to obtain a declaratory judgment as follows:

"'Basically, the question in each case is whether the facts alleged, under all the circumstances,

show that there is a substantial controversy, between parties having adverse legal interests, or

sufficient immediacy to warrant the issuance of a declaratory judgment.'"  *Id.* (quoting *Maryland*

*Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

The defendants assert that the NHLC cannot meet this standard for two reasons.  First,

the defendants argue that the NHLC has not alleged that it has engaged in conduct "arguably

affected with a constitutional interest."  Second, the defendants assert that the NHLC cannot

show a credible threat of prosecution.  Neither of these arguments has merit.

### A.  The NHLC Does Not Need To Show That It Is Engaged In Conduct "Arguably Affected With A Constitutional Interest" To Obtain A Declaratory Judgment.

In a pre-enforcement declaratory judgment action, the court's "analysis must begin with

the recognition that, where threatened action *by government* is concerned, [the court] do[es] not

require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the

threat—for example, the constitutionality of a law threatened to be enforced."  *MedImmune, Inc.*,

549 U.S. at 128-29 (emphasis in the original).  The presence of an affected constitutional interest

is not a required element of such an action; it is merely an "example" of when a declaratory

judgment might be appropriate.  *See id.*  Thus, *MedImmune, Inc.*, a case between private

litigants, stands for the broad proposition that "putting the challenger to the choice between

abandoning his rights or risking prosecution . . . is 'a dilemma that it was the very purpose of the

Declaratory Judgment Act to ameliorate.'"  *Id.* at 129 (quoting *Abbott Labs.*, 387 U.S. at 152)[4];

---

[4] In reaching this conclusion, the United States Supreme Court adopted and endorsed the reasoning in *Steffel v. Thompson*, 415 U.S. 452 (1974), and did not find the lack of a "constitutional interest" a basis on which not to apply *Steffel*'s reasoning to other types of declaratory judgment actions.  *MedImmune, Inc.*, 549 at 134 n. 12 ("Moreover,

*see also Sevigny v. United States*, No. 13-cv-401-PB, 2014 WL 3573566, at *4 & n.5 (D.N.H. July 21, 2014).

First Circuit precedent aligns with *MedImmune, Inc.*'s broad interpretation of what types of actions may present the opportunity for a declaratory judgment.  *See, e.g.*, *Stern v. U.S. Dist. Court for Dist. of Mass.*, 214 F.3d 4, 13 (1st Cir. 2000) (assessing legal question of the authority of court to adopt a certain local rule where adverse interests were present); *New Hampshire Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 5 (1st Cir. 2000) (examining whether federal Controlled Drug Act applied to a specific type of cannabis without accompanying attack on the statute's constitutionality).  The defendants' assertion that the NHLC lacks standing because it has not engaged in conduct "arguably affected with a constitutional interest" should be rejected.

Even if the NHLC had to show it is engaged in conduct "arguably affected with a constitutional interest," it has easily done so.  The regulation of gambling activity within state borders has long been a power reserved to the States by the Tenth Amendment of the United States Constitution.  *See*, *e.g.*, *Iannelli v. United States*, 420 U.S. 770, 790 (1975) ("gambling activities normally are matters of state concern"); *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*, 989 F.2d 1266, 1269 (1st Cir. 1993) ("the cause of action questions what activities may lawfully be carried out at a state-regulated gambling facility, <u>a matter traditionally relegated to state law</u> . . . .") (emphasis added).

The defendants have interpreted the Wire Act broadly to extend to all gambling.  State-conducted lotteries are a form of gambling.  State-conducted lotteries therefore plainly fall within the vast interpretation the defendants have adopted, which directly interferes with the authority

---

even if today's decision could be described as an 'extension of *Steffel*' to private litigation, the dissent identifies no principled reasoned why that extension is not appropriate.  Article III does not favor litigants challenging threatened government enforcement action over litigants challenging threatened private enforcement action.").

constitutionally reserved to the States by prohibiting them from using the wires to facilitate

lottery transactions.  The defendants' attempts to ignore this reality underscore only the fact that

the defendants failed to adequately consider the ramifications of the 2018 Opinion prior to

issuing and adopting it as official policy of the USDOJ.  *See FCC v. Fox Television Stations,*

*Inc.*, 556 U.S. 502, 515 (2009) (holding that it is arbitrary and capricious under the APA to

ignore matters that have engendered serious reliance interests when changing agency policies).

