**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| NEW HAMPSHIRE LOTTERY COMMISSION,<br><br>                    Plaintiffs,<br><br>        v.<br><br>WILLIAM BARR,<br>in his official capacity as Attorney General,<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>                    Defendants. | Civil Action No. 1:19-cv-00163-PB |
| NEOPOLLARD INTERACTIVE LLC,<br><br>POLLARD BANKNOTE LIMITED,<br><br>                    Plaintiffs,<br><br>        v.<br><br>WILLIAM P. BARR,<br>in his official capacity as Attorney General of the United States of America,<br><br>THE UNITED STATES DEPARTMENT OF JUSTICE,<br><br>THE UNITED STATES OF AMERICA,<br><br>                    Defendants. | Civil Action No. 1:19-cv-00170-SM (consolidated) |

**DEFENDANTS' REPLY MEMORANDUM**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.      The Court Should Dismiss These Cases For Lack Of Standing. ................... 2

II.     Plaintiffs' Claims Concerning The Sports-Gambling Modifier Fail Because Only One Of The Wire Act's Four Prohibitions Is Limited To Sports Gambling. .... 5

     A.    The Clear Text Of The Wire Act Shows That Only One Of Its Four Prohibitions Is Limited To Sports Gambling. ............................................................................. 5

         1.    The Sports-Gambling Modifier Does Not Travel Backwards To Apply To The First Prohibition Of The First Clause. ................................................. 5

         2.    The Sports-Gambling Modifier Does Not Travel Forwards To Apply To Either Prohibition Of The Second Clause. ................................................. 9

         3.    Additional Textual Evidence Within The Wire Act Confirms That The Statute Is Not Exclusively Limited To Sports Gambling. ........................... 10

     B.    The Court Should Reject The Lottery Commission's Interpretation. .................... 11

     C.    The Court Need Not Consider Ambiguous Legislative History Or Statutory Purpose. ........................................................................................ 13

         1.    Legislative History Does Not Demonstrate That The Wire Act Exclusively Targets Sports Gambling. ........................................................... 14

         2.    Statutory Purpose Does Not Demonstrate That The Wire Act Exclusively Targets Sports Gambling. ........................................................... 16

     D.    The First Circuit Has Not Held That The Wire Act Is Limited To Sports Gambling. ........................................................................................................... 17

     E.    Constitutional Concerns Do Not Compel Plaintiffs' Interpretation. .................... 20

     F.    The Rule Of Lenity Does Not Apply. ......................................................... 21

III.    Any Relief Should Be Exclusively Declaratory. .............................................. 22

CONCLUSION ....................................................................................................... 24

## **TABLE OF AUTHORITIES**

**Statutes**

18 U.S.C. § 1081 ...................................................................................................... 6

18 U.S.C. § 1084 .............................................................................................. *passim*

18 U.S.C. § 1953 ...................................................................................................... 7

**Cases**

*Abramski v. United States,*
   573 U.S. 169 (2014) ......................................................................................... 21

*Am. Library Ass'n v. Barr,*
   956 F.2d 1178 (D.C. Cir. 1992) ........................................................................ 2

*Appalachian Power Co. v. EPA,*
   208 F.3d 1015 (D.C. Cir. 2000) ...................................................................... 23

*AT&T v. EEOC,*
   270 F.3d 973 (D.C. Cir. 2001) ........................................................................ 24

*Babbitt v. Farm Workers,*
   442 U.S. 289 (1979) ....................................................................................... 2, 4

*Barber v. Thomas,*
   560 U.S. 474 (2010) ......................................................................................... 21

*Behre v. Gonzales,*
   464 F.3d 74 (1st Cir. 2006) ............................................................................. 19

*Buscaglia v. Bowie,*
   139 F.2d 294 (1st Cir. 1943) ............................................................................. 8

*DRG Funding Corp. v. Sec. of Housing & Urban Dev.,*
   76 F.3d 1212 (D.C. Cir. 1996) ........................................................................ 24

*Dunn v. CFTC,*
   519 U.S. 465 (1997) ......................................................................................... 17

*El Dia v. Hernandez Colon,*
   963 F.2d 488 (1st Cir. 1992) ............................................................................. 5

*Encino Motorcars, LLC v. Navarro,*
   138 S. Ct. 1134 (2018) ..................................................................................... 15

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976).................................................................................... 7

*Frozen Food Express v. United States*,
   351 U.S. 40 (1956)..................................................................................... 23

*FTC v. Standard Oil. Co. of Cal.*,
   449 U.S. 232 (1980).................................................................................. 23

*Holistic Candlers & Consumers Ass'n v. FDA*,
   664 F.3d 940 (D.C. Cir. 2012).................................................................. 24

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004).................................................................. 24

*Lockhart v. United States*,
   136 S. Ct. 958 (2016).................................................................... 7, 8, 11, 20

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ................................................................... 23

*MedImmune, Inc. v. Genentech*,
   127 S. Ct. 764 (2007)................................................................................. 5

*Mills v. Harmon Law Offices*,
   344 F.3d 42 (1st Cir. 2003)....................................................................... 4

*Moore v. Charlotte-Mecklenburg Bd. of Ed.*,
   402 U.S. 47 (1971).................................................................................... 19

*National Automatic Laundry & Cleaning Council v. Shultz*,
   443 F.2d 689 (D.C. Cir. 1971).................................................................. 23

*New Hampshire Hemp Council, Inc. v. Marshall*,
   203 F.3d 1 (1st Cir. 2000)...................................................................... 4, 5

*Porto Rico Ry., Light & Power Co. v. Mor*,
   253 U.S. 345 (1920).................................................................................. 8

*Rideau v. Parkem Indus. Servs.*,
   917 F.2d 892 (5th Cir. 1990) .................................................................... 8

*Sorenson v. Sec'y of Treasury of U.S.*,
   475 U.S. 851 (1986).................................................................................. 13

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)............................................................................... 2, 4

*Torres-Fuentes v. Motorambar, Inc.*,
  396 F.3d 474 (1st Cir. 2005) ................................................................................ 4

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) .............................................................................. 22, 24

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
  508 U.S. 439 (1993) ........................................................................................ 14

*United States v. Bass*,
  404 U.S. 336 (1971) .................................................................................. 10, 20

*United States v. Hausmann,*
  345 F.3d 952 (7th Cir. 2003) ......................................................................... 20

*United States v. Jicarilla Apache Nation*,
  564 U.S. 162 (2011) ........................................................................................ 13

*United States v. Jimenez*,
  507 F.3d 13 (1st Cir. 2007) ............................................................................ 13

*United States v. Kaplan*,
  No. 06CR-337CEJ-2, ECF No. 606 (E.D. Mo. Mar. 20, 2008) ...................... *passim*

