New Hampshire Lottery Commission,
et al.

     **v.**

William Barr, in his official
capacity as Attorney General of
the United States of America,
et al.

Consolidated Case No.
19-cv-163-PB
Opinion No. 2019 DNH 091P

MEMORANDUM AND ORDER

The Wire Act of 1961 criminalizes certain gambling
activities that use interstate wires.  In 2011, the Justice
Department's Office of Legal Counsel ("OLC") issued a formal
opinion declaring that the Wire Act only punishes activities
associated with sports gambling.  Last year, the OLC changed its
mind.  It now asserts that the Act also covers lotteries and
other forms of gambling that do not involve sports.

The New Hampshire Lottery Commission has long offered
lottery games such as Powerball that necessarily use interstate
wires.  Fearing that these games, which produce substantial
revenue for the State, will be deemed to be criminal activities
under the OLC's current interpretation of the Wire Act, the
Commission filed a complaint in this court seeking both a
declaratory judgment that the Act is limited to sports gambling
and an order under the Administrative Procedure Act setting

aside the OLC's new interpretation.  One of the Commission's

vendors also filed a complaint that has been joined with the

current action, seeking declaratory relief.

Before me are the Government's motion to dismiss for lack

of standing and the parties' cross-motions for summary judgment.

As I explain below, I agree with the plaintiffs that they have

standing to sue.  Based on the text, context, and structure of

the Wire Act, I also conclude that the Act is limited to sports

gambling.  Accordingly, I deny the Government's motions and

grant the plaintiffs' motions for summary judgment.

## I.  <u>BACKGROUND</u>

**A.   The Wire Act**

The relevant portion of the Wire Act provides:

> Whoever being engaged in the business of betting or
> wagering knowingly uses a wire communication facility
> for the transmission in interstate or foreign commerce
> of bets or wagers or information assisting in the
> placing of bets or wagers on any sporting event or
> contest, or for the transmission of a wire
> communication which entitles the recipient to receive
> money or credit as a result of bets or wagers, or for
> information assisting in the placing of bets or
> wagers, shall be fined under this title or imprisoned
> not more than two years, or both.

18 U.S.C. § 1084(a).

Section 1084(a) consists of two clauses.  The first clause

makes it a crime for anyone engaged in the business of gambling

to use a wire communication facility "for the transmission in

interstate or foreign commerce of bets or wagers or information

assisting in the placing of bets or wagers on any sporting event or contest." Id. The second clause prohibits "the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers." Id.

The key question this case presents is whether the limiting phrase "on any sporting event or contest" in § 1084(a)'s first clause modifies all references to "bets or wagers" in both clauses or only the single reference it directly follows in the first clause. If, as the OLC concluded in 2011, the sports-gambling modifier limits each reference to "bets or wagers," then both clauses apply only to sports gambling. On the other hand, if the OLC's current interpretation is correct, then § 1084(a)'s first clause prohibits the interstate transmission of both sports and non-sports bets or wagers but punishes the interstate transmission of information only if the information assists in the placing of bets or wagers on sports. It also follows from the OLC's current interpretation that § 1084(a)'s second clause is unconstrained by the sports-gambling modifier.

### B.    The OLC Opinions

The path that leads to both OLC opinions begins in 2009, when New York and Illinois asked the Department of Justice whether in-state sales of lottery tickets via the internet would violate the Wire Act if those sales caused information to be

3

transmitted across state lines.  The Department referred the
matter to the OLC for a formal opinion.  In 2011, the OLC
responded by concluding that "interstate transmissions of wire
communications that do not relate to 'a sporting event or
contest,' 18 U.S.C. § 1084(a), fall outside of the reach of the
Wire Act."  See Virginia A. Seitz, *Whether Proposals by Illinois
and New York to Use the Internet and Out-of-State Transaction
Processors to Sell Lottery Tickets to In-State Adults Violate
the Wire Act, Memorandum Opinion for the Assistant Attorney
General, Criminal Division,* U.S. Dept. Just. 1 (Sept. 20, 2011)
("2011 OLC Opinion" or "2011 Opinion"), Doc. No. 2-4.

        The OLC arrived at this conclusion by first determining
that the phrase "on any sporting event or contest" in the first
clause of § 1084(a) applies to the transmissions of both "bets
or wagers" and "information assisting in the placing of bets or
wagers."  2011 OLC Opinion at 5.  Noting that the statutory text
could be read either way, the OLC explained that it was
"difficult to discern" why Congress would forbid the interstate
transmission of all types of bets or wagers but only prohibit
the transmission of information assisting in the placing of bets
or wagers that concern sports.  Id.  The more reasonable
inference, according to the OLC, was that Congress intended that
the prohibitions "be parallel in scope."  Id.

Next, the OLC concluded that the phrase "on any sporting event or contest" also modifies the references to "bets or wagers" in § 1084(a)'s second clause. Id. at 7. The OLC explained that the references to "bets or wagers" in the second clause are best understood as shorthand references to "bets or wagers on any sporting event or contest" as described in the first clause. Id. The 2011 Opinion also relied heavily on the Act's legislative history to confirm its interpretation of the section's limited scope. See id. at 6-10.

In 2018, the OLC reversed course and released a new opinion concluding that "the prohibitions of 18 U.S.C. § 1084(a) are not uniformly limited to gambling on sporting events or contests." See Steven A. Engel, *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, *Memorandum Opinion for the Acting Assistant Attorney General, Criminal Division*, U.S. Dept. Just. 23 (Nov. 2, 2018) ("2018 OLC Opinion" or "2018 Opinion"), Doc. No. 2-5. The OLC now reasoned that the plain text of § 1084(a) unambiguously requires that all but one of the section's prohibitions apply to gambling generally. See id. at 7, 11.

The OLC based its new reading on the syntactic structure of § 1084(a). Relying heavily on a canon of statutory construction commonly referred to as the "rule of the last antecedent," the OLC concluded that the use of the sports-gambling modifier in the section's first clause applies only to the prohibition on

the interstate transmission of "information assisting in the placing of bets or wagers" and not the transmission of "bets or wagers" themselves.  Id. at 7-8.

The OLC then concluded that the use of the sports-gambling modifier in § 1084(a)'s first clause should not be carried forward into the section's second clause.  Id. at 11.  The two clauses are distinct "[a]s a matter of basic grammar" and "[i]t would take a considerable leap for the reader to carry that modifier both backward to the first prohibition of the first clause, then forward across the entire second clause," the OLC reasoned.  Id.

The OLC acknowledged its earlier concern that this reading of § 1084(a) would produce anomalous results.  Id. at 14-15.  It concluded, however, that it was obligated to give the section the meaning suggested by its syntactic structure because the anomalies identified in the 2011 Opinion did not rise to the level of "patent absurdity."  Id.

On January 15, 2019, the Deputy Attorney General instructed federal prosecutors to adhere to the OLC's 2018 Opinion.  See *Applicability of the Wire Act, 18 U.S.C. § 1084, to Non-Sports Gambling*, U.S. Dept. Just. (Jan. 15, 2019) ("Enforcement Directive"), Doc. No. 2-6.  As an exercise of prosecutorial discretion, however, they "should refrain from applying Section 1084(a) in criminal or civil actions to persons who engaged in

conduct violating the Wire Act in reliance on the 2011 OLC Opinion prior to the date of this memorandum, and for 90 days thereafter." Id. The grace period was intended to allow time for businesses "to bring their operations into compliance with federal law." Id. On February 28, the Deputy Attorney General extended that window through June 14, 2019. See *Additional Directive Regarding the Applicability of the Wire Act, 18 U.S.C. § 1084, to Non-Sports Gambling*, U.S. Dept. Just. (Feb. 28, 2019), Doc. No. 23-1.

### C. New Hampshire Lottery System

The Lottery Commission offers multiple types of lottery games. Those games include instant ticket and draw games that offer tickets for sale at brick-and-mortar retailers, multi-jurisdictional games such as Powerball and Mega Millions that permit tickets to be purchased either in stores or through the internet, and "iLottery" games that sell tickets exclusively through the internet. Each game involves the use of interstate wire transmissions.

The Lottery Commission contracts with a vendor, Intralot, Inc., to provide a computer gaming system ("CGS") to manage the games and a back-office system ("BOS") to manage inventory and sales data. Its CGS and BOS servers for traditional retailer-based lottery games are located in Barre, Vermont, with a disaster recovery location in Strongsville, Ohio.

Brick-and-mortar retailers employ lottery terminals that connect the retailer to the CGS and BOS systems via the internet, a cellular network, or a satellite connection. The terminals send and receive different types of data based on the type of game. For example, in an instant ticket game, a player purchases a pre-printed ticket and scratches it to reveal the result. The lottery terminal then communicates with the CGS to activate the ticket, validate the result, and record the sale and payment of prizes. Draw games require players to purchase sets of numbers for a future draw. The retailer requests a wager transaction from the CGS through the terminal. The CGS generates a wager in the system and sends the information to the terminal. In both types of transactions, the data travels between a lottery terminal in New Hampshire and CGS servers in Vermont and Ohio.

The Lottery Commission also offers a variety of multi-jurisdictional games, including Powerball, Mega Millions, Tri-State Lotto, and Lucky for Life. Like the in-state games, ticket sales for these games typically occur through communications between lottery terminals in New Hampshire and CGS servers in Vermont and Ohio.[1] For verification purposes, bets for multi-state games are then sent from those CGS

_____

[1]    As discussed below, Powerball and Mega Millions tickets can also be purchased through the Lottery Commission's website.

8

locations to two independent control system servers in New Hampshire over the internet. The Lottery Commission also shares sales and transaction data with member states over the internet. Finally, once a jackpot is won, the participating lotteries transfer their portions of the jackpot to the jurisdiction that sold the winning ticket. This is typically done via a wire transfer or an automated clearing house process.