**B.  The NHLC And Its Vendors, Agents, And Associates Face A Credible Threat Of Prosecution.**

The NHLC, its vendors, agents, and associates engage in activity that, under 2018

Opinion, violates the Wire Act.  Though given ample opportunity to do so, the defendants have

not "disavowed any intention of invoking" criminal penalties against the NHLC, its vendors,

agents, and associates.  *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979);

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164-65 (2014) (citing absence of disavowal as

support of credible threat of prosecution).  Rather, the defendants overtly indicated in their 2018

Opinion that, at the very least, online state-conducted lottery activity comes within the ambit of

the Wire Act's prohibitions:

> We acknowledge that some may have relied on the views expressed in our 2011
> Opinion about what federal law permits. Some States, for example, began selling
> lottery tickets via the Internet after the issuance of our 2011 Opinion. But in light
> of our conclusion about the plain language of the statute, we do not believe that
> such reliance interests are sufficient to justify continued adherence to the 2011
> opinion.

ECF Doc. #2-5 at 23-24 (emphasis added).  The Deputy Attorney General formalized this

reasoning in a memorandum to all federal prosecutors, stating that the "Department of Justice's

attorneys should adhere to OLC's [2018] interpretation, which represents the Department's

position on the meaning of the Wire Act." ECF Doc. #2-6 (citing 28 C.F.R. § 0.25). The Deputy

Attorney General continued:

> As an exercise of discretion, Department of Justice attorneys should refrain from
> applying Section 1084(a) in criminal or civil actions to persons who engaged in
> conduct violating the Wire Act in reliance on the 2011 OLC opinion prior to the
> date of this memorandum, and for 90 days thereafter. A 90-day window will give
> businesses that relied on the 2011 OLC opinion time to bring their operations into
> compliance with federal law. <u>This is an internal exercise of prosecutoria1
> discretion; it is not a safe harbor for violations of the Wire Act.</u>

*Id.* (emphasis added).[5]

According to the Deputy Attorney General's adoption of the 2018 Opinion's reasoning,

NHLC's lottery activity, all of which uses the wires, is in violation of federal law for which there

is no safe harbor. To bring itself into compliance with federal law—as the Deputy Attorney

General has ordered of all businesses that conduct gambling-related activity—the NHLC must

dramatically alter its present operations at great expense to the agency itself, and at great cost to

the State of New Hampshire of millions in lost anticipated revenue. ECF Doc. #2-1 at 11-12.

Should NHLC not conform to the USDOJ's developing views on the Wire Act, or, due to the

vagaries inherent in the statutory language, should the NHLC only partially conform despite best

efforts, then the NHLC, its officials, its vendors, its agents, and its business partners run an

actual risk of criminal prosecution. And the defendants now state in their memorandum of law

that the NHLC has an "adequate alternative remedy in a court": it can "present every one of its

arguments in a motion to dismiss any indictment." ECF Doc. #47 at 41.

Given the above, the NHLC is "not without some reason in fearing prosecution" for

violating the 2018 Opinion's binding interpretation of the criminal law. *Babbitt*, 442 U.S. at

302; *see also Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 392 (1988) (recognizing imminent

threat where challenged statute would require plaintiffs "to take significant and costly

---

[5] The Deputy Attorney General has extended the 90-day timeframe by 60 days, to June 14, 2019. ECF Doc. #23-1.

compliance measures or risk criminal prosecution"). Consequently, a credible threat of prosecution exists sufficient to enable the NHLC to maintain this action.