*United States v. Laureys*,
  653 F.3d 27 (D.C. Cir. 2011) ........................................................................... 6

*United States v. Lombardo*,
  639 F. Supp. 2d 1271 (D. Utah. 2007) ................................................. 9, 11, 21

*United States v. Lopez*,
  514 U.S. 549 (1995) ........................................................................................ 10

*United States v. Lyons*,
  740 F.3d 702 (1st Cir. 2014) ............................................................. 17, 18, 19, 20

*United States v. Morrison*,
  529 U.S. 598 (2000) ........................................................................................ 10

*United States v. Shrader*,
  675 F.3d 300 (4th Cir. 2012) ........................................................................... 6

*United States v. Starks*,
  861 F.3d 306 (1st Cir. 2017) ........................................................................... 20

**Administrative Materials**

U.S. Dep't of Justice, Office of Legal Counsel,
  *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling* (Nov. 2, 2018),
  https://www.justice.gov/olc/file/1121531/download .......................................................... *passim*

U.S. Dep't of Justice, Office of Legal Counsel,
  *Whether Proposals by Illinois and New York to Use the Internet
  and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults
  Violate The Wire Act* (Sept. 20, 2011), https://www.justice.gov/sites/default/files/olc/
  opinions/2011/09/31/state-lotteries-opinion.pdf ........................................................ 12

**Legislative Materials**

Report of Proceedings: Hearing Before the S. Comm. on the Judiciary, Exec. Sess.,
  87th Cong. (July 10, 1961) ...................................................................................... 15

S. 1656, 87th Cong. (1961) ............................................................................................ 14

S. Rep. 87-588 .............................................................................................................. 14

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
  Reading Law: The Interpretation of Legal Texts (2012) ...................................... 7, 11

Lewis, Sutherland Statutory Construction, Vol. 2 ......................................................... 8

Webster's Deluxe Unabridged Dictionary (2d Ed. 1979)........................................... 13

# INTRODUCTION

The Department of Justice's Office of Legal Counsel ("OLC") has issued an opinion concluding that certain provisions of the Wire Act, 18 U.S.C. § 1084(a), are not exclusively limited to sports gambling. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling* (Nov. 2, 2018), https://www.justice.gov/olc/file/1121531/download ("2018 OLC Opinion"). The OLC opinion did not address, however, whether the Wire Act applies to state lotteries and their vendors.  Rather, as set out in a Memorandum from the Deputy Attorney General dated today and attached hereto, the Department is currently reviewing that question, and all federal prosecutors have been instructed to "refrain from applying Section 1084(a) to State lotteries and their vendors, if they are operating as authorized by State law, until the Department concludes its review." *See* Memorandum from the Deputy Attorney General, *Notice Regarding Applicability of the Wire Act, 18 U.S.C. § 1084, to State Lotteries and Their Vendors* (April 8, 2019) (Declaration of Steven A. Myers Ex. 1). Should the Department ultimately determine that the Wire Act does apply to state lotteries and their vendors, federal prosecutors are further instructed to "extend the forbearance period for 90 days after the Department publicly announces this position." *Id.*

Because Plaintiffs do not have a current credible fear of prosecution, Plaintiffs lack standing to challenge OLC's interpretation of the Wire Act. If the Department ever determines that state lotteries and their vendors are subject to prosecution under the Wire Act, Plaintiffs might at that time contend that they have standing to challenge the 2018 OLC Opinion. Until then, any challenge is premature: there is no need for this Court to reach out to decide a question that is not ripe today and could be rendered moot in the future. The Court should dismiss these cases without prejudice for lack of jurisdiction.

If the Court nevertheless reaches the merits, it should uphold Defendants' interpretation of the Wire Act. Notwithstanding the arguments presented in Plaintiffs' two most recent briefs, *see* ECF No. 57 ("NeoPollard Opp."); ECF No. 58 ("Lottery Commission Opp."), only Defendants' interpretation is faithful to the statutory text, which limits one reference to "bets or wagers" to those on "sporting event[s] or contest[s]" but otherwise applies more broadly. While Plaintiffs believe that legislative history and policy concerns favor their interpretation, those arguments cannot overcome plain text.

## ARGUMENT

### I.    The Court Should Dismiss These Cases For Lack Of Standing.

To have standing to bring a pre-enforcement challenge to a federal criminal statute, Plaintiffs must demonstrate that they have "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see also Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1194 (D.C. Cir. 1992). Plaintiffs cannot satisfy that legal standard.

1.    Plaintiffs do not have a current credible fear of prosecution under the Wire Act. The 2018 OLC Opinion did not address whether state lotteries or their vendors are subject to prosecution under the Wire Act, and the Department as a whole had never issued guidance on whether or how prosecutors should enforce the Wire Act against state lotteries and their vendors.[1]

---

[1] While the 2018 OLC Opinion notes that certain state lotteries had relied upon the 2011 OLC Opinion's holding that the statute does not apply to non-sports gambling, *see* 2018 OLC Opinion at 22; *see also* Lottery Commission Opp. at 7, the 2018 OLC Opinion certainly does not hold that the statute affirmatively covers state lotteries or that they would have no other defenses to prosecution under the Wire Act, let alone that prosecutions of lotteries would be forthcoming.

Rather, the OLC opinion is limited to resolving a question of statutory interpretation about the Wire Act in general.

As the Lottery Commission accurately observes, Defendants "intentionally chose[]" not to respond to Plaintiffs' arguments that focus specifically on state lotteries and their vendors, *see* Lottery Commission Opp. at 1, and Defendants' brief explained why: Plaintiffs "cannot manufacture a justiciable controversy by filing a declaratory action that seeks to compel Defendants to adopt an enforcement position." *See* Defs.' Mem. (ECF No. 47) at 10 n.4. As confirmed in today's memorandum from the Deputy Attorney General, the Department is "now reviewing" "whether the Wire Act applies to State lotteries and their vendors," Myers Decl. Ex. 1. Defendants acknowledge that a fourteen-year-old letter from a deputy assistant attorney general in the Criminal Division might be read to suggest that the Criminal Division once believed that state lotteries could be subject to liability under the Wire Act, *see* ECF No. 57-2, but that letter was superseded by the 2011 OLC opinion, and neither the 2011 nor the 2018 OLC opinion specifically addresses this issue. In any case, the memorandum from the Deputy Attorney General confirms that, as of the date of this filing, the Department is currently considering whether the Wire Act applies to state lotteries and their vendors.