In September 2018, the Lottery Commission also began to offer e-instant and draw games, including Powerball and Mega Millions, via its internet platform or "iLottery." NeoPollard Interactive LLC, its vendor, operates a separate CGS with servers located in New Hampshire. The system uses geo-location data from a player's computer or mobile device to ensure the player can only make a bet or wager while physically located in New Hampshire. Although all financial transactions and bets must begin and end in New Hampshire, the Commission states that it cannot guarantee that intermediate routing of data or information ancillary to a transaction does not cross state lines.

Given the way in which these systems operate, the Lottery Commission contends that the implementation of the 2018 OLC Opinion may result in the suspension of all lottery sales by the Commission, resulting in an annual loss of over $90 million in state revenue.

**D.    Lottery Systems and "iGaming" in Amici States**

The State of New Jersey, the Commonwealth of Pennsylvania, and the Michigan Bureau of State Lottery[2] have filed amicus briefs in support of the plaintiffs.[3]  They describe the impact the 2018 OLC Opinion would have on their respective state-run lotteries.  The lottery systems in those states are substantially similar to New Hampshire's, including the types of games offered and their reliance on interstate wires.

In addition, New Jersey and Pennsylvania have legalized some forms of online gambling or "iGaming."  Those states permit state-licensed private companies to offer online casino and poker games to players within the state.  New Jersey also has a shared agreement with Delaware and Nevada allowing online poker players from those states to play together.

---

[2]    The Michigan Bureau of State Lottery represents that the Kentucky Lottery Corporation, the Tennessee Education Lottery Corporation, the Virginia Lottery, the Rhode Island Lottery, the Colorado State Lottery Division, the North Carolina Education Lottery, the State of Delaware, the State of Idaho, the State of Vermont, the State of Mississippi, the State of Alaska, and the District of Columbia support its brief.  See Doc. No. 37 at 2.

[3]    I also granted leave to iDevelopment and Economic Association ("iDEA") to participate as amicus on behalf of the plaintiffs, and to the Coalition to Stop Internet Gambling and the National Association of Convenience Stores to participate as amici on behalf of the Government.  The Government's amici submitted a joint brief.

**E.   Procedural History**

The Lottery Commission filed its complaint and a concurrent motion for summary judgment on February 15, 2019.  The Commission seeks both a declaratory judgment that the Wire Act does not extend to state-conducted lottery activities and an order setting aside the 2018 OLC Opinion pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. Later that day, NeoPollard Interactive LLC, the vendor that supports New Hampshire's iLottery system, and its 50% owner, Pollard Banknote LTD (collectively "NeoPollard") filed a complaint and a concurrent motion for summary judgment. NeoPollard seeks a judgment declaring that the Wire Act is limited to gambling on sporting events.  I consolidated the NeoPollard action with the Lottery Commission action on February 22, 2019.

The Government responded by filing a motion to dismiss the complaints pursuant to Rule 12(b)(1), because the plaintiffs lack standing to sue, and Rule 12(b)(6), because the complaints fail to state viable claims for relief.  With the parties' consent, I converted the Government's request for relief pursuant to Rule 12(b)(6) into a Rule 56 motion for summary judgment.

## II.  ANALYSIS

The Government has challenged the plaintiffs' standing to sue.  I address the Government's standing argument first because a court lacks subject matter jurisdiction unless the plaintiffs have Article III standing.  See Pollard v. Law Office of Mandy L. Spaulding, 766 F.3d 98, 101 (1st Cir. 2014).  I then turn to the parties' cross-motions for summary judgment, which raise two issues: (1) whether the Lottery Commission's APA claim fails because the 2018 OLC Opinion is not "final agency action," and (2) whether the Wire Act is limited to sports gambling.  I conclude by considering the scope of the remedy.

### A. Standing

The Government argues that the plaintiffs lack standing because they do not face an imminent threat of prosecution.  I disagree.

The plaintiffs, as the parties invoking the court's jurisdiction, bear the burden of establishing standing.  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014).  The level of proof required to meet this burden depends on the stage of the proceedings.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  At summary judgment, the plaintiffs must support their standing with specific evidence in the record.  Id.; accord Clapper v. Amnesty Int'l USA, 568 U.S. 398, 412 (2013).

Because the jurisdictional facts are not in dispute in this case, the plaintiffs' standing turns on a pure question of law.

Rooted in Article III's case-or-controversy requirement, the constitutional core of standing requires a showing that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).[4] An injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted). "The imminence requirement is met 'if the threatened injury is "certainly impending" or there is a "substantial risk" that the harm will occur.'" Massachusetts v. U.S. Dep't of Health & Human Servs., 923 F.3d 209, 222 (1st Cir. 2019) (quoting Driehaus, 573 U.S. at 158).

To establish an imminent injury in the context of a pre-enforcement challenge to a criminal statute, a plaintiff must demonstrate that he faces a threat of prosecution because of his present or intended conduct. "[J]ust how clear the threat of

---

[4]     The second and third elements are not challenged here, for good reason.  To the extent that the plaintiffs have suffered an injury in fact, that injury can be traced directly to the Government's threatened enforcement of the Wire Act and can be redressed in this action.  See N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996).

prosecution needs to be turns very much on the facts of the case and on a sliding-scale judgment that is very hard to calibrate." N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1, 5 (1st Cir. 2000). Courts have variably described the requisite likelihood of enforcement as "sufficiently imminent," "credible," "substantial," and "realistic." See Driehaus, 573 U.S. at 159, 164 ("sufficiently imminent," "credible," and "substantial"); Holder v. Humanitarian Law Project, 561 U.S. 1, 15 (2010) ("credible"); Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) ("credible" and "realistic"); Hemp Council, 203 F.3d at 5 ("realistic").[5]

Caselaw demonstrates where different types of pre-enforcement claims fall on the imminence spectrum. At the "clearly credible threat" end of the spectrum are pre-enforcement claims brought after an enforcer has actually threatened the plaintiff with arrest or prosecution. See, e.g., Steffel v. Thompson, 415 U.S. 452, 459 (1974) (protester had standing to bring pre-enforcement claim challenging

---

[5]     Standing and ripeness concerns overlap in pre-enforcement cases. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128 n.8 (2007). Whether the threatened enforcement is sufficiently imminent can be analyzed in terms of either the injury-in-fact requirement or the hardship element of the ripeness test, which requires that the threat have a sufficiently direct and immediate impact on a plaintiff. See id.; Abbott Labs. v. Gardner, 387 U.S. 136, 152 (1967). Because the parties have briefed the issue as one of standing, I follow their lead.

constitutionality of state criminal trespass law after being
warned to stop handbilling and threatened with arrest and
prosecution).  Further along the spectrum, but still satisfying
the imminence requirement, are cases where a plaintiff has
engaged in behavior that a statute arguably makes unlawful, the
plaintiff intends to continue to engage in the allegedly
unlawful behavior, and though the enforcement process has not
yet begun, the risk of future prosecution is substantial.  See
Driehaus, 573 U.S. at 161-66; see also Humanitarian Law Project,
561 U.S. at 15-16 (plaintiffs faced credible threat of
prosecution where there was history of prosecution under
challenged law and "Government ha[d] not argued . . . that
plaintiffs will not be prosecuted if they do what they say they
wish to do"); Babbitt, 442 U.S. at 302 (plaintiffs' fear of
prosecution credible where, inter alia, "State ha[d] not
disavowed any intention of invoking the criminal penalty
provision" against entities that violate the statute).  At the
far end of the spectrum, where a threat of prosecution cannot be
considered imminent, are cases in which "an unambiguous
disclaimer of coverage by the prosecutor" would likely eliminate
the threat of prosecution.  Hemp Council, 203 F.3d at 5.

The plaintiffs in this case easily satisfy the imminence
requirement.  First, they have openly engaged for many years in
conduct that the 2018 OLC Opinion now brands as criminal, and

they intend to continue their activities unless they are forced to stop because of a reasonable fear that prosecutions will otherwise ensue. Second, the risk of prosecution is substantial. After operating for years in reliance on OLC guidance that their conduct was not subject to the Wire Act, the plaintiffs have had to confront a sudden about-face by the Department of Justice. Even worse, they face a directive from the Deputy Attorney General to his prosecutors that they should begin enforcing the OLC's new interpretation of the Act after the expiration of a specified grace period. Given these unusual circumstances, the plaintiffs have met their burden to establish their standing to sue.

The Government challenges this conclusion by arguing that the likelihood that the plaintiffs will face prosecution under the Wire Act is low, because the 2018 OLC Opinion does not explicitly conclude that state agencies, state employees, and state vendors are subject to prosecution under the Act. I reject this argument because the record tells a different story.

It is worth remembering that the 2011 OLC Opinion responded to a request from two states for an opinion as to whether they could sell lottery tickets online without violating the Wire Act. In concluding that the Wire Act did not apply to non-sports gambling such as lotteries, the 2011 Opinion did not even hint at the possibility that states would be exempt from the

Act's proscriptions.  Had the OLC believed that states were
excluded from the Act's coverage, it could have responded to the
states' request by simply informing them that they were not
subject to the Act.  To infer from the OLC's silence on this
point that it might conclude in the future that state actors are
not subject to the Wire Act requires an unwarranted speculative
leap.  This is especially true given the fact that a Department
of Justice official warned the Illinois lottery in 2005 that the
contemplated online sale of lottery tickets by the state would
violate the Wire Act.  See Letter from Laura H. Parsky, Deputy
Assistant Attorney General, to Carolyn Adams, Illinois Lottery
Superintendent (May 13, 2005), Doc. No. 57-2.