### C. This Court Should Exercise Its Discretion To Provide Declaratory Relief.

The defendants make a final plea for this Court to refrain from exercising its discretion under the Declaratory Judgment Act based on the fallacy that they have not yet decided whether Section 1084(a) extends to state-conducted lottery activity. The Court should decline the invitation. The 2018 Opinion extends Section 1084(a) to all gambling activity and expressly references state-conducted lottery activity. The defendants have not disavowed prosecuting persons or entities under Section 1084(a) for engaging in state-conducted lottery activity. The law does not require the NHLC or its vendors, agents, or associates to abandon its business activities to come into conformance with the 2018 Opinion or to be indicted prior to filing suit. In short, this case presents a real and substantial controversy that is ripe for resolution under the Declaratory Judgment Act and the APA and should be resolved by this Court. *See Stern*, 214 F.3d at 11 (holding controversy ripe for adjudication in part because "[d]elaying adjudication until a more concrete controversy emerges . . . would inflict significant institutional costs with little corresponding gain").

### II.    Final Agency Action Exists Because The Deputy Attorney General Has Commanded Federal Agents And The Gambling Industry To Conform To The 2018 Opinion.

The defendants assert that final agency action does not exist in this case because "no legal consequences flow from" the OLC's issuance of the 2018 Opinion or the Deputy Attorney General's memorandum formally adopting the opinion and directing enforcement action to be taken pursuant to it. ECF Doc. 47 at 40. According to the defendants, prosecution for a violation of the Wire Act alone is the only governmental action that could justify this court's review. *Id.* at 40-41. The defendants are incorrect.

9

The Deputy Attorney General's 2019 memorandum explicitly adopts the 2018 Opinion's binding Wire Act interpretation as the standard that all federal agents must apply and to which all entities in the gambling industry, such as the NHLC, must adhere and to which they must conform their business practices.  With regard to an agency's statutory interpretation, this expectation of conformity is sufficient to constitute final agency action.  *See*, *e.g.*, *Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956) (holding agency's statutory interpretation was final action where failure to conform caused carriers to "run civil and criminal risks"); *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 698 (D.C. Cir. 1971) (finding agency administrator's letter interpreting statute was final action, asserting "[t]he Court has found final action in a wide array of pronouncements and communications having the contemplation and likely consequence of 'expected conformity.'") (quoting *Abbott Labs.*, 387 U.S. at 150); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (holding published agency "guidance" was "final agency action, reflecting a settled agency position which has legal consequences" for both states and private entities); *Trafalgar Capital Assocs.*, *Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) ("In determining whether a particular agency action is final, 'the core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").

The defendants do not dispute that the Deputy Attorney General's 2019 memorandum is the consummation of the USDOJ's decision-making process regarding the Wire Act's application to "non-sports betting."  The defendants also do not dispute that their current position is binding upon both federal agents and the gambling industry.  Rather, the defendants seem to suggest that the USDOJ's formally-adopted interpretation of the Wire Act and simultaneous command that those in the industry conform within a specified time period is not legally

significant enough to warrant review.   *See* ECF Doc. #47 at 40-41 ("consequences could only follow if someone were actually charged with a violation of the Wire Act.").   The defendants are wrong and the few cases they rely upon are materially distinguishable.

The defendants' reliance on *F.T.C. v. Standard Oil Co. of California*, 499 U.S. 232 (1980) is misplaced.   In that case, the FTC brought an administrative complaint against Standard Oil Company of California ("Socal") that, pursuant to administrative processes, would be reviewed by an administrative law judge, whose decision would ultimately be subjected to judicial review.   *Id.* at 241.   The Court concluded that the complaint itself did not constitute final agency action, and, in doing so, explained that the burden of answering an administrative complaint, although "substantial," was "different in kind and legal effect from the burdens attending what heretofore have been considered to be a final agency action."   *Id.* at 242. Specifically the Court stated:

> '[T]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way.'   In *Abbott Laboratories* . . . the publication of certain regulations . . . was held to be final subject to judicial review in an action for declaratory judgment brought prior to any Government action for enforcement. . . . The regulations were 'definitive' statements of the Commission's position and had a 'direct and immediate . . . effect on the day-to-day business' of the complaining parties.   They had 'the status of law' and 'immediate compliance with their terms was expected.'   In addition, the question presented by the challenge to the regulations was a 'legal issue . . . fit for judicial resolution.'
>
> .      .      .
>
> Serving only to initiate the proceedings, the issuance of the complaint [against Socal] . . . has no legal force comparable to that of the regulation at issue in *Abbott Laboratories*, nor any comparable effect upon Socal's daily business.   The regulations in *Abbott Laboratories* forced manufacturers to 'risk serious criminal and civil penalties' for noncompliance, or 'change all their labels, advertisements, and promotional materials; . . . destroy stocks of printed matter; and . . . invest heavily in new printing type and new supplies.'   Socal does not contend that the issuance of the complaint had any such legal or practical effect, except to impose upon Socal the burden of responding to the charges made against it.