In the meantime, the Memorandum from the Deputy Attorney General instructs federal prosecutors that no Wire Act prosecutions may be brought against "State lotteries and their vendors, if they are operating as authorized by State law, until the Department concludes its review." Myers Decl. Ex. 1. And "[i]f the Department determines that the Wire Act does apply to State lotteries or their vendors, then Department of Justice attorneys should extend the forbearance period for 90 days after the Department publicly announces this position." *Id.* Because Plaintiffs will not be prosecuted under the Wire Act at least until the Department finishes reviewing whether

the Wire Act applies to State lotteries and their vendors (and even then only if the Department finds that any particular prosecution is appropriate, and only for conduct postdating that conclusion by ninety days), Plaintiffs do not face a "realistic" "threat of federal prosecution." *New Hampshire Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 5 (1st Cir. 2000). Indeed, even Plaintiffs acknowledge that an unambiguous disclaimer of intent to prosecute suffices to remove such a fear. *See* NeoPollard Opp. at 3-4; Lottery Commission Opp. at 7.

There is accordingly no reason whatsoever for the Court to either (1) resolve the correctness of OLC's opinion, or (2) even more fancifully, decide issues that the opinion does not even address. The Court should instead dismiss these cases for lack of standing. Such a dismissal would be without prejudice, *see, e.g.*, *Torres-Fuentes v. Motorambar, Inc.*, 396 F.3d 474, 475 (1st Cir. 2005) ("Dismissals for lack of jurisdiction should generally be without prejudice." (citing *Mills v. Harmon Law Offices*, 344 F.3d 42, 45-46 (1st Cir. 2003)), and so would not preclude Plaintiffs from returning to Court in the future if the Department ever reaches an enforcement position that gives rise to a reasonable fear of prosecution.[2]

2.      In addition to the fact that Plaintiffs do not have a credible fear of prosecution, they also do not have "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). The Lottery Commission has abandoned its First Amendment theory, and at most it suggests that Tenth

---

[2] If the Court nevertheless determines that it has jurisdiction over all of Plaintiffs' claims now, including those that focus specifically on state lotteries and their vendors and that were not addressed by the 2018 OLC Opinion, Defendants respectfully request an opportunity to address those claims prior to any ruling by the Court. To ensure that the Plaintiffs would suffer no prejudice as a result of any additional briefing, Defendants would be willing, if necessary, to extend the forebearance period, for the Plaintiffs in this case, through the date of the Court's decision following the submission of those additional briefs. Nevertheless, in light of the memorandum from the Deputy Attorney General described in the main text, the more appropriate course is for the Court to dismiss these cases without prejudice for lack of jurisdiction.

Amendment imposes a plain-statement rule that informs the Court's construction of the Wire Act. The Lottery Commission does not suggest, however, that the Tenth Amendment precludes Congress from regulating the use of interstate wires for gambling, nor could such a contention be squared with Congress's plenary power over the use of the wires. Contrary to Plaintiffs' contentions, moreover, the Supreme Court has not held that plaintiffs may preemptively challenge the government's interpretation of a federal criminal statute on nonconstitutional grounds. *MedImmune, Inc. v. Genentech*, 549 U.S. 118 (2007), dealt with preemptive challenges to patent validity and has little to say about the availability of preemptive relief on nonconstitutional theories against the government's interpretation of criminal statutes. Defendants acknowledge that the First Circuit permitted a plaintiff to seek preemptive declaratory relief on statutory grounds in *New Hampshire Hemp Council*, 203 F.3d 1, but respectfully maintain that Supreme Court case law requires more.[3]

## II. Plaintiffs' Claims Concerning The Sports-Gambling Modifier Fail Because Only One Of The Wire Act's Four Prohibitions Is Limited To Sports Gambling.

If the Court reaches the merits, it should uphold Defendants' interpretation of the Wire Act, as only Defendants' interpretation is consistent with the statutory text.

### A. The Clear Text Of The Wire Act Shows That Only One Of Its Four Prohibitions Is Limited To Sports Gambling.

#### 1. The Sports-Gambling Modifier Does Not Travel Backwards To Apply To The First Prohibition Of The First Clause.

Defendants demonstrated that under established canons of construction, the sports-gambling modifier ("on any sporting event or contest") only applies to the statutory prohibition

---

[3] For all the same reasons, the Court should exercise its discretion to decline to provide declaratory relief. Such relief is appropriate when "the need is clear, not remote or speculative." *El Dia v. Hernandez Colon*, 963 F.2d 488, 493 (1st Cir. 1992). At this point, Plaintiffs' request is plainly premature.

that it immediately follows, i.e., the second prohibition of the first clause. *See generally* Defs.'
Mem. at 11-15. Plaintiffs' arguments to the contrary fail.

      1.     The NeoPollard Plaintiffs indicate that "the only type of bets and wagers mentioned
in Section 1084(a) are those on sporting events or contests." NeoPollard Opp. at 7; *see also* Lottery
Commission Opp. at 18 ("The second subpart uses the phrase 'as a result of bets or wagers,' which
begs the question: As a result of bets or wagers on what?"). While it is true that the Wire Act only
mentions one specific type of bets or wagers, that does not answer the question of how broadly the
sports-gambling modifier applies. Congress was free to specify the type of bets or wagers at issue
in some of the Wire Act's prohibitions, but nothing stopped Congress from speaking to bets or
wagers generally in others.

      2.     The NeoPollard Plaintiffs contend that the Wire Act's definitions section
distinguishes bets from lotteries and games of chance. *See* NeoPollard Opp. at 8. The relevant
language provides as follows:

> The term "gambling establishment" means any common gaming or gambling
> establishment operated for the purpose of gaming or gambling, including accepting,
> recording, or registering bets, or carrying on a policy game or any other lottery, or
> playing any game of chance, for money or other thing of value.

18 U.S.C. § 1081. Contrary to Plaintiffs' interpretation, this paragraph does not "distinguish"
"bets" from "lotter[ies]" and "games[s] of chance": if anything, it could be read to suggest that
"lotter[ies]" are a form of "gaming or gambling." It certainly does not distinguish lotteries and
games of chance from bets, since the mere fact that the statute lists these terms separately does not
mean that there is no overlap in meaning among the listed items. Indeed, "Congress often uses
multiple words with overlapping meaning to capture a broad swath of conduct." *United States v.
Shrader*, 675 F.3d 300, 311 (4th Cir. 2012) (quoting *United States v. Laureys*, 653 F.3d 27, 41

(D.C. Cir. 2011)). Just as there is overlap between "bets" and "wagers," *see* 18 U.S.C. § 1084(a), there can be overlap among betting, lotteries, and games of chance.