Any remaining doubt about the OLC's view on the issue is
dispelled by both the 2018 OLC Opinion itself and the
Government's actions after its issuance.  In defending its
decision to reinterpret the Wire Act, the OLC noted that "[s]ome
States . . . began selling lottery tickets via the Internet
after the issuance of our 2011 Opinion."  See 2018 OLC Opinion
at 22.  The OLC deemed these reliance interests insufficient to
warrant continued adherence to the 2011 Opinion.  See id. at 22-
23.  After the 2018 OLC Opinion issued, the Deputy Attorney
General issued the Enforcement Directive informing federal
prosecutors that ensuing prosecutions should be deferred for a
90-day grace period to give entities that "relied on the 2011

OLC Opinion time to bring their operations into compliance with federal law." See Enforcement Directive, Doc. No. 2-6. That guidance did not suggest that state entities that had relied on the 2011 Opinion would be exempt from prosecution after the grace period expired. Accordingly, nothing the Department of Justice said or did before the plaintiffs filed their complaints gave states like New Hampshire any reason to believe that state actors would not be prosecuted under the OLC's new interpretation of the Wire Act. When the complaints were filed, therefore, the plaintiffs faced a sufficiently imminent threat of prosecution to give them standing to sue.

Hemp Council supports this conclusion. There, in a hearing before the New Hampshire legislature, a representative of the Drug Enforcement Administration ("DEA") asserted that cultivating hemp plants violated federal law. See Hemp Council, 203 F.3d at 3. The First Circuit reasoned that the DEA had made its position clear and there was no "reason to doubt the government's zeal" in enforcing its position. Id. at 5. That position established that the plaintiffs, who were deterred from farming hemp, faced a "realistic" threat of prosecution. See id. So too here.

In resisting this assessment, the Government relies heavily on an April 8, 2019 memorandum issued by the Deputy Attorney General. That memorandum, which was issued after this case was

well underway, states that the Department of Justice is currently reviewing whether the Wire Act applies to state lotteries and their vendors.  *See* *Notice Regarding Applicability of the Wire Act, 18 U.S.C. § 1084, to State Lotteries and Their Vendors*, U.S. Dept. Just. (April 8, 2019) ("State Actor Directive"), Doc. No. 61-1 at 4.  All federal prosecutors are directed to "refrain from applying section 1084(a)" to such entities during the pendency of the Department's review and for 90 days thereafter.  Id.  Because the State Actor Directive declares that the Department has not yet determined whether state lotteries and their vendors can be prosecuted under the Wire Act, the Government argues that the plaintiffs do not face a realistic threat of prosecution under the Act.  I am unpersuaded by the Government's argument.

In a case such as this, where the defendant argues that its actions after a complaint is filed eliminate the threatened injury upon which the plaintiffs' claim to standing is based, the defendant bears the "heavy burden" of persuading the court that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)); accord Already, LLC v.

Nike, Inc., 568 U.S. 85, 92 (2013); Ramírez v. Sánchez Ramos, 438 F.3d 92, 100 (1st Cir. 2006).

The Government cannot satisfy this burden for two related reasons. First, at present, the State Actor Directive is nothing more than a temporary moratorium that cannot sustain a mootness claim. See City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983) (temporary moratorium on use of challenged policy did not moot the case). Second, to the extent that the Government holds out the possibility that the temporary moratorium might become permanent at a later date, its argument is purely speculative. The Government has rejected the only argument put forward by the Lottery Commission that states are not covered by the Act, and it has otherwise failed to identify any alternative legal theory as to why state actors might be exempt. See Doc. No. 70. Speculation that such a viable theory may exist cannot provide a sufficient foundation to moot a live controversy.

The Government's remaining standing argument is less conventional, but it too fails to persuade. It is based on the mistaken premise that a plaintiff has standing to seek pre-enforcement review only when challenging a criminal statute on constitutional grounds. The Supreme Court cases the Government cites for this proposition merely hold that constitutional challenges are susceptible to pre-enforcement review. See, e.g., Driehaus, 573 U.S. at 159; Humanitarian Law Project, 561

U.S. at 15-16; Babbitt, 442 U.S. at 298.  They do not imply that a constitutional challenge is necessary.  In fact, the Supreme Court has suggested that constitutional challenges are only an "example" of permissible pre-enforcement review when the Government issues a threat.  See MedImmune, 549 U.S. at 128-29.

This case also differs from the cases the Government cites because it involves a claim that the 2018 Opinion is an unlawful final agency action that must be set aside pursuant to the APA. In addressing a similar APA pre-enforcement claim that lacked an alleged constitutional violation, the Supreme Court held in Abbott Labs that the plaintiffs had standing to seek pre-enforcement review.  See 387 U.S. at 154.  The Court reasoned that the challenged agency action "is directed at [the plaintiffs] in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the [agency's] rule they are quite clearly exposed to the imposition of strong sanctions."  Id.  The plaintiffs thus suffered an injury in fact that satisfied Article III, although they did not present a constitutional claim.  See id.  The same circumstances are present here and the same conclusion follows.

As recently as 2016, the Supreme Court reiterated that "[a]s we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil

penalties.'" U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S.
Ct. 1807, 1815 (2016) (quoting Abbott Labs., 387 U.S. at 153).
Although Hawkes did not address standing, only the finality of
agency action, the Court's observation supports the view that
Driehaus did not engraft a constitutional requirement for pre-
enforcement review of APA claims that is absent in Abbott Labs.

In any event, the Government concedes that its position is
at odds with the First Circuit's decision in Hemp Council, which
entertained a statutory challenge to the DEA's interpretation of
a federal criminal statute. See 203 F.3d at 5. Because I am
bound to follow First Circuit precedent, Hemp Council alone
forecloses the argument that a constitutional challenge is
needed to meet the imminence requirement.

In sum, this is no hypothetical case: The plaintiffs have
demonstrated with specific record evidence that they had
standing when they filed suit because a sufficiently imminent
threat of enforcement loomed. The plaintiffs faced the choice
between risking criminal prosecution, winding down their
operations, or taking significant and costly compliance measures
that may not even eliminate the threat. This choice "between
abandoning [their] rights or risking prosecution . . . is 'a
dilemma that it was the very purpose of the Declaratory Judgment
Act to ameliorate.'" MedImmune, 549 U.S. at 129 (quoting Abbott
Labs., 387 U.S. at 152).

**B. Cross-Motions for Summary Judgment**

The parties' cross-motions for summary judgment raise two legal questions: (1) whether the 2018 OLC Opinion is subject to review under the APA as final agency action, and (2) whether the Wire Act applies to non-sports gambling.[6]  I analyze each question in turn.

**a.  Final Agency Action**

The APA entitles an aggrieved party to judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704.  An action is final if "the agency has completed its decisionmaking process . . . [and] the result of that process is one that will directly affect the parties." Franklin v. Massachusetts, 505 U.S. 788, 797 (1992); Trafalgar Capital Assocs., Inc. v. Cuomo, 159 F.3d 21, 35 (1st Cir. 1998).  The Supreme Court has emphasized that the APA "creates a 'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" Weyerhaeuser

---

[6]    As I have noted, the Lottery Commission also contends that the Wire Act does not apply to the State, its employees, or its vendors.  The Wire Act imposes liability on "[w]hoever" engages in the gambling business and that term is defined in the Dictionary Act to exclude the sovereign, the argument goes.  See 1 U.S.C. § 1.  The Government initially refused to respond to this contention, but after I invited it to brief the issue, it argued against the Commission's construction.  Given that I construe the Wire Act to be limited to sports gambling, I need not reach the viability of the Commission's Dictionary Act argument.

Co. v. U.S. Fish & Wildlife Serv., 139 S. Ct. 361, 370 (2018)

(quoting Abbott Labs., 387 U.S. at 140).

The finality requirement for an APA claim is satisfied if

"a decision is a 'definitive statement of the agency's position

and [has] a direct and immediate effect on the day-to-day

business' of the complaining parties." Sig Sauer, Inc. v.

Brandon, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (quoting FTC v.

Standard Oil Co., 449 U.S. 232, 241 (1980)) (internal

alterations omitted); cf. Hawkes, 136 S. Ct. at 1813.  The

Government does not challenge the Lottery Commission's

contentions that the 2018 OLC Opinion represents the culmination

of the Justice Department's review of the Wire Act and is a

"definitive statement of [the agency's] position." See Standard

Oil, 449 U.S. at 241.  Thus, the sole issue I must address is

whether the 2018 Opinion and the accompanying Enforcement

Directive will also "directly affect the parties." See

Trafalgar Capital, 159 F.3d at 35.

The Government argues that the 2018 OLC Opinion and the

Enforcement Directive will not have a direct effect on the

Lottery Commission unless and until it is indicted.  I disagree.

The State derives substantial revenue from its lottery

operations.  The final agency action requirement has not been

construed to require litigants in the Commission's position to

choose between abandoning an otherwise lawful and productive

activity and facing a credible threat of "serious criminal and
civil penalties." Hawkes, 136 S. Ct. at 1815 (quoting Abbott
Labs., 387 U.S. at 153).  Here, because the threat of
prosecution the plaintiffs face is substantial, that threat
alone satisfies the direct effect component of the final agency
action test.

The 2018 OLC Opinion will also have an immediate adverse
effect on the Commission even if no indictment issues.  The 2011
OLC Opinion explicitly gave businesses engaged in non-sports
gambling a "reasonable reliance" defense to prosecution under
the Wire Act.  See 2018 OLC Opinion at 23 n.19 ("An individual
who reasonably relied upon our 2011 Opinion may have a defense
for acts taken in violation of the Wire Act after the
publication of that opinion and prior to the publication of this
one.") (citing United States v. Pa. Indus. Chem. Corp., 411 U.S.
655, 673-74 (1973)); cf. United States v. Ledee, 772 F.3d 21, 31
(1st Cir. 2014) (observing that "criminal prosecution may be
barred [where] government misled defendant on whether charged
conduct was criminal") (citing Pa. Indus., 411 U.S. at 674).
That defense will no longer be available to the Commission once
the Department of Justice begins to enforce the 2018 Opinion
against entities engaged in non-sports gambling.  Thus, even if
the Commission is not immediately indicted, its position will
become far more perilous if the 2018 OLC Opinion is allowed to

stand.  Cf. Hawkes, 136 S. Ct. at 1815 (finding final agency

action because, inter alia, it "depriv[ed] respondents of a

five-year safe harbor from liability under the [statute]").