*Id.* at 239-42 (internal citations omitted).

The *F.T.C.* Court's discussion of final agency action and *Abbott Laboratories* supports the NHLC's position in this case that final agency action exists.  Here, as in *Abbott Laboratories*, the defendants have issued a binding legal interpretation as well as a clear directive that all affected entities must conform to the specified standard.  As set forth above, that new legal standard, which upends the USDOJ's 2011 interpretation, forces the NHLC to either risk criminal penalties for noncompliance, abandon certain business practices and incur considerable financial losses in doing so, or engage in a costly restructuring of its business practices.  This type of mandatory compliance with an agency directive aligns with both the APA's plain language and the Supreme Court's "pragmatic" approach to final agency action.  *Id.*; *see also* 5 U.S.C. § 551(4) (a "rule" may consist of "part of an agency statement of general or particular applicability and future effect . . . .").

Also distinguishable is *AT&T Co. v. E.E.O.C.*, 270 F.3d 973 (D.C. Cir. 2001), which the defendants cite without discussion.  In that case the federal Equal Employment Opportunity Commission ("EEOC") published a manual that endorsed a Ninth Circuit holding, which concluded that certain conduct violated federal antidiscrimination laws, and, in response to complaints submitted by several AT&T employees, issued a letter to AT&T that indicated that the EEOC may file a civil action against it for engaging in that employment practice.  *Id.* at 974-75.  In concluding that the EEOC's conduct did not constitute final agency action, the court explained that the EEOC activity at issue did "not affect the regulated community"; it merely agreed with a particular legal position.  *Id.* at 976.

This case is materially different from *AT&T*.  The agency action at issue here expressly underline criminalizes conduct that was formally permissible and demands industry compliance.  The

USDOJ, via the Deputy Attorney General's 2019 memorandum, gave all "businesses that relied on the 2011 OLC opinion" a specific amount of "time to bring their operations into compliance with federal law," and simultaneously mandated that all federal agents "adhere to OLC's interpretation, which represents the Department's position on the meaning of the Wire Act." ECF Doc. #2-6 at 2 (emphasis added).  This directive to the gambling industry to conform to the the 2018 Opinion constitutes the formal consummation of the USDOJ's decision-making process, directly affects the rights and business practices of the NHLC, and imposes obligations upon the NHLC to come into conformance with its mandates.  Consequently, the NHLC has presented this court with reviewable final agency action and has stated a claim under the APA.[6]

### III. The Defendants Offer Nothing To Rebut The Presumption That The Word "Whoever" As Used In Section 1084(a) Does Not Extend To State Entities Or Officials In The Conduct Of State Lotteries.

The presumption that the words "person" or "whoever" as used in a statute do not ordinarily include the sovereign, its agencies, or its officials when acting in their official capacities "may be disregarded only upon some affirmative showing of statutory intent to the contrary."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 781 (2000). The defendants have failed to make any affirmative showing of statutory intent to the contrary and instead have rested their case on the fallacy that they have not yet addressed whether Section 1084(a) extends to state-conducted lotteries.  ECF Doc. #47 at 20 n. 4.  Accordingly, the NHLC is entitled to a declaration that Section 1084(a) does not extend to the states, their agencies, or their officials acting in their official capacities and are entitled to have the defendants'

---

[6] In addition to contending that their binding interpretation of the Wire Act does not constitute final agency action, defendants also assert, in one sentence, that the NHLC does not state an APA claim because it "could present every one of [its] arguments in a motion to dismiss any indictment." ECF Doc. #47 at 41.  This is not the case.  The Supreme Court has not interpreted the APA to require the issuance of a criminal indictment prior to the availability of review.  *See*, *e.g.*, *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1815 (2016) (endorsing final agency action analysis set forth in *Frozen Food Express* and finding agency action final in part because it placed the respondents "at the risk of significant criminal and civil penalties").

interpretation of the statute vacated and set aside for impermissibly extending the reach of Section 1084(a) to state-conducted lottery activity.