3.      Plaintiffs point to the Interstate Transportation of Wagering Paraphernalia Act, 18 U.S.C. § 1953. *See* NeoPollard Opp. at 8. As Defendants have previously explained, the Court can infer little about the meaning of the Wire Act by comparing it to a different statute. *See* Defs.' Mot. at 22 n.8. Indeed, 18 U.S.C. § 1953 is written in a different structure than 18 U.S.C. § 1084, further undercutting whatever comparative force might otherwise exist. That Congress listed a number of specific items in the Wagering Paraphernalia Act but used a general term in the Wire Act does not mean that the Wire Act's general term should not be read as written. *See also* ECF No. 54 (CSIG Amicus Br.) at 17-19 (discussing this statute).

4.      Plaintiffs challenge Defendants' reliance on the last-antecedent canon. Yet rather than grappling with the doctrinal criteria governing when the canon is appropriately applied (when the statute does not consist of a simple, parallel series of nouns or verbs, *see* Defs.' Mem. at 13-14), Plaintiffs attempt to insert policy arguments into what ought to be a textual analysis of the statute. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201 (1976). Plaintiffs may dismiss Defendants' "primer on the parts of speech," NeoPollard Opp. at 10, but it is indisputable that the first clause of the Wire Act is not "simple and parallel without unexpected internal modifiers or structure." *Lockhart v. United States*, 136 S. Ct. 958, 963 (2016), and that it takes "more than a little mental energy to process the individual entries in the list," *id.* The doctrinal question is whether "the syntax involves something other than a parallel series of nouns or verbs," Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152 (2012) ("Scalia & Garner"), and the Wire Act plainly does. *See also Lockhart*, 136 S. Ct. at 963 ("[T]he varied syntax

of each item in the list makes it hard for the reader to carry the final modifying clause across all three.").

To be sure, the last-antecedent rule may be "overcome by other indicia of meaning," *Lockhart*, 136 S. Ct. at 963 (quoted in NeoPollard Opp. at 8), but those indicia may not be that Plaintiffs do not like the result reached when the last-antecedent rule is applied. Similarly, while Plaintiffs have identified a seventy-six-year-old First Circuit opinion quoting an even older treatise indicating that the last-antecedent rule is "of no great force," *Buscaglia v. Bowie*, 139 F.2d 294, 296 (1st Cir. 1943) (quoting Lewis, Sutherland Statutory Construction, Vol. 2, Sec. 420), more modern Supreme Court cases make clear that the Supreme Court "typically" applies this rule and has "applied the rule from our earliest decisions to our more recent." *Lockhart*, 136 S. Ct. at 963.[4]

6.      Plaintiffs ask the Court to consider an example from ordinary speech: "Would you please help me find a house or condo or information about buying a house or condo anywhere in New Hampshire?" NeoPollard Opp. at 10. According to Plaintiffs, anyone hearing this request would understand the speaker to be exclusively interested in houses or condos in New Hampshire. Whether that is true or not, however, would depend on how the request was delivered; English speakers do not speak in flat monotone but instead "use pauses and inflections to make their meanings clear." *Rideau v. Parkem Indus. Servs.*, 917 F.2d 892, 896 (5th Cir. 1990). In spoken English, someone who wanted "anywhere in New Hampshire" applied to his entire request would add pauses after each instance of the word "condo." In written English, those pauses would be

---

[4] While it is true that in *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920), the two relevant clauses each began with the same noun ("citizens"), *see* NeoPollard Opp. at 9, the key difference is that the remainder of the statute was also parallel: in each clause, the word "citizens" was followed by prepositional phrase introducing a list of places. The statute at issue in *Mor* was therefore an appropriate candidate for the series-qualifier canon. The Wire Act is not.

indicated by commas: "Would you please help me find a house or condo[,] or information about buying a house or condo[,] anywhere in New Hampshire?" Equivalent commas do not exist in the Wire Act, and Plaintiffs have no explanation for why.[5]

>       **2.     The Sports-Gambling Modifier Does Not Travel Forwards To Apply To Either Prohibition Of The Second Clause.**

Basic grammar compels the conclusion that the sports-gambling modifier, which is part of the second prohibition of the first clause, does not travel forwards to modify either prohibition of the second clause. *See* Defs.' Mem. at 15-16; *accord United States v. Lombardo*, 639 F. Supp. 2d 1271, 1281 (D. Utah. 2007); *United States v. Kaplan*, No. 06CR-337CEJ-2, ECF No. 606, at 4 (E.D. Mo. Mar. 20, 2008) (report and recommendation).[6]

Plaintiffs do not meaningfully challenge Defendants' demonstration that it would be exceedingly odd to treat a modifier as applying to prohibitions that both precede and follow it. Other than the policy arguments that are addressed below, *see infra* Part II.C.2, Plaintiffs' only response is to suggest that the phrase "in interstate or foreign commerce" likewise appears only in the first clause but is properly read as applying to both clauses. *See* NeoPollard Opp. at 13. Textually, however, the interstate-commerce modifier appears at the very start of the first clause,

---

[5] The Lottery Commission further suggests, with no reference to any authority, that the "of" in the phrase "transmission in interstate or foreign commerce *of* bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest" operates as a "function word that indicates the object of the action denoted by the word 'transmission.'" Lottery Commission Opp. at 16 (emphasis added). The Lottery Commission is correct that the word "of" introduces the things that are being transmitted, but that does not answer the question of how broadly to read the scope of the sports-gambling modifier.

[6] Plaintiffs observe that the report and recommendation in *Kaplan* was never adopted by the district court. *See* NeoPollard Opp. at 11. That is true; it appears that objections to the report and recommendation were still pending when the defendant entered a guilty plea. What matters about *Kaplan* is not whether it was adopted by the district court or not (it would not be binding precedent even if it had been), but instead whether its careful analysis is persuasive. And on the latter point, Plaintiffs have nothing to say.

prior to the first prohibition. *See* 2018 OLC Opinion at 13 (citing *United States v. Bass*, 404 U.S. 336, 339-40 (1971)). It is thus significantly less odd to treat it as applying to the entire statute than the sports-gambling modifier, which follows the second prohibition of the first clause and (in Plaintiffs' telling) would apply to prohibitions that both precede *and* follow it.

Moreover, contrary to Plaintiffs' contentions, the canon of constitutional avoidance supports reading the interstate-commerce modifier across the entire statute in a way that does not apply to the sports-gambling modifier. Especially in light of Supreme Court precedent suggesting limits on Congress's Commerce Power, *see, e.g. United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000), it is conceivable to imagine constitutional challenges to convictions for gambling activity that lacked any nexus to interstate commerce. That the Supreme Court in 1971 (decades before those cases were decided) chose to rely on a different principle to avoid a construction that would criminalize the possession of firearms absent a nexus to interstate commerce is beside the point. *See* Lottery Commission Opp. at 17-18; NeoPollard Opp, at 15 (each citing *Bass*). As explained below, *see infra* Part II.E, that principle, dealing with alterations to the traditional federal-state balance, is irrelevant to the correct construction of the sports-gambling modifier.