Finally, the 2018 OLC Opinion also has an adverse effect on

the Commission that does not depend upon any effort by the

Department of Justice to enforce the opinion.  Section 1084(d)

of the Wire Act provides:

> When any common carrier, subject to the jurisdiction
> of the Federal Communications Commission, is notified
> in writing by a Federal, State, or local law
> enforcement agency, acting within its jurisdiction,
> that any facility furnished by it is being used or
> will be used for the purpose of transmitting or
> receiving gambling information in interstate or
> foreign commerce in violation of Federal, State or
> local law, it shall discontinue or refuse, the
> leasing, furnishing, or maintaining of such facility,
> after reasonable notice to the subscriber . . . .

18 U.S.C. § 1084(d).  In other words, once the 2018 OLC Opinion

was published, any law enforcement agency could notify in

writing a common carrier (such as a telephone or internet

service provider) that it was providing services "used for the

purpose of transmitting or receiving gambling information" in

violation of the Wire Act.  Upon receipt of such notice, the

provider would be compelled to "discontinue or refuse" that

service to the offending subscriber.

The Government has not represented that it will forebear

from enforcing § 1084(d).  The Enforcement Directive, which

instructs Department of Justice attorneys to "adhere to OLC's

[2018] interpretation," announces that they "should refrain from applying Section 1084(a) in criminal or civil actions to persons who engaged in conduct violating the Wire Act in reliance on the 2011 OLC Opinion." See Enforcement Directive, Doc. No. 2-6. It extends no such "internal exercise of prosecutorial discretion" to § 1084(d). See id. Before the 2018 Opinion, federal law enforcement could not invoke the Wire Act to disconnect the Lottery Commission from the internet. Now it can. And that is a legal consequence.

The 2018 OLC Opinion is a definitive statement concerning the Justice Department's interpretation of the Wire Act, and the opinion has a direct and immediate impact on the Commission's operations. See Sig Sauer, 826 F.3d at 600 n.1; see also Standard Oil, 449 U.S. at 242 (explaining that regulations in Abbott Labs had sufficient legal effect because they forced manufacturers to choose between risking criminal and civil penalties for noncompliance and drastically altering their business and investment practices) (citing Abbott Labs., 387 U.S. at 152-53). Accordingly, the opinion constitutes final agency action without an adequate alternative to APA review.[7]

---

[7]    The Government also contends that the Lottery Commission does not state an APA claim because it has an "adequate remedy in a court," see 5 U.S.C. § 704, in the form of a motion to dismiss any future indictment.  But this argument is unavailing because a party need not wait to be indicted to seek judicial relief when the plaintiff is faced with a substantial risk of

**b. The Wire Act**

The plaintiffs argue that the OLC got it right when it concluded in the 2011 Opinion that the Act applies only to sports gambling. The Government defends the 2018 Opinion and claims that all but one of the Act's prohibitions apply to any form of gambling. Each side maintains that its interpretation is compelled by the plain language of § 1084(a). I examine these arguments after first addressing the plaintiffs' contention that controlling First Circuit precedent has already resolved the dispute.

**1. First Circuit Caselaw**

The plaintiffs argue that the First Circuit has authoritatively ruled that the Wire Act applies only to sports gambling. It has not. The plaintiffs confuse the court's dictum in United States v. Lyons, 740 F.3d 702 (1st Cir. 2014), with binding precedent.

The defendants in Lyons were convicted of two Wire Act violations in 2012. See id. at 712. At trial, the court admitted evidence suggesting that the defendants had accepted sports bets, and it instructed the jury that the Wire Act

_____

prosecution. See Hawkes, 136 S. Ct. at 1815 ("As we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'") (quoting Abbott Labs., 387 U.S. at 153).

28

applied only to sports gambling.  See id. at 718.  The
defendants nevertheless argued on appeal that the Government had
produced insufficient evidence to support the convictions
because "some evidence at trial showed that [the defendants'
business] also accepted bets on casino games and other forms of
gambling not covered by the Wire Act." Id.  In rejecting this
argument, the court of appeals began by declaring that "[t]he
Wire Act applies only to 'wagers on any sporting event or
contest,' that is sports betting." Id. (quoting 18 U.S.C.
§ 1084(a)).  But the court did not uphold the convictions on
that basis.  Instead, it reasoned that because the Wire Act
applied to sports gambling and the record included sufficient
evidence to support a finding that the defendants had accepted
sports bets, it did not matter that they had also accepted non-
sports bets.  See id.

    The logical structure on which the court's ruling on this
point is based is self-evident.  It begins with two legal
propositions: (1) the Wire Act applies to sports gambling; and
(2) the convictions stand if sufficient evidence was produced at
trial to support a conclusion that the defendants accepted
sports bets, even if they also accepted non-sports bets.  See
id.  The court examined the record and concluded that the
evidence permitted a conclusion that the defendants had accepted
sports bets.  See id.  The court's additional statement that the

Wire Act applied only to sports gambling played no role in its decision.  Therefore, that statement is mere dictum, not a holding that binds lower courts.  See Rossiter v. Porter, 357 F.3d 26, 31 (1st Cir. 2004).

Although the First Circuit has explained that "considered dicta" is also ordinarily binding, at least where it "is of recent vintage and not enfeebled by any subsequent statement," McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991), the First Circuit's dictum in Lyons does not qualify as "considered."  First, the trial court instructed the jury that the Wire Act applied only to sports gambling.  And the Government, constrained by the 2011 OLC Opinion, did not contest the trial court's instruction at trial or on appeal.  As a result, the court of appeals did not receive the benefit of briefing on the issue.

Second, because the trial court's instruction went unchallenged, and the circuit court's statement that the Wire Act applies only to sports gambling was not necessary to its decision, the court understandably did not attempt to explain how its statement resulted from the text of the Wire Act. Instead, it merely cited to the only circuit court decision to address the issue, which supported the trial court's instruction.  See Lyons, 740 F.3d at 718 (citing In re MasterCard Int'l Inc., 313 F.3d 257, 263 (5th Cir. 2002)).

Under these circumstances, I cannot defer to the circuit court's unconsidered dictum in <u>Lyons</u> without first undertaking my own independent analysis of the issue.

### 2. Ambiguity

Most statutory text can be readily understood by a careful reader. In such cases, the court's mission is clear: It must give the statute its plain meaning. See <u>Schindler Elevator Corp. v. U.S. ex rel. Kirk</u>, 563 U.S. 401, 412 (2011). Sometimes, however, words have multiple meanings even when read in context, and legislators fail to achieve syntactic precision. See, e.g., <u>Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson</u>, 545 U.S. 409, 417 (2005); <u>Jones v. Donnelley & Sons Co.</u>, 541 U.S. 369, 377 (2004). Even proper syntax can produce ambiguous text when it leaves a statute as a whole internally incoherent. See, e.g., <u>Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.</u>, 508 U.S. 602, 624, 627 (1993) (treating as ambiguous statute containing terms "inconsistent with each other on any reading"); <u>Harvey v. Veneman</u>, 396 F.3d 28, 40 (1st Cir. 2005) (statute "lacks coherence and consistency, creating ambiguity concerning Congress' intent"). In such cases, a court cannot blind itself to permissible sources of meaning. It must instead undertake a nuanced and comprehensive review of all relevant evidence in an attempt to give the statute as a whole a fair reading. See

Graham, 545 U.S. at 417-22; Jones, 541 U.S. at 377-83; see also
Bond v. United States, 134 S. Ct. 2077, 2088 (2014) (employing
"background principles" to construe ambiguous text).  Bearing
these lessons in mind, I begin by determining whether § 1084(a)
is ambiguous.

Although the 2011 and 2018 OLC opinions end up in very
different places, they proceed from common ground.  Both agree
that § 1084(a) includes two general clauses that each, in turn,
prohibit two types of wire transmissions.  See 18 U.S.C.
§ 1084(a).  The first clause bars anyone engaged in the business
of gambling from knowingly using the wires "for the transmission
in interstate or foreign commerce of bets or wagers or
information assisting in the placing of bets or wagers on any
sporting event or contest."  Id.  The second clause prohibits
any such person from using the wires "for the transmission of a
wire communication which entitles the recipient to receive money
or credit as a result of bets or wagers, or for information
assisting in the placing of bets or wagers."  Id.[8]

_____

[8]    The Lottery Commission stands alone in arguing that
§ 1084(a) consists of three clauses.  It maintains that the
phrase "or for information assisting in the placing of bets or
wagers" is not part of the second clause but a third independent
clause.  According to this reading, the third clause
criminalizes the use of the wires "to seek information that
would assist [a gambling enterprise] in the placing of bets or
wagers."  Doc. No. 58 at 16.  I am unpersuaded by the
Commission's argument because it either creates a conflict
between the second and fourth prohibitions (assuming the sports-

The limiting phrase "on any sporting event or contest" immediately follows and plainly modifies the second prohibition in the first clause, which prohibits the transmission of "information assisting in the placing of bets or wagers."  The question is whether this sports-gambling modifier also applies to the other three prohibitions.  Should each reference to "bets or wagers" be interpreted to mean "bets or wagers on any sporting event or contest"?  Or is the phrase "bets or wagers" in the first, third, and fourth prohibitions untethered to the sports-gambling modifier, such that those prohibitions apply to all forms of gambling?  Each party contends that the plain language of § 1084(a) mandates its position.  I conclude that the text does not provide an unambiguous answer to this question.