## IV. The Defendants' Interpretation Of Section 1084(a) Erroneously Extends The Statute To All Gambling And Gambling Operations.

The defendants' interpretation of the Wire Act is tortured, unnatural, and unpersuasive. As recently as March 26, 2019, the United States Supreme Court made clear that where a statute has one or more plausible interpretations, the most natural interpretation controls. *Republic of Sudan v. Harrison*, _ U.S. _, No. 16-1094, 2019 WL 1333259, at *4 (U.S. Mar. 26, 2019). The 2018 Opinion offers an implausible, unnatural interpretation that, among other things, ignores basic grammar rules, dictionary definitions, and punctuation, thereby distorting the meaning of Section 1084(a) to extend to subject matter it was never intended to reach.

### A. Section 1084(a) Contains Three Subparts, Each Beginning With The Word "For."

The most basic grammar rule the defendants ignore concerns the parallel structure of the prepositional phrases within Section 1084(a). Section 1084(a) contains effectively three subparts. These three subparts begin with the preposition "for." "For" is a function word that has various meanings. As used in the first two subparts ("uses a wire transmission facility . . . for the transmission[7] . . . of"), the word "for" means "with the purpose of . . . doing something." Webster's Deluxe Unabridged Dictionary at 715 (2d Ed. 1979). As used in the third subpart ("uses a wire transmission facility . . . for information"), the word "for" means "in expectation of; in quest of; as expecting or seeking." *Id.* at 714. The word "for" is repeated three times in order to maintain parallelism between the three listed subparts. *See* Chicago Manual of Style §

---

[7] The word "transmission" means "a transmitting or being transmitted." Webster's Deluxe Unabridged Dictionary at 1940 (2d Ed. 1979). The word "transmit" means "to send or to cause to go from one person or place to another especially across intervening space or distance; to transfer; to convey." *Id.*

5.213 (prepositions and parallel structure). Thus, the most natural, grammatically correct reading of Section 1084(a) is as follows:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility:
>
> (1)     for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or
>
> (2)     for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or
>
> (3)     for information assisting in the placing of bets or wagers,
>
> shall be fined under this title or imprisoned not more than two years, or both.

Under the above statute, an entity engaged in the business of betting or wagering cannot use a wire transmission facility: (1) to transmit in interstate or foreign commerce bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest; (2) to transmit money or credits as a result of bets or wagers; or (3) to seek information that would assist it in the placing of bets or wagers.

The defendants' interpretation rewrites the statute by reading out of it the comma that clearly separates the second and third subparts from each other. That result is contrary to well-settled rules of statutory construction. Punctuation is a critical indicator of legislative intent, and removing it often changes the meaning and import of a law. *See United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993) ("[T]he meaning of a statute will typically heed the commands of its punctuation."). The defendants provide no sound excuse for reading this critical comma out of the text of Section 1084(a). In short, the most natural, grammatically correct reading of the statute reveals that it contains three subparts.

15

1. **The Last-Antecedent Rule Does Not Apply To The First Subpart Of Section 1084(a).**

The next interpretive question Section 1084(a) presents involves the meaning of the first statutory subpart, which states in full:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility . . . *for the transmission in interstate or foreign commerce **of** bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest* . . . shall be fined under this title or imprisoned not more than two years, or both.

(emphases added).  In this context, the bolded "of" is a function word that indicates the object of the action denoted by the word "transmission."  The phrase "***of*** bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest" is the compound object of the word "transmission."  The clause "on sports events or contests" modifies this compound object.  Thus, when read naturally, one understands the clause "on any sporting event or contest" to apply to the preceding listed terms "bets or wagers" and "information assisting in the placing of bets or wagers."

The defendants reject this natural interpretation in favor of a rigid application of the "last-antecedent rule."  ECF Doc. #47 at 23.   However, like all canons of statutory construction, the last-antecedent rule is "not an absolute." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  The rule does not apply where the "modifying clause appear[s] . . . at the end of a single, integrated list," *Jama v. Immigration & Customs Enforcement*, 543 U. S. 335, 344, n. 4 (2005), or where he rule's application "would require accepting 'unlikely premises,'" *Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) (quoting *United States v. Hayes*, 555 U. S. 415, 425 (2009)).