### 3. Additional Textual Evidence Within The Wire Act Confirms That The Statute Is Not Exclusively Limited To Sports Gambling.

In Section 1084(b), Congress demonstrated that it knew how to repeat the sports-gambling modifier when it wanted it to apply beyond its nearest and most reasonable referent. *See* Defs.' Mem. at 17-18; *see also Kaplan*, at 5-6 ("Thus the exclusion of the words 'on any sporting event or contest' from three of the prohibitions in subsection (a) of the statute and the specific inclusion of the words in the exception in subsection (b) of the statute mean that Congress intended just that . . . ."). In response, Plaintiffs suggest that it was necessary to repeat the sports-gambling

modifier in 18 U.S.C. § 1084(b) because it "contains three completely different formulations with varied nouns." NeoPollard Opp. at 11. The doctrinal test is not "varied nouns," however, but rather "varied syntax." *Lockhart*, 136 S. Ct. at 963. Plaintiffs are correct that the last-antecedent rule would have applied to 18 U.S.C. § 1084(b) if Congress had not repeated the sports-gambling modifier, but the reason is that 18 U.S.C. § 1084(b) — just like 18 U.S.C. § 1084(a) — does not consist of a "parallel series of nouns or verbs," Scalia & Garner at 152. The rule of the last antecedent would be as appropriate for 18 U.S.C. § 1084(b) as it is for 18 U.S.C. §1084(a), but only 18 U.S.C. § 1084(b) has repeated references to sporting events or contests. The Court cannot ignore such clear differences in drafting within the same statute.

Plaintiffs' response to 18 U.S.C. § 1084(d) is equally unpersuasive. This provision contains no indication that it is limited to sports gambling, and so the most logical inference is that 18 U.S.C. § 1084(a) is also not so limited. Defs.' Mem. at 18-19; *see also Kaplan*, at 6 ("In addition, subsection (d) deals with facilities being used 'for the purpose of transmitting or receiving gambling information.' It does not limit its application to sports betting but includes the transmission of all gambling information. This is consistent with subsection (a) and is further proof of Congressional intent."); *Lombardo*, 639 F. Supp. 2d at 1281 (similar). Plaintiffs suggest that Section 1084(d) is an "unrelated mandate" that "go[es] beyond the scope of Section 1084(a)," NeoPollard Opp. at 12, but it makes far more sense to read provisions of the same statute in harmony, rather than as "unrelated" provisions. Indeed, it is difficult to imagine why Congress would have attached a notice-and-disconnect provision addressing gambling in all its forms to a statutory section that only made one specific form of gambling unlawful.

### B.    The Court Should Reject The Lottery Commission's Interpretation.

While Defendants and the NeoPollard Plaintiffs disagree on the most significant issues in this case, they at least agree on one important premise: the Wire Act contains two clauses, each of

11

which contains two prohibitions. *See, e.g.*, NeoPollard Mot. (ECF No. 10) at 8. The Lottery

Commission, however, now reveals that under its reading, the statute contains three subparts.

Under the Lottery Commission's reading, the statute would be parsed as follows:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility:
>
> > (1)    for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or
> >
> > (2)    for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or
> >
> > (3)    for information assisting in the placing of bets or wagers,
>
> shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1084(a).

The Lottery Commission is misreading the statute, and even if it were not, it would still be

wrong about the reach of the sports-gambling modifier. At the outset, as OLC explained in 2018,

*see* 2018 Opinion at 3 n.4, parsing the statute as the Lottery Commission does creates significant

overlap between the first and third prohibitions; the first prohibition would apply to "information

assisting in the placing of bets or wagers on any sporting event or contest" and the third prohibition

would apply to "information assisting in the placing of bets or wagers." And as OLC explained in

2011, under this reading the third "clause would prohibit the 'use[] [of] a wire communication

facility . . . for information assisting in the placing of bets or wagers,' but it is unclear what, if

anything, 'us[ing]' a wire communication facility 'for information' would mean." U.S. Dep't of

Justice, Office of Legal Counsel, *Whether Proposals by Illinois and New York to Use the Internet

and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate The

Wire Act* (Sept. 20, 2011), at 4 n.5, https://www.justice.gov/sites/default/files/olc/opinions/2011/

09/31/state-lotteries-opinion.pdf.

12

The Lottery Commission's answer to both objections is to suggest that the word "for" as used in the third clause means "in expectation of; in quest of; as expecting or seeking." Lottery Commission Opp. at 14 (quoting Webster's Deluxe Unabridged Dictionary at 714 (2d Ed. 1979)). That reading, which is exceptionally unnatural, would require the Court to find that the phrase "for information assisting in the placing of bets or wagers" has two very different meanings within the same statute. Yet "[t]he normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986) (internal quotation marks and citations omitted); *see also United States v. Jimenez*, 507 F.3d 13, 19 (1st Cir. 2007) (similar).

Nonetheless, if the Court were to read the statute to have three clauses, that would only strengthen the case for restricting the sports-gambling modifier to the first clause. At the outset, the sports-gambling modifier would be separated from the second and third prohibitions by one or two comma/conjunction/preposition (", or for") separators, respectively, making it even more difficult to carry the sports-gambling modifier across the entire statute. Moreover, if the sports-gambling modifier applied to the third clause, the statute would contain two identical prohibitions on the transmission of "information assisting in the placing of bets or wagers" on sporting events or contests, in violation of the rule against superfluity. *See, e.g.*, *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011).

## C.   The Court Need Not Consider Ambiguous Legislative History Or Statutory Purpose.

Because the statutory language is clear, the Court need go no further. If it does, however, the legislative history is at most ambiguous, and in fact it may be read to support Defendants' interpretation. *See Kaplan*, at 5 (Senate Reports "indicate clearly that the Bill was intended to apply

to gambling in general and not only to sports gambling"). Plaintiffs' policy arguments, moreover, are not sufficient to avoid giving the text its fair reading.