Starting with the first clause, the Government contends that the syntactic structure of the clause and the rule of the last antecedent make it plain that the sports-gambling modifier does not apply to the first prohibition ("the transmission . . . of bets or wagers").  The canon of statutory construction known as the rule of the last antecedent counsels that when a

_____

gambling modifier applies only to the former) or renders the fourth prohibition superfluous (if the sports-gambling modifier applies to both prohibitions).  Given these conflicts, I agree with NeoPollard, the Government, and both OLC opinions that the two-clause construction makes better sense of the statute and avoids these problems.

qualifying phrase has multiple antecedents, the phrase
ordinarily qualifies only the final antecedent, here the second
prohibition.[9]  See Lockhart v. United States, 136 S. Ct. 958, 962
(2016); 2A Norman J. Singer & J.D. Shambie Singer, Sutherland on
Statutes and Statutory Construction § 47:33 (7th ed. 2014);
Antonin Scalia & Bryan A. Garner, Reading Law: The
Interpretation of Legal Texts 144 (2012).  Although applying the
rule is "quite sensible as a matter of grammar," it "is not an
absolute and can assuredly be overcome by other indicia of
meaning." Barnhart v. Thomas, 540 U.S. 20, 26 (2003) (internal
quotation marks omitted).  Nor does the rule apply "in a
mechanical way where it would require accepting 'unlikely
premises.'" Paroline v. United States, 572 U.S. 434, 447 (2014)
(quoting United States v. Hayes, 555 U.S. 415, 425 (2009)).

     The plaintiffs respond with their own canon of
construction.  Relying on the series-qualifier canon, they argue
that the sports-gambling modifier clearly applies to both

---

[9]    The 2018 OLC Opinion recognizes that the last antecedent
canon does not really apply here, because the modifier at issue
is not a pronoun.  See 2018 OLC Opinion at 8 n.10; see also
Scalia & Gardner, Reading Law at 152 ("Strictly speaking, only
pronouns have antecedents . . . .").  Instead, a closely related
canon known as the "nearest reasonable referent" canon provides
the real support for the Government's position because the
modifier here is an adjectival phrase.  See Scalia & Gardner,
Reading Law at 152 (this canon "also applies to adjectives,
adverbs, and adverbial or adjectival phrases").  Courts,
however, often use the two canons interchangeably, so I follow
the OLC's lead and treat the issue as a last-antecedent problem.

prohibitions in the first clause.  This canon provides that a modifier appearing at the beginning or end of a series of terms modifies the entire series where "the natural construction of the language demands that the clause be read as applicable to all."  Paroline, 572 U.S. at 447 (quoting P.R. Railway, Light & Power Co. v. Mor, 253 U.S. 345, 348 (1920)); see United States v. Bass, 404 U.S. 336, 339–40 (1971) (applying series-qualifier canon where modifier "undeniably applies to at least one antecedent" and "makes sense with all").

I am not persuaded that the language and syntactic structure of § 1084(a)'s first clause compels the use of either canon, because § 1084(a) lacks punctuation that would clearly signal which canon applies.  See Scalia & Garner, Reading Law at 161 ("Punctuation in a legal text . . . will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part."); see also 1A Sutherland on Statutory Construction § 21:15 (similar).  For instance, a comma before the conjunction "or" separating the phrases "bets or wagers" and "information assisting in the placing of bets or wagers" would demonstrate that the rule of the last antecedent applies.  See 1A Sutherland on Statutory Construction § 21:15 (comma separating two members of a list indicates they are to be treated separately rather than as a whole); cf. Lockhart, 136 S. Ct. at 962 (applying rule of last antecedent to statute that had

commas separating each antecedent).  Without it, the appropriateness of the last antecedent canon is unclear.

Conversely, a comma placed directly before the phrase "on any sporting event or contest" would confirm that the series-qualifier canon applies.  See 2A Sutherland on Statutory Construction § 47:33 ("A qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one."); Am. Int'l Grp., Inc. v. Bank of Am. Corp., 712 F.3d 775, 782 (2d Cir. 2013).  In that instance, the sports-gambling modifier would plainly apply to both prohibitions in the first clause.

The absence of clarifying punctuation prevents the first clause from being a textbook application of either canon. Either reading is consistent with the syntax of the first clause, even if neither creates a perfectly wrought text.  The OLC came to the same conclusion in 2011, noting that the first clause "can be read either way" because it lacks punctuation that would have made only one interpretation plausible.  See 2011 OLC Opinion at 5.  The phrase "on any sporting event or contest" may modify one prohibition, or both.  Accordingly, the clause is ambiguous.  Cf. Graham, 545 U.S. at 419 n.2 ("[The statute] is ambiguous because its text, literally read, admits of two plausible interpretations.").

Consistent with the 2018 OLC Opinion, the Government also
argues that § 1084(a)'s second clause is plainly unconstrained
by the sports-gambling modifier because "[b]asic grammar compels
the conclusion that [it] . . . does not travel forwards to
modify either prohibition of the second clause."  Doc. No. 61 at
15; accord 2018 OLC Opinion at 11.  As the Government sees it,
because the sports-gambling modifier does not appear anywhere in
the second clause, neither of the clause's prohibitions can
possibly be subject to it.

The plaintiffs respond by pointing to an example in
§ 1084(a) itself that defies the "basic grammar" on which the
Government's argument is based.  Section 1084(a)'s first clause
is expressly limited to transmissions "in interstate or foreign
commerce" but the transmissions prohibited by the second clause
do not contain this limitation.  Nevertheless, both OLC opinions
agree that the interstate-commerce modifier is borrowed from the
first clause and applied to the transmissions prohibited by the
second clause.  See 2011 OLC Opinion at 7; 2018 OLC Opinion at
13.  Indeed, the Supreme Court has suggested as much.  See Bass,
404 U.S. at 341 & n.8 (citing Wire Act for proposition that,
consistent with approach in other federal statutes, "in commerce
or affecting commerce" applies to all three parts of preceding
phrase "receives, possesses, or transports" in Title VII of
Omnibus Crime Control and Safe Streets Act).  Otherwise, the

second clause would sweep in purely intrastate wire
communications, giving the statute "a curious reach." See id.
at 340. As the OLC concluded in 2011, the omission of the
interstate-commerce modifier from the second clause "suggests
that Congress used shortened phrases in the second clause to
refer back to terms spelled out more completely in the first
clause." 2011 OLC Opinion at 7. I agree with the 2011 OLC
Opinion that this instance of borrowing by the drafters of §
1084(a) gives textual support for similarly importing the
sports-gambling modifier into the second clause.

The Government's arguments for discounting the interpretive
force of the interstate-commerce modifier fall short. According
to the 2018 Opinion, the interstate-commerce modifier is
different because, unlike the sports-gambling modifier, which
appears "midway through the list" of the Wire Act's
prohibitions, the interstate-commerce modifier appears at the
beginning of the Act's four prohibitions. See 2018 OLC Opinion
at 13. This argument is flawed. The fact that the modifier
precedes the four references to "bets or wagers" is irrelevant
because it does not modify "bets or wagers." Instead, the
interstate-commerce modifier immediately limits the term
"transmission" in the first clause. Viewed properly, the use of
the interstate-commerce modifier supports the plaintiffs'
argument. Like the statute's use of the sports-gambling

modifier, the interstate-commerce modifier follows the term it modifies in the first clause ("transmission") and is borrowed to modify the same term in the second clause.  This consistent pattern of borrowing indicates that Congress used shorthand in the second clause to refer to terms delineated "more completely in the first clause."  See 2011 OLC Opinion at 7.[10]

The Government also contends that the constitutional avoidance doctrine strengthens the rationale for applying the interstate-commerce modifier across the entire statute to avoid doubts about Congress's regulatory authority.  The same is obviously not the case with the sports-gambling modifier.  But the doctrine of constitutional avoidance is not the only reason to import the modifier into the second clause.  The text and context provide sufficient indicia that the second clause borrows that term from the first clause.  Cf. Bass, 404 U.S. at 338-47 (applying traditional canons of constructions, including coherency, to extend interstate-commerce modifier to all three statutory prohibitions while disclaiming reliance on constitutional avoidance).  Thus, § 1084(a)'s second clause is

---

[10]    The Government is also wrong that the interstate-commerce modifier appears before the first prohibition in § 1084(a).  The four prohibitions are all prohibitions on uses of a "wire communication facility," and the interstate-commerce modifier appears in the first prohibition ("the transmission in interstate or foreign commerce of bets or wagers"), not prior to the prohibition.  See 18 U.S.C. § 1084(a) (emphasis added).

ambiguous because both of its prohibitions can be read either to apply only to sports gambling or to apply broadly to all forms of gambling.

The principal problem with the 2018 OLC Opinion is that it assigns nearly controlling weight to a reading of § 1084(a) that is suggested, but not required, by the rule of the last antecedent and a general conception of what the OLC calls "basic grammar." Other potentially relevant sources of meaning are then dismissed as inconsequential because they do not result in "patent absurdity." 2018 OLC Opinion at 14. This is not the approach to statutory construction that Supreme Court precedent requires. See, e.g., Lockhart, 136 S. Ct. at 965 ("This court has long acknowledged that structural or contextual evidence may 'rebut the last antecedent inference.'") (quoting Jama v. Immigration & Customs Enf't, 543 U.S. 335, 344 n.4 (2005)); Paroline, 572 U.S. at 447 (rule of last antecedent not followed because it would require acceptance of "unlikely premises") (quoting Hayes, 555 U.S. at 425). Instead, where, as here, a statute is ambiguous, a court must look at more than grammar to determine its meaning. Therefore, I now turn to the significant contextual evidence that calls the OLC's current interpretation into question.