In this case, the first subpart of Section 1084(a) presents a modifying clause ("on sports events or contests") at the end of a single, integrated list ("bets or wagers or information assisting in the placing of bets or wagers").  This circumstance counsels against the application of the last-

16

antecedent rule.  Additionally, applying the last-antecedent rule to the modifying clause "on

sports events or contests" would require the Court to accept the unlikely premise that Congress,

in choosing to prohibit the placing of bets or wagers generally, simultaneously sought only to

outlaw the transmission of information assisting in the placing of bets or wagers on any sporting

event or contest.  That result seems unlikely and, thus, also counsels against the application of

the last-antecedent rule.[8]

   More notably, however, the application of the last-antecedent rule has been rejected

when analyzing statutory passages similar to those presented in this case, particularly where the

rule's application would run afoul of the Tenth Amendment's plain statement rule.  Specifically,

in *United States v. Bass*, 404 U.S. 336, 337 (1971), the United States Supreme Court rejected the

last-antecedent rule in interpreting the phrase "who receives, possesses, or transports in

commerce or affecting commerce" in the following statute:

> Any person who—
>
> (1) has been convicted by a court of the United States or of a State or any political
> subdivision thereof of a felony . . . and who receives, possesses, or transports in
> commerce or affecting commerce . . . any firearm shall be fined not more than
> $10,000 or imprisoned for not more than two years, or both

In doing so, the Supreme Court explained that:

> While the statute does not read well under either view, 'the natural construction of
> the language' suggests that the clause 'in commerce or affecting commerce'
> qualifies all three antecedents in the list. *Porto Rico Railway, Light & Power Co.*
> v. *Mor,* 253 U. S. 345, 348 (1920). Since 'in commerce or affecting commerce'
> undeniably applies to at least one antecedent, and since it makes sense with all
> three, the more plausible construction here is that it in fact applies to all three.

*Id.* at 339-40.  Thus, because, under the statute, the "sanctions [were] criminal and because,

under the Government's broader reading, the statute would mark a major inroad into a domain

---

[8] The 2018 Opinion offers no persuasive justifications for this construction of the statute, other than to suggest that
the result is not absurd.  ECF Doc. #2-5 at 15-16.

traditionally left to the States," the United States Supreme Court "refuse[d] to adopt the broad reading in the absence of a clearer direction from Congress." *Id.* at 339.

The same result should be reached in this case. The first subpart of Section 1084(a) presents an integrated list followed by a single modifying clause. The most natural construction of the language used suggests that the clause "on sports events or contests" qualifies the antecedents "bets or wagers" in both places where it appears in that subpart. Moreover, because Section 1084(a) imposes criminal sanctions and the USDOJ's broad interpretation of it would mark a major inroad into a domain traditionally left to the States, the Court should refuse to adopt the government's interpretation, absent a clearer direction from Congress.

## 2. The Second And Third Subparts Of Section 1084(a) Apply Solely To Sports Events Or Contests.

Having resolved the first subpart of Section 1084(a), the question remains whether Congress intended the phrase contained in the first subpart—"on any sporting event or contest"—to carry through to the second and third subparts. Given the statute's structure, wording, and purpose[9], that phrase should carry through to the other two subparts. The second subpart uses the phrase "as a result of bets or wagers," which begs the question: As a result of bets or wagers on what? One does not place "bets or wagers" in a vacuum; one places a bet or wager on something. The third prohibition uses the phrase "information assisting in the placing of bets or wagers," which is identical to the phrasing used in the first subpart and which also raises the question: information assisting in the placing of bets or wagers on what?