### 1. Legislative History Does Not Demonstrate That The Wire Act Exclusively Targets Sports Gambling.

With respect to the legislative history, Plaintiffs principally rely upon Assistant Attorney General Miller's statement at a Senate hearing that the Wire Act "is limited to sporting events or contests." NeoPollard Opp. at 16. But while Plaintiffs suggest that the Department of Justice has "repudiated the interpretation offered by its own representative," *id.*, a more accurate statement would be that Congress repudiated the bill as to which Assistant Attorney General Miller was testifying. As originally proposed, section 1084(a) would have imposed criminal penalties on anyone who "leases, furnishes, or maintains any wire communication facility with intent that it be used for the transmission in interstate or foreign commerce of bets or wagers**,** or information assisting in the placing of bets or wagers**,** on any sporting event or contest . . . ." S. 1656, 87th Cong. § 2 (1961) (as introduced) (emphasis added). That is not the law that Congress actually passed, however. For some reason — and the legislative history does not say why — Congress removed the commas that had "so clearly limited the initial prohibitions to sporting events and contests." 2018 OLC Opinion at 16. To quote the Plaintiffs, however: "Punctuation is a critical indicator of legislative intent, and removing it often changes the meaning and import of a law." Lottery Commission Opp. at 15 (citing *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993)). Those critical changes to the punctuation cannot be ignored.

As Plaintiffs observe, the legislative history does shed light on why Congress made a different change, amending the bill so that it would target the users of wire facilities rather than the wire facilities themselves. *See* S. Rep. 87-588 at 2 ("The second amendment changes the language of the bill, as introduced (which prohibited the leasing, furnishing, or maintaining of wire

14

communication facility with intent that it be used for the transmission in interstate or foreign commerce of bets or wagers), to prohibit the use of wire communication facility [sic] by persons engaged in the business of betting or wagering, in the belief that the individual user, engaged in the business of betting or wagering, is the person at whom the proposed legislation should be directed . . . ."). What the Senate Report does not speak to, however, is why the commas were removed from the phrase "bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest," which is otherwise identical between the original and enacted legislation. Those revisions were left to speak for themselves, and they must be permitted to do so. *See, e.g.*, *Kaplan*, at 5 ("Another rule of statutory construction also applies to the Wire Wager Act. If Congress had intended the Wire Wager Act to apply to sports betting alone, it could have said so — but it did not."). There is only silence in the legislative history as to the removal of the commas, but since "the text is clear, it needs no repetition in the legislative history." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018).

Nor is it relevant that after these changes were made, Deputy Attorney General Byron White indicated that the revised bill was "aimed now at those who use the wire communication facility for the transmission of bets or wagers in connection with a sporting event." Report of Proceedings: Hearing Before the S. Comm. on the Judiciary, Exec. Sess., 87th Cong. 55 (July 10, 1961). In context, it is clear that the Deputy Attorney General was discussing why the bill was amended to place liability on users of wire facilities rather than wire facilities themselves, and not opining on the reach of the sports-gambling modifier:

> After discussion and hearings, there being noted that there was considerable sentiment that there should be further discussion before the telephone company itself or the telegraph company was subjected to a liability, we had eliminated from the criminal penalty the telephone company or the company that furnishes. It is aimed now at those who use the wire communication facility for the transmission of bets or wagers in connection with a sporting event and also who use the facility

for the transmission of the winnings, as suggested by Senator Kefauver.

*Id.* at 54-55.[7] This statement, like the Senate Report, does not suggest that the Court should not give the statutory language its fair reading — including the fact that the statute does not contain the commas that could have clearly restricted the scope of the statute to sports betting.[8]

### 2.    Statutory Purpose Does Not Demonstrate That The Wire Act Exclusively Targets Sports Gambling.

Plaintiffs further ask the Court to reject a textual reading of the Wire Act because such a reading would lead to odd results. First, Plaintiffs say that the Department's reading "would lead to an 'odd' regime wherein Congress prohibited *all* forms of bets and wagers, but prohibited certain transmissions of information assisting in the placing of *only* those bets or wagers that are placed on sporting events or contests." NeoPollard Opp. at 10; *see also* Lottery Commission Opp. at 17 ("seems unlikely" that Congress would "prohibit the placing of bets or wagers generally" yet seek

---

[7] Plaintiffs make two other history-based arguments that warrant brief response. First, they refer to certain statements by Nathan Skolnik and Frank O'Connor, who testified at a Senate Hearing. *See* NeoPollard Opp. at 17. Neither individual was a member of Congress, and their testimony offers no opinion concerning the scope of the Wire Act. Plaintiffs also point to what they call the "post-enactment history of the Wire Act," NeoPollard Opp. at 18, notwithstanding their prior argument that "the Criminal Division's past practice is not a relevant consideration in questions of statutory interpretation." NeoPollard Mot. (ECF No. 10) at 10 n.*. In any case, while OLC recognized that "[i]n two congressional hearings in 1998 and 2000, the Criminal Division had acknowledged some uncertainty concerning the scope of the Wire Act," *see* 2018 OLC Opinion at 5, it explained that the overwhelming weight of the Department's post-enactment conduct reflects the view stated in the 2018 opinion.

[8] Indeed, in a memorandum to the Bureau of the Budget providing the Department of Justice's views on whether the President should sign the bill, Deputy Attorney General White described the bill more broadly, indicating that it would "make it criminal for one engaged in the business of betting to knowingly use a wire communication facility in interstate or foreign commerce for the transmission of bets or wagers or information assisting in the placing of bets or wagers." *See* Myers Decl. Ex. 2. The enrolled bill memo produced by the Bureau of the Budget and presented to the President described the bill as "mak[ing] it a criminal offense, punishable as a felony, for professional gamblers to use a wire communication facility in interstate or foreign commerce to transmit bets or wagers or information assisting in the placing thereof." *See* Myers Decl. Ex. 3. Neither memorandum suggested that the bill was exclusively focused on sports gambling.

"only to outlaw the transmission of information assisting in the placing of bets or wagers on any sporting event or contest"). In response to the government's suggestion that Congress may have had specific reasons to target information assisting in the placing of sports bets, *see* Defs.' Mem. at 23, Plaintiffs respond that any form of gambling requires information about the "details surrounding the game on which the wager is being placed." NeoPollard Opp. at 10. That may well be, and had Plaintiffs been in Congress in the early 1960s, they could have suggested that there was no logical reason to limit the restriction on transmitting information assisting in the placing of bets or wagers to bets or wagers on sports. For Plaintiffs to avoid a textual reading of the Wire Act, however, it does not suffice for them to show that Congress wrote an imperfect statute. They must show that Congress wrote an absurd one. *See, e.g.*, *Dunn v. CFTC*, 519 U.S. 465, 470 (1997). This policy argument does not satisfy that burden, nor does Plaintiffs' suggestion that Congress could have accommodated free-speech concerns exclusively in section 1084(b) instead of through the scope of section 1084(a). *See* NeoPollard Opp. at 11.[9]

### D.   The First Circuit Has Not Held That The Wire Act Is Limited To Sports Gambling.

Plaintiffs are also wrong to suggest that the First Circuit has already decided the reach of the sports-gambling modifier. Their only support for that proposition, *United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014), is a case in which the government did not contest the issue on which

---

[9] Plaintiffs also suggest that it would have been absurd for Congress to permit the transmission of bets or wagers on poker games through interstate wire transmissions, yet prohibit the transmission of information entitling players to their winnings through the same channels. NeoPollard Opp. at 14; *see also* Lottery Commission Opp. at 19 (similar). That argument only makes sense if Defendants are wrong about the first clause, which they are not. In any case, as the 2018 OLC Opinion observed, improbability does not amount to absurdity. *See* 2018 OLC Opinion at 15.