### 3. Context, Structure, and Coherence

In determining whether § 1084(a) is limited to sports gambling, I am guided by the rule of construction that "[s]tatutes should be interpreted 'as a symmetrical and coherent regulatory scheme.'" Mellouli v. Lynch, 135 S. Ct. 1980, 1989 (2015) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)).  Limiting the Wire Act to sports gambling conforms to this rule.  It avoids significant coherence problems that result from the OLC's current interpretation and it construes the Wire Act in harmony with another gambling statute that Congress enacted the same day as the Wire Act.

The OLC's 2018 Opinion, by contrast, produces an unlikely reading of § 1084(a) that the 2011 OLC Opinion avoids.  Under the current interpretation, the section's first clause prohibits transmissions of all bets or wagers but bars transmissions of information that assist the placement of only those bets or wagers that concern sports.  The incongruous results that follow from this interpretation are problematic because, as the OLC explained in 2011 when it rejected this construction, "it is difficult to discern why Congress, having forbidden the transmission of all kinds of bets or wagers, would have wanted to prohibit only the transmission of information assisting in bets or wagers concerning sports." See 2011 OLC Opinion at 5. Even in its current opinion, the OLC continues to recognize that

"[t]here is a logic to this reasoning." See 2018 OLC Opinion at

14.  This logic, however, did not persuade the OLC in 2018 for

two reasons:  first, because Congress might have wanted to

specifically target transmissions of information on sports bets

or wagers given the special importance of such information to

this form of gambling; and second, because "Congress might have

been worried that an unfocused prohibition on transmitting any

information that 'assisted' in any sort of gambling whatsoever

would criminalize a range of speech-related conduct." Id. at

14-15.  These arguments are unpersuasive.  Such speculation may

show that the OLC's 2018 interpretation is not patently absurd.

But it does not establish that its reading is a better

construction of an ambiguous text.

The OLC's current construction of the second clause gives

rise to an even more serious coherence problem.  If, as the OLC

now contends, the clause is read without the sports-gambling

modifier, the two clauses of § 1084(a) cannot easily be

reconciled: The second clause prohibits transmissions that

enable a recipient to receive payment for information that

facilitates both sports and non-sports gambling, but the first

clause prohibits only transmissions of sports-related

information.  In other words, the OLC's current interpretation

incongruously permits information transmissions that facilitate

non-sports gambling in the first clause while criminalizing

42

transmissions that enable a person to receive payment for the same transmissions in the second clause.

The Government's only explanation for this inconsistency is that Congress might have had a special interest in preventing gambling-related payouts via the wires, regardless of whether the money was for lawful or unlawful activities. This rationale is inadequate. It does not explain why a rational legislator would have designed a statute that prevents a lawful gambling business from sending or receiving payment for a business activity that the statute does not prohibit. It is bizarre to authorize an activity but prohibit getting paid for doing it.

Consider a vendor who contracts with an online casino to solicit players. The contract guarantees the vendor payment for every new player who bets $100 at the site. The Wire Act permits the vendor to send emails to players enticing them and explaining the site's games. But, under the OLC's current interpretation, the Act prohibits the vendor from receiving (and the casino from sending) money transfers for supplying that information. That makes little sense. The incoherence that plagues the statute when the sports-gambling modifier is not imported into the second clause significantly undermines the OLC's current construction of § 1084(a). Limiting the entire section to sports gambling renders the statute coherent and makes the 2011 Opinion the better reading of the text.

Reading § 1084(a) to apply only to sports gambling also finds support in another gambling statute passed the same day as the Wire Act.  Cf. United States v. Am. Bldg. Maint. Indus., 422 U.S. 271, 277 (1975) (looking to Federal Trade Commission Act to define term used in Clayton Act, in part because both statutes were passed by the same Congress and designed to deal with closely related aspects of the same problem); Kokoszka v. Belford, 417 U.S. 642, 650 (1974) (noting that it is relevant to consider related statutes when interpreting ambiguous text). Like the Wire Act, the Interstate Transportation of Wagering Paraphernalia Act was passed by Congress on August 31, 1961. See 107 Cong. Rec. 17,694 (1961).  The Paraphernalia Act prohibits carrying paraphernalia in interstate commerce that is to be used in "(a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game."  18 U.S.C. § 1953(a).[11]  On the same day the Paraphernalia Act outlawed carrying equipment for use in

_____

[11]    As the Department of Justice explained at the time, "numbers, policy, and bolita . . . are similar types of lotteries wherein an individual purchases a ticket with a number."  Legislation Relating to Organized Crime: Hearings on H.R. 468, H.R. 1246, H.R. 3021, H.R. 3022, H.R. 3023, H.R. 3246, H.R. 5230, H.R. 6571, H.R. 6572, H.R. 6909, H.R. 7039 Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 87th Cong. 350 (1961) (statement of Herbert Miller, Assistant Att'y Gen., Crim. Div.).

"numbers, policy, bolita or similar game," Congress passed the
Wire Act with no such reference to lottery-style games.

That these two gambling statutes were passed the same day
sends a strong contextual signal concerning the Wire Act's
scope.  The Paraphernalia Act demonstrates that when Congress
intended to target non-sports gambling it used clear and
specific language to accomplish its goal.  In other words, when
Congress wished to achieve a specific result, "it knew how to
say so." Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 826
(2018).  The absence of similar language in the accompanying
Wire Act supports the plaintiffs' position that the Wire Act is
limited to sports gambling.  Cf. United States v. Fabrizio, 385
U.S. 263, 266–67 (1966) (interpreting scope of Paraphernalia Act
by citing Wire Act for proposition that "[i]n companion
legislation where Congress wished to restrict the applicability
of a provision to a given set of individuals, it did so with
clear language").

The Government presents its own contextual arguments based
on other sections of the Wire Act.  Those arguments do not
withstand scrutiny.  Section 1084(b) creates a safe harbor for
interstate wire communications transmitting (1) "information for
use in news reporting of sporting events or contests," and (2)
"information assisting in the placing of bets or wagers on a
sporting event or contest" between two states where "betting on

that sporting event or contest" is legal. 18 U.S.C. § 1084(b).
The Government maintains that § 1084(b) supports its contention
that Congress repeated the phrase "sporting event or contest"
when it wanted to apply it beyond its nearest referent.  I am
unpersuaded by the Government's argument.  Section 1084(a)
repeats the same phrase ("bets or wagers") four times, so the
question is whether Congress used that phrase as a shorthand for
"bets or wagers on a sporting event or contest."  By contrast,
§ 1084(b) has varied formulations of phrases followed by the
sports-gambling modifier.  See id. ("news reporting of sporting
events or contests," "bets or wagers on a sporting event or
contest," and "betting on that sporting event or contest")
(emphasis added).  Unlike the recurrent "bets or wagers," those
diverse phrases are not susceptible to an abridged reference.
As a result, § 1084(b) requires that the modifier be repeated.

     The Government also contends that because § 1084(d) is not
limited to sports gambling, neither is § 1084(a).  That reading
misunderstands the role of § 1084(d).  Section 1084(d) requires
a common carrier to discontinue the operation of a wire facility
if it is notified that the facility is being used "for the
purpose of transmitting or receiving gambling information in
interstate or foreign commerce in violation of Federal, State or
local law."  18 U.S.C. § 1084(d).  The provision thus
incorporates federal, state, and local gambling laws that go

beyond the scope of § 1084(a).  That § 1084(d) is broader in this regard tells us nothing about the scope of the prohibitions in § 1084(a).

In summary, although § 1084(a) reasonably can be read either to apply only to sports gambling, as the OLC concluded in 2011, or to apply to both sports and non-sports gambling, as the OLC concluded in 2018, a careful contextual reading of the statute supports the view that § 1084(a) applies only to sports gambling.

### 4.  Legislative History

The Government's amici argue that the Wire Act's legislative history supports the OLC's current interpretation of the Wire Act.  If anything, the legislative history supports the plaintiffs' position.

The original version of § 1084(a) would have imposed criminal penalties on anyone who "leases, furnishes, or maintains any wire communication facility with intent that it be used for the transmission in interstate or foreign commerce of bets or wagers, or information assisting in the placing of bets or wagers, on any sporting event or contest, or knowingly uses such facility for any such transmission."  S. 1656, 87th Cong. § 2 (1961) (as introduced) (emphasis added) (excerpt appended to

this opinion as Appendix A).[12] It is undisputed that the original text was unequivocally limited to sports gambling. See 2018 OLC Opinion at 16; 2011 OLC Opinion at 6.