Common sense, and ordinarily rules of statutory construction, would suggest that these final two subparts are referencing the bets or wagers described in the first part of the statute, *i.e.*,

---

[9] See *United States v. Southard*, 700 F.2d 1, 20 (1st Cir. 1983) (explaining that the purpose of 18 U.S.C. § 1084(a) "was to assist the states in enforcing their own laws against gambling")(citing H. Rep. No. 967, 87th Cong., 1st Sess., reprinted in 1961 U.S. Code Cong. & Ad. News 2631).

bets or wagers "on any sporting event or contest." *See Harrison*, _ U.S. at _ 2019 WL 1333259, at *4 (holding that the word "address," most naturally read, applied to a foreign official's specific residence or place of business, not to other possible undefined locations to which the item was sent, such as the embassy associated with the official's country); *see also Stern*, 214 F.3d at 13 ("The most sensible way to construe Local Rule 3.8(f) is as a unified whole. Each subparagraph is a mere sentence fragment and neither makes sense without reference to the shared introductory language."). To hold otherwise would make little sense. An entity in the gambling business would not be prohibited from transmitting bets or wagers on non-sporting activities, but would be prohibited from receiving money or credits as a result of those bets or wagers and would be prohibited from using the Internet to acquire information to help it place bets or wagers that it is lawfully permitted to place.

The defendants cannot escape the logic and cohesion of Section 1084(a) when it is read holistically to apply solely to betting or wagering on sporting events or contests. Read with respect to that subject matter (Section 1084(a) is, after all, a single sentence), the statute creates a lockbox around the specific activity that Congress sought to proscribe: sports betting or wagering. Specifically, Section 1084(a) prohibits entities engaged in the business of betting or wagering from using a wire transmission facility: (1) for transmitting in interstate or foreign commerce bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest; (2) for transmitting in interstate or foreign commerce money or credits as a result of bets or wagers on any sporting event or contest; and (3) for information in interstate or foreign commerce that would assist them in placing bets or wagers on any sporting event or contest. To escape any portion of this statutory lockbox, you would need an appropriate statutory exemption, which Congress provided in Section 1084(b).

In short, the most logical, natural interpretation of Section 1084(a) limits the statute's reach to "sporting events or contests."  While this interpretation may not be the only plausible interpretation, it is the most natural interpretation.  The defendants' contrary interpretation offers a tortured construction of the statute that makes little sense and appears ultimately to be questing for a particular result rather than Congress's intended meaning.  It should therefore be vacated and set aside under the APA and this Court should declare that Section 1084(a) extends only to sports betting activity and does not extend to state-conducted lotteries.

## V.  The Relief The NHLC Seeks Is Not Limited Solely To The Parties In This Action.

The remedy under the APA is to vacate and aside the unlawful or arbitrary agency action at issue.  This relief is not limited solely to the parties before the court nor is it limited in any geographical sense.  The declaratory relief the NHLC seeks is an order declaring that Section 1084(a) does not extend to state-conducted lottery activity.  That relief necessarily extends beyond the NHLC itself to offer the NHLC and those who engage in state-conducted lottery activity with the NHLC relief from the defendants' far-reaching interpretation of the law.

## CONCLUSION

Thus, for all of the above reasons, the court should deny the defendants' motion to dismiss and grant the NHLC's motion for summary judgment.  This case presents pure issues of law on an undisputed factual record.  No genuine issues of material fact exist.  This court should therefore issue an order declaring that 18 U.S.C. 1084 does not extend to state-conducted lottery activity and vacating and setting aside the defendants' new interpretation under 5 U.S.C. § 706(2)(A) & (C).  In the event the defendants do not follow the court's order, the NHLC has appropriately reserved the right in its pleadings to seek injunctive relief against them.

Respectfully submitted,

NEW HAMPSHIRE LOTTERY
COMMISSION

By its attorney,

GORDON J. MACDONALD
ATTORNEY GENERAL

Date:  March 29, 2019                    By:   /s/ Anthony J. Galdieri_____
                                         Anthony J. Galdieri, Bar # 18594
                                         Senior Assistant Attorney General
                                         Francis C. Fredericks, Bar # 21161
                                         Senior Assistant Attorney General
                                         Civil Bureau
                                         New Hampshire Dept. of Justice
                                         33 Capitol Street
                                         Concord, NH 03301
                                         (603) 271-3650
                                         anthony.galdieri@doj.nh.gov
                                         francis.fredericksjr@doj.nh.gov

## Certificate of Service

I hereby certify that a copy of the foregoing was served this 29th day of March, 2019, on all counsel of record, via the ECF System.

/s/  Anthony J. Galdieri
Anthony J. Galdieri