Plaintiffs seek to divine a holding, and in which the relevant statement had no effect upon the conclusion reached by the Court. That is the definition of dicta.

 *Lyons* was briefed, argued, and decided while the 2011 OLC Opinion was in effect, and the government and the defendants therefore agreed that the Wire Act reached only sports betting. The question presented for the First Circuit was whether there was sufficient evidence of sports betting to sustain the defendants' conviction, and the First Circuit's holding was that there was sufficient evidence of such betting even though the defendants had also engaged in other forms of betting. *See id.* at 718 ("But nothing in the statute limits its reach to entities devoted exclusively to sports betting any more than a bank robber gets off if he also withdraws money properly from an ATM. . . . [T]here was amply sufficient evidence that Lyons and Eremian, at least, aided and abetted the receipt of sports bets.").

Given the First Circuit's rulings as to the evidentiary sufficiency (as to which the parties did not agree), the First Circuit's statement about the legal rule (as to which the parties did agree) had no bearing on the conclusion reached by the Court. Had the First Circuit thought that the Wire Act only applied to sports gambling (as Plaintiffs here contend), it would have affirmed the convictions because there was sufficient evidence of sports gambling. Had the First Circuit thought that the Wire Act reaches sports gambling and other forms of gambling (as Defendants here contend), it would affirmed the convictions because there was sufficient evidence of sports gambling. The Court would have reached the exact same conclusion whether the Wire Act was or was not limited to sports gambling. And because the parties agreed that the Wire Act applied only to sports gambling, the First Circuit was not presented an opportunity to pass on the issue.

Plaintiffs nonetheless suggest that the statement in *Lyons* may constitute a holding even if it was not necessary to the conclusion reached by the First Circuit. *See* NeoPollard Opp. at 6

18

("'[W]hen a federal appellate court confronts an issue germane to the eventual resolution of the case,' then 'that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.'" (quoting *Behre v. Gonzales*, 464 F.3d 74, 83 (1st Cir. 2006)). Yet Plaintiffs omit the portion of the quoted *Behre* opinion that they find inconvenient:

> The petitioners misread our precedent. First, *Amaral*'s ruling was not dicta. In *Amaral*, we were *required to determine* whether the petitioner had been convicted of an "aggravated felony" as defined in the INA, and in doing so, we employed a method that looked to the offense's hypothetical status under federal law. *See id.* at 36. Though we might have grounded our decision on the state's classification of the offense, we did not do so. *See id. Cf. United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (noting that when a federal appellate court "confronts an issue germane to the eventual resolution of the case, and resolves it *after reasoned consideration in a published opinion*, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense").

*Behre*, 464 F.3d at 83 (emphasis added). In other words, *Behre* said that when a prior opinion offered "reasoned consideration" on an issue that it was "required to determine," that considered statement constitutes a holding of the Court.

Even Plaintiffs do not contend that *Lyons* reflects any "reasoned consideration" of the scope of the Wire Act's sports-gambling modifier. Nor was it "required to determine" that issue to decide the case. At most, Plaintiffs suggest that "the question of the Wire Act's scope was squarely teed up," NeoPollard Opp. at 7, but that too is wrong: while it is true that the appellants contended that the Wire Act was limited to sports gambling, the government did not dispute that proposition, and so there was no adversarial presentation of that issue. *See* Brief for the United States, *United States v. Lyons*, Nos. 12-1835, 12-1858, at 83-84 (1st Cir. Apr. 29, 2013) ("Defendants violated the Wire Act, however, so long as SOS customers used the Internet and phones to place bets on sporting events, even if some individual SOS customers occasionally placed bets on non-sporting events."). An issue is not "squarely teed up" when the parties agree on the answer. *Cf. Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 47-48 (1971) (per

19

curiam) ("We are thus confronted with the anomaly that both litigants desire precisely the same result, namely a holding that the anti-busing statute is constitutional. There is, therefore, no case or controversy within the meaning of Art. III of the Constitution.").

Ultimately, whether the statement at issue in *Lyons* is dicta is answered by *United States v. Starks*, 861 F.3d 306 (1st Cir. 2017). In *Starks*, the First Circuit confronted a statement in an earlier judicial opinion that "may be read to imply" that the Court had decided the dispositive issue. *Id.* at 323. Because the statement was "presented without analysis," addressed an argument that "the defendant had waived," and "was not necessary to the court's conclusion," the statement was dicta. *Id.* All the same considerations apply here, and the same result should follow.

### E.     Constitutional Concerns Do Not Compel Plaintiffs' Interpretation.

Plaintiffs further contend that the Wire Act must be interpreted as they propose because any other construction would offend the federal-state balance. NeoPollard Opp. at 15-16; *see also* Lottery Commission Opp. at 17-18. As Defendants explained in their motion to dismiss, that argument fails because this case is about the use of wires in interstate commerce, not in-state gambling activity. *See* Defs.' Mem. at 29-30; *United States v. Hausmann,* 345 F.3d 952, 958 n.4 (7th Cir. 2003) (Congress's authority to regulate interstate wire communications systems is authorized in the text of the Constitution). Other than citing cases that note states' general authority to regulate in-state gaming, Plaintiffs have nothing to say in response.

*Bass*, 404 U.S. 336, likewise does not suggest that federalism concerns compel Plaintiffs' construction of the statute. At the outset, the text of the statute in *Bass* made it a perfect candidate for the series-qualifier canon, since the statutory language — "receives, possesses, or transports in commerce or affecting commerce, . . . any firearm," *id.* at 337 — consists of a parallel series of verbs. *See Lockhart*, 136 S. Ct. at 963 (series-qualifier principle is limited to lists that are "simple and parallel without unexpected internal modifiers or structure"). And with respect to the federal-

20

state balance, reading the statute to not impose any interstate commerce requirement upon the possession of a firearm would criminalize purely intrastate conduct. *See id.* at 349. This case, in contrast, is only about gambling that uses wires for the conduct of interstate commerce. The same federalism concerns simply do not apply; Congress has plenary power in this area.