After conducting hearings in June 1961, the Senate Judiciary Committee, in collaboration with the Department of Justice, proposed an amendment to the bill. See S. Rep. No. 87-588, at 1-2 (1961); Report of Proceedings: Hearing Before the S. Comm. on the Judiciary, Exec. Sess., 87th Cong. 54-55 (1961). Reflected in the enacted text, the amendment made three modifications to § 1084(a): (1) it changed the class of covered persons to those who are "engaged in the business of betting or wagering," (2) it added a second clause prohibiting payment-

---

[12] A brief overview of the Wire Act's travel through Congress is useful for context. The legislative proposal came from the Department of Justice in April 1961. See S. Rep. No. 87-588, at 3 (1961). The bill was introduced in the Senate as S. 1656 and in the House as H.R. 7039, respectively by Senator James Eastland and Representative Emanuel Celler, each house's Chairman of the Committee on the Judiciary. See S. 1656, 87th Cong. (as introduced, April 18, 1961); H.R. 7039, 87th Cong. (as introduced, May 15, 1961). Following hearings held in June 1961, the Senate Committee on the Judiciary suggested an amendment to S. 1656, which resulted from a collaboration with the Department of Justice. See S. Rep. No. 87-588, at 1-2 (1961); Report of Proceedings: Hearing Before the S. Comm. on the Judiciary, Exec. Sess., 87th Cong. 54-55 (1961). After the amended version of S. 1656 passed the Senate at the end of July, the bill was referred to the House Judiciary Committee. See S. 1656, 87th Cong. (referred in House, July 31, 1961). The House passed S. 1656 on August 21, 1961 with minor amendments, in which the Senate concurred on August 31, 1961. See 107 Cong. Rec. 16,533, 16,537, 17,694 (1961). President John F. Kennedy signed the bill into law on September 13, 1961. See Pub. L. No. 87-216, 75 Stat. 491 (1961).

related transmissions, and (3) it removed the commas before and after the phrase "or information assisting in the placing of bets or wagers" in the first clause.  See S. 1656, 87th Cong. (as reported in Senate, July 24, 1961) (excerpt appended to this opinion as Appendix B).  As I have explained, without those commas, it is not clear whether both prohibitions in the first clause are limited to sports gambling.

The Government's amici contend that the legislative history shows that the removal of the commas was intended to expand the scope of § 1084(a) to cover all gambling.  They principally rely on three pages from the transcript of the hearing before the Senate Committee on the Judiciary on June 20, 1961.  See The Attorney General's Program to Curb Organized Crime and Racketeering: Hearings on S. 1653, S. 1654, S. 1655, S. 1656, S. 1657, S. 1658, S. 1665 Before the S. Comm. on the Judiciary, 87th Cong. 277-79 (1961).  Those pages reflect an exchange between Senator Carey Kefauver and Herbert Miller, the Assistant Attorney General in charge of the Department's Criminal Division.  See id.  According to the Government's amici, Senator Kefauver suggested three changes to the original text during the exchange: (1) changing the covered persons to those engaged in the business of gambling; (2) adding prohibitions to cover transmissions of money; and (3) expanding the scope of the bill from sports gambling to all forms of gambling.  See id.  The

49

Committee's subsequent amendment, discussed above, was intended to incorporate all three changes, the argument goes. Whereas the changed wording of the bill reflected the first two changes, punctuation purportedly accomplished the third. According to the Government's amici, the deletion of the two commas "was an efficient way" to accommodate Senator Kefauver's proposal for the Wire Act to encompass all bets and wagers, not just sports-related ones. See Doc. No. 68 at 130.

The idea that this change in punctuation was intended to broaden the scope of § 1084(a) is too speculative to carry any weight. First, the legislative record suggests, if anything, that the omission of the second comma (appearing directly before the phrase "on any sporting event or contest") was inadvertent. In the original version of the bill, this comma carried the weight of signaling that the proposed law prohibited only transmissions related to sports gambling. See supra at 35-36. The amendment, as reported in the Senate, contained a redline version showing what was stricken from the original text. See Appendix B. That redline, however, incorrectly reports that the second comma was never a part of the original text, suggesting that its omission from the amended version of the bill was not an intentional act. Compare Appendix A, with Appendix B.

Second, in reporting on the amendment, the Senate Judiciary Committee explained that it was offered to alter the class of

covered persons and expand its prohibitions to include "money or
credit" communications.  See S. Rep. No. 87-588, at 2 (1961).
The report does not even hint that by omitting a single comma
from the original bill, the Committee also intended to
dramatically expand the scope of prohibited transmissions from
"bets or wagers . . . on any sporting event or contest" to all
"bets or wagers."  See id.  Adopting the argument of the
Government's amici on this point requires a speculative leap
that I am unwilling to make.  Cf. Whitman v. Am. Trucking
Ass'ns, 531 U.S. 457, 468 (2001) (recognizing in different
context that Congress does not "hide elephants in mouseholes").

     Third, rather than guess whether the amendment's omission
of a single comma was intended to radically expand the proposed
law's scope, it makes more sense to focus on the description of
the amendment that the Department of Justice provided to the
Judiciary Committee while it was under consideration.  In that
description, Deputy Attorney General Byron White explained that,
as amended:

     [The Wire Act] is aimed now at those who use the wire
     communication facility for the transmission of bets or
     wagers in connection with a sporting event and also
     who use the facility for the transmission of the
     winnings, as suggested by Senator Kefauver.

Report of Proceedings: Hearing Before the S. Comm. on the

Judiciary, Exec. Sess., 87th Cong. 55 (1961) (emphasis added).

Consistent with the Committee's report, White confirmed that the

amendment incorporated Senator Kefauver's first two proposals
and suggested that, even as amended, the bill continued to be
limited to sports gambling.[13]  Compare _id._, with S. Rep. No. 87-
588, at 2 (1961).[14]  If the legislative history of § 1084(a) has
any relevance, it tends to subvert rather than support the
Government's interpretation of the statute.

—

In sum, while the syntax employed by the Wire Act's
drafters does not suffice to answer whether § 1084(a) is limited
to sports gambling, a careful contextual reading of the Wire Act

---

[13]    Deputy Attorney General White's explanation of the
amendment to the Judiciary Committee is also consistent with the
position the Department took when its representative responded
to the questions from Senator Kefauver that prompted the
amendment.  At that hearing, Assistant Attorney General Miller
indicated that the Department would have no objection to Senator
Kefauver's proposals to alter the class of covered persons and
expand the legislation to include payment-related transmissions.
See The Attorney General's Program to Curb Organized Crime and
Racketeering: Hearings on S. 1653, S. 1654, S. 1655, S. 1656, S.
1657, S. 1658, S. 1665 Before the S. Comm. on the Judiciary,
87th Cong. 277-79 (1961).  He did not, however, signal support
for the Senator's suggestion to expand the bill to cover non-
sports gambling.  Instead, he reiterated that the proposed
legislation was "limited to sporting events or contests."  Id.
at 278.

[14]    The Government's amici argue that White's views on the
final text are more accurately expressed in a September 1961
memorandum to the Bureau of the Budget, where his summary of the
Wire Act does not suggest that it was limited to sports
gambling.  See Doc. No. 61-1 at 6.  That memorandum post-dates
Congress's passage of the bill; it is not a relevant source of
legislative history.  In any event, White's summary is
equivocal.  It does not accurately report that one of the Act's
prohibitions plainly applies only to sports gambling.  See id.

as a whole reveals that the narrower construction proposed by the 2011 OLC Opinion represents the better reading. The Act's legislative history, if anything, confirms this conclusion. Accordingly, I construe all four prohibitions in § 1084(a) to apply only to bets or wagers on a sporting event or contest.

## C. Remedy

The Lottery Commission requests relief under both the APA and the Declaratory Judgment Act, whereas NeoPollard seeks only a declaratory judgment. The plaintiffs' amici also urge me to order nationwide injunctive relief. I briefly address the scope of the remedy available to the plaintiffs under each theory.

### a. Declaratory Relief

The Declaratory Judgment Act provides that I "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). It is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (internal quotation marks and citation omitted). Here, declaratory relief is appropriate because the plaintiffs face a credible threat of prosecution, their interests are sufficiently affected, and a judgment will resolve the dispute. See Verizon New Eng., Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322, 651 F.3d 176, 188-90 (1st Cir. 2011). As the First

Circuit has explained, where an agency has made a definitive interpretation of a criminal law, the Declaratory Judgment Act provides "a way to resolve the legal correctness of [the] position without subjecting an honest businessman to criminal penalties."  See Hemp Council, 203 F.3d at 5 (citation omitted).

The parties nevertheless disagree as to whether a declaratory judgment should be limited to the parties or have universal effect.[15]  The plaintiffs maintain that declaratory relief "necessarily extends beyond the [Commission] itself."  Doc. No. 58 at 21.  The Government contends that any declaratory relief must apply only to the parties to the case.  I agree with the Government.

Declaratory judgments do not bind non-parties.  The Act allows me to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C.

---

[15]    Nationwide relief, and in particular nationwide injunctions, have recently received significant judicial and academic attention.  Compare Trump v. Hawaii, 138 S. Ct. 2392, 2424 (2018) (Thomas, J., concurring), and Samuel Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417 (2017) (questioning doctrinal, historical, and normative grounds for nationwide injunctions), with Pennsylvania v. Trump, 351 F. Supp. 3d 791, 830-35 (E.D. Pa. 2019), and Amanda Frost, In Defense of Nationwide Injunctions, 93 N.Y.U. L. Rev. 1065 (2018) (supporting the practice).  I use the term universal to refer to relief beyond the parties (the "who") and nationwide to refer to geographic scope (the "where").  Cf. Howard M. Wasserman, "Nationwide" Injunctions Are Really "Universal" Injunctions and They Are Never Appropriate, 22 Lewis & Clark L. Rev. 335, 349 (2018).

§ 2201(a) (emphasis added).  It thus limits me to declaring the
rights and legal relations of the plaintiffs seeking the
declaration.  It "does not contain any provisions indicating
that declaratory judgments are authoritative vis-à-vis
nonparties to the litigation."  Mass. Delivery Ass'n v. Coakley,
671 F.3d 33, 48 n.12 (1st Cir. 2012).  The idea that a
declaration necessarily binds non-parties finds no support in
the statute or in caselaw.[16]  Accordingly, I decline to give my
declaratory judgment the broader scope that the plaintiffs seek.