### F.     The Rule Of Lenity Does Not Apply.

Although neither Plaintiff previously invoked the rule of lenity, NeoPollard invokes it now. *See* NeoPollard Opp. at 14-15. The rule of lenity, however, "only applies if, after considering text, structure, history, and purpose, there remains a *grievous* ambiguity or uncertainty in the statute, such that the Court must simply *guess* as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citations and internal quotation marks omitted; emphasis added). That does not describe this case: the Court does not need to guess what Congress intended because it can resolve this case using traditional tools of statutory interpretation. *See Lombardo*, 639 F. Supp. 2d at 1282.

The fact that OLC interpreted the statute differently in 2011 does not mean that the statute is sufficiently ambiguous to call for the rule of lenity, *contra* NeoPollard Opp. at 15. Indeed, the Supreme Court typically only grants certiorari when there is a difference of opinion among multiple federal appellate courts, *see* Sup. Ct. R. 10, yet it regularly resolves disputes concerning the meaning of federal criminal laws without applying the rule of lenity. As just one recent example, in *Abramski v. United States*, 573 U.S. 169 (2014), the Supreme Court confronted a disagreement about the interpretation of a federal criminal statute that had divided at least three federal courts of appeals. *See id.* at 176. Even though the Supreme Court acknowledged that the "text creates some ambiguity," the Supreme Court refused to apply the rule of lenity, holding that the ambiguity could be resolved using traditional tools of statutory interpretation. *See id.* at 188 n.10. The same result should follow here.

**III.    Any Relief Should Be Exclusively Declaratory.**

In moving to dismiss, Defendants contended that if the Court rules against Defendants, it should enter exclusively declaratory relief. Defendants explained that the Declaratory Judgment Act authorizes only declaratory relief; that the Lottery Commission fails to state a claim under the Administrative Procedure Act ("APA"); that the default remedy under the APA is in any case vacatur, not an injunction; and that any injunction against the government would raise serious separation of powers concerns. *See* Defs.' Mem. at 30-32.

The NeoPollard Plaintiffs make clear that they have "not sought injunctive relief" and are merely "reserve[ing] the right to do so," NeoPollard Opp. at 2, and the Lottery Commission similarly indicates that it is only reserving the right to seek injunctive relief at a later date. *See* Lottery Commission Opp. at 20. For that reason, the Court need not decide at this time whether Plaintiffs could theoretically seek injunctive relief in the future. If the Court reaches the issue now, however, it should dismiss the Lottery Commission's request for injunctive relief.

As the Lottery Commission admits, the "remedy under the APA is to vacate and [set] aside the unlawful or arbitrary agency action at issue." Lottery Commission Opp. at 20. In other words, even if Plaintiffs stated an APA claim, that still would not entitle them to an injunction. Yet Plaintiffs do not state a claim under the APA, for they do not challenge "final agency action for which there is no other adequate remedy in a court." Most significantly, neither the 2018 OLC Memo nor the memo from the Deputy Attorney General adopting it constitutes final agency action, as neither determines rights or obligations, and no legal consequences flow from either action. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) ("[T]he action must be one by which rights or obligations have been determined, or from which legal consequences will flow.").

The Lottery Commission suggests that the OLC memo "criminalizes conduct that was formally [sic] permissible" Lottery Commission Opp. at 12 (emphasis omitted), but the OLC Memo does no such thing; indeed, neither OLC nor the Deputy Attorney General has authority to render conduct criminal that Congress has not already prohibited. OLC can offer the Department of Justice legal advice, and the Deputy Attorney General can instruct federal prosecutors to follow that advice, but neither can create new criminal liability. It is up to Congress to write criminal laws, *see* U.S. Const. art. I, sec. 1, and it is "emphatically the province and duty of the judicial department," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), to finally determine what they mean.

Because OLC and the Deputy Attorney General cannot issue rulings that bind the public or the courts on the meaning of federal criminal statutes, Plaintiffs' cases concerning final agency action do not apply. *Frozen Food Express v. United States*, 351 U.S. 40 (1956), involved a challenge to "an order of the Interstate Commerce Commission" that had the effect of "exempt[ing] vehicles from ICC supervision," *FTC v. Standard Oil. Co. of Cal.*, 449 U.S. 232, 240 n.8 (1980). *National Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689 (D.C. Cir. 1971), involved an executive interpretation that would warrant deference from a court. *See id.* at 697 ("The authoritative interpretation of an executive official has the legal consequence . . . of commanding deference from a court that itself might have reached a different view if it had been free to consider the issue as on a blank slate."). As for *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000), that case involved a challenge to an EPA document that "reads like a ukase" insofar as it "commands," "requires," "orders," and "dictates," which stands in contrast to an OLC memo that simply provides legal analysis and a Deputy Attorney General memo that

provides guidance to Department of Justice employees. Neither document binds the public, and neither is entitled to deference from a federal court.

Because the OLC Opinion merely offers an opinion about what a statute means, this case is indistinguishable from the long series of cases holding that a bare statement of an agency's opinion does not create legal consequences sufficient to create final agency action. *See, e.g.*, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) ("We have held that we lacked authority to review claims where 'an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.'" (quoting *AT&T v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001))); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944-45 (D.C. Cir. 2012) (agency action not final because "[n]o legal consequences flow from the agency's conduct to date, for there has been no order compelling [the appellants] to do anything" (brackets in original)); *DRG Funding Corp. v. Sec. of Housing & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (similar).[10] The Court should therefore dismiss the Lottery Commission's APA claims.

## CONCLUSION

Defendants respectfully request that the Court grant Defendants' dispositive motion and deny Plaintiffs' motions for summary judgment.

Dated: April 8, 2019                     Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Deputy Assistant Attorney General

---

[10] Because the OLC Memo does not affect Plaintiffs' rights or obligations, *Hawkes*, 136 S. Ct. 1807, does not undermine Defendants' contention that Plaintiffs also have an adequate remedy in a court, *contra* Lottery Commission Opp. at 13 n.6. *Hawkes* involved a challenge to an agency determination that affected a landowner's potential liability under the Clean Water Act, *see id.* at 1814, but the OLC Memo has no such legal effect; a hypothetical future court remains free to decide the proper scope of the Wire Act. The considerations animating the *Hawkes* court's conclusion that the plaintiffs did not have an adequate alternative remedy accordingly do not apply here.

JOHN R. TYLER
Assistant Director, Federal Programs Branch

/s/ *Steven A. Myers*
STEVEN A. MYERS (NY Bar No. 4823043)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L St. NW
Washington, DC 20005
Telephone: (202) 305-8648
Fax: (202) 616-8470
Email: Steven.A.Myers@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that, on April 8, 2019, I served the foregoing via ECF electronic transmission in accordance with the Court's Administrative Procedures for ECF to the registered participants as identified on the Notice of Electronic Filing.

Dated:   April 8, 2019                          /s/ Steven A. Myers
                                                Steven A. Myers