It is clear, however, that the judgment binds the parties
beyond the geographic boundaries of my district.  See
Restatement of Judgments § 1 (1942).  And such an effect is
necessary here.  NeoPollard's iLottery system is currently used
in Michigan and New Hampshire, and its system "has been
configured according to state specifications for deployment" in
Virginia.  See Siver Decl., Doc. No. 10-2 at 2-3.  The Lottery

_____

[16]     At oral argument, NeoPollard suggested that a declaratory
judgment may necessarily be universal in effect, because "the
idea that the law means something for the New Hampshire Lottery
Commission and something for NeoPollard and something different
for somebody else is not the way the criminal law in this
country works."  Doc. No. 69 at 52.  Of course, every time a
circuit split on an issue of criminal law arises, the criminal
law in this country works that way until the conflict is
resolved by the Supreme Court.  See, e.g., Johnson v. United
States, 135 S. Ct. 2551, 2560 (2015) (relying, in part, on
"numerous splits among the lower federal courts" to declare that
residual clause of Armed Career Criminal Act was
unconstitutionally void for vagueness) (collecting cases)
(internal quotations marks and citation omitted).

Commission's operations similarly extend beyond the State.  Its servers are located in Vermont, with a disaster recovery location in Ohio.

The State sells multi-jurisdictional games as a member of the Tri-State Lotto Compact along with Maine and Vermont, sells Powerball and Mega Millions through the Multi-State Lottery Association, and is a member of a consortium of 25 states and the District of Columbia that sells Lucky for Life.  See McIntyre Decl., Doc. No. 2-2 at 5.  The multi-jurisdictional games "involve up to 48 states and territories."  Id. at 6.  My declaration thus binds the United States vis-à-vis NeoPollard and the Lottery Commission everywhere the plaintiffs operate or would be otherwise subject to prosecution.

Michigan, as an amicus, presents a somewhat more novel theory for extending the declaratory judgment to non-parties on behalf of the Lottery Commission.  The argument goes like this: New Hampshire, as a member of the Multi-State Lottery Association, benefits financially from the large scale of multi-jurisdictional games such as Powerball.  If another state, such as Michigan, shuttered its state lottery, then the overall revenues of Powerball would decline.  If the revenues of Powerball decline, then the share of Powerball revenue that New Hampshire receives would decrease.  Therefore, because I should ensure that New Hampshire not suffer any adverse financial

effect, "anything short of nationwide equitable relief is hollow." See Doc. No. 37 at 11.

New Hampshire has not advocated for this theory in its pleadings or at oral argument, and the issue is insufficiently developed factually and legally. For instance, no party has addressed whether extending relief to the Multi-State Lottery Association members would be relief for an "interested party seeking such declaration" as the Declaratory Judgment Act requires. See 28 U.S.C. § 2201(a). The Association is not a party to this litigation, and the Lottery Commission did not bring this case as a member of the Association. See Compl., Doc. No. 1. Finally, although the factual record specifies that the Commission recorded operating revenue of $337.8 million for the 2018 fiscal year, see McIntyre Decl., Doc. No. 2-2 at 2, it is bereft of information detailing the sources of that revenue, much less how another state's cessation of operations would affect its bottom line. In such a situation, granting relief on the Powerball-as-joint-venture theory would risk going "beyond the bounds of the complaint and the evidence in this case." Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 40 (1st Cir. 2006). I decline to take up Michigan's argument on the present record.[17]

_____

[17]     Should the Lottery Commission wish to pursue such relief, however, I am willing to entertain its claim. Accordingly, I grant it 14 days from the issuance of this order to file an appropriate motion and supplement the record with adequate

### b. APA Relief

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). Notwithstanding the mandatory "shall," the First Circuit has explained that a reviewing court "is not required automatically to set aside [an] inadequately explained order." Cent. Me. Power Co. v. FERC, 252 F.3d 34, 48 (1st Cir. 2001) (citation omitted). "Whether to do so rests in the sound discretion of the reviewing court; and it depends <u>inter</u> <u>alia</u> on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." Id. (citation omitted).

When a court does not set aside an improper agency action, the typical alternative response is an order remanding the case for reconsideration by the agency in light of the court's decision. It is not clear, however, that I have the discretion to remand instead of set aside an agency action where, as here, the defect is substantive. See Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 127 (1st Cir. 2002) (Lynch, J., dissenting) ("It is in the reviewing court's sound discretion to remand a rule to

---

factual and legal support.

an agency to mend procedural defects without overturning it in
its entirety.") (emphasis added) (citations omitted).  In any
event, this is an inappropriate case for remand.  The agency has
not disregarded procedural requirements or inadequately
explained its conclusions.  Cf. Harrington v. Chao, 280 F.3d 50,
60 (1st Cir. 2002) (remanding to provide agency "an opportunity
to better explain [its] position").  It has produced a capable,
but mistaken, legal opinion that no additional process can cure.
The proper remedy is to "set aside" the 2018 OLC Opinion.

### c.  Injunctive Relief

The Lottery Commission initially requested injunctive
relief in its complaint and motion for summary judgment.  In its
summary judgment briefing, however, the Commission "reserved the
right in its pleading to seek injunctive relief" in the event
the defendants did not comply with this order.  See Doc. No. 58
at 21.  The fact that no party currently requests injunctive
relief resolves the matter.  See Town of Chester v. Laroe
Estates, Inc., 137 S. Ct. 1645, 1651 (2017).

Injunctive relief would also be unnecessary.  An injunction
is "an extraordinary remedy never awarded as of right."  Sindi
v. El-Moslimany, 896 F.3d 1, 29 (1st Cir. 2018) (quoting Winter
v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008)).  And it is
not appropriate where a party's interests will be adequately
protected by a declaratory judgment.  See Wooley v. Maynard, 430

U.S. 705, 711 (1977).  I have no reason to believe that the
Government will fail to respect my ruling that the Wire Act is
limited to sports gambling.  The judgment provides the Lottery
Commission and NeoPollard complete relief.  No more is needed.

### III.  CONCLUSION

In summary, I deny the Government's motion to dismiss for
lack of jurisdiction (Doc. No. 45) because the plaintiffs have
established standing, and the Government has not met its burden
to show that the case is moot.  I grant the plaintiffs' motions
for summary judgment (Doc. Nos. 2 & 10) and deny the
Government's cross-motion for summary judgment (Doc. No. 45).

I hereby declare that § 1084(a) of the Wire Act, 18 U.S.C.
§ 1084(a), applies only to transmissions related to bets or
wagers on a sporting event or contest.  The 2018 OLC Opinion is
set aside.

SO ORDERED.

/s/ Paul Barbadoro
Paul Barbadoro
United States District Judge

June 3, 2019

cc:  Francis Charles Fredericks, Esq.
     Anthony Galdieri, Esq.
     Matthew D. McGill, Esq.
     Michael A. Delaney, Esq.
     Theodore B. Olson, Esq.
     Steven A. Myers, Esq.
     Matthew J. Glover, Esq.
     Alain J. Ifrah, Esq.
     Andrew J. Silver, Esq.
     Claude M. Stern, Esq.

Demetrio F. Aspiras, III, Esq.
Derek L. Shaffer, Esq.
Avram D. Frey, Esq.
Gillian A. Woolf, Esq.
Lawrence S. Lustberg, Esq.
Meghal J. Shah, Esq.
Thomas R. Valen, Esq.
Donald S. McGehee, Esq.
Mark G. Sands, Esq.
Melinda A. Leonard, Esq.
Peter S. Cowan, Esq.
A Michael Pratt, Esq.
Christopher B. Chuff, Esq.
Joanna J. Cline, Esq.
Patrick J. Queenan, Esq.
Robert R. Lucic, Esq.
Brian W. Barnes, Esq.
Charles J. Cooper, Esq.
David H. Thompson, Esq.
J. Joel Alicea, Esq.
Michael J. Tierney, Esq.
Nicole Frazer Reaves, Esq.
Stephen N. Zaharias, Esq.

87th CONGRESS
1st Session

# S. 1656

---

## IN THE SENATE OF THE UNITED STATES

April 18, 1961

Mr. Eastland introduced the following bill; which was read twice and referred to the Committee on the Judiciary

---

1    Sec. 2. Chapter 50 of such title is amended by adding
2    thereto a new section 1084 as follows:
3    "§ 1084. **Transmission of wagering information; penalties**
4    " (a) Whoever leases, furnishes, or maintains any wire
5    communication facility with intent that it be used for the
6    transmission in interstate or foreign commerce of bets or
7    wagers, or information assisting in the placing of bets or
8    wagers, on any sporting event or contest, or knowingly uses
9    such facility for any such transmission, shall be fined not
10   more than $10,000 or imprisoned not more than two years,
11   or both.

87TH CONGRESS
1ST SESSION
# S. 1656

[Report No. 588]

---

## IN THE SENATE OF THE UNITED STATES

APRIL 18, 1961

Mr. EASTLAND introduced the following bill; which was read twice and referred
to the Committee on the Judiciary

JULY 24, 1961

Reported by Mr. McCLELLAN (for Mr. EASTLAND), with amendments

[Omit the part struck through and insert the part printed in italic]

---

1 SEC. 2. Chapter 50 of such title is amended by adding
2 thereto a new section 1084 as follows:
3 "§ 1084. Transmission of wagering information; penalties
4 " (a) Whoever leases, furnishes, or maintains any wire
5 communication facility with intent that it be used for the
6 transmission in interstate or foreign commerce of bets or
7 wagers, or information assisting in the placing of bets or
8 wagers on any sporting event or contest, or knowingly uses
9 such facility for any such transmission, *Whoever being*
10 *engaged in the business of betting or wagering knowingly uses*
11 *a wire communication facility for the transmission in inter-*
12 *state or foreign commerce of bets or wagers or information*
13 *assisting in the placing of bets or wagers on any sporting*
14 *event or contest, or for the transmission of a wire communi-*
15 *cation which entitles the recipient to receive money or credit*
16 *as a result of bets or wagers, or for information assisting in*
17 *the placing of bets or wagers,* shall be fined not more than
18 $10,000 or imprisoned not more than two years, or